**ICE MILLER LLP**
Louis T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
1500 Broadway, Suite 2900
New York, NY 10036
Phone: 212-835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

Counsel to AIRN Liquidation Trust Co., LLC
in its capacity as Liquidation Trustee of the
AIRN Liquidation Trust

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 22-14539 (JKS)<br><br>(Jointly Administered) |
| In re:<br><br>AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH CIPOLLA, CIPOLLA & CO., LLC, CFA ASSURANCE SERVICES LLC, CFA REVIEW SERVICES LLC, CFA TAX SERVICES LLC, CIPOLLA FINANCIAL ADVISORS LLC, and DOES 1-100,<br><br>Defendants. | Adv. Pro. No. _____ |

## ADVERSARY COMPLAINT

AIRN Liquidation Trust Co., LLC, in its capacity as Liquidation Trustee of the AIRN Liquidation Trust (the "Liquidation Trustee"), by and through its undersigned counsel, by way of its complaint against Joseph Cipolla ("Cipolla"), Cipolla & Co., LLC, CFA Assurance Services LLC, CFA Review Services LLC, CFA Tax Services LLC, and Cipolla Financial Advisors LLC (each a "Cipolla Affiliate" and collectively the "Cipolla Affiliates" and with Cipolla, the "Defendants"), avers as follows:

## INTRODUCTION[1]

1.      The Liquidation Trustee seeks a judgment against Joseph Cipolla and the Cipolla Affiliates (a) finding that Cipolla and the Cipolla Affiliates aided and abetted securities fraud, breaches of fiduciary duty, and the Ponzi scheme perpetrated by Thomas Nicholas (Nick) Salzano ("Salzano"), Rey Grabato ("Grabato"), and others through National Realty Investment Advisors, LLC ("NRIA") and its related debtor entities (collectively the "Debtors"); (b) avoiding, unwinding, and recovering at least $4.61 million in investor funds that Salzano and Cipolla caused the Debtors to fraudulently transfer to two newly created Cipolla Affiliates; and (c) disallowing and subordinating the claims asserted by the Defendants.

2.      In late March 2021, Cipolla and certain of the Cipolla Affiliates were engaged by NRIA's counsel as *Kovel* accountants and thereafter, directly by Debtors as their accountants and auditors.[2] Defendants quickly became aware of the scope of the fraud and Ponzi scheme, having

---

[1] The allegations in this Complaint are based upon the documents and information available to the Liquidation Trustee at the time of this filing and are subject to clarification, amendment, revision, or other modification in light of new documents and information obtained through subsequent discovery in this action, in the underlying Chapter 11 cases, or otherwise.

[2] A *Kovel* accountant is a term derived from the case *United States v. Kovel* and refers to accountants who are hired by attorneys (often tax attorneys) to assist in reviewing client conduct that is believed to have criminal tax implications and who in turn provide their accounting opinion as to what exposure might be present. 296 F.2d 918 (2d Cir. 1961).

been engaged originally as *Kovel* professionals, yet thereafter actively aided and abetted the

wrongdoing, and then profited from it. Among other things, Cipolla and the Cipolla Affiliates:

(a)     Played an active role in reviewing and revising Private Placement Memoranda ("PPMs") that were used to fraudulently induce Investors (defined below) to participate in the Ponzi scheme;

(b)     Coerced the Debtors, under Salzano's direction, to pay and fraudulently transfer at least $4.61 million in allegedly non-refundable retainers to two newly created shell Cipolla Affiliates that provided no services to the Debtors;

(c)     Advised the Debtors to book revenue contrary to accepted principles, including Generally Accepted Accounting Principles ("GAAP") to, among other elements of the fraud, fund and fraudulently transfer the $4.61 in allegedly non-refundable retainers, funded entirely by diverted investor funds; and

(d)     Have failed to return the alleged $4.61 million retainers to the Debtors despite the Debtors' demand for the return thereof.

3.     The Court should enter judgment against the Defendants and in favor of the

Liquidation Trustee so that the Debtors, their creditors, and investors can be made whole.

4.     The Liquidation Trustee is continuing its investigation against Defendants and

reserves the right to supplement this Complaint as additional facts and information come to light.

## JURISDICTION

5.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(A), (B), (C) and (O) and Federal Rule of Bankruptcy Procedure 7001 *et seq*., and the

Liquidation Trustee consents to the entry of final orders or judgments by this Court.

6.     Venue of this action is proper in the Bankruptcy Court for the District of New Jersey

pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     The statutory and legal predicates for the relief requested herein are sections 502(d),

542(b), 544, 548, and 550 of the Bankruptcy Code, Bankruptcy Rules 6009 and 7001, and D.N.J.

LBR 7003-1.

## PARTIES

8.      AIRN Liquidation Trust Co., LLC is the Liquidation Trustee under the AIRN

Liquidation Trust, a liquidating trust established under the *First Amended Joint Chapter 11 Plan*

*of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* [Case No.

22-14539, Docket No. 3256] (as amended and supplemented, the "Plan") and the order confirming

same [Docket No. 3599] (the "Confirmation Order").

9.      Defendant Joseph Cipolla is a Certified Public Accountant and, upon information

and belief, is a resident of the State of New Jersey.

10.      Defendant Cipolla & Co., LLC ("CCO") is a New Jersey limited liability company.

Defendant Joseph Cipolla is the sole member of the company.

11.      Defendant CFA Assurance Services LLC ("CFA Assurance Services") is a New

Jersey limited liability company. Defendant Joseph Cipolla is the sole member of the company.

12.      Defendant CFA Review Services LLC ("CFA Review Services") is a New Jersey

limited liability company. Defendant Joseph Cipolla is the sole member of the company.

13.      Defendant CFA Tax Services LLC ("CFA Tax Services") is a New Jersey limited

liability company. Defendant Joseph Cipolla is the sole member of the company.

14.      Notably, both CFA Review Services and CFA Tax Services **were incorporated**

**just days before** they received the fraudulent transfers discussed herein and were retained to

perform the very same types of financial and accounting services that CCO and its pre-existent

affiliates performed for many other clients for decades before the fraudulent engagement by

Debtors (*see*, paragraph 18 below).

15.      Defendant Cipolla Financial Advisors LLC ("Cipolla Financial Advisors") is a

New Jersey limited liability company. Defendant Joseph Cipolla is the sole member of the

company.

16.    Defendant Joseph Cipolla is the principal of Defendants CCO, CFA Assurance Services, CFA Review Services, CFA Tax Services, and Cipolla Financial Advisors. At all times relevant to this action, all of the Cipolla Affiliates have operated from the same office, 851 Franklin Lakes Road, Franklin Lakes, NJ 07417, and shared the same personnel.

17.    Upon information and belief, at all times relevant to this action, the Cipolla Affiliates employed no more than ten people, including administrative staff.

18.    To this day, Defendants Cipolla Financial Advisors and CCO continue to hold themselves out to the public as: "a full-service financial services firm, providing accounting, tax, advisory and forensic accounting/litigation support services to individuals, . . . , businesses and their attorneys, real estate organizations and not-for-profit organizations. . . . as a preeminent accounting firm in the New York Metropolitan area. We possess the resources to handle the most complex and sophisticated matters." *See About Us*, CIPOLLA FINANCIAL ADVISORS, LLC, http://cipollacpa.com/about-us/ (last visited Sep. 29, 2023). Similarly, Cipolla's own entry page touts his "extensive experience," including "forensic accounting," "federal, local, and international taxation," and audits. *See Joseph P. Cipolla, Jr., CPA/ABV/CFF/PFS, CFE*, CIPOLLA FINANCIAL ADVISORS, LLC, http://cipollacpa.com/people/josephcipolla/ (last visited Sep. 29, 2023). Furthermore, the signature blocks of representatives of the Cipolla Affiliates boasted that they were the "Best Forensic Accounting Firm," "Best Litigation Accounting Firm," and "Best Business Accounting Firm." *See e.g.,* **Exhibit A**.

19.    Because (i) Cipolla Financial Advisors and CCO have been in business for years (long before the suspicious incorporation of CFA Tax Services and CFA Review Services immediately prior to their receipt of $4.61 million in Investor funds from the Debtors), and (ii) as reflected immediately above, have historically provided the same tax and related advisory services

for which the Debtors' purportedly engaged CFA Tax Services and CFA Review Services, the Debtors' engagement of CFA Tax Services and CFA Review Services (at Salzano's direction, over the objection of the Debtors' professionals) and the payment of the unjustified retainer of $4.61 million with Investor funds (at a time when Cipolla knew that virtually all of the Debtors' funds were commingled with and largely (if not entirely) comprised of investor funds), appears to be consciously in furtherance of the Ponzi scheme (described below).

20.     Defendants Does 1-100 are fictitious parties, the proper identities for which are currently unknown, who were an initial, mediate, or subsequent transferee of any transfer alleged herein, who aided and abetted in conduct described herein, or who are otherwise liable for the conduct described herein.

## FACTS

### I.     NRIA Was a Massive Ponzi Scheme

#### NRIA's Structure

21.     Salzano, Grabato, and other co-conspirators (the "Insiders") operated NRIA and its affiliated debtor entities as a Ponzi scheme to defraud innocent investors (the "Investors") for the benefit of those in their inner circle, their insiders, and affiliates.

22.     NRIA was held out to the investing public as a real estate investment, management, and development firm that since its inception had developed dozens of luxury properties in Florida, New York, New Jersey, and Pennsylvania. NRIA also claimed that it would return extraordinarily high "guaranteed returns" to its Investors and that its Investors would be paid their return of capital first. In reality, NRIA operated as a Ponzi scheme, using Investors' contributions to pay other Investor distributions and to pay the personal expenses of Salzano, Grabato, and their family

members.[3] *See, e.g.*, Summary Cease and Desist Order (Case No. 22-14539, Docket No. 60); Administrative Consent Order between the New Jersey Bureau of Securities, NRIA, the Fund, and NRIA Structured Credit Strategies, LLC (Docket No. 1651); Complaint filed in *Securities and Exchange Commission v. National Realty Investment Advisors LLC, et al.* (D.N. J. Case No 22-06066, Docket No. 1); Indictment filed in *United States of America v. Salzano and Grabato* (D.N.J. Case No. 22-00690, Docket No. 19).

23.     To facilitate the fraud, beginning in 2016, NRIA offered Investors interests in a series of limited liability companies ("LLCs") as investments in developing real estate properties. Each LLC purportedly held a single investment property, and NRIA represented to each Investor which property the Investors were investing in and from which property the Investors would purportedly receive distributions. U.S. Construction, Inc. ("USC"), a company co-owned by Salzano's son (a fact that was concealed from Investors), worked on virtually all of the properties and represented and guaranteed that they would be built on time and at a fixed price. NRIA also guaranteed to Investors a minimum annual return and projected a much higher target return and immediate monthly distributions for many of the LLCs. Importantly, NRIA guaranteed that each property would be built and sold, and Investors' investments and distributions returned, within a stated period (often 18 months). These opportunities were marketed to Investors as securities exempt from registration under applicable securities laws.

---

[3] NRIA operated almost identically to how the United States Securities and Exchange Commission ("SEC") defines a Ponzi scheme, which is an investment fraud that pays existing or first-in investors with the monies of the newer investors so that it appears the first-in investors are receiving value when in reality all they are receiving are the funds collected from the newer investors. *See Ponzi Schemes*, Investor.gov, https://www.investor.gov/introduction-investing/investing-basics/glossary/ponzi-schemes (last visited July 10, 2023) ("[A]n investment fraud that pays existing investors with funds collected from new investors…Ponzi scheme organizers often promise high returns with little or no risk. Instead, they use money from new investors to pay earlier investors and may steal some of the money for themselves. With little or no legitimate earnings, Ponzi schemes require a constant flow of new money to survive. When it becomes hard to recruit new investors, or when large numbers of existing investors cash out, these schemes tend to collapse.").

24.     In reality, NRIA, and not USC paid on such guarantees to Investors (with other Investor funds), which was never disclosed to Investors in any investment offering document.

25.     On February 5, 2018, Salzano, Grabato, and Arthur S. Scuttaro (a/k/a Arthur Scutaro) ("Scuttaro"), with the assistance, participation, and in collaboration with others, formed NRIA Partners Portfolio Fund I LLC (the "Fund"). One goal of the Fund was to "roll up" pre-existing Investors in individual property LLCs into one pooled fund, and to solicit investments from additional Investors. The creation of the Fund eliminated the obligation for NRIA to buy back property under its "Guaranteed Buy Back" program and created the opportunity to distribute cash to pre-Fund Investors from new Investors' money. In classic Ponzi scheme fashion, losses of the pre-Fund Investors and the "bonuses" offered by NRIA as an inducement to Investors to "roll" their investments into the Fund were concealed from other Investors, and severely diluted the holdings of existing Investors in the Fund which was all done without any disclosure to Fund (or other) Investors. The creation of the Fund also made it more difficult for Investors to track the progress on any particular property in which they were invested or the alleged profits flowing therefrom.

26.     The Fund was purportedly managed and operated by Salzano, Scuttaro, D. Coley O'Brien ("O'Brien"), and Grabato. Grabato participated in management as a signatory, and his name and signature stamp were used extensively. However, it appears that Grabato permitted Salzano and others full license to use his name and signature stamp to handle NRIA's affairs.

27.     Salzano was the true, undisclosed manager of the Fund and all Debtors. Neither Salzano's true role as the person in control of the Debtors, nor his prior significant criminal record and past as an adjudicated fraudster was disclosed to Investors. In fact, Salzano, Grabato, Scutaro

and others took active steps (with material assistance of others) to purposefully conceal his role and criminal past.

28.     NRIA was owned by Grabato and NRIA Capital Partners, Inc. ("NRIA Capital"). O'Brien, who served as Managing Director of the Fund, wholly owned NRIA Capital.

29.     Shortly before the bankruptcy filing, Grabato stepped down as Manager, President, and Chief Executive Officer of NRIA, and, upon information and belief, has fled the country.

**NRIA's Fraudulent Operations—The Ponzi Scheme**

30.     From the Fund's inception in 2018, until at least January 2022, NRIA raised more than $600 million for the Fund from approximately 2,000 investors. Three hundred and eighty-two Investors were retirees who contributed approximately $100 million from hard-earned retirement accounts.

31.     Because neither NRIA nor the Fund generated enough revenue from operations to cover distributions made to Investors, NRIA manipulated the Fund's financial statements and financial information included within marketing materials to mislead Investors.

32.     NRIA had little to no profits and used Investor funds to pay Investor distributions.

33.     To keep the Ponzi scheme afloat, NRIA needed to continually receive substantial new Investor funds. To do so, NRIA advertised on radio and television nationwide and had multiple billboards in New Jersey and elsewhere. For example, billboards in high traffic areas in New Jersey lured Investors into the scheme by promising 12% "guaranteed" returns and the opportunity of obtaining up to 21%.

34.     NRIA spent over $80 million on advertising and promotional costs, which amounts to more than 10% of the monies received from Investors.

35.    To raise money from Investors, NRIA offered and sold membership units in the Fund and promised an annual return of at least 10%. NRIA also guaranteed an annual distribution of 6% during the first four years of an investment.

36.    NRIA repeatedly represented in Private Placement Memoranda ("PPMs") that distributions would come from the operating cash flow derived from investments made by the underlying operating companies. In actuality, distributions were paid not by profit generated from operations but new Investor funds that had been invested in the Fund.

37.    NRIA also failed to disclose many conflicts of interest and misused investor funds to personally benefit the Insiders and their families and friends. Many of the employees and contractors of NRIA were family members or friends of Salzano, Grabato, and other Insiders, who were "overpaid" for services they may not have even rendered.

38.    For example, Salzano's son, Dustin Salzano, was USC's chief financial officer and co-owner, which was the Fund's purported lead general contractor. Dustin Salzano was also co-founder of the alleged main residential marketing and leasing company used by NRIA, Premier Access Management. NRIA also paid hundreds of thousands of dollars to Salzano's son-in-law's company (this same son-in-law was Vice President of Information Technology at NRIA). Other Salzano relatives were paid for business entity formation fees, purchasing and leasing equipment, real estate commissions, and other services that they did not perform or were not qualified to perform. Salzano's daughter, Bethany Salzano, and the entity she created and controlled also received millions in diverted Investor funds, and Investor funds were also used to pay Salzano's alimony payment obligations to his former spouse.

39.    At Salzano's direction and in collaboration with USC and his son, Dustin Salzano, NRIA charged the Fund annual development fees of up to 4.5 percent of the overall value of any

given project and failed to disclose the development fees were paid at the outset of the projects, not when performance obligations were met as required by standard business practices and Generally Accepted Accounting Principles. *See* Accounting Standards Codification Topic 606, Revenue from Contracts with Customers ("ASC 606"). This practice grossly inflated NRIA's revenue on its financial statements, with any references to GAAP departures buried in a footnote.

40.    NRIA also used "straw" purchasers to complete transactions with the intent of giving a false appearance of a high demand for NRIA properties when the demand for these properties was in fact much lower. These "straw" purchasers were individuals employed by NRIA or close to or entities owned by individuals close to the Insiders, who often purported to offer to purchase the properties using funds from NRIA bank accounts comingled with Investor funds. This scheme and the resulting inflated demand were not disclosed to Investors and was also deployed to fraudulently induce lenders to the Debtors.

41.    In September 2020, NRIA began using Investor funds to purchase risky Commercial Mortgage Backed Securities ("CMBS"). This practice involved tens of millions of dollars of Investor funds, which increased risk to Investors. NRIA did not clearly disclose that Investor funds were being used to purchase CMBSs or the risks associated therewith. Instead, NRIA simply mentioned in the PPMs that it *might* use Investor funds for these types of investments.

42.    NRIA and the Fund continuously misrepresented to Investors that their money was being used to further the Fund's actual purpose, developing real estate, when in reality, NRIA was misusing investor money in the variety of ways including those described above.

43.    Throughout its operation, NRIA represented to Investors that its business strategy—and the reason it was allegedly so profitable—was purchasing properties at below-

market value which were then renovated and/or flipped into profitable sale properties. Consent Order at 9. This was false. The reality was that NRIA was purchasing properties from intermediaries (i.e., wholesalers) who find properties for purchase but at a substantial cost to NRIA and its Investors.

44.    NRIA did not have adequate funds to operate its business and pay the guaranteed investor distributions without a constant influx of new investor capital. And absent a continuous stream of new Investor money, NRIA could not pay its obligations to existing Investors and was clearly unable to absorb the losses it incurred from the properties it held. This inability to fund NRIA's obligations to Investors without new Investor money began even prior to the establishment of the Fund, which simply served as a further, principal vehicle to conceal NRIA's actual "pre-Fund" property level losses, thereby diluting and damaging other Fund Investors.

## II.    NRIA Retains Cipolla and His Affiliates

45.    On March 6, 2021, Salzano was arrested in connection with an attempted fraud on a bank and investor while "employed" at NRIA. In that same month, both of NRIA's accounting and auditing firms, Van Duyne & Co CPA's and Advisors and Cullari Carrico, resigned, suspending an audit and leaving NRIA without essential accounting services.

46.    To cover its operational accounting concerns, NRIA entered into an engagement agreement with Withum Smith+Brown, PC ("Withum") to perform audit services and forensic accounting for NRIA.

47.    Around that same time, NRIA retained Cipolla to prepare a partnership tax return for a single NRIA affiliate. After that, Cipolla's scope increased, and pushed NRIA to hire an outside law firm—expressly recommending McCarter—to allegedly help establish credibility. *See March 22, 2021 Audit Advice Email*, **Exhibit B**, pg. 5.

48.     NRIA retained both McCarter & English, LLP ("McCarter") and Pashman Stein Walder Hayden P.C. ("Pashman") to provide general legal services and advice in connection with various regulatory investigations. McCarter's engagement letter provided that it could employ an accountant to assist in its provision of legal services. A copy of the McCarter Engagement Letter is attached hereto as **Exhibit C**.

49.     As part of his pitch, Cipolla claimed that he and the Cipolla Affiliates were nimbler and could provide the same services. Cipolla also claimed he had significant experience working on complex engagements, including underscoring his own "30+ years in forensic accounting," and represented that NRIA required various expert accounting services, including forensic accounting, assurance services, tax return preparation, and litigation support. *See* **Exhibit B**.

50.     On or about March 25, 2021, NRIA informed Pashman of its intentions to replace Withum and retain Cipolla through Cipolla Financial Advisors to "be engaged through McCarter & English as a Kovel Accountant" to "help navigate through the typical disclosures that are required in these types of audits." *See March 25, 2021 CFA Engagement Email*, **Exhibit D**, pg. 1.

51.     On March 26, 2021, Cipolla executed an engagement letter between CCO (not Cipolla Financial Advisors) and McCarter to perform "confidential services" in connection with McCarter's representation of NRIA. *See* March 26, 2021 Engagement Letter, pg. 1, attached hereto as **Exhibit E**. Pursuant to the March 26, 2021 Engagement Letter, CCO stated that it would charge "Joseph Cipolla's initial hourly rate [of] **$725 per hour**, with lower hourly rates for others," in addition to a "$50,000 retainer check which shall be applied against the final invoice relating to this engagement." *Id.* at pgs. 2–3.

52.     On or about March 30, 2021, Grabato and Cipolla executed an Agreement for Professional Services (the "March 30, 2021 Engagement Letter"). A copy of the March 30, 2021

Engagement Letter is attached hereto as **Exhibit F**. Pursuant to the March 30, 2021 Engagement Letter, NRIA separately agreed to pay CFA Assurance Services for Cipolla's services using the same rate structure in addition to another $100,000. *See* March 30, 2021 Engagement Letter, pgs. 2-3. This retainer was wired to Cipolla Financial Advisors on that same day. Confirmation of this wire transfer is attached hereto as **Exhibit G**. In exchange, Cipolla and CFA Assurance Services were to provide NRIA with audit, "tax, consulting and assurance services" *Id.* at pg. 1.[4]  Initially, the intent was for Cipolla to audit NRIA affiliate Structured Credit Strategies, LLC ("Structured Credit"). However, given NRIA's accounting needs, Cipolla's scope expanded to the point that he and the Cipolla Affiliates were providing general accounting services for the entire NRIA organization.

53.    Within days of its retention, NRIA replaced McCarter with Reed Smith LLP ("Reed Smith").

54.    On or about May 19, 2021, Cipolla executed a new Kovel Agreement (the "May 2021 Agreement"), which superseded the March 26, 2021 Engagement Letter. A copy of the May 2021 Agreement is attached as **Exhibit I**.

55.    Under the May 2021 Agreement, CCO was retained by Pashman and Reed Smith to "continue to perform confidential services in connection with [the firms'] legal representation of [NRIA]." May 2021 Agreement, pg. 1.

56.    The May 2021 Agreement provided that Cipolla would again be paid at a rate of **$725 per hour**, which would be deducted from a retainer Cipolla had already received. *Id.*

---

[4] Based upon counsel's review of the Cipolla Financial Services website, Cipolla is no longer providing "assurance services." A screen capture of the Cipolla Financial Services website "Assurance Services" page is attached hereto as **Exhibit H.**

57.     Between March and October 2021, Cipolla and CCO audited Structured Credit while at the same time providing accounting and consulting advice to NRIA and its other affiliates. Given the deeply intertwined nature of NRIA and its affiliates, it would have been nearly impossible for the Defendants to audit Structured Credit without auditing, or at least performing assurance-like services, as to the entire NRIA enterprise.

Defendants billed NRIA and collected at least $2,137,935 for purported work, most of which was paid from the trust account of Rubin Winston Diercks Harris & Cooke LLP ("Rubin Winston"), Salzano's criminal defense counsel. The payments made to Cipolla directly and through Rubin Winston were made from NRIA operating accounts in which Investors' money was deposited and comingled with other funds—a fact known to Cipolla. For example, Rubin Winston paid an invoice for $39,026.25 for "Professional Services" provided by Defendants that predominately amounted to mere meetings, discussions, and document reviews, at Grabato's direction. *See generally April 6, 2021 Invoice*, **Exhibit J**.[5] The following chart details amounts the Defendants received directly or indirectly from NRIA:

---

[5] Why Rubin Winston paid Cipolla's fees is still unknown and remains suspect. The Liquidation Trustee is investigating the import of this fact and retains all rights in connection therewith.

**Payments Identified To Or For The Benefit of Defendants**

| Date | Payor | Payee | Amount | |
|------|-------|-------|--------|---|
| 3/17/2021 | National Realty Investment Advisors, LLC | Cipolla Financial Advisors LLC | $ 1,200 | |
| 3/30/2021 | National Realty Investment Advisors, LLC | Cipolla Financial Advisors LLC | 100,000 | |
| 10/26/2021 | National Realty Investment Advisors, LLC | CFA Review Services, LLC | 3,360,000 | |
| 10/26/2021 | National Realty Investment Advisors, LLC | CFA Tax Services, LLC | 1,250,000 | |
| | | **Total Direct Payments From NRIA:** | **$ 4,711,200** | [1] |
| | | **Total Paid Through Rubin Winston:** | **$ 2,036,735** | [2] |
| | | **Total Payments Identified:** | **$ 6,747,935** | [3] |
| | | **Total Payments Excluding October 2021 Wires:** | **$ 2,137,935** | |

**Notes**:
[1] Per a review of NRIA's accounting and bank records. Additional transfers may exist.
[2] Per a "NRIA Attorney Fee Detail" schedule provided by the Debtors.
[3] Excludes a $50,000 payment to Gibbons PC "FBO Cipolla" on 8/16/2021.

58.     Defendants' exposure to NRIA's books and records quickly gave them the information needed to realize it was being operated as a fraud. On May 19, 2021, Cipolla sent NRIA an email that included as an attachment a memo detailing "non-tax disclosures." Copies of the May 19, 2021 email and memo are attached hereto as **Exhibits K and L**, respectively. The memo cites various observations that form the foundation of the Ponzi scheme, including:

"All cash funds of all NRIA-affiliated companies are generally maintained in financial accounts of NRIA and are commingled - this includes but is not limited to Investor money not otherwise invested in REO SPEs, NRIA Structured Credit Strategies, LLC or other affiliates."

"Commingled funds may be and are routinely used to pay Investor Returns of Capital, as well as Targeted and Minimum Returns. All investor cash funds are deposited with, received by and held by NRIA on behalf of the Investors' investment in PPF1 and are commingled with other cash funds. The deposit of Investor funds with NRIA are treated as a non-interest bearing inter-company loan from PPF1 to NRIA."

"Disbursements of NRIA cash, which is from various sources, including but not limited to Investors, including investors in the Fund who invested previously, is used to pay, including but not limited to, Investor Return of Capital, Targeted Returns and Minimum Returns (including but not limited to monthly amounts) without regard to when an Investor invested in the Fund; returns of capital and profit to other non-PPF1 investors who made investments prior to the establishment of PPF1 in February 2018; salaries of NRIA employees, as well as payments to owners and individuals and/or entities who work exclusively or predominantly for NRIA; distributions and guaranteed payments to NRIA

owners regardless of NRIA's book value or fair market value of equity (or lack thereof); other disbursements and expenses of NRIA including but not limited to rent, and radio, TV and other media advertising expenses (which could amount to tens of millions of dollars annually focused principally on attracting investor funds)."

*See* **Exhibit L**.

59.     The operating agreements of the Fund and the Pre-Fund LLCS all contained a provision that required all of the Fund's (and Pre-Fund's) money to be maintained in a segregated account in each entity's name and prohibited the comingling of those funds with the funds of any other person, a fact that Defendants knew or were reckless in not knowing. *See* **Exhibit L**.

60.     On June 1, 2021, Albert Manzo ("Manzo"), a Managing Director at CCO and Cipolla Financial Advisors, circulated an email identifying a list of inaccuracies, misrepresentations and omissions in NRIA's PPMs. *See June 1, 2021 Email*, **Exhibit M**. Cipolla was copied on the June 1, 2021 Email. As with the May 19, 2021 email, this email shows that Cipolla knew as early as June 2021 that NRIA was (a) commingling Investor funds; (b) actively making misrepresentations to Investors regarding same; and (c) using Investor funds to pay other Investors. NRIA also used the accounts containing comingled Investors' funds to pay NRIA's, Salzano's, and Grabato's legal expenses incurred relating to regulatory and criminal investigations, including the payments made to and received by CCO.[6]

61.     The material misrepresentations and omissions identified in **Exhibit M** and its attached redline were not incorporated into the June 14, 2021 PPM. *See June 4, 2021 Email*, **Exhibit N**; *June 1, 2021 Redline of NRIA PPM*, **Exhibit O**; *June 14, 2021 PPM*, **Exhibit P**. These included, but were not limited to: (a) failures to disclose comingling of funds and payments made to so-called "legacy investors" (**Exhibit O**, pg. 10; **Exhibit P**, pg. 10); (b) failures to disclose

---

[6] The Liquidation Trustee is investigating and is considering the commencement of actions for the recovery of such payments as fraudulent transfers under applicable federal and state law.

Salzano's true role at NRIA or the potential involvement of other Insiders, including Grabato (**Exhibit O**, pg. 27; **Exhibit P**, pgs. 27 and 67); and (c) failures to disclose related-party transactions (**Exhibit O**, pg. 30; **Exhibit P**, pg. 31).

62.      NRIA's history of material non-disclosures made to the Fund and pre-Fund Investors also added the substantial risk to NRIA and the Fund (and therefore, its Investors) of a contingent liability for apparent violations of federal and state securities laws. Manzo recognized this risk in his May 19, 2021 Memo. *See* **Exhibit L**, comment 11 ("Does the new PPM need to be presented to existing investors in the Fund, possibly with a right of recission, and what new PPM disclosures regarding this issue needs to be made . . .").

63.      These nondisclosures continued in later iterations of the PPMs during Defendants' engagement. *See e.g.*, July 1, 2021 PPMs, **Exhibit Q**; September 1, 2021 PPMs, **Exhibit R**.

64.      No right of recission was ever disclosed to the Investors, yet Defendants profited from the continuing inflow of defrauded Investor funds. *See,* Section IV herein.

65.      Despite Defendants' knowledge of the Ponzi scheme, Defendants took no action to disclose the misrepresentations, omissions or fraud to Investors, to protect Investors or remedy the inaccuracies contained with the PPMs after discovering the fraud. The PPMs conceal material information that Cipolla and the Cipolla Affiliates not only knew about but had themselves identified, including but not limited to failures to disclose (a) the co-mingling of Investor funds with general NRIA funds, (b) the ongoing related-party transactions, (c) the non-disclosure of Salzano's criminal record and actual managerial, control-person role; (d) the Debtors' non-compliance with GAAP and other applicable accounting principles; and (e) the risks associated with the lack of arm's length transactions. *See e.g.,* **Exhibit O**, pgs. 10, 30, 61; *see generally* **Exhibit P**. As detailed further herein, Defendants nevertheless materially benefited and profited

from the fraud well after the fraud was known to Defendants, while Investors continued to lose millions in earned retirement funds. *See,* Section IV herein.

### III. Cipolla Uses His Position and Specialized Knowledge to Threaten NRIA Management, Obtain New Engagements, Demand Additional Outsized Retainers, and Attempt to Shield His Gains from Foreseen Legal Risk

66.     In or about September 2021, six months after assuring NRIA's management that he and the Cipolla Affiliates could render the agreed services to NRIA, Cipolla asserted that he never agreed to provide auditing services to NRIA. He claimed that he could not provide assurance services at all, despite the facts that he had been engaged through CFA Assurance Services, that his engagement agreement provided for assurance services, and that he would audit Structured Credit.

67.     Cipolla also stated that he and the Cipolla Affiliates could offer "review services" only as part of a separate engagement and for an additional fee, despite him having provided broad-ranging accounting advice to NRIA generally for six months.

68.     Contrary to Cipolla's assertion, NRIA employees had been working closely with Cipolla on gathering and sharing documents in preparation for the audit of Structured Credit. Furthermore, NRIA had received numerous communications from the Cipolla Affiliates and Cipolla himself recognizing that he was responsible for the audit of Structured Credit. For example, in March 2021, Cipolla was copied on an email that stated "Cipolla Financial Advisors is going to be handling the audit for Structure," and none of the Defendants ever sought to deny this characterization. **Exhibit D**, pg. 1. Cipolla's new position was also counter to the invoices submitted to NRIA on or about April 6, 2021, which included entries stating that Cipolla and/or the Cipolla Affiliates had met with NRIA "regarding potential audit by Cipolla" and that they had been reviewing audit files and meeting with audit consultants/counsel. *See generally* **Exhibit J**.

69.     Cipolla then began to pressure NRIA to sign *new* engagement letters for the "review services" and "tax services" that he claimed he was not previously engaged to provide. Cipolla also repeatedly expressed to NRIA that it was highly unlikely a different accounting firm would provide NRIA with these services, considering the governmental investigations and the timeframe for which NRIA required services. *See e.g., October 25, 2021 Email*, **Exhibit S**, pgs. 3-4.

70.     On October 20, 2021, Cipolla sent NRIA drafts of a CFA Tax Services, LLC Engagement Letter (the "Tax Services Engagement Letter") and a CFA Review Services, LLC Engagement Letter (the "Review Services Engagement Letter," and collectively with the Tax Services Engagement Letter the "October 2021 Agreements"). Copies of the Tax Services Engagement Letter and the Review Services Engagement Letter are attached hereto as **Exhibits T and U**, respectively.

71.     Despite operating for decades rendering the very same services he proposed to provide through CFA Tax Services LLC and CFA Review Services, LLC, Cipolla inexplicably elected to form two new entities (CFA Tax Services LLC and CFA Review Services, LLC) just days before seeking their retention by NRIA.

72.     To complete the review and tax services for NRIA, Cipolla demanded two non-refundable retainers totaling $4,610,000: (i) a $3,360,000 retainer for review services, and (ii) a $1,250,000 retainer for tax services—which were far in excess of what NRIA had previously paid to *any* professional. Upon information and belief, the amount of the retainer was not tied to the value of the "new" services Cipolla was offering. By comparison, Cipolla requested a retainer of only $50,000 when first engaged by NRIA. Cipolla was effectively using his knowledge of the NRIA fraud to extract extraordinary fees from NRIA.

73.     Cipolla was explicitly aware of the fraud, SEC investigation, and thereafter, the NJ Bureau of Securities investigation and Grabato depositions, as early July 2021—months *before* he orchestrated the diversion of $4.61 million of Investor funds. *See* October 8, 2021 invoice from Critchley, Kinum & Luria, LLC addressed to Rey Grabato, President, NRIA, for "legal services rendered from June 28, 2021 to October 7, 2021." attached hereto as **Exhibit V**.

74.     Evan *after* Defendants knew of the Ponzi scheme (and the blatant comingling of Investor funds with operating funds), the fraud on the Investors, the sale of the illicit securities to the retiree Investors, the lack of any NRIA profits from operations, and the failure to correct the disclosures in the PPMs NRIA issued to Investors, Defendants (a) sought to be engaged to render further services to NRIA while it perpetuated the Ponzi scheme, (b) increased their retainer demand to $4,610,000 (92 times *greater* than their original retainer), and (c) increased their hourly rates from $720 hour (just a few months earlier) to $1,200 per hour (an increase of more than 60%).

75.     Because Cipolla knew that NRIA was the center of a Ponzi scheme, and was misusing Investor funds, Cipolla facially sought to immunize himself by demanding that NRIA pay the retainer to the two newly formed Cipolla Affiliates from funds that did not include any Investor funds. *See* **Exhibit T**, pg. 3; **Exhibit U**, pg. 3.

76.     But Cipolla knew that, like virtually all Ponzi schemes, almost all of the Debtors' funds were Investor funds, and any non-Investor funds were commingled with Investor funds. Thus, Cipolla's demand that his unconscionable, patently fraudulent retainers be paid from non-Investor funds was a knowing rouse.

77.     Particularly telling is that Salzano **insisted** that NRIA engage Defendants in October 2021 *over the objection of virtually all other NRIA officers (other than Grabato)* <u>*and*</u> *their individual and corporate attorneys. See*, Section IV herein.

78.     Salzano's insistence on NRIA's retention of Defendants was motivated by Cipolla's willingness to provide accounting and other financial advisory services that were inconsistent with accepted accounting standards. Specifically, Defendants advised NRIA that the development fees it received for real estate projects could be recognized as revenue as soon as a deal was executed rather than waiting until the company satisfied its performance obligations. *See generally*, **Exhibit S**.

79.     GAAP does not permit recognition of fees in this way. *See* ASC 606. Nonetheless, Defendants advised that it was ok for NRIA to do so to support payment of his new retainers.

**IV.   Cipolla Wrongfully Extracted $4.61 Million Retainers from NRIA for the Review and Tax Engagements**

80.     On or about October 25, 2021, Cipolla presented NRIA with the final forms of the October 2021 Agreements. *See* **Exhibits T** and **U**.

81.     <u>All</u> of NRIA's attorneys unequivocally advised NRIA to <u>not</u> enter into the October 2021 Agreements:

> On behalf of Joe Hayden:
>
> Rey,
>
> As discussed extensively on Friday, all attorneys on Friday's conference agreed that NRIA should not enter into this agreement with Cipolla. We remind you that additionally, our understanding is that Reed Smith also concluded that the Cipolla agreement is unacceptable. We were stunned to receive today's email in light of your conclusion on Friday that "Cipolla is ripping NRIA off" and Glenn's follow-up email after Friday's conference, which is attached and reads in relevant part:
>
> "NRIA would like to thank all parties that participated in the 4:30 call. Ownership and upper management agree 110% that the Cipolla agreement is one sided and is not one that we will entertain, in its current form this agreement is more of a form of blackmail."
>
> Our position remains the same. To the attorneys copied here, if you've reconsidered your prior position please advise all.

*See* **Exhibit S**. NRIA's other attorneys agreed. *See* **Exhibit W** ("Under no circumstances should NRIA sign the Cipolla proposed retainer.").

82.     Defendants' October 2021 Agreements are rife with indicia of fraud. As noted above, neither CFA Review Services, LLC nor CFA Tax Services, LLC existed until on or about October 18, 2021—just days before the Debtors wired Defendants $4.61 million in "retainers" for which they never rendered services. *See CFA Review Services, LLC Certificate of Formation*, **Exhibit X**; *CFA Tax Services, LLC Certificate of Formation*, **Exhibit Y**.

83.     Notably, the October 2021 Agreements contained language expressly requiring the retainers to be paid from non-Investor funds—language that was not in Defendants' prior engagement letters that were drafted and executed just months earlier and which clearly indicates they knew that the Insiders were misusing and comingling Investor funds. There is also *no indication or evidence* that Defendants did anything independently to ascertain if the funds they received were or were not Investors funds–they knew that once Investor funds were comingled with all other funds, the "identity" of the funds was lost.

84.     Cipolla also required NRIA to stipulate that any fees for all *prior* engagements with any of the Cipolla Affiliates were purportedly "reasonable" and waive any claims with respect to any prior services from Defendants. **Exhibit T**, pg. 2; **Exhibit U**, pg. 2.

85.     And Cipolla included provisions allowing the new Cipolla Affiliates to decline to finish the review and issue a report yet still retain their fees in nearly any circumstance. **Exhibit T**, pgs. 5–6; **Exhibit U**, pg. 7.

86.     Cipolla acknowledged that, although NRIA sought to engage Cipolla solely for three reporting periods (2018 through 2020), he would not agree to any fewer than seven reporting periods per year, at an adjusted fee of $1,200 an hour (a significant increase from the $725 per hour agreed to in the May Agreement). **Exhibit T**, pgs. 6, 10; **Exhibit U**, pgs. 6, 10.

87.    Cipolla also required that the $4.61 million in retainers be "non-refundable." **Exhibit T**, pg. 6; **Exhibit U**, pg. 6.

88.    To reduce Cipolla's potential liability, the agreements also included a broad "Release, Hold-Harmless & Indemnification," provision. **Exhibit T**, pg. 7; **Exhibit U**, pg. 7.

89.    Further evidencing his knowledge of and intent to exploit the Ponzi scheme, Cipolla told NRIA's management that if they did not sign the engagement agreements as written by October 25, 2021, he would not provide the services and NRIA would be "dead in the water." **Exhibit S**, pgs. 3–4.

90.    Then Salzano pressured NRIA to accept the agreements. In an email purportedly from Grabato but using Salzano's widely recognized "all-caps" text, Salzano listed the myriad reasons why NRIA had to retain the newly created Cipolla Affiliates. *See* **Exhibit S**. Salzano claimed that, without Cipolla, the "company goes to zero funding raise in 30 days" in which "all return numbers fail," all staff will have to be laid off immediately, all investments will implode, and NRIA will be completely unable to receive any loans. *Id.* By the next morning, Cipolla stated that he had reconsidered the engagement and was no longer interested because "he was feeling too much pressure from the attorneys," only to later assert that he would accept the engagement if NRIA executed both agreements "as is" and wired the retainer payment by that afternoon. *See, October 26, 2021 Email Re: Cipolla Engagement*, **Exhibit Z**.

91.    Collectively, Cipolla, Grabato, and Salzano led NRIA to believe that the business would crumble without this work.

92.    By 3:00 p.m. that day, NRIA management executed the agreements and wired $4.61 million to the newly formed Cipolla Affiliates. Confirmations of the wire transfers

amounting to $4.61 million are included in the wire transfer summary attached hereto as **Exhibit AA.**

93. The timing of Cipolla and Salzano's pressure campaign and the formation of the shell Cipolla Affiliates is especially suspect given that Casey Group, Ltd. ("Casey") was appointed to assume certain management functions for the Debtors effective as of November 1, 2021. *See* Declaration in Support of Chapter 11 Petitions and First Day Pleadings (Case No. 22-14539, Docket No. 16). Given Casey's expanded managerial role and authority and the advice from counsel, it is unlikely Cipolla's unconscionable agreements or retainers would have been approved after that date. Cipolla, Grabato and Salzano knew that Casey was going to be "in charge" after November 1, 2021, so Defendants *had* to have the $4.61 million wired before the end of October. *See October 26, 2021 Email Re: NRIA and Cipolla*, **Exhibit BB.**

94. Ultimately, Debtors transferred the $4.61 million in "retainers" to CFA Tax Services and CFA Review Services at Salzano's direction and in furtherance of the Ponzi scheme, at a time when the Debtors were insolvent.

95. The Debtors received no services or other consideration of any kind in exchange for the transfers of the retainers to CFA Tax Services and CFA Review Services, both of which are and were, at all relevant times, owned and operated by and under the control of Cipolla.

**V.   Cipolla and NRIA Agree Not to Proceed Forward with the Engagement**

96. Immediately after executing the agreements, Cipolla informed NRIA that the tax and review work could not begin until *other work* was first performed (and most shockingly, paid for *separately and not out of the new $4.61 million retainer*)—a fact not previously disclosed to NRIA management. According to Cipolla, this additional work was not covered by the $4.61 million retainer. *See e.g., October 28, 2021 Email*, **Exhibit CC.**

97.     After pushback, Cipolla stated that if the arrangement was unacceptable, he was willing to discontinue the review and tax engagements and refund the $4.61 million retainer. NRIA responded that it did not want Cipolla to conduct the review or tax services and instead only wanted Cipolla to continue the work under its prior engagements and refund the $4.61 million in retainer payments. Cipolla agreed. *See e.g., October 29, 2021 Email*, **Exhibit DD**; *November 2, 2021 Email*, **Exhibit EE**.

98.     After Cipolla had agreed to rescind the October 2021 Agreements and return the $4.61 million in retainers, he stopped taking NRIA's calls or responding to their written communications. *See e.g.,* **Exhibit DD**; **Exhibit EE** ("[W]hen do you anticipate the return to NRIA of the Review and Tax retainers paid to you last week. NRIA requested the return of those monies by close of business yesterday.").

99.     Cipolla never produced any work product to NRIA related to the October 2021 Agreements and never refunded the retainers. Shortly thereafter, on or about November 9, 2021, NRIA terminated the March Engagement Letter. *See November 9, 2021 Termination Letter*, **Exhibit FF**.

100.    After Cipolla's termination, NRIA retained EisnerAmper LLP to perform accounting services. Notwithstanding his termination, Cipolla continued to have CCO invoice NRIA, including for time he and his staff allegedly spent responding to an SEC subpoena (directed at him, not NRIA), which he billed at his full professional rates.[7]

101.    On June 7, 2022 (the "Petition Date"), each of the Debtors filed chapter 11 petitions in the United States Bankruptcy Court for the District of New Jersey.

---

[7] As noted above, the Kovel engagement under the May 2021 Agreement was with CCO. While the invoices appeared on CCO letterhead, the invoices provided for payment to be made to Cipolla Financial Advisors, and the timesheets supporting the invoices indicated that they were from Cipolla Financial Advisors.

102.    Defendants filed the following claims against the Debtors in the Chapter 11 Cases

(the "Proofs of Claim"):

| Claimant Name (as listed on Proof of Claim) | Debtor (Case No.) | Claim No. | Amount |
|---|---|---|---|
| CFA REVIEW SERVICES, LLC (CIPOLLA & CO, LLC) | NRIA Structured Credit Strategies, LLC (22-14660) | 3 | $2,235,038.22 for "Services Performed" |
| CIPOLLA & CO, LLC | NRIA Structured Credit Strategies, LLC (22-14660) | 4 | $258,276.11 for "Services Performed" |
| CFA REVIEW SERVICES, LLC (CIPOLLA & CO, LLC) | NRIA Partners Portfolio Fund I, LLC (22-14540) | 2370 | $2,235,038.22 for "Services Performed" |
| CIPOLLA & CO, LLC | NRIA Partners Portfolio Fund I, LLC (22-14540) | 2371 | $258,276.11 for "Services Performed" |
| CFA REVIEW SERVICES, LLC (CIPOLLA & CO, LLC) | National Realty Investment Advisors, LLC (22-14539) | 2534 | $2,235,038.22 for "Services Performed" |
| CIPOLLA & CO, LLC | National Realty Investment Advisors, LLC (22-14539) | 2538 | $258,276.11 for "Services Performed" |

As is set forth in more detail below, the Liquidation Trustee objects to these claims because, among

other reasons, CFA Review Services performed no services for the Debtors for which they were

not paid, and any claims by any of the Defendants should be disallowed or subordinated on account

of their receipt of fraudulent transfers and aiding and abetting the Ponzi scheme.

## COUNT I
### AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER SECTIONS 548(a)(I)(A), 550(a), AND 551(a) OF THE BANKRUPTCY CODE
**(*Against CFA Review Services, LLC, CFA Tax Services, LLC, Cipolla, and Does 1-100*)**

103.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if

fully set forth herein.

104.    On October 26, 2021, NRIA transferred to CFA Review Services the sum of

$3,360,000 as a retainer under the Review Services Engagement Letter.

105.    On October 26, 2021, NRIA transferred to CFA Tax Services the sum of

$1,250,000 as a retainer under the Tax Services Engagement Letter.

106.    The transfers to CFA Tax Services and CFA Review Services were made within

two years of the Petition Date and constitute transfers of interests of NRIA's property.

107.    CFA Review Services, CFA Tax Services, and Cipolla were the initial and/or subsequent transferees of the transfers and/or were the persons for whose benefit the transfers were made.

108.    As is set forth in detail above, each transfer was made with actual intent to hinder, delay, or defraud creditors because, among other things, they were made in furtherance of and perpetuated the Ponzi scheme. Further, in the context of a Ponzi scheme, intent to hinder, delay, or defraud creditors is presumed from the nature of the scheme itself.

109.    The Defendants did not take any of the transfers in good faith.

110.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment avoiding the transfers of the $4.61 million in retainers paid pursuant to the October 2021 Agreements under 11 U.S.C. § 548(a), plus such additional costs, interest and other charges to which it may be entitled under applicable law, and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550.

## COUNT II
**AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER SECTIONS 548(a)(I)(B), 550(a), AND 551(a) OF THE BANKRUPTCY CODE**
(*Against CFA Review Services, LLC, CFA Tax Services, LLC, Cipolla, and Does 1-100*)

111.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

112.    On October 26, 2021, NRIA transferred to CFA Review Services the sum of $3,360,000 as a retainer under the Review Services Engagement Letter.

113.    On October 26, 2021, NRIA transferred to CFA Tax Services the sum of $1,250,000 as a retainer under the Tax Services Engagement Letter.

114.     The transfers to CFA Tax Services and CFA Review Services were made within two years of the Petition Date and constitute transfers of interests of NRIA's property.

115.     CFA Review Services, CFA Tax Services, and Cipolla were the initial and/or subsequent transferees of the transfers and/or were the persons for whose benefit the transfers were made.

116.     NRIA received less than reasonably equivalent value in exchange for the transfers. Indeed, NRIA received no value whatsoever for the $4.61 million in retainer payments.

117.     On the date of the transfers, NRIA (i) was insolvent, or became insolvent as a result of such transfers; (ii) was engaged in business or a transaction or was about to engage in business or a transaction, for which any property remaining with NRIA constituted unreasonably small capital; or (iii) intended to incur, or believed that it would incur, debts that would be beyond NRIA's ability to pay as such debts matured.

118.     Based upon the foregoing, the Liquidation Trustee is entitled to a judgment avoiding the transfers of the $4.61 million in retainers paid pursuant to the October 2021 Agreements and under 11 U.S.C. § 548(a) and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550.

## COUNT III
### AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER SECTIONS 544(b)(1), 550(a), and 551(a) OF THE BANKRUPTCY CODE AND THE NEW JERSEY UNIFORM FRAUDULENT TRANSFER ACT
### (N.J. Rev. Stat. § 25:2-25(a)(1))
### (*Against CFA Review Services, LLC, CFA Tax Services, LLC, Cipolla, and Does 1-100*)

119.     The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

120.    NRIA's transfers to CFA Tax Services and CFA Review Services were each made within four years of the Petition Date and constitute transfers of an interest in property of NRIA.

121.    CFA Review Services, CFA Tax Services, and Cipolla were the initial and/or subsequent transferees of the transferred payments and/or were the persons for whose benefit the transfers were made.

122.    As is set forth in detail above, each transfer was made with actual intent to hinder, delay, or defraud creditors because, among other things, they were made in furtherance of and perpetuated the Ponzi scheme. Further, in the context of a Ponzi scheme, intent to hinder, delay, or defraud creditors is presumed from the nature of the scheme itself.

123.    The Defendants did not take any of the transfers in good faith.

124.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment avoiding the transfers under 11 U.S.C. §§ 544(b) and New Jersey Revised Statutes § 25:2-25(a)(1) and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550.

## COUNT IV
### AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER SECTIONS 544(b)(1), 550(a), and 551(a) OF THE BANKRUPTCY CODE AND THE NEW JERSEY UNIFORM FRAUDULENT TRANSFER ACT
### (N.J. Rev. Stat. §§ 25:2-25(b) & 25:2-29(1))
### (*Against CFA Review Services, LLC, CFA Tax Services, LLC, Cipolla, and Does 1-100*)

125.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

126.    NRIA's transfers to CFA Tax Services and CFA Review Services were each made within four years of the Petition Date and constitute transfers of an interest in property of NRIA.

127.    CFA Review Services, CFA Tax Services, and Cipolla were the initial and/or subsequent transferees of the transferred payments and/or were the persons for whose benefit the transfers were made.

128.    NRIA received less than reasonably equivalent value in exchange for the transferred payments. Indeed, NRIA received no value whatsoever for the $4.61 million in retainer payments.

129.    On the date of the transfers, (i) NRIA was engaged or was about to engage in a business or a transaction for which its remaining assets was unreasonably small in relation to the business or transaction, or (ii) intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as they became due.

130.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment avoiding the transfers under 11 U.S.C. §§ 544(b) and New Jersey Revised Statutes §§ 25:2-25(b) and 25:2-29(1) and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550.

**<u>COUNT V</u>**
**AIDING AND ABETTING FRAUD**
**(*Against All Defendants*)**

131.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

132.    The Insiders, including Salzano and Grabato, leveraged NRIA and the Fund to fraudulently take more than $600 million dollars from approximately 2,000 Investors.

133.    By virtue of the acts and omissions described herein, the Insiders demonstrably committed a fraud and were engaged in perpetuating a Ponzi scheme by, among other things, knowingly manipulating NRIA's financial statements and financial information and actively

working to misrepresent true profitability by concealing the fact that NRIA had little to no revenue to pay Investors the alleged guaranteed 10% or more returns except from other defrauded Investor's money.

134.    The Insiders clearly intended for Investors to rely on these fraudulent statements, and nearly 2,000 Investors did.

135.    The Insiders were aided and abetted in the commission of their fraud and in the perpetuation of the Ponzi scheme by other tortfeasors, including Defendants.

136.    Defendants actively aided and abetted the Insiders' fraudulent Ponzi by, among other things:

(a)    Playing an active role in reviewing and revising PPMs that were used to fraudulently induce Investors to participate in the Ponzi scheme;

(b)    Coercing NRIA, with the assistance of Salzano, to pay at least $4.61 million in allegedly non-refundable retainers to two newly created shell Cipolla Affiliates that provided no services to the Debtors;

(c)    Advising the Debtors to book revenue contrary to GAAP in order to fund the $4.61 in allegedly non-refundable retainers, and to artificially inflate and generate revenue for NRIA contrary to generally accepted accounting principles; and

(d)    Failing to return the alleged $4.61 million retainers to the Debtors despite the Debtors' demand that they do so.

137.    In short, the Defendants aided the Insider's scheme and leveraged their knowledge of the fraud to divert millions to themselves.

138.    Defendants were aware of the Ponzi scheme and Insiders' fraud. Defendants had access and exposure to NRIA's books and records, such that anyone with their same experience would have understood that the Insiders were operating a fraud on the Investors. Further, the October 2021 Agreements contained language expressly requiring the retainers to be paid from non-Investor funds—a provision ordinarily not included in retention agreements, including those

previously delivered to Debtors by Cipolla, who would not have included such a provision but for his awareness of the existence of the Ponzi scheme.

139.  Defendant's actions enabled the Insiders to extend the longevity of their fraudulent scheme, to sell millions in additional unregistered, illicit securities and further damage Investors.

140.  Based upon the above, Defendants engaged in wrongful acts that caused significant damage to the Investors.

141.  As a result of the substantial assistance Defendants provided by aiding and abetting the Insiders, the Investors were injured and lost millions to the Ponzi Scheme.

142.  Based upon the foregoing, the Liquidation Trustee is entitled to a judgment against Defendants finding that they aided and abetted the Insiders' fraudulent Ponzi scheme and awarding damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

**COUNT VI**
**AIDING AND ABETTING SECURITIES FRAUD PURSUANT**
**TO THE NEW JERSEY UNIFORM SECURITIES ACT**
**(N.J.S.A. § 49:3-71)**
**(*Against All Defendants*)**

143.  The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

144.  Under New Jersey law, an individual violates the New Jersey Uniform Securities Act ("NJUSA") if they, among other things:

    (b)    Offer, sell, or purchase a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

    (c)    Offer, sell, or purchase a security by employing any device, scheme, or artifice to defraud;

    (d)    Offer, sell, or purchase a security by engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, or

33

(e)     Engage in the business of advising others, for compensation, either directly or through publications or writings, as to the value of securities, or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities (i) in willful violation of this act or of any rule or order promulgated pursuant to this act, or (ii) employs any device, scheme or artifice to defraud the other person or engages in any act, practice or course of business or conduct which operates or would operate as a fraud or deceit on the other person, is liable as set forth in subsection (c) of this section.

N.J.S.A. § 49:3-71(a) (emphasis added).

145.    Furthermore, the NJUSA establishes a broad scope of parties that may be liable for violations of the act:

Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer, or director of such a seller, or investment adviser, every person occupying a similar status or performing similar functions, every employee of such a seller or investment adviser who materially aids in the sale or in the conduct giving rise to the liability, and every broker-dealer, investment adviser, investment adviser representative **or <u>agent</u> who materially aids in the sale or conduct are also liable jointly and severally with and to the same extent as the seller or investment adviser**, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts under paragraphs (1) through (5) of subsection (a) of this section which give rise to liability. There is contribution as in cases of contract among the several persons so liable.

N.J.S.A. § 49:3-71(a) (emphasis added).

146.    Defendants, as accountants, were agents of NRIA, and in that capacity, provided an assortment of auditing, accounting, and other advisory services to NRIA and the Debtors that materially aided the Insiders in their fraud. Defendants knew that NRIA had been engaged in a Ponzi scheme and that the scheme was continuing. Defendants maneuvered to and did in fact obtain NRIA's reliance on them for accounting and consulting in exchange for the prospect of extraordinary fees. Investors reasonably relied on Defendants to ensure that offering documents provided to them in connection with the offer and sale of securities did not contain materially false and misleading statements or material omissions of fact. However, Defendants knew that the PPMs and other offering documents contained materially false and misleading information that concealed

the true nature of NRIA's ongoing Ponzi scheme but did nothing to prevent the distribution of

PPMs or the ongoing solicitation of Investors. Defendants not only knew about but had themselves

identified NRIA's material misrepresentations that went to the very heart of NRIA's scheme,

including but not limited to failures to disclose (a) the co-mingling of Investor funds with general

NRIA funds; (b) the ongoing related-party transactions; (c) the non-disclosure of Salzano's true

managerial, control-person role; (d) the Debtors' non-compliance with GAAP and other applicable

accounting principles; and (e) the risks associated with the lack of arm's length transactions. *See

e.g.,* **Exhibit O**, pgs. 10, 30, 61; *see generally* **Exhibit P**.

147.    Through the services provided to NRIA, Defendants materially participated in

facilitating, marketing, and promoting the sale of securities, as well as other related conduct, for

their own personal gain—aiding and abetting not only in the defrauding of investors but also in

violation of the NJUSA.

148.    Defendants knew there were glaring misstatements and omissions in NRIA's

PPMs, did nothing to stop their dissemination, and continued to provide NRIA with assistance in

the issuance and solicitation of the inaccurate PPMs.

149.    Defendants possessed the necessary expertise to be able to identify the Ponzi

scheme and in fact did identify central elements of the scheme. Defendants also possessed the

expertise to understand that their continued participation facilitated the Ponzi scheme.

150.    As a result of Defendants' aiding and abetting the Insiders in selling securities in

violation of the NJUSA, Investors were injured and lost millions of dollars to the Ponzi Scheme.

151.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment finding

that Defendants aided and abetted securities fraud in violation of the NJUSA and are entitled to

damages pursuant to N.J.S.A. § 49:3-71 in an amount to be determined at trial, together with an

award of pre- and post-judgment interest thereon from the date of demand to the date of payment
and the costs of this action.

**COUNT VII**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
(*Against All Defendants*)

152.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if
fully set forth herein.

153.    The Insiders owed fiduciary duties to NRIA and their Investors, including but not
limited to the duties to act in good faith and to conduct themselves in a manner that was in the best
interest of both NRIA and its Investors. As part of their fiduciary duties, they were also required
to be honest and candid and to make complete and accurate disclosures in their dealings with the
Investors in all material respects.

154.    The Insiders actively misrepresented information to Investors and failed to disclose
their conflicts of interest and misuse of Investor funds, to the personal benefit of the Insiders and
their families and friends.

155.    Defendants played an active and informed role in these breaches, and in fact, knew
of these misrepresentations and conflicts of interest, among others, and took no meaningful steps
to try and address them. And the Defendants did nothing to protect Investors despite knowing that
these breaches of fiduciary duties were not disclosed in the PPMs.

156.    After learning of the fraud, Defendants did not sound the alarm. Instead, they and
Salzano pressured NRIA into entering the October 2021 Agreements and diverted Investor funds
for their benefit.

157.    Through their acts and omissions, the Insiders repeatedly violated their fiduciary duties to Investors, and Defendants knowingly gave substantial assistance to the Insiders in breaching these fiduciary duties.

158.    As a result of Defendants' aiding and abetting the Insiders' breaches of fiduciary duties, Investors were injured and lost millions to the Ponzi Scheme.

159.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment finding that Defendants aided and abetted the Insiders' breaches of their fiduciary duties and awarding damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT VIII
## ACCOUNTING MALPRACTICE
### (*Against All Defendants*)

160.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

161.    Under N.J. Stat. Ann. § 2A:53A-25, an accountant will be liable for damages for negligence associated with their professional accounting services if, among other things, the accountant:

    (a)    knew at the time of the engagement by the client, or agreed with the client after the time of the engagement, that the professional accounting service rendered to the client would be made available to the claimant, who was specifically identified to the accountant in connection with a specified transaction made by the claimant;

    (b)    knew that the claimant intended to rely upon the professional accounting service in connection with that specified transaction; and

    (c)    directly expressed to the claimant, by words or conduct, the accountant's understanding of the claimant's intended reliance on the professional accounting service.

N.J. Stat. Ann. § 2A:53A-25(b)(2).

162.    Cipolla and the Cipolla Affiliates entered into multiple accounting services contracts to supply NRIA with accounting advice, expertise, and services. As such, the Defendants had duties to perform these services with reasonable care.

163.    Cipolla and the Cipolla Affiliates repeatedly assured NRIA of their accounting expertise and consistently stated that they were familiar with, and capable of complying with, accepted accounting standards, including GAAP and GAAS.

164.    Cipolla and the Cipolla Affiliates breached their duties by advising NRIA contrary to GAAP accounting standards for their personal benefit.

165.    For example, under ASC 606, revenue should be recognized when the party satisfies performance obligations under a contract.[8] Typically, these performance obligations are met as goods or services are transferred to a customer over a period of time. The multi-step process for properly recognizing revenue includes identifying the contract with the customer, identifying the performance obligations, determining the transaction price, allocating the transaction price to the performance obligations, and recognizing revenue as the entity satisfies the performance obligations.

166.    Contrary to ASC 606, Cipolla and the Cipolla Affiliates advised NRIA that it could book revenue for development fees upon initial execution of an agreement, rather than at the time NRIA satisfied its performance obligations.

---

[8] The SEC complaint filed on October 13, 2022 charged NRIA with improperly recording development fees as revenue for 2018, 2019, and through June 30, 2020.  As a result, NRIA materially overstated net income in those years, when in fact NRIA had net losses of $9,217,588, $17,451,238, and $21,918,592 per year respectively (which, in 2020, represented an overstatement of net income of 4653%). *See* Complaint, SEC v. National Realty Investment Advisors, LLC, et al., D.N.J. Case No. 22-6066, Doc. No. 1 at ¶ 53.

167.    Cipolla and the Cipolla Affiliates also intentionally overstated the potential consequences that NRIA could face if Cipolla's newly formed Cipolla Affiliates were not promptly retained.

168.    Cipolla and the Cipolla Affiliates knew that NRIA would rely on their accounting services to make significant financial decisions, including paying the retainers.

169.    Defendants' misrepresentations and breach of accepted accounting principles caused NRIA to suffer significant damages.

170.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment against Defendants for the damages caused by their malpractice, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT IX
## TURNOVER OF PROPERTY OF THE ESTATE PURSUANT TO SECTION 542(b) OF THE BANKRUPTCY CODE
**(*Against CFA Review Services, LLC, CFA Tax Services, LLC, Cipolla, and Does 1-100*)**

171.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

172.    The retainers that CFA Review Services, CFA Tax Services, and Cipolla received from NRIA were property of NRIA and therefore became property of the Debtor's estate when NRIA filed its petition for relief.

173.    The retainers that CFA Review Services, CFA Tax Services, and Cipolla received from NRIA are of consequential value and benefit to the estate and may be used pursuant to Section 363 of the Bankruptcy Code.

174.    Based on the foregoing, the Liquidation Trustee is entitled to a judgment ordering CFA Review Services, CFA Tax Services, and Cipolla to turn over the $4.61 million in retainers paid pursuant to the October 2021 Agreements under 11 U.S.C. § 542.

**COUNT X**
**CONVERSION**
(*Against All Defendants*)

175.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

176.    NRIA had an absolute right to demand the return of the $4.61 million in retainers held by Defendants and which remain in the possession of Defendants.

177.    NRIA made repeated demands for possession of the $4.61 million in retainers.

178.    Defendants wrongfully and without authorization have assumed control, dominion, and ownership over the $4.61 million in retainers.

179.    Accordingly, the Liquidation Trustee is entitled to a judgment against Defendants in an amount to be determined at trial, which will include, but is not limited to, the $4.61 million, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

**COUNT XI**
**FRAUD IN THE INDUCEMENT**
(*Against All Defendants*)

180.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

181.    Cipolla represented to NRIA that Defendants could provide the same type and quality of services that Withum was providing to NRIA.

182.    Cipolla further represented to NRIA that he and the Cipolla Affiliates were competent professional accountants "who possess the highest levels of experience in their fields" and were familiar with, and capable of complying with accepted accounting standards, such as GAAP.

183.    Cipolla repeatedly expressed to NRIA's management that it was highly unlikely a different accounting firm would be willing to provide NRIA with the accounting services it needed.

184.    Cipolla demanded $4.61 million in retainers from NRIA in exchange for tax and review services—nearly 50 times the retainer Cipolla requested for his previous accounting services.

185.    Cipolla stated that the services covered by the October 2021 Agreements would be sufficient to meet NRIA's accounting needs.

186.    Cipolla insisted on the terms of the October 2021 Agreements to avoid any attempt by the government to claw funds back from him at a later time and shield him from a subsequent lawsuit seeking its avoidance.

187.    Cipolla knew at the time that NRIA was commingling investor funds, actively making misrepresentations to investors, and using investor funds to pay other investors.

188.    Cipolla told NRIA management that NRIA could pay the $4.61 million in retainers from development fees booked as revenue upon initial execution of an agreement rather than only at the time NRIA satisfied its performance obligations, which Cipolla knew violated accepted accounting standards.

189.    Cipolla told NRIA to use these methods with the intent that NRIA would rely on those methods in determining whether it could afford Cipolla's demands.

190.    Cipolla knew NRIA would rely on their accounting advice and methods to determine whether NRIA would meet Cipolla's demands.

191.    Cipolla and Cipolla Affiliates presented the flawed accounting advice in the same manner they had presented advice to NRIA in the past.

192.    Cipolla depicted dire accounting and financial consequences if he and his new Cipolla Affiliates were not immediately retained.

193.    Neither Cipolla nor the Cipolla Affiliates ever indicated that additional work was needed before the tax and review work under the October 2021 Agreement could commence.

194.    NRIA reasonably relied on the above advice and representations.

195.    Cipolla, both personally and acting through the Cipolla Affiliates, fraudulently induced NRIA to enter into the October 2021 Agreements and pay $4.61 million in retainers.

196.    Cipolla intentionally incorporated provisions into the October 2021 Agreements to protect the $4.61 million if the fraud was discovered, including provisions that the retainers would be "non-refundable," that NRIA promised not to fund his engagement using investor funds and/or equity, and an arbitration provision, notwithstanding the facts that Cipolla performed no work under the October 2021 Agreements.

197.    Less than 24 hours after receiving NRIA's payment, Cipolla informed NRIA management that he would not perform work under the October 2021 Agreements without first doing other accounting work that would not be covered under the $4.61 million retainers.

198.    Upon information and belief, Cipolla and the Cipolla Affiliates never intended to, and in fact could not, complete the work agreed to in the October 2021 Agreements.

199.    When Cipolla demanded more funds, NRIA refused and rescinded the agreements, to which Cipolla agreed and stated that he would return the retainers.

200.    To date, neither Cipolla nor CFA Review Services nor CFA Tax Services have returned the retainers or conferred any benefit on NRIA pursuant to the October 2021 Agreements.

201.    But for Defendants' fraudulent conduct, NRIA would never have entered into the October 2021 Agreements or paid the $4.61 million in retainers.

202.    Because of Defendants' fraudulent inducement, the October 2021 Agreements should be declared void, the $4.61 million in retainers should be returned to the Liquidation Trustee, and the Liquidation Trustee should be awarded damages as may be just and proper.

203.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment against Defendants ordering that the October 2021 Agreements be rescinded and/or declared void, or in the alternative, for money damages caused by Defendants' fraudulent inducement, including but not limited to the amount of the $4.61 million in retainers, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT XII
### BREACH OF CONTRACT
**(*Against CFA Review Services, LLC, CFA Tax Services, LLC, and Cipolla*)**

204.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

205.    To the extent the October 2021 Agreements are not void, CFA Review Services, LLC, CFA Tax Services, LLC, and Cipolla breached the October 2021 Agreements by not performing the tax and review services required by the contracts.

206.    NRIA suffered monetary losses as a result of Defendants' failure to perform their contractual obligations under the October 2021 Agreements, including the loss of the $4.61 million retainers.

207.     CFA Review Services, LLC, CFA Tax Services, LLC, and Cipolla acted outrageously, maliciously, and with a reckless disregard for the interests of NRIA, justifying an award of punitive damages.

208.     Based upon the foregoing, the Liquidation Trustee is entitled to a judgment against CFA Review Services, LLC, CFA Tax Services, LLC, and Cipolla for the damages caused by their breach, including but not limited to the $4.61 million in retainers, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT XIII
### DISALLOWANCE OF ALL CLAIMS PURSUANT TO SECTION 502(d) OF THE BANKRUPTCY CODE
#### (*Against All Defendants*)

209.     The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

210.     Pursuant to section 502(d) of the Bankruptcy Code, the Liquidation Trustee objects to the allowance of any claim filed by or scheduled on behalf of any Defendants.

211.     Pursuant to section 502(d) of the Bankruptcy Code, to the extent property is recoverable from any Defendant under sections 544(b) or 548 of the Bankruptcy Code, any and all claims of such Defendants and/or their assignee against the Debtors must be disallowed until such time as the applicable Defendant pays the Liquidation Trustee the amounts and/or returned the property subject to avoidance. To the extent any Defendant asserts any right to payment from the AIRN Liquidation Trust, such claim must be disallowed until such time as any avoidable transfers are repaid.

212.    Further, the Liquidation Trustee objects to the filed Proofs of Claim because each of them fails to attach or include any documentation or other information to substantiate the basis for the claim beyond the statement "Services Performed."

213.    Finally, the Liquidation Trustee objects to every Proof of Claim filed by CFA Review Services given that such entity was created just days before the October 2021 Agreements were signed and performed no actual services for the Debtors.

214.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment disallowing any and all claims that Defendants may assert in these Chapter 11 Cases.

**COUNT XIV**
**EQUITABLE SUBORDINATION**
***(Against All Defendants)***

215.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

216.    To the extent any Defendant has filed one or more Proofs of Claim or may otherwise assert a claim in any manner against the AIRN Liquidation Trust, such claims should be equitably subordinated to the claims of the Debtors' general unsecured creditors and Investors.

217.    As set forth herein, each of the Defendants engaged in, and benefitted from, a pattern of misconduct and inequitable conduct at the expense of the Debtors, its estate, and its Investors and creditors, and aided and abetted fraud, breach of fiduciary duty, and securities law violations thereby harming Investors.

218.    Under the principles of equitable subordination, any claims scheduled in favor of or filed by any of the Defendants are subject to subordination pursuant to section 510(c) of the Bankruptcy Code.

219.    Accordingly, the Liquidation Trustee is entitled to a judgment finding that any claim of a Defendant is subject to equitable subordination.

**COUNT XV**
**UNJUST ENRICHMENT**
(*Against All Defendants*)

220.    The Liquidation Trustee repeats and realleges all prior applicable allegations as if fully set forth herein.

221.    Each of CFA Review Services, CFA Tax Services, and Cipolla were enriched and received economic benefits without justification as a result of their conduct, including but not limited to their receipt of the $4.61 million retainers.

222.    Defendants' retention of the retainers is unjust, and it would be inequitable for Cipolla and the Cipolla Affiliates to retain the benefit conferred on them by NRIA, and for those assets to remain out of the reach of NRIA's creditors and Investors.

223.    Further, by receiving payment for services that aided and abetted the Insiders' fraud, breaches of fiduciary duty, and securities law violations, Defendants have been unjustly enriched at the expense of NRIA, its creditors, and the Investors.

224.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment against Defendants in the amount they were unjustly enriched, including but not limited to the $4.61 million in retainers, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

**PRAYER FOR RELIEF**

**WHEREFORE,** the Liquidation Trustee respectfully requests entry of a final judgment in favor of the Liquidation Trustee and against Defendants as follows:

(a)    On Count I, a judgment against CFA Review Services, CFA Tax Services, and Cipolla (i) avoiding the transfers of the of the $4.61 million in retainers paid

pursuant to the October 2021 Agreements under 11 U.S.C. § 548(a)(1)(A) and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550;

(b)    On Count II, a judgment against CFA Review Services, CFA Tax Services, and Cipolla avoiding the transfers of the of the $4.61 million in retainers paid pursuant to the October 2021 Agreements under 11 U.S.C. § 548(a)(1)(B) and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550;

(c)    On Count III, a judgment against CFA Review Services, CFA Tax Services, and Cipolla avoiding the transfers of the of the $4.61 million in retainers paid pursuant to the October 2021 Agreements under 11 U.S.C. § 544(b) and New Jersey Revised Statutes § 25:2-25(a)(1) and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550;

(d)    On Count IV, a judgment against CFA Review Services, CFA Tax Services, and Cipolla avoiding the transfers of the of the $4.61 million in retainers paid pursuant to the October 2021 Agreements under 11 U.S.C. § 544(b) and New Jersey Revised Statutes §§ 25:2-25(b) & 25:2-29(1) and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550;

(e)    On Count V, a judgment against Defendants finding that they aided and abetted fraud and for money damages in an amount to be determined at trial;

(f)    On Count VI, a judgment against Defendants finding that they aided and abetted securities fraud and for money damages in an amount to be determined at trial;

(g)    On Count VII, a judgment against Defendants finding that they aided and abetted breaches of fiduciary duty and for money damages in an amount to be determined at trial;

(h)   On Count VIII, a judgment against Defendants finding Defendants committed accounting malpractice and for money damages in an amount to be determined at trial;

(i)   On Count IX, a judgment ordering that CFA Review Services, CFA Tax Services, and Cipolla turnover the $4.61 million in retainers paid pursuant to the October 2021 Agreements under 11 U.S.C. § 542;

(j)   On Count X, a judgment finding that Defendants converted the $4.61 million retainers and for money damages in an amount to be determined at trial;

(k)   On Count XI, a judgment against Defendants ordering that the October 2021 Agreements be rescinded and/or declared void, or in the alternative, for money damages caused by Defendants' fraudulent inducement, including but not limited to the amount of the $4.61 million in retainers;

(l)   On Count XII, a judgment against CFA Review Services, LLC, CFA Tax Services, LLC, and Cipolla for money damages caused by their breach of contract, including but not limited to the amount of the $4.61 million in retainers;

(m)   On Count XIII, a judgment against all Defendants disallowing all claims filed by any Defendant as set forth herein;

(n)   On Count XIV, a judgment against all Defendants equitably subordinating any claims filed by Defendants;

(o)   On Count XV, a judgment against Defendants in the amount they were unjustly enriched, including but not limited to the $4.61 million retainer;

(p)   Awarding the Liquidation Trustee compensatory damages;

(q)   Awarding the Liquidation Trustee attorney's fees and costs to the extent permitted by law;

(r)   Awarding the Liquidation Trustee punitive damages to the extent permitted by law;

(s)     Awarding the Liquidation Trustee pre- and post-judgment interest as may be permitted by law on all amounts awarded hereunder at the maximum applicable judgment rate plus costs of suit; and

(t)     Awarding the Liquidation Trustee such further relief as the Court deems just and proper.

Dated: February 23, 2024

/s/ Louis T. DeLucia
Louis T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
**ICE MILLER LLP**
1500 Broadway, Suite 2900
New York, NY 10036
Phone: (212) 835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

*Counsel to the Liquidation Trustee*