**GIBBONS P.C.**
Robert K. Malone, Esq.
Mark B. Conlan, Esq.
Christopher P. Anton, Esq
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey  07102
Telephone:  (973) 596-4500
Email: rmalone@gibbonslaw.com
        mconlan@gibbonslaw.com
        canton@gibbonslaw.com
        kmcevilly@gibbonslaw.com

*Attorneys for the Cipolla Defendants*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC,<br><br>                      Debtor. | Chapter 11<br><br>Case No. 22-14539 (JKS)<br><br>Hon. John K. Sherwood |
| AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>               Plaintiff,<br><br>    v.<br><br>JOSEPH CIPOLLA, CIPOLLA & CO., LLC, CFA ASSURANCE SERVICES LLC, CFA REVIEW SERVICES LLC, CFA TAX SERVICES LLC, CIPOLLA FINANCIAL ADVISORS LLC, and DOES 1-100,<br><br>               Defendants. | Adv. Pro. No. 24-01097-JKS |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF CIPOLLA DEFENDANTS TO DISMISS PLAINTIFF'S ADVERSARY COMPLAINT PURSUANT TO RULE 7012 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................... iv

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY .................................. 4

    A.     The Debtors' Business ................................................................. 5

    B.     The *Kovel* Engagements and the PPMs ..................................... 6

    C.     The CFA Review and CFA Tax Retentions ................................ 8

    D.     The Bankruptcy Filing ............................................................... 15

    E.     Cipolla Proofs of Claim ............................................................. 16

ARGUMENT ....................................................................................................... 16

I.      LEGAL STANDARDS ................................................................................ 16

    A.     Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6) ................... 16

    B.     Fed. R. Civ. P. 8 (a)(2) and 9(b) ................................................ 17

II.     COUNTS I AND III (ACTUAL FRAUDULENT TRANSFERS) MUST BE
DISMISSED ................................................................................................ 19

III.   COUNTS II AND IV (CONSTRUCTIVELY FRAUDULENT TRANSFERS)
MUST BE DISMISSED .............................................................................. 22

    A.     The Liquidation Trustee Failed to Plead Receipt of Less Than Reasonably
Equivalent Value ........................................................................ 23

    B.     The Debtor Fails to Plead Insolvency. ....................................... 26

IV.   COUNT V (AIDING AND ABETTING FRAUD) MUST BE DISMISSED ......... 27

    A.     State Law Tort Claims Cannot Lawfully Be Assigned to the Liquidation
Trust ........................................................................................... 27

    B.     The Claim for Aiding and Abetting Fraud is Barred by the Doctrine of *In
Pari Delicto* ............................................................................... 28

    C.     The Complaint Fails to State a Claim for Aiding and Abetting Fraud. ......... 33

V.    COUNT VI (AIDING AND ABETTING SECURITIES FRAUD MUST BE
DISMISSED ................................................................................................ 37

i

Table of Contents (continued)

Page

A.    The Cipolla Defendants are Not "Agents" Under the NJSUA. ............................37

B.    The Claim for Aiding and Abetting Securities Fraud is a Non-Assignable Tort Claim. ...........................................................................................................43

C.    The Claim for Aiding and Abetting Securities Fraud is Barred by the Doctrine of *In Pari Delicto*. .......................................................................43

D.    The Complaint Fails to Meet the Applicable Pleading Requirements..................43

VI.    COUNT VII (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY) MUST BE DISMISSED ...............................................................................................44

A.    The Claim for Aiding and Abetting Breach of Fiduciary Duty is a Non-Assignable Tort Claim. ........................................................................................44

B.    The Claim for Aiding and Abetting Breach of Fiduciary Duty is Barred by the Doctrine of *In Pari Delicto*. .......................................................................44

C.    The Complaint Fails to State a Claim for Aiding and Abetting Breach of Fiduciary Duty. .................................................................................................45

VII.    COUNT VIII (ACCOUNTING MALPRACTICE) MUST BE DISMISSED .................46

A.    The Claim for Accounting Malpractice is a Non-Assignable Tort Claim. ...........47

B.    The Claim for Accounting Malpractice is Barred by the Doctrine of *In Pari Delicto*...........................................................................................................47

C.    The Complaint Fails to State a Claim for Accounting Malpractice......................48

VIII.    COUNT IX (TURNOVER) MUST BE DISMISSED....................................................49

IX.    COUNT X (CONVERSION) MUST BE DISMISSED ..................................................51

A.    The Complaint Fails to State a Claim for Conversion. ........................................51

B.    Conversion is a Non-Assignable Tort Claim. .....................................................52

C.    The Economic Loss Doctrine Bars the Liquidation Trustee's Conversion Claim....................................................................................................................53

X.    COUNT XI (FRAUDULENT INDUCEMENT) MUST BE DISMISSED .....................53

A.    The Complaint Fails to Plausibly Allege All of the Elements of a Claim for Fraudulent Inducement.......................................................................................53

Table of Contents (continued)

Page

B. The Complaint Fails to Plead Fraudulent Inducement with Particularity..............54

C. The Economic Loss Doctrine Bars the Liquidation Trustee's Claim for Fraudulent Inducement. .......................................................................................55

D. Even Assuming the Liquidation Trustee has a Viable Fraudulent Inducement Claim, the Claim Must be Dismissed as to Defendants Cipolla, Cipolla & Co., and Cipolla Financial Advisors. .....................................56

XI. COUNT XII (BREACH OF CONTRACT) MUST BE DISMISSED .............................57

XII. COUNT XIII (DISALLOWANCE OF CLAIMS) MUST BE DISMISSED ...................60

XIII. COUNT XIV (EQUITABLE SUBORDINATION) MUST BE DISMISSED ................60

XIV. COUNT XV (UNJUST ENRICHMENT) MUST BE DISMISSED................................61

CONCLUSION ....................................................................................................................... 64

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ackerman v. Schwartz*,
   733 F. Supp. 1231 (N.D. Ind.1989), *aff'd in part and rev'd in part on other
   grounds*, 947 F.2d 841 (7th Cir. 1991) ....................................................................43

*Advanced Enterprises Recycling*,
   869 A.2d at 472 .......................................................................................................54

*Ahern v. Gaussoin*,
   611 F. Supp. 1465 (D. Or.1985) ..............................................................................43

*AMS v. VFP LLC Campbell Soup Co.*,
   482 F.3d (3d. Cir. 2007)...........................................................................................27

*Any Garment Union, LLC v. Dry Clean Express I, LLC*,
   No. A-3169-20, 2022 WL 14995413 (N.J. Super. Ct. App. Div. Oct. 27, 2022 ....................35

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................ *passim*

*Associated Builders, Inc. v. Alabama Power Co.*,
   505 F.2d 97 (5th Cir. 1974) .......................................................................................5

*AV Design Servs., LLC v. Durant*,
   2021 U.S. Dist. LEXIS 60661 (D.N.J. March 30, 2021) .........................................53

*Azzil Granite Materials, LLC v. Canadian Pac. Ry. Corp. (In re Lizza Equip.
   Leasing, LLC)*,
   614 B.R. 653 (Bankr. D.N.J. 2020) .........................................................................57

*Baker, Watts & Co. v. Miles & Stockbridge*,
   95 Md. App. 145, 620 A.2d 356 (Md. Ct. Spec. App. 1993)....................................43

*Barton v. RCI, LLC*,
   No. 10-3657, 2011 U.S. Dist. LEXIS 80134, 2011 WL 3022238 (D.N.J. July
   22, 2011) .................................................................................................................58

*In re Bayou Grp., LLC*,
   362 B.R. 624 (Bankr. S.D.N.Y. 2007).....................................................................21

*Bear Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
   397 B.R. 1 (S.D.N.Y. 2007)..............................................................................2, 21

iv

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................. *passim*

*Berdeaux v. OneCoin Ltd.*,
    561 F. Supp. 3d 379 (S.D.N.Y. 2021) ................................................................. 47

*Bergen Bev. Distribs.. LLC v. Eastern Distribs., Inc.*,
    2022 U.S. Dist. LEXIS 50331; 2022 WL 833373 (D.N.J. March 21, 2022) ......................... 58

*Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.")*,
    372 F.3d 154 (3d Cir. 2004) .............................................................................. 49

*Binsack v. Lackawanna Cnt. Prison*,
    438 F. App'x 158 (3d Cir. 2011) ....................................................................... 36

*Bogie v. Rosenberg*,
    705 F.3d 603 (7th Cir. 2013) ............................................................................. 5

*Bondi v. Citigroup, Inc.*,
    No. BER-L-10902-04, 2005 WL 975856 (N.J. Super. Ct. Law Div. Feb. 28,
    2005) ........................................................................................................ 46

*Braunstein v. Benjamin Berman, Inc.*,
    No. 89-5344, 1990 WL 192547 (D.N.J. Sept. 12, 1990) ........................................... 45

*Callano v. Oakwood Park Homes Corp.*,
    91 N.J. Super. 105, 219 A.2d 332 (App. Div. 1966) ......................................... 64, 65

*Cargill Global Trading v. Applied Dev. Co.*,
    706 F.Supp.2d 563 (D.N.J. 2010) ...................................................................... 53

*Cast Art Industries, LLC v. KPMG LLP*,
    209 N.J. 208 (N.J. 2012) ................................................................................. 50

*Chen v. HD Dimension Corp.*,
    2010 U.S. Dist. LEXIS 120599, 2010 WL 4721514 (D.N.J. Nov. 15, 2010) .......... 57, 58

*Chicago Title Ins. Co. v. Ellis*,
    409 N.J. Super. 444 (App. Div. 2009), *cert. denied*, 200 N.J. 506, 983 A.2d
    1113 (2009) ................................................................................................ 53

*Communications Programming, Inc. v. Summit Manufacturing, Inc.*,
    1998 U.S. Dist. LEXIS 9006 (D.N.J. June 16, 1998) ............................................. 54

*Conopco, Inc. v. McCreadie*,
    826 F. Supp. 855 (D.N.J.1993) ......................................................................... 29

*Conroy v. Schultz,*
   80 N.J. Super. 43 (Ch. Div. 1963) ..........................................................42

*Costanzo v. Costanzo,*
   590 A.2d 268 (N.J. Super. Ct. App. Div. 1991)........................................29

*Cummings v. Premier Rehab Keller, PLLC,*
   596 U.S. 212 (2022).................................................................................62

*In re DBSI, Inc., et al.,*
   Case No. 08-12687 (Bankr. D. Del.), *First Amended Plan of Liquidation* ...........................3

*DHP Holdings II Corp. v. Home Depot, Inc,*
   435 D.R. 264, 272 (Bankr. D. Del. 2010) ...............................................62

*Dillworth v. Amerant Bank, N.A. (In re Bal Harbour Quarzo, LLC),*
   623 B.R. 903 (Bankr. S.D. Fla. 2020)......................................................48

*In re Dublin Sec., Inc.,*
   133 F.3d 377 (6th Cir. 1997) .........................................................30, 34, 50

*East Orange Lumber Co. v. Feiganspan,*
   199 A. 778 (N.J. 1938)..............................................................................29

*Excalibur Oil, Inc. v. Sullivan,*
   616 F. Supp. 458 (N.D. Ill. 1985) ...........................................................43

*Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.),*
   926 F.2d 1458 (5th Cir. 1991) .................................................................63

*FDIC v. Ernst & Young,*
   967 F.2d 166 (5th Cir. 1992) ...................................................................31

*Finderne Management Co., Inc. v. Barrett,*
   355 N.J. Super. 197 (App. Div. 2002) .....................................................50

*Flood v. Caro Corp.,*
   272 N.J. Super. 398 (App. Div. 1994) .....................................................24

*Fox v. State Farm Fire & Cas. Co.,*
   2021 U.S. Dist. LEXIS 184787 (D.N.J. Sept. 24, 2021) .........................66

*In re Fruehauf Trailer Corp.,*
   444 F.3d 203 (3d Cir. 2006)......................................................................25

*Gennari v. Weichert Co. Realtors,*
   148 N.J. 582, 691 A.2d 350 (1997)..........................................................56

*Goldfarb v. Solimine*,
    245 N.J. 326 (2021) ...........................................................................59

*Grassmueck v. Am. Shorthorn Ass'n*,
    402 F.3d 833 (8th Cir. 2005) ...................................................30, 50

*Gray v. Evercore Restructuring, L.L.C.*,
    544 F.3d 320 (1st Cir. 2009)..............................................................31

*Gross v. Yeskel*,
    100 N.J. Eq. 293, 134 A. 737 (N.J. Eq. 1926) ........................................66

*In re Hedged-Invs. Associates*,
    84 F.3d 1281 (10th Cir. 1996) ...........................................................30

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995)...............................................................30

*Ill. Nat. Ins. v. Wyndham Worldwide Operations, Inc.*,
    653 F.3d 225 (3d Cir. 2011)...............................................................66

*Image Masters, Inc. v. Chase Home Finance*,
    439 B.R. 375 (Bankr. E.D. Pa. 2013) ................................................20

*In re Infocure Secs. Litig. v. Infocure Corp.*,
    210 F. Supp. 2d 1331 (N.D. Ga. 2002) ..............................................44

*Integrated Solutions, Inc. v. Service Support Specialties, Inc.*,
    124 F.3d 487 (3d Cir. 1997).................................................29, 46, 49

*Johansen v. Myers*,
    2023 U.S. Dist. LEXIS 148979; 2023 WL 5498060 (D. Miss. August 24,
    2023) .............................................................................................36

*Jurista v. Amerinox Processing, Inc.*,
    2013 U.S. Dist. LEXIS 44057 (D.N.J. March 28, 2013)...................52, 53

*Jurista v. Amerinox Processing, Inc.*,
    492 B.R. 707 (Bankr. D.N.J. 2013) .................................................20, 46

*Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Fin. Servs., LLC)*,
    2011 Bankr. LEXIS 2394 (Bankr. M.D. Fla. June 24, 2011) ...................21

*Kwanzaa v. Tell*,
    2019 U.S. Dist. LEXIS 186077 (D.N.J. Oct. 28, 2019)........................5, 18

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)...............................................................57

*Levine v. Wiss & Co.*,
    478 A.2d 397 (N.J. 1984)........................................................................49

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993).....................................................................62

*Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*,
    787 F.3d 716 (5th Cir. 2015) .................................................................55

*Liquidating Tr. of the Amcast Unsecured Creditor Liquidation Trust v. Baker (In
    re Amcast Indus. Corp.)*,
    365 B.R. 91 (Bankr. S.D. Ohio 2007)...............................................52, 53

*Longo v. Envtl. Prot. & Improvement Co.*,
    2017 U.S. Dist. LEXIS 85681; 2017 WL 2426864 (D.N.J. June 5, 2017)........................54, 55

*Mayer v. Belichick*,
    605 F.3d 223 (3d Cir. 2010)......................................................................5

*State ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*,
    904 A.2d 775 (N.J. Super. Ct. App. Div. 2006)........................................35

*McCormac v. Qwest Communications Intern., Inc.*,
    387 N.J. Super. 469 (App. Div. 2006) ....................................................47

*MHA, LLC v. Amerigroup Corp.*,
    539 F. Supp. 3d. 349 (D.N.J. 2021) ........................................................19

*Microbilt Corp. v. L2C, Inc.*,
    2011 N.J. Super. Unpub. LEXIS 2280, 2011 WL 3667645 (App. Div. Aug.
    23, 2011) ...............................................................................................56

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*,
    331 F. 3d. 406 (3d Cir. 2003)............................................................19, 35

*Motorworld, Inc. v. Bennkendorf*,
    228 N.J. 311 (2017) ...............................................................................25

*MSKP Oak Grove, LLC v. Venuto*,
    875 F. Supp. 2d. 426 (D.N.J. 2002) ........................................................20

*Munenzon v. Peters Advisors, LLC*,
    553 F. Supp. 3d 187 (D.N.J. 2021).........................................................56

*In re N. Am. Acceptance Corp. Sec. Cases*,
    513 F. Supp. 608 (N.D. Ga.1981) ...........................................................43

*In re Nat'l Century Fin. Enters., Inv. Litig.,*
    504 F. Supp. 2d 287 (S.D. Ohio 2007) ...................................................48

*In re Nat'l Pool Constr., Inc.,*
    598 Fed. App'x 841 (3d. Cir. 2015)........................................................27

*National Amusements, Inc. v. New Jersey Turnpike Authority,*
    261 N.J. Super. 468 (N.J. Super. 1992) ..........................................64, 65

*NCA Investors Liquidating Trust v. TD Bank, N.A. (In re Seabord Hotel Member Assocs., LLC),*
    2019 Bankr. LEXIS 3632, No. 17-51857 (Bankr. D. Del. Nov. 25, 2019) ............................48

*Nisselson v. Lernout,*
    469 F.3d 143 (1st Cir. 2006) .................................................................34

*In re Norvergence, Inc.,*
    405 B.R. 709 (Bankr. D.N.J. 2009) ......................................................19

*In re Oakwood Homes Corp.,*
    325 B.R. 696 (Bankr. D. Del. 2005) .....................................................20

*In re Odom Antennas, Inc.,*
    340 F.3d 705 (8th Cir. 2003) ................................................................62

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,*
    322 F.3d 147 (2d Cir. 2003)..................................................................50

*Official Comm of Unsecured Creditors v. R.G. Lafferty & Co., Inc.,*
    267 F.3d 340 (3d Cir. 2001)..............................................30, 31, 34, 50

*Official Committee of Unsecured Creditors of PSA, Inc.. v. Edwards,*
    473 F.3d 1145 (11th Cir. 2006) ......................................................30, 33

*OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.),*
    356 Fed. App'x 622 (3d Cir. 2009)..................................................31, 60

*In re Pearlman,*
    440 B.R. 569 (Bankr. M.D. Fla. 2010) .................................................21

*Peltz v. Hatten,*
    279 B.R. 710 (D. Del. 2002).................................................................27

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,*
    998 F.2d 1192 (3d Cir. 1993).................................................................5

*Peterson v. McGladrey & Pullen*,
   676 F.3d 594 (7th Cir. 2012) .......................................................................... 30

*Petric & Assocs., Inc. v. CCA Civ., Inc.*,
   2020 N.J. Super. Unpub. LEXIS 1089, 2020 WL 3041418 (N.J. Super. Ct.
   App. Div. June 8, 2020) .................................................................................. 58

*Phillips v. County of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ........................................................................... 18

*PHP Liquidating, LLC v. Robins (In re PHP Healthcare Corp.)*,
   128 Fed. App'x 839 (3d Cir. 2005)................................................................. 26

*Prudential Ins. Co. of Am. v. Bank of Am.*,
   14 F. Supp. 3d 591 (D.N.J. 2014) .................................................................. 38

*In re Refco, Inc.*,
   Case No. 05-60006 (Bankr. S.D.N.Y.) ............................................................ 3

*Rendler v. Markos*,
   154 Wis.2d 420, 453 N.W.2d 202 (App. 1990)............................................. 43

*Rhode Island Res. Recovery Corp. v. Van Liew Trust Co.*,
   2012 R.I. Super. LEXIS 167, No. PB-10-4503 (R.I. Super. Ct. Nov. 5, 2012)...................... 48

*RNC Sys. v. Modern Tech. Group, Inc.*,
   861 F. Supp. 2d 436 (D.N.J. 2012) ......................................................... 58, 59

*Rolo v. City Investing Co. Liquidation Trust*,
   155 F.3d. 64174 (3d Cir. 1998)...................................................................... 19

*Schiano v. MBNA*,
   2013 U.S. Dist. LEXIS 81440, 2013 WL 2452681 (D.N.J. Feb. 11, 2013) .................... 36, 60

*Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd.*,
   345 F. Supp. 3d 515 (S.D.N.Y. 2018)............................................................ 57

*Shubert v. Lucent Techs. Inc.*
   *(In re Winstar Communications, Inc.)*, 554 F.3d 382 (3d Cir. 2009)...............................4, 63

*Sikirica v. US Foods, Inc.*,
   500 B.R. 729 (Bankr. W.D. Pa. 2013) ........................................................... 62

*Stanziale v. Pepper Hamilton LLP (In re Student Finance Corp.)*,
   335 B.R. 539 (D. Del. 2005)...................................................................... 52, 53

*Sun Coast Merchandice Corp. v. Myron Corp.*,
   393 N.J. Super. 55 (App. Div. 2007) .............................................................. 54

*Swift v. Pandey*,
    2013 U.S. Dist. LEXIS 93245 (D.N.J. July 1, 2023)...........................36, 47, 55, 60

*Tatone v. SunTrust Mortg., Inc.*,
    857 F. Supp. 2d 821 (D. Minn. 2012) .................................................................36

*Thor 725 8th Ave. LLC v. Goonetilleke*,
    2019 U.S. Dist. LEXIS 180282 (D.N.J. Oct. 17 2019).........................................25

*Turner v. Williams*,
    65 F.4th 564 (11th Cir. 2023) .............................................................................5

*United States v. Kovel*,
    296 F.2d 918 (2d Cir. 1961).......................................................................... *passim*

*United States v. Noland*,
    517 U.S. 535, 116 S. Ct. 1524, 134 L. Ed. 2d 748 (1996).....................................63

*Village of Ridgewood v. Shell Oil Co.*,
    673 A.2d 300 (N.J. Super. Ct. App. Div. 1996).....................................................29

*Viridian Res., LLC v. Inco Ltd.*,
    2023 U.S. Dist. LEXIS 99466 (D.N.J. June 7, 2023) ...........................................55

*In re Weinstock*,
    1999 Bankr. LEXIS 616 (Bankr. E.D. Pa. May 25, 1999) ...................................52

*Wiatt v. Winston & Strawn LLP*,
    838 F. Supp. 2d 296 (D.N.J. 2012) ....................................................................47

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000)...............................................................................31

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3d Cir. 2007)..........................................................................5, 18

*Young v. New Prime, Inc. (In re Transcon. Refrigerated Lines, Inc.)*,
    494 B.R. 816 (Bankr. M.D. Pa. 2013) ...............................................................49

*Zazzali v. 1031 Exch. Group LLC (In re DBSI, Inc.)*,
    476 B.R. 413 (Bankr. D. Del. 2012) ..................................................................21

**Statutes**

11 U.S.C. §§ 101-1532 ...........................................................................................16

11 U.S.C. § 544(b) .................................................................................................24

11 U.S.C. § 547.......................................................................................................25

11 U.S.C. § 548 ............................................................................................................25

11 U.S.C. § 548(a)(1)(B) ...........................................................................24, 26, 27, 28

11 U.S.C. § 550(a) ......................................................................................................24

11 U.S.C.  § 551(a) .....................................................................................................24

28 U.S.C. § 157 (b) (1) ..............................................................................................49

28 U.S.C. § 157 (b)(1), (c)(1) ....................................................................................49

28 U.S.C. § 157 (c) (1) ...............................................................................................49

Bankruptcy Code § 502(d) ...............................................................................17, 62, 63

Bankruptcy Code § 510(c) ............................................................................4, 17, 63, 64

Bankruptcy Code § 541 ......................................................................................30, 50

Bankruptcy Code § 542 ...............................................................................................52

Bankruptcy Code § 542(b) ..........................................................................................52

Bankruptcy Code § 548 .......................................................................................24, 26

Bankruptcy Code § 548(a)(1)(A) ................................................................................20

Bankruptcy Code § 548(a)(1)(B) ................................................................................24

Bankruptcy Code § 550(a) ....................................................................................20, 24

Bankruptcy Code § 551(a) ....................................................................................20, 24

Maryland Securities Act § 11-401 ..............................................................................43

Maryland Securities Act § 11-402 ..............................................................................43

N.J.S.A. § 2A:53A-25 ................................................................................................49

N.J.S.A. § 2A:53A-25(b)(2) .......................................................................................50

N.J.S.A § 25:2-20 .......................................................................................................24

N.J.S.A. § 25:2-25(a)(1)(A) ........................................................................................20

N.J.S.A. § 25:2-25(b) ..................................................................................................24

N.J.S.A. § 25:2-29(1) ..................................................................................................24

N.J.S.A. § 49:3-47 ............................................................................................................39

N.J.S.A. § 49:3-49((i) .....................................................................................................42

N.J.S.A. § 49:3-49(b) .................................................................................................41, 42

N.J.S.A. § 49:3-49(c) .......................................................................................................41

N.J.S.A. § 49:3-49(g) .......................................................................................................41

N.J.S.A. § 49:3-49(s) .......................................................................................................41

N.J.S.A. § 49:3-56(a) .......................................................................................................44

N.J.S.A. § 49:3-57 ............................................................................................................44

N.J.S.A. § 49:3-71 ............................................................................................................39

N.J.S.A. § 49:3-71(a) ..................................................................................................39, 40

N.J.S.A. § 49:3-71(d) .................................................................................40, 41, 42, 45

N.J. Stat. Ann. § 2A:25-1 ................................................................................................29

New Jersey Uniform Fraudulent Transfer Act ................................................................20

New Jersey Uniform Securities Act .................................................................................39

New Jersey Uniform Voidable Transactions Act ............................................................24

S.C. Code Ann. § 35-1-20(2) ...........................................................................................44

Securities Exchange Act of 1934 .....................................................................................41

Uniform Securities Act ....................................................................................................43

Uniform Securities Law ...................................................................................................41

**Other Authorities**

COLLIER ON BANKRUPTCY at § 510.05 ..............................................................................63

NJ UVTA § 25:2-25 (a)(2) ...............................................................................................28

**Rules**

Fed. R. Bankr. P. 7012 .....................................................................................................18

Fed. R. Bankr. P. 7012(b) ................................................................................................33

Fed. R. Civ. P. 8 .................................................................................................................3, 19

Fed. R. Civ. P. 8(a)(2) ................................................................................................. *passim*

Fed. R. Civ. P. 9 .......................................................................................................................4

Fed. R. Civ. P. 10(c) ...............................................................................................................5

Fed. R. Civ. P. 12(b)(6) .............................................................................................. *passim*

Fed. R. Civ. P. 9(b) ...................................................................................................... *passim*

**Treatises**

17 *C.J.S. Contracts § 6* (1963) ............................................................................................65

**Constitutional Provisions**

Seventh Amendment ..............................................................................................................49

Joseph Cipolla ("**Cipolla**"), Cipolla & Co., LLC ("**Cipolla & Co.**"), CFA Assurance Services LLC, CFA Review Services LLC ("**CFA Review**"), CFA Tax Services LLC ("**CFA Tax**") and Cipolla Financial Advisors LLC (collectively, the "**Cipolla Defendants**") hereby submit this Memorandum of Law is support of the *Motion of Cipolla Defendants to Dismiss Plaintiff's Adversary Complaint Pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure* (the "**Motion to Dismiss**")[1] and, in support thereof, respectfully state as follows:

### PRELIMINARY STATEMENT

The Complaint is nothing more than a backdoor attempt by a Liquidation Trust to divest the Debtors' (as defined below) former accountants of fees that were paid and fully earned pre-petition under binding contracts.  The Complaint includes thirty-two (32) exhibits that fortunately speak for themselves; in many instances they (i) are not written by the people that the Complaint alleges they were written by, or (ii) do not in any way state what the Complaint alleges they state. The exhibits require diligent scrutiny.  More importantly, the Liquidation Trustee's unfounded and sensational allegations in the Complaint are flatly contradicted by the Complaint's exhibits, which control for purposes of this Motion to Dismiss.

The Complaint intentionally ignores the relevant timeline, which is critical to understanding the Complaint's deficiencies.  Thomas Nicholas Salzano ("**Salzano**"), who is alleged to be the mastermind of a fraudulent scheme at National Realty Investment Advisors, LLC and its debtor affiliates ("**NRIA**" and the "**Debtors**," respectively), was arrested on March 4, 2021, which, according to the New Jersey Board of Securities ("**NJBOS**"), cast a cloud over the NRIA

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion to Dismiss.

Partners Portfolio Fund I, LLC (the "**Fund**").[2]  Cipolla & Co., an independent professional firm, was engaged by the NRIA's outside counsel (McCarter & English, LLP) to "provide confidential services as may be requested and guided by Counsel" twenty-two (22) days later on March 26, 2021.  Compl., Exhibit E.  That timeline shows that Cipolla & Co., a respected accounting firm, was not part of the fraud; rather, as the facts show, Cipolla & Co. was retained by NRIA's defense counsel as part of the solution.  The Complaint's allegations that the Cipolla Defendants aided and abetted the Debtor's alleged scheme are patently absurd and defy logic.  Anyone reading the fanciful allegations of the Complaint could easily be misled into believing that Joseph Cipolla was the "mastermind" of the alleged Ponzi scheme rather than Salzano.

Some of the work performed by Cipolla & Co. was confidential and privileged work performed in connection with a *Kovel* engagement,[3] (Compl., ¶ 2) with the Debtors' defense, criminal and regulatory counsel.  At the request of NRIA's counsel, the *Kovel* work performed by Cipolla & Co. included *inter alia* a review and comments to a draft amended Private Placement Memoranda ("**PPM**") prepared by the law firm of Reed Smith LLP.  Compl., Exhibits K, L & M.  Some additional work in the nature of consulting services was done for the Debtors under separate engagement contracts.  The Complaint's "shotgun pleading" approach makes no effort at all to distinguish between the work done by different Cipolla Defendants under independent contracts, and certainly fails to distinguish between *Kovel* work and non-*Kovel* work, as required under Rule 8 of the Federal Rules of Civil Procedure.

---

[2] *See* the NJBOS' Summary Cease & Desist Order, which is expressly referenced in the Complaint [¶ 22] and available on the docket in the Bankruptcy Case at ECF No. 60.

[3] *See United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961) (extending the attorney client privilege to include work product prepared by accountants engaged by attorneys in connection with the provision of legal advice).

The Complaint repeatedly refers to "investors." In fact, it does so almost 100 times. If there has been an assignment of investors' claims to the Liquidation Trust, there is no mention of it in the Complaint. However, the *First Amended Joint Chapter 11 Plan of Liquidation of the Debtors* [Bankruptcy Case ECF No. 3256] (the "**Plan**") suggests that such an assignment occurred, but it failed to keep the ***estate's*** claims arising under chapter 5 of the Bankruptcy Code separate and distinct from the purported assigning ***investors'*** claims. Typically, because of the imputation of a debtor's bad acts to a trustee, a separate trust to hold and assert the assigning investors' claims is established avoid imputation.[4]

The Plan and the Complaint have commingled the estate's claims with the investors' claims into a single trust, and the Complaint fails to distinguish one from the other. Thus, many of the Liquidation Trustee's claims asserted in the Complaint are subject to imputation and *in pari delicto* defenses, which dictate that they be dismissed with prejudice. To the extent that the Liquidation Trustee is asserting either the estate's or investors' tort claims, New Jersey state law unequivocally deems assignment of prejudgment tort claims *void ab initio*. Accordingly, the tort claims asserted in the Complaint are invalid and must be dismissed with prejudice.

The Complaint also contains a meritless equitable subordination claim under section 510(c) of the Bankruptcy Code. Section 510(c) is remedial, not penal, and is used sparingly. It provides that "a creditor's claim can be subordinated only to the claims of other creditors, not equity

---

[4] *See, e.g.*, *In re DBSI, Inc., et al.*, Case No. 08-12687 (Bankr. D. Del.), *First Amended Plan of Liquidation* [ECF No. 5606] (forming a private actions trust to hold investors' contributed non-estate causes of action); *see also, In re Refco, Inc.*, Case No. 05-60006 (Bankr. S.D.N.Y.) *Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries* [ECF 3214] (same).

interests."[5]  Thus, even if the trustee is successful on its equitable subordination claim, the Cipolla

Defendants' claims can never be subordinated to equity interests (*i.e.*, Class 5 Investor Claims).

Separate and apart from *in pari delicto*, the impermissible assignment of pre-judgment tort

claims, and the circular nature of the Liquidation's Trustee's equitable subordination claim, among

other shortfalls, the Complaint fails to plausibly state claims for relief as required by the United

States Supreme Court precedent in *Iqbal* and *Twombly*.  The claims that sound in fraud do not

come close to meeting the heightened pleading requirements of Rule 9 of the Federal Rules of

Civil Procedure.  Significantly, the Complaint and its exhibits do not support the Liquidation

Trustee's bare allegations that the Cipolla Defendants' accounting services somehow substantially

furthered the alleged Ponzi Scheme.

For these reasons, and those stated below, the Court should dismiss the Complaint in its

entirety.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

For purposes of this Motion only, the Cipolla Defendants rely upon and incorporate by

reference the allegations of the Liquidation Trustee's Complaint,[6] inasmuch as the Court is

required, on a Fed. R. Civ. P. 12(b)(6) motion,[7] to consider only the Complaint, exhibits attached

to the Complaint, matters of public record (including judicial proceedings) and documents

---

[5] *Shubert v. Lucent Techs. Inc. (*In re *Winstar Communications, Inc.)*, 554 F.3d 382 (3d Cir. 2009).

[6] The Complaint included 32 exhibits, designated Exhibits A – FF.  Each of these exhibits are
incorporated into the Complaint.  The Cipolla Defendants may also cite to documents that were
filed on the Bankruptcy Court docket (Case No. 22-14539) and/or the within adversary proceeding
(Adv. Proc. No. 24-01097).  The Court may therefore take judicial notice of these documents
without converting this motion into one for summary judgment.  *Pension Benefit Guar. Corp. v.
White Consol. Indus., Inc*., 998 F.2d 1192, 1196 (3d Cir. 1993); *Mayer v. Belichick*, 605 F.3d 223,
230 (3d Cir. 2010).

[7] While factual allegations on a FED. R. CIV. P. 12(b)(6) motion are to be taken as true, the Court
is not required to accept Plaintiffs' assertions of law.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

identified or explicitly relied upon in the pleading.  *See, e.g*., *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).

Moreover, "[w]hen an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss."  *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).  "If the appended document, to be treated as part of the complaint for all purposes under *Rule 10(c), Fed. R. Civ. P.*, reveals facts which foreclose recovery as a matter of law, dismissal is appropriate."  *Id.* (quoting *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974)).  *See also Turner v. Williams*, 65 F.4th 564 (11th Cir. 2023) ("If an exhibit attached to a complaint contradicts the allegations about the exhibit set forth in the complaint itself, the exhibit controls."); *Kwanzaa v. Tell*, 2019 U.S. Dist. LEXIS 186077, at *2 (D.N.J. Oct. 28, 2019) ("Where the facts as stated in the exhibits cannot be reconciled with the facts alleged in the pleading, the exhibit controls.").

## A.    The Debtors' Business

NRIA and its affiliated Debtors operated a real estate development firm with dedicated fund management specializing in luxury home sales and apartment rental divisions.  *Declaration of Brian J. Casey in Support of Chapter 11 Petitions and First Motions* [Bankruptcy Case ECF No. 16, ¶ 7] ("**Casey Decl**.").[8]

NRIA is a Delaware limited liability company formed on November 27, 2006.  NRIA owned 100% of the common interests of the Fund.  Casey Decl., ¶ 8.

On or about March 4, 2021, Salzano, who is alleged to be an "Insider" of NRIA (Compl., ¶ 21), was arrested and charged with one count of wire fraud and one count of aggravated identity

---

[8] The Casey Declaration is expressly referred to in paragraph 93 of the Complaint.

theft in connection with an offer to sell an interest in the Fund.  Compl., ¶ 45; *see also* D.N.J. Case No. 22-cr-00690 (EP), ECF No. 1 at 2-3; Casey Decl., ¶ 27.

On March 6, 2021, the United States Attorney's Office for the District of New Jersey obtained a warrant authorizing the (i) search of the Debtor's premises, and (ii) seizure of certain records and tangible items.  Casey Decl., ¶ 27.

### B.    The *Kovel* Engagements and the PPMs

On March 26, 2021, twenty (20) days following the execution of the search warrant and twenty-two (22) days after Salzano's arrest, Cipolla & Co. was retained by the Debtors' then outside counsel, McCarter & English, LLP ("**McCarter**"), as *Kovel* accountants to assist counsel with the representation of NRIA and its affiliates.  Compl., ¶ 2; *see also* Compl., Exhibit E.

McCarter subsequently withdrew from the engagement with NRIA and was replaced by Reed Smith LLP ("**Reed Smith**").  Compl., ¶ 53.  Pashman Stein Walder Hayden, P.C. ("**Pashman Stein**") was also retained by NRIA to provide legal services.  Compl., ¶ 48.

On May 17, 2021, Cipolla & Co. entered into a new *Kovel* agreement with Pashman Stein and Reed Smith that effectively superseded the *Kovel* agreement with McCarter.  Compl., ¶ 55, Exhibit I.

On March 30, 2021, NRIA engaged CFA Assurance Services, LLC ("**CFA Assurance**") to provide certain "tax, consulting and assurance services."  Compl., Exhibit F.

Notwithstanding the Liquidation Trustee's persistent and careless use of the words "audit" and "auditors" in the Complaint (*see, e.g.*, Compl., ¶ 2), at no time did any of the Cipolla Defendants ever agree to or provide "audit services" to any of the Debtors.  *See* Compl., Exhibits E, F, I, T & U.  Indeed, the October 25, 2021 contracts (discussed *infra*) expressly provide that "CFA has not nor will we audit or compile the financial information provided to us and,

accordingly, we express no audit opinion regarding this information." Compl., Exhibit T at 9, Exhibit U at 11.

At some point prior to May 19, 2021, John Collins ("**Collins**"), NRIA's EVP for Business Development, circulated a first draft of a revised PPM that Reed Smith, as the Debtors' counsel, had prepared. Compl., Exhibit K. On May 19, 2021, Cipolla, in connection with Cipolla & Co.'s *Kovel* engagement, circulated comments to that initial draft PPM and asked for a call with Collins and Tommy Fierro, NRIA's CFO, so that they could coordinate the submission of comments to Reed Smith. Compl., Exhibits K & L.

Cipolla's review of the initial draft PPM revealed a number of missing or inadequate disclosures that Cipolla recommended be added to Reed Smith's revisions to the PPM, including disclosure of (i) the commingling of funds, (ii) the use of commingled funds to pay investor returns, (iii) the Fund's sources and uses of funds, (iv) use of bank borrowings, (v) variances in investor returns, (vi) the Fund's ability to defer an investor's return of capital, (vii) the Fund's interest rate variations, (viii) the engagement of U.S. Construction to build most of the NRIA's real estate projects, an entity owned by a project manager's son, (ix) the Fund's fee structure, and (x) that new investor money can be used to pay old investor returns. Compl., Exhibit L. Cipolla's recommendations also included the disclosure of the governmental investigation of NRIA "to be written with guidance from defense counsel." These additional recommended disclosures unequivocally contradict the bare assertions in the Complaint that the Cipolla Defendants aided and abetted a fraudulent scheme or breach of a fiduciary duty. To the contrary, the Complaint itself demonstrates that the Cipolla Defendants insisted that the Debtors restate their deficient disclosures.

That list of recommended changes to Reed Smith's initial draft PPM were clearly in connection with the *Kovel* engagement as it includes a header on the top of each page that it was

"Prepared at the Request of Counsel:  Preliminary & Tentative DRAFT."  Compl., <u>Exhibit L</u>.

Moreover, Joseph Cipolla's cover email to Collins, dated May 19, 2021, states: "Thanks for

forwarding the ReedSmith first draft PPM.  I expect that this RS document is the initial draft that

intentionally omits most major Fund-specific disclosure, including tax related. Let's chat

tomorrow . . . so we can all be on the same page regarding what is submitted to RS…."  Compl.,

<u>Exhibit K</u>.

Based on the later versions of the PPM that are attached to the Complaint as <u>Exhibits O, P,

Q & R</u>, Reed Smith incorporated some, but not all, of Cipolla's recommended changes to later

drafts of the PPM, including the investigation of NRIA by the Securities and Exchange

Commission (the "<u>**SEC**</u>"), the Office of the United States Attorney, the New Jersey Bureau of

Securities and the Alabama Securities Commission.  Compl., <u>Exhibit P</u> at 67; <u>Exhibit Q</u> at 67-68;

and <u>Exhibit R</u> at 65-66.

The important point here that cannot be ignored is that none of the Cipolla Defendants are

attorneys and none of them were ever engaged to draft or circulate the PPMs.  Cipolla & Co., in

its capacity as *Kovel* accountant, was merely asked to review and comment on a draft prepared by

Reed Smith and in doing so found and advised that there were a number of material disclosure

deficiencies—the antithesis of advancing any alleged fraud or breach of fiduciary duty.

### C.    The CFA Review and CFA Tax Retentions

The Complaint pushes the false narrative that the Cipolla Defendants were pressuring the

Debtor to retain CFA Review and CFA Tax to do additional accounting work.  *See e.g*., Compl.,

¶ 93.  Nothing could be further from the truth.  If anyone was pushing the retention of the CFA

Review and CFA Tax, it was Rey Grabato ("<u>**Grabato**</u>"), not Cipolla or Salzano.  *See* Compl.,

<u>Exhibit W</u>.

In paragraph 49 of the Complaint, the Liquidation Trustee alleges that:

As part of his pitch, Cipolla claimed that he and the Cipolla Affiliates were nimbler and could provide the same services. Cipolla also claimed he had significant experience working on complex engagements, including underscoring his own "30+ years in forensic accounting," and represented that NRIA required various expert accounting services, including forensic accounting, assurance services, tax return preparation, and litigation support. *See* Exhibit B.

Compl., ¶ 49. First, Exhibit B is a March 22, 2021 e-mail from NRIA CFO Thomas Fierro to NRIA management team members Rey Grabato, Glenn La Mattina and Tim Oyediran summarizing a phone call Fierro had with Joseph Cipolla about the difficulties Fierro was facing. It is in no way a "pitch" from Joseph Cipolla. Exhibit B merely shows that Fierro, who started working for NRIA in February 2021, had reached out to his former employer looking for help as he started to grasp the scope of the accounting problems at NRIA. Moreover, there is zero discussion of Cipolla being "nimbler and providing the same services."

Following Salzano's arrest on March 4, 2021, NRIA's accounting and auditing firms both resigned. Compl., ¶ 45. According to Grabato, by October 2021, NRIA had tried and failed to retain 7-8 other accounting firms. Compl., Exhibit W. The other accounting firms all said that they could not take on the risk of working for NRIA because of the known risks, which were not insurable. Compl., Exhibit W. Any accounting firm that would agree to do work for NRIA also would be assuming significant risk of future litigation, as the Compliant here amply demonstrates, as do the binding contracts between certain Cipolla Defendants and the Debtors.

According to paragraph 52 of the Complaint, CFA Assurance Services, LLC was retained "to provide NRIA with audit, 'tax, consulting and assurance services.'" Compl., ¶ 52. The reference to "audit" however, like much of the Complaint, is pure fiction. The relevant engagement agreement never mentions the word "audit." Compl., Exhibit F. The Liquidation Trustee shamelessly adds words to a binding contract and then brazenly asks this Court to bind CFA Assurance Services, LLC to them.

Again, paragraph 57 of the Complaint goes on to assert that "[b]etween March and October 2021, Cipolla and Cipolla & Co. audited Structured Credit…." An audit engagement letter needs to be precise in terms of scope and procedures. As set forth above, there are five engagement letters signed by one or more of the Cipolla Defendants and not one of them provides for any of the Cipolla Defendants to provide audit services. *See* Compl., Exhibits E, F, I, T & U.

The Complaint cites to a single time entry on Exhibit J to support the allegation that the Cipolla Defendants had agreed to perform an audit. Compl., ¶ 68. That time entry by Joseph Cipolla, on March 23, 2021, states: "discussion with AFM regarding *potential* audit by Cipolla Financial Advisors, LLC." Compl., Exhibit J at 2 (emphasis added). That time entry, on what appears to be the second day of the engagement with Cipolla & Co., does not support an allegation that Cipolla agreed to perform an audit. It merely refers to a "potential audit," which, as evidenced by the Complaint's exhibits, the Cipolla Defendants never agreed to, and did not, perform.

The Cipolla entities were reluctant to take on additional work from NRIA for the reasons that are set forth in the October 25, 2021 contracts. The review work required a massive review of the consolidated financial statements of the NRIA entities for seven (7) reporting periods between 2018 and 2022. Essentially, the engagement necessarily covered all periods since the Fund was established.

Likewise, CFA Tax agreed to prepare tax returns for the consolidated group of NRIA, including its controlled affiliates, the Fund and its investee affiliates, and other NRIA controlled entities. That engagement would necessarily require the preparation and filing of federal, state and local returns for many entities. Collectively, CFA Tax committed to prepare hundreds of tax returns.

CFA Review and CFA Tax were formed on the eve of the engagement. Compl., ¶ 82 and Exhibits X & Y. They were not formed as part of a fraudulent scheme as the Complaint baldly

asserts; rather, they were established as a prudent business measure to protect the Cipolla affiliates from the reputational damage that could arise from undertaking work with a troubled company like NRIA. This is evident from 7-8 other firms refusing to contract with NRIA to perform accounting services. Compl., Exhibit W.

The CFA Review and CFA Tax engagement agreements (the "**CFA Review Agreement**" and the "**CFA Tax Agreement**," respectively, and together, the "**October 2021 Agreements**") recognized the potential reputational and litigation risks associated with the engagements, including potential litigation with the SEC, the New Jersey Attorney General, investors and others. Compl., Exhibit T at 6-7 of 11; Exhibit U at 8-9 of 13. Hence the $2,850,000 escrow account NRIA agreed to fund to "be used to fulfill the Release, Hold-Harmless and Indemnification obligations…." (Compl., Exhibit U), and NRIA's failure to fund such account rendered it in breach of the contract. *See* Bankruptcy Case ECF No. 942 at 81 (pre-petition arbitration commenced by certain Cipolla Defendants due to NRIA's breach of the CFA Review Agreement and CFA Tax Agreement).

Notably, the October 2021 Agreements both observed that the Client (*i.e.*, NRIA) had made consequential progress in correcting its accounting issues in the six months leading up to the October 2021 engagements. Specifically, the October 2021 Agreements provide, in relevant part, that:

> Client has undertaken major, positive transformative changes in the last six months, including but not limited to the wholesale restructuring of the accounting department with qualified, experienced CPAs of integrity, new compliance counsel, a new CFO, a new Fund administrator and general manager, and other counselors and advisors….

Compl., Exhibit T at 6 of 11; Exhibit U at 8 of 13.

Contrary to the Complaint's relentless use of the word "retainer," the CFA Review and CFA Tax engagements were both done on a flat-fee basis, with the fees paid in advance, and

earmarked for specific work.  The word "retainer" does not appear in either contract.  The CFA

Review was priced at a flat fee of $480,000 per reporting period (totaling $3,360,000) and the CFA

Tax engagement was priced at a flat fee of $625,000 per tax year (totaling $1,250,000).  Both fees

were refundable to NRIA *unless*:

> . . . (iv) *Client terminates the engagement* on the basis of any reason other
> than CFA's failure to timely issue a review report; or (v) such fee is non-
> refundable should you *or the Fund or NRIA later decide or determine that
> any or all of the services contemplated by this agreement are not desired or
> required*, or should we withdraw from this engagement because we are
> unable to perform due to circumstances beyond our control."

Compl., Exhibit U (emphasis added); *see also* Compl., Exhibit T (similar).

The fees associated with the CFA Tax and CFA Review contracts necessitated a premium

rate and payment in advance for a number of reasons, each of which was expressly set forth in the

October 2021 Agreements:

a.    The amount of time and resources that would need to be spent on the engagements,
including the negative impact those engagements would have on other existing
Cipolla clients;

b.    The multi-year risk of becoming embroiled in litigation, including subpoenas, law
suits, and testimony from various potential adverse parties, including the
Department of Justice, the SEC, the New Jersey Attorney General, investors and
others;

c.    The known withdrawal by and refusal of other accounting firms to provide the
requested tax and review services;

d.    The reputational risk having nothing to do with the quality of CFA Tax and CFA
Review's work;

e.    The lack of adequate professional liability insurance in a scenario where the firms
were taking on "known risks;" and

f.    The ongoing investigations of the company, its owners and managers.

Compl., Exhibit T at 6-7 of 11; Exhibit U at 8-9 of 13.

In light of the growing interest in the Fund's financial statements by regulators, the October

2021 Agreements prudently included the following provision:  "You agree that this engagement

will not be funded in any part by Fund investor funds and/or equity, and we cannot enter into this engagement if you do not agree to this fact." Exhibit T at 2 of 11; Exhibit U at 2 of 13. The October 2021 Agreements each provided that, at the conclusion of the engagements, NRIA would provide a letter that confirms NRIA's representations that no Fund investor funds or equity were used to pay CFA Tax's and CFA Review's fees. Exhibit T at 3 of 11; Exhibit U at 4 of 13.

Paragraph 89 of the Complaint falsely states that "Cipolla told NRIA's management that if they did not sign the engagement agreements as written by October 25, 2021, he would not provide services and NRIA would be 'dead in the water.'" Compl., ¶ 89, citing Exhibit S at 3-4. However, Exhibit S is not from Cipolla at all, nor does it say anything about being "dead in the water." It starts with an e-mail from Rey Grabato explaining the reasons he believes that CFA Tax and CFA Review need to be engaged. Compl., Exhibit S.

In paragraph 90, the Complaint asserts that because Salzano generally used "all-caps text," the Exhibit S email must have been written by Salzano. Compl., ¶ 90. Whether or not Salzano "ghost wrote" the substance of Exhibit S, the e-mail indisputably came from Rey Grabato. Paragraph 90 of the Complaint goes on to say that "[b]y the next morning, Cipolla stated that he had reconsidered the engagement and was no longer interested because 'he was feeling too much pressure from the attorneys.'" Compl., ¶ 90, citing Exhibit Z. Once again, the Exhibit Z e-mail is not from Cipolla, nor is he even copied on it, neither is Salzano,  The quoted language was from Glenn La Matina, NRIA's Chief Operating Officer.

The e-mail chain depicted on Exhibit Z was started by "additional manager" Brian Casey ("**Casey**") on October 26, 2021.  Although the Complaint asserts that Casey of the Casey Group, Ltd. ("**Casey Group**") was appointed to act as an "additional manager" effective November 1, 2021, exhibits to the Complaint make clear that the Casey Group was on board and acting for the

Debtors prior to November 1, 2021.[9]  *See e.g.*, Compl, Exhibits S & Z.  In fact, the agreement appointing the Casey Group was dated October 20, 2021, *six (6) days before the engagement agreements at issue in this adversary proceeding were executed*.  Casey Decl., ¶ 14; *see also* Compl. ¶ 92 and Exhibits T & U.[10]

In fact, Casey provided multiple comments to the CFA Review and the CFA Tax contracts before they were signed.  *See* Compl., Exhibit BB (Oct. 26, 2021, 12:27 a.m. e-mail from Brian Casey to Rey Grabato stating that Mr. Casey "would take a look at an updated proposal from Joe"); Exhibit Z (Oct. 26, 2021, 12:46 p.m. e-mail from Brian Casey of the Casey Group to Grabato, Collins and Glenn La Mattina from NRIA providing comments on the pending Cipolla engagement more than two hours *before* it was executed on October 26, 2021 at 3:00 p.m.); Compl., ¶ 92.  And, Casey, on behalf of NRIA PPF I, LLC, was copied on the October 2021 Agreements.  Compl., Exhibit T at 12 and Exhibit U at 14.

The Complaint alleges a pressure campaign by Cipolla, Grabato and Salzano to have the October 2021 Agreements executed and paid before the November 1, 2021 "Effective Date" of the Casey Group's engagement.  Compl., ¶ 93.  With Casey's active participation in negotiating the CFA Review and CFA Tax contracts, evidenced in Exhibits S & Z of the Complaint, the allegations of any time-driven pressure campaign in the Complaint are demonstrably false.

---

[9] On April 29, 2022, Brian Casey entered into that certain *Independent Manager Agreement* with NRIA (the "Independent Manager Agreement").   Pursuant to the Independent Manager Agreement: (a) Brian Casey was appointed as the sole manager of NRIA, (b) Casey Group resigned as the "Additional Manager" of the Fund, and (c) Mr. Grabato resigned as the Member, President, and CEO of NRIA.  Casey Decl., ¶ 18.

[10] For some unknown reason, the Liquidation Trustee attached unsigned copies of the Debtor's engagement agreements with CFA Tax (Compl., Exhibit T) and CFA Review (Compl., Exhibit U) to the Complaint.  Those engagement agreements were executed on October 26, 2021.  Fully executed copies of those agreements are attached hereto as **Exhibit A** (CFA Tax Agreement) and **Exhibit B** (CFA Review Agreement).

The Complaint alleges that immediately after executing the October 2021 Agreements, Cipolla advised NRIA that the tax and review work would not begin until after other work was performed, which the Complaint asserts was not previously disclosed—yet another demonstrably false allegation.  Compl., ¶ 96, *citing* Exhibit CC.  Exhibit CC states that the review of the financial statements cannot begin until the financial statements are completed.  Such a logical statement could not possibly be a surprise to NRIA.  In fact, it is entirely consistent with the last sentence of the CFA Review Agreement:  "Moreover, our review engagement shall not commence until financial statements and related footnotes are produced by Client in substantially complete form for any of the reporting periods."  Compl., Exhibit U at 12.

Paragraphs 97 and 98 of the Complaint cite to Exhibits DD & EE in support of the false proposition that Cipolla agreed to rescind the October 2021 Agreements and refund the $4.6 million in fees paid.  Compl., ¶¶ 97-98.  Exhibit DD is an October 29, 2021 e-mail from Collins, NRIA SVP, to Joseph Cipolla requesting a call about NRIA's request for a return of the fees for the review and tax engagements.  There is no response from or agreement by Joseph Cipolla to rescind the October 2021 Agreements or refund the fees paid.  Compl., Exhibit DD.  Exhibit EE is a November 2, 2021 e-mail from Collins again seeking a return of the fees for the review and tax engagements.  Again, there is no response from, and certainly no agreement by, Joseph Cipolla to return the non-refundable fees under the October 2021 Agreements.  Compl., Exhibit EE.

### D.    The Bankruptcy Filing

On June 7, 2022 (the "**Petition Date**"), the Debtors each filed voluntary petitions for relief under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**").  Casey Decl., ¶ 2.

As of the Petition Date, the Debtors had completed thirty-one (31) real estate properties (including those assigned by the Debtor to the Fund), three (3) were near completion and sixteen (16) properties were in various planning or development stages.  Casey Decl., ¶ 12.

### E.    Cipolla Proofs of Claim

The Complaint seeks the disallowance of the claims filed by CFA Review Services, LLC and Cipolla & Co., LLC (together, the **Cipolla Claimants**"), pursuant to Bankruptcy Code section 502(d) (Count XIII) and the equitable subordination of those claims pursuant to Bankruptcy Code section 510(c) (Count XIV).

The Cipolla Claimants timely filed the six (6) proofs of claim on December 20, 2022 as set forth in paragraph 102 of the Complaint.  CFA Review Services, LLC filed claims in the amount of $2,235,038.22 against Debtors NRIA, the Fund and NRIA Structured Credit Strategies, LLC, and Cipolla & Co. filed claims in the amount of $258,276.11 against the same three Debtors.  Compl., ¶ 102.  The proofs of claim are *prima facie* valid, and, in any event, a claims objection should be by motion in the main bankruptcy case, not in an adversary proceeding.  As such, Count XIII should be dismissed.

## ARGUMENT

## I.    LEGAL STANDARDS

### A.    Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

The legal standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(6), made applicable to this adversary proceeding pursuant to Fed. R. Bankr. P. 7012, is well-settled.  Fed. R. Civ. P. 12(b)(6) allows a defendant to move to dismiss an action for failure to state a claim upon which relief can be granted by motion made before the responsive pleading is filed.  Courts considering a motion to dismiss must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the

complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). However, the principle that a court must accept as true all of the allegations contained in a complaint "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Further, as discussed above, exhibits attached to the complaint, matters of public record (including judicial proceedings) and documents identified or explicitly relied upon in the pleading may be considered on a motion to dismiss. *See, e.g.*, *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007). If the exhibits to the complaint cannot be reconciled with the facts alleged in the pleading, the exhibits controls. *Kwanzaa v. Tell*, 2019 U.S. Dist. LEXIS 186077, at *2 (D.N.J. Oct. 28, 2019).

To survive a motion to dismiss, a plaintiff must plead "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Only non-conclusory factual allegations are entitled to the presumption of truth on review of a motion to dismiss—conclusory allegations of law, inferences not supported by facts, and formulaic recitations of the elements of a claim do not satisfy the pleading standard under the Federal Rules and cannot defeat a Rule 12(b)(6) motion to dismiss. *Id.* at 678; *Twombly*, 550 U.S. at 555. A complaint that contains "facts that are 'merely consistent with' a defendant's liability" is insufficient as it "'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

### B.    Fed. R. Civ. P. 8 (a)(2) and 9(b)

"Federal Rule of Civil Procedure 8(a)(2) requires a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotations

omitted); Fed. R. Civ. P. 8.  Where, however, a complaint alleges fraud or mistake, Fed. R. Civ. P. 9(b) provides that "a party must state with particularity the circumstances constituting the fraud or mistake."  Fed. R. Civ. P. 9(b).  On a motion to dismiss a complaint "based upon a plaintiff's failure to meet the heightened pleading requirements of Fed. R. Civ. P. 9(b)," mandating "the pleadings of fraud claims with precision," the Court will require the party alleging fraud to "state with particularity the circumstances constituting fraud."  *In re Norvergence, Inc*., 405 B.R. 709, 726 (Bankr. D.N.J. 2009).  This demand "for specificity exists to enable defendants to prepare a defense to the allegations," and not to "test the factual allegations of the claim."  *Id*. at 726 (citing *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F. 3d. 406, 414 n.2 (3d Cir. 2003); *Rolo v. City Investing Co. Liquidation Trust*, 155 F.3d. 64174, 659 (3d Cir. 1998).

In addition to fraud claims, the heightened pleading requirements of Fed. R. Civ. P.  9(b) apply "to claims under any legal theory whose supporting factual allegations 'sound in fraud.'" *MHA, LLC v. Amerigroup Corp*., 539 F. Supp. 3d. 349, 360 (D.N.J. 2021).  Similarly, in bankruptcy proceedings, actual fraudulent transfer claims are among those that must be pleaded with particularity under Rule 9(b).  *In re Oakwood Homes Corp*., 325 B.R. 696 (Bankr. D. Del. 2005); *Jurista v. Amerinox Processing, Inc*., 492 B.R. 707, 746 (Bankr. D.N.J. 2013); *MSKP Oak Grove, LLC v. Venuto*, 875 F. Supp. 2d. 426 (D.N.J. 2002) (fraud pleading rule applies to claims under New Jersey Uniform Fraudulent Transfer Act); *Image Masters, Inc. v. Chase Home Finance*, 439 B.R. 375, 393 (Bankr. E.D. Pa. 2013).

For the reasons set forth below, the Liquidation Trustee has failed to plead its claims of fraud, and fraudulent transfer, aiding and abetting fraud, aiding and abetting securities fraud, and fraud in the inducement with the required specificity to survive a motion to dismiss, requiring the dismissal of Counts I, II, V, VI, and XI of the Complaint.

## II.   COUNTS I AND III (ACTUAL FRAUDULENT TRANSFERS) MUST BE DISMISSED

Count I of the Complaint seeks to avoid and recover the $4.61 million of fee payments as actual fraudulent transfers pursuant to sections 548(a)(1)(A), 550(a) and 551(a) of the bankruptcy Code.   Count III seeks to avoid and recover the same transfers as actual fraudulent transfers pursuant to N.J.S.A. § 25:2-25(a)(1)(A) and sections 544(b), 550(a) and 551(a) of the Bankruptcy Code.   These claims must be dismissed because the Complaint does not meet the particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure.

In alleging that the transfers were made with actual intent to hinder, delay or defraud creditors, the Liquidation Trustee asserts that the transfers were made "in furtherance of and perpetuated" the Debtors' alleged Ponzi scheme and that "in the context of a Ponzi Scheme, intent to hinder, delay, or defraud creditors is presumed."   Compl., ¶¶ 108, 122.   These allegations fall far short of meeting Fed. R. Civ. P. 9(b)'s particularity requirement, even assuming for purposes of this Motion that the Liquidation Trustee's allegation that NRIA and related entities operated as a Ponzi scheme are true.

When the Ponzi presumption is available, the plaintiff still has the burden of showing that the transfer at issue was made "in furtherance of" the Ponzi scheme.   *See, e.g.*, *Zazzali v. 1031 Exch. Group LLC (In re DBSI, Inc.)*, 476 B.R. 413 (Bankr. D. Del. 2012) (citing *Bear Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007)) (noting that the court must determine "whether the transfers at issue were related to a Ponzi scheme" before it can apply the Ponzi presumption); *In re Pearlman*, 440 B.R. 569, 575 (Bankr. M.D. Fla. 2010) ("To rely on the Ponzi scheme presumption, the trustee must allege the debtors' loan repayments were somehow in furtherance of either the EISA Program or the TCTS Stock Program Ponzi schemes.").   This is because even where the plaintiff has alleged the existence of a broad, fraudulent scheme,

"the [c]ourt must focus precisely on the specific transaction or transfer sought to be avoided in order to determine whether that transaction falls within the statutory parameters of [an actually fraudulent transfer]." *In re Bayou Grp., LLC*, 362 B.R. 624, 638 (Bankr. S.D.N.Y. 2007). *See also Manhattan Inv. Fund*, 397 B.R. at 11 (noting that "[c]ertain transfers may be so unrelated to a Ponzi scheme that the presumption not apply").

In *Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Fin. Servs., LLC)*, 2011 Bankr. LEXIS 2394, at *18 (Bankr. M.D. Fla. June 24, 2011), the court found that "[t]he Ponzi scheme presumption must have some limitations, lest it swallow every transfer made by a debtor, whether or not such transfer has anything to do with the debtor's Ponzi scheme." In sum, the plaintiff must plead that the debtor was engaged in a Ponzi scheme *and* that the transfers at issue were related to or in furtherance of the fraudulent scheme. Even if the Debtor is alleged to have operated a Ponzi scheme, the Court cannot permit the Liquidation Trustee to rely on the Ponzi scheme presumption to survive a Fed. R. Civ. P 9(b) motion to dismiss without also alleging specific facts that support the wholly conclusory statement that the transfers at issue here were made in furtherance of the Debtors' alleged Ponzi scheme. Compl., ¶¶ 108, 122.

Contrary to the conclusory allegations in the Complaint that the transfers were made in furtherance of the Ponzi scheme, CFA Tax and CFA Review were engaged to prepare and file tax returns and conduct a financial review. If anything, the work CFA Tax and CFA Review agreed to do would shine a light on the Debtors' accounting practices and financial statements, which would hardly be consistent with furthering a Ponzi scheme. The accounting work contemplated by the October 2021 Agreements would have been detrimental to the continued operation of a Ponzi scheme.

Indeed, the CFA Review engagement agreement (Compl., <u>Exhibit U</u>) was full of contractual provisions that were purposefully designed to expose and deter fraud. Pursuant to the CFA Review engagement agreement, NRIA assumed, among other things, the following:

> … responsibilities that are fundamental to our undertaking the engagement in accordance with SSARS [Statements on Standards for Accounting and Review Services]:
>
> 1. The selection of accounting principles generally accepted in the United States of America as the financial reporting framework to be applied in the preparation of the financial statements.
>
> 2. The design, implementation, and maintenance of internal controls relevant to the preparation and fair presentation of the financial statements.
>
> 3. The prevention and detection of fraud.
>
> 4. To ensure that the entity complies with the laws and regulations applicable to its activities.
>
> 5. The accuracy and completeness of the records, documents, explanations, and other information, including significant judgments, you provide to us for the engagement.
>
> * * *
>
> 7.    The preparation and fair presentation of the financial statements in accordance with [GAAP] and the inclusion of all informative disclosures that are appropriate for [GAAP], as well as informative disclosures that may exceed those required by GAAP, *determined at our discretion*. Informative disclosures include, but are not limited to, subsequent events, such as governmental investigations, responses thereto, litigation and contingences related thereto and disclosure regarding going concern, including but not limited to, for example, the extent to which governmental investigations or the results thereof may prevent the execution of an established business model or cause a premature winding-up of the Fund's and/or NRIA's activities.
>
> * * *
>
> 10. To include CFA's review report in any document containing financial statements that indicates that such financial statements have been reviewed by us.

Compl, Exhibit U, at 3-4.  Finally, once the written review reports were issued by CFA Review,

NRIA was obligated to include the review report and footnotes approved by CFA Review in any

financial statements.  Compl, Exhibit U, at 6.

In light of the foregoing, the Liquidation Trustee has clearly failed to meet his burden of

alleging facts that show how the bargained for tax and accounting review services furthered or

advanced a Ponzi scheme.  The work product from the October 2021 Agreements was indisputably

detrimental to a Ponzi scheme.  Because the Liquidation Trustee's actual fraudulent transfer claims

are premised solely on the Ponzi presumption, without alleging how the transfers at issue were in

furtherance of a Ponzi scheme, the Counts I and III must be dismissed.

Counts I and III of the Complaint are asserted against Joseph Cipolla in his individual

capacity.  However, the Complaint fails to allege that Joseph Cipolla is the transferee of any of the

subject transfers.  *See* Complaint, ¶ 57 (chart depicting disputed transfers).  Therefore, to the

extent, if any, that the Complaint states a viable claim for fraudulent transfers, Counts I and III

must be dismissed as against Joseph Cipolla, as he was not the recipient of any transfers from the

Debtors, nor is he alleged to be.

## III.    COUNTS II AND IV (CONSTRUCTIVELY FRAUDULENT TRANSFERS) MUST BE DISMISSED

Count II of the Complaint seeks to avoid and recover the $4.61 million of fee payments as

constructively fraudulent transfers pursuant to sections 548(a)(1)(B), 550(a) and 551(a) of the

Bankruptcy Code.  Count IV seeks to avoid and recover the same transfers as constructively

fraudulent transfers pursuant to N.J.S.A. §§ 25:2-25(b) and 25:2-29(1) and sections 544(b), 550(a)

and 551(a) of the Bankruptcy Code.  These claims must be dismissed because the Complaint does

not adequately allege two necessary elements of a constructively fraudulent transfer: (1) that the

Debtor did not receive reasonably equivalent value in exchange for the obligation incurred; and

(2) that, at the time the obligation was incurred, certain solvency-related events had occurred or were about to occur.

**A.    The Liquidation Trustee Failed to Plead Receipt of Less Than Reasonably Equivalent Value.**

Both of the Liquidation Trustee's constructively fraudulent transfer claims (Counts II and IV) fail for the same reason, *i.e.*, the Liquidation Trustee fails to plausibly allege facts in support of its conclusory allegation that the Debtors received less than reasonably equivalent value in exchange for the October 2021 Agreements.  *See* 11 U.S.C. § 548(a)(1)(B).  The Liquidation Trustee brings these two (2) avoidance claims under the section 548(a)(1)(B) of the Bankruptcy Code (Count II), and under the New Jersey Uniform Voidable Transactions Act (N.J.S.A § 25:2-20 *et seq.*) ("NJ UVTA")[11] (Count IV).   The primary thrust of the Liquidation Trustee's constructively fraudulent transfer claims hinges on the faulty foundational allegation that "NRIA received no value whatsoever for the $4.61 million in retainer payments"  [Compl., ¶¶ 116, 128.] These claims are bereft of the legal implications concerning "value" as it pertains to the provision of accounting services and must therefore be dismissed as a matter of law.

The constructively fraudulent transfer claims fail because value must be "based on the circumstances that existed that existed at the time of the transfer," and courts should not consider subsequent events.  *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 212 (3d Cir. 2006).  Similarly, under NJ UVTA, "the Court must determine whether, at the time of the transfer, the value received was reasonably equivalent to what the debtor gave up."  *Thor 725 8th Ave. LLC v. Goonetilleke*,

---

[11]  Under 11 U.S.C. § 544(b), a transfer may also be set aside in accordance with state law (*i.e.*, the NJ UVTA).   The NJ UVTA provides for the avoidance and recovery of constructively fraudulent transfers on a showing substantially the same as section 548 of the Bankruptcy Code. *Flood v. Caro Corp.*, 272 N.J. Super. 398, 403-404 (App. Div. 1994) ("A prime purpose of [NJ UVTA] is to align state law on fraudulent transfers with the federal Bankruptcy Act, *see* 11 U.S.C. §§ 547 and 548….")

2019 U.S. Dist. LEXIS 180282, at *15 (D.N.J. Oct. 17 2019) (quoting *Motorworld, Inc. v. Bennkendorf*, 228 N.J. 311, 327 (2017)).

As of the date of the transfers on October 26, 2021, in exchange for $1,250,000 fixed fee paid by NRIA, CFA Tax had agreed to prepare and file *hundreds* of federal, state and local tax returns for tax years 2020 and 2021.  Compl., Exhibit T at 2; *see also* Bankruptcy Case ECF No. 16 at 22  (NRIA Corporate Organizational Chart depicting the scope of the number of entities involved).  It was a massive undertaking.  The fee charged under the CFA Tax Agreement was also in consideration for the following concerns that arose upon execution of the CFA Tax Agreement:  (i) the amount of time and resources that would need to be spent on the engagements, including the negative impact those engagements would have on other existing Cipolla clients; (ii) the multi-year risk of becoming embroiled in litigation, including investigations by regulatory authorities, (iii) the known withdrawal by and refusal of other accounting firms to provide the requested tax and review services, (iv) the reputational risk of doing work for accounting work for NRIA, (v) the professional liability exposure for taking on "known risks" with the engagement, in light of the then ongoing investigations of management.  Compl., Exhibit T at 6-7.

In connection with the CFA Review Agreement, in exchange for the $3,360,000 fixed fee paid by NRIA, CFA Review agreed to conduct a review engagement on a consolidated basis for seven (7) separate accounting periods between 2018 and 2022.  Another massive undertaking.  The fee charge under the CFA Review Agreement was also in consideration of the concerns outlined in (i) through (v) in the preceding paragraph.

When NRIA purportedly cancelled the October 2021 Agreements at the end of October, 2021, which is only vaguely hinted at in Compl., Exhibits DD & EE, CFA Tax and CFA Review were ready to complete the engagements.  As measured at the time of the transfers on October 26, 2021, the October 2021 Agreements amply demonstrate reasonably equivalent value.

Accordingly, because receipt of less than reasonably equivalent value is a *required* element under both 11 U.S.C. § 548(a)(1)(B) and the NJ UVTA, the Liquidation Trustee's inability to plead facts supporting this element is fatal to its constructively fraudulent transfer claims. *PHP Liquidating, LLC v. Robins (In re PHP Healthcare Corp.)*, 128 Fed. App'x 839, 847 (3d Cir. 2005) (dismissing section 548 claim as "facially deficient" because "it did not plead [debtor] received less than a reasonably equivalent value"). The same is true here, the Trustee has utterly failed to plausibly plead any facts showing why the bargained for accounting services received in exchange of the payment obligations incurred were not of reasonably equivalent value *at the time* the obligations were incurred.

The "reasonably equivalent value" analysis is the same under both 11 U.S.C. § 548(a)(1)(B) and the NJ UVTA. *In re Nat'l Pool Constr., Inc*., 598 Fed. App'x 841, 844 (3d. Cir. 2015) (citing *AMS v. VFP LLC Campbell Soup Co*., 482 F.3d, 630 (3d. Cir. 2007). Lack of reasonably equivalent value is a necessary, but not sufficient, condition for a constructively fraudulent transfer claim. 5 COLLIER ON BANKRUPTCY, ¶ 548.05 (16th ed.).

Critically, CFA Tax and CFA Review did not unilaterally set the engagement prices in a vacuum—those prices were set after six (6) months of learning about the considerable scope of NRIA accounting problems and after 7-8 other accounting firms refused to take on the engagement.

The objectively sophisticated nature of the parties, in conjunction with naturally occurring marketplace influences, is the single-most determinative factor on "reasonably equivalent value":

> [I]n determining whether a value is objectively "reasonable" the court gives significant deference to marketplace values. When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight. . . .

*Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002).

In sum, the Liquidation Trustee's claims do not plausibly allege NRIA received less than reasonably equivalent value under the applicable legal standards, and the Court should accordingly dismiss Counts II and IV.

### B.    The Debtor Fails to Plead Insolvency.

The Complaint contains no allegations whatsoever plausibly alleging NRIA's insolvency at the time of the transfers on October 26, 2021.  Rather, the Complaint only recites generally and in a conclusory fashion that it "became insolvent."  Compl. ¶¶ 94 and 117.  Moreover, paragraph 94 does not even allege that NRIA (the transferor) was insolvent; rather, it alleges generally that the "Debtors were insolvent."  Whether or not "the Debtors" were insolvent on a consolidated basis is not the point.  Exhibit AA to the Complaint establishes that NRIA was the transferor. There is no allegation in the Complaint that NRIA was insolvent.  More is required under the *Twombly-Iqbal* pleading standards, however, than a rote formulaic conclusion of law.

The Bankruptcy Code and the NJ UVTA similarly require some demonstration on the Liquidation Trustee's part that NRIA was (i) insolvent on the date of transfer, or became insolvent as a result of the transfer, (ii) the transaction left NRIA with unreasonably small capital, or (iii) NRIA incurred debts beyond its ability to pay as they came due.  11 U.S.C. § 548(a)(1)(B); NJ UVTA § 25:2-25 (a)(2).  The Liquidation Trustee merely recites these elements in Paragraphs 117 & 129 of the Complaint.  This is an obvious pleading defect that cannot be overlooked by this Court.

Because the Complaint entirely lacks any plausible allegation related as to insolvency, Counts Two and Four of the Complaint must be dismissed on this basis alone.

## IV.   COUNT V (AIDING AND ABETTING FRAUD) MUST BE DISMISSED

Count V of the Complaint, which purports to state a claim against "[a]ll for aiding and abetting the Debtor's "Insiders" fraud, must be dismissed because: (1) prejudgment tort claims are not assignable under New Jersey state law; (2) the claim is barred by the doctrine of *in pari delicto*; and (3) the Complaint fails to state a claim for aiding and abetting fraud.

### A.   State Law Tort Claims Cannot Lawfully Be Assigned to the Liquidation Trust

The Plan's definition of "Causes of Action" purports to include claims sounding in tort. Plan at 3.  Since the Liquidation Trust did not arise until the Effective Date of the Plan, any Causes of Action that the Liquidation Trustee is attempting to prosecute here were admittedly assigned by either the Debtors or the "Contributing Investors" to the Liquidation Trust.

The Liquidation Trust lacks standing to bring assigned tort claims, including aiding and abetting claims, because New Jersey state law prohibits the assignment of such claims.  The Third Circuit definitively ruled in *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 488 (3d Cir. 1997) that any such assignments are *void ab initio*.  There, the Third Circuit reasoned that New Jersey, by statute, permits "all choses in action arising in contract [to] be assignable."  *Id.* at 490 (quoting N.J. Stat. Ann. § 2A:25-1).  The court further deduced that because no corollary statute existed for assignment of tort claims and because New Jersey case law consistently ruled that tort claims were not assignable, New Jersey did not recognize the assignability of tort claims.  *Id.* (collecting cases); *see, e.g.*, *Village of Ridgewood v. Shell Oil Co.*, 673 A.2d 300, 307-08 (N.J. Super. Ct. App. Div. 1996); *Costanzo v. Costanzo*, 590 A.2d 268, 271 (N.J. Super. Ct. App. Div. 1991) ("[I]n New Jersey, as a matter of public policy, a tort claim cannot be assigned."); *East Orange Lumber Co. v. Feiganspan*, 199 A. 778, 779 (N.J. 1938); *see also Conopco, Inc. v. McCreadie*, 826 F. Supp. 855, 865-67 (D.N.J.1993) ("It is clear that under New Jersey law, choses in action arising out of tort are not assignable prior to judgment.").

The Third Circuit also rejected the argument that New Jersey's non-assignability rule applied differently for intentional torts or in the bankruptcy context: "New Jersey law clearly forbids the assignment of prejudgment tort claims, and applies to the tort claims at issue here [in the bankruptcy context]." *Integrated Sols*., 124 F.3d at 490.

Regardless of whether the Liquidation Trust's Counts sounding in tort originated with the Debtor or the Contributing Investors (as defined in the Plan), the Liquidation Trust lacks the requisite standing to bring <u>any</u> assigned prejudgment tort claims. Accordingly, Count V, among others, must be dismissed.

### B. The Claim for Aiding and Abetting Fraud is Barred by the Doctrine of *In Pari Delicto*

The Liquidation Trustee "stands in the shoes of the [Debtors]" and can assert only those causes of action the Debtors possessed as of the Petition Date. *See Official Comm of Unsecured Creditors v. R.G. Lafferty & Co., Inc.*, 267 F.3d 340, 354-56 (3d Cir. 2001). Moreover, the claims that pass into the bankruptcy estate are "no stronger than they were when actually held by the debtor." *Id*. at 357. For that reason, where, as happened in NRIA's bankruptcy cases, the bankruptcy estate purports to have assigned those claims to an innocent successor, the successor/assignee does not—and cannot—take greater rights in them than the debtor held in the claims. *Lafferty*, 267 F.3d at 357 (quoting *In re Hedged-Invs. Associates*, 84 F.3d 1281, 1285-86 (10th Cir. 1996)).

Having no greater rights than the Debtors in the claims asserted against the Cipolla Defendants, the Liquidation Trustee is "subject to the same defenses as could have been asserted by [the Cipolla Defendants] had [this adversary proceeding] been initiated by the [D]ebtors." *Lafferty*, 267 F.3d at 356. In other words, the Liquidation Trustee is vulnerable to imputation of the Debtors' wrongful pre-petition conduct—which the Liquidation Trustee sets forth in detail in

Complaint—and, therefore, the application of the doctrine of *in pari delicto* to its claims against the Cipolla Defendants. *Id.*, at 357-58 (*in pari delicto* is applicable to the claims of bankruptcy trustees acting pursuant to § 541) (citing *In re Dublin Sec., Inc.*, 133 F.3d 377, 380-81 (6th Cir. 1997)); *Hedged-Invs. Associates*, 84 F.3d 1281, 1284 (10th Cir. 1996); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094-95 (2d Cir. 1995)). *See also*, *to the same effect*, *Peterson v. McGladrey & Pullen*, 676 F.3d 594, 598-99 (7th Cir. 2012); *Official Committee of  Unsecured Creditors of PSA, Inc.. v. Edwards*, 473 F.3d 1145, 1158 (11th Cir. 2006); *Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833, 836-37 (8th Cir. 2005).  Indeed, because the Liquidation Trust was created by the confirmation of the Plan, *in pari delicto* may be asserted against the Liquidation Trust itself.  *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 356 Fed. App'x 622, 625-28 (3d Cir. 2009); *Gray v. Evercore Restructuring, L.L.C.*, 544 F.3d 320, 322-23 n.1, 327 (1st Cir. 2009).

The doctrine of *in pari delicto* prevents a party from suing others for a wrong in which the party itself participated.  *Lafferty*, 267 F.3d at 354.  *In pari delicto* applies to non-individual debtors acting as plaintiffs when the misconduct of directors, officers or employees can be imputed to the debtor.  *Lafferty*, 267 F.3d at 355.  Generally, the acts of directors, officers within the scope of their employment are imputable to the corporation.  *See*, *e.g*., *Lafferty*, 267 F.3d at 358; *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86-87 (2d Cir. 2000) ("[T]he misconduct of managers within the scope of their employment will normally be imputed to the corporation."); *FDIC v. Ernst & Young*, 967 F.2d 166, 171 (5th Cir. 1992) (where the persons dominating and controlling the corporation orchestrated the misconduct, their knowledge is imputed to the corporation).  *In pari delicto* may shield even non-innocent parties from liability.  *Lafferty*, 267 F.3d at 358.

The Liquidation Trustee's Complaint is replete with allegations by the Liquidation Trustee

of the misconduct of individuals indisputably in control of the Debtors that can be imputed to the

Debtors:

- Paragraph 1 of the Complaint references "the Ponzi scheme perpetrated by [Salzano, Grabato] and others through the [Debtors];"

- To facilitate the Ponzi scheme, "beginning in 2016, NRIA offered Investors interests in a series of limited liability companies ("LLCs") as investments in developing real estate properties." (Compl., ¶ 23);

- "NRIA also guaranteed to Investors a minimum annual return and projected a much higher return and immediate monthly distributions for many of the LLCs." (Compl., ¶ 23);

- "NRIA guaranteed that each property [being developed by the LLC's] would be built and sold, and Investors' investments and distributions returned, within a stated period (often 18 months)," but such guarantees were paid "with other Investor funds" (Compl., ¶¶ 23, 24);

- One goal of the creation of the Fund on February 5, 2018 by "Salzano, Grabato and Arthur S. Scuttaro … with the assistance, participation, and in collaboration with others, … was to 'roll up' preexisting Investors in individual property LLCs into one pooled fund, and to solicit investments from additional Investors." (Compl., ¶ 25);

- Creation of the Fund "eliminated the obligation for NRIA to buy back property under its 'Guaranteed Buy Back' program and created the opportunity to distribute cash to pre-Fund Investors from new Investors' money." (Compl., ¶ 25);

- "[L]osses of the pre-Fund Investors and the "bonuses" offered by NRIA as an inducement to Investors to "roll" their investments into the Fund were concealed from other Investors, and severely diluted the holdings of existing Investors in the Fund …" (Compl., ¶ 25);

- Salzano, Scuttaro, Grabato and D. Coley O'Brien ("O'Brien") managed the Fund, with Salzano (despite his undisclosed "prior significant criminal record and past as an adjudicated fraudster") the "true, undisclosed manager of the Fund and all Debtors. (Compl., ¶¶ 26, 27);

- "[I]t appears that Grabato permitted Salzano and others full license to use his name and signature stamp to handle NRIA's affairs." (Compl., ¶ 26);

- "NRIA was owned by Grabato and NRIA Capital Partners, Inc. ("NRIA Capital"). O'Brien, who served as managing director of the Fund, wholly owned NRIA Capital." (Compl., ¶ 28);

- "Because neither NRIA nor the Fund generated enough revenue from operations to cover distributions made to investors, NRIA manipulated the Fund's financial statements and financial information included within marketing materials to mislead investors." (Compl., ¶ 31);

- "NRIA had little to no profits and used Investor funds to pay Investor distributions." (Compl., ¶ 32);

- "To keep the Ponzi scheme afloat, NRIA needed to receive substantial new Investor funds." (Compl., ¶ 33)

- "[B]illboards in high traffic areas in New Jersey lured Investors into the scheme by promising 12% 'guaranteed' returns and the opportunity of obtaining up to 21%" (Compl., ¶ 33);

- "NRIA repeatedly represented in Private Placement Memoranda ("PPM's") that distributions would come from operating cash flow derived from investments made by the underlying operating companies.  In actuality, distributions were paid not by profit generated by operations but new Investor funds that had been invested in the Fund (Compl., ¶ 36); and

- "NRIA and the Fund continuously misrepresented to Investors that their money was being used to further the Fund's actual purpose, developing real estate, when in reality, NRIA was misusing investor money in a variety of ways …" (Compl., ¶ 42).

Those allegations can be summed up in the Litigation Trustee's allegations at paragraph 21 of the Complaint that certain so-called Insiders "operated Debtor NRIA and its affiliated debtor entities as a Ponzi scheme to defraud innocent investors … for the benefit of those in their inner circle, their insiders and affiliates," and at paragraph 22 that "… NRIA operated as a Ponzi scheme." Compl., ¶¶ 22, 23.

For purposes of this Motion, the allegations in the Complaint, including those set forth above, must be accepted as true.  FED. R. CIV. P. 12(b)(6), made applicable to this adversary proceeding by FED. R. BANKR. P. 7012(b).  Because the allegations contained in paragraphs 1, 21-28, 31-33, 36 and 42 must be accepted as true, for purposes of this Motion only, it must be accepted as true that NRIA (together with its affiliates) carried out the Ponzi scheme and, in fact, was nothing more than a Ponzi scheme operated to defraud Investors.  *See, e.g., Edwards*, 473 F.3d at

1155 (*in pari delicto* applied to bar claims by bankruptcy trustee where the trustee's complaint alleged that the debtor "was the hub of the Ponzi scheme to defraud investors").  Similarly, because the allegations contained in paragraphs 1 and 25-28 of the Complaint must be accepted as true, it must also be accepted as true that Salzano, Scuttaro, Grabato and O'Brien controlled the operations activities of NRIA, its co-debtors and the Fund for "for the benefit of those in their inner circle, insiders and affiliates." Compl., ¶ 21.

Given the alleged status of NRIA and its co-Debtors as operating a Ponzi scheme and their role in the defrauding of innocent Investors, they cannot, under any theory, be considered innocent parties.  To effectuate the Ponzi scheme, as alleged in the Complaint, the separateness of NRIA (as well as the Fund) was obviously disregarded.  *See, e.g.*, Compl., ¶ 31 ("… NRIA manipulated the Fund's financial statements and financial information included within marketing materials to mislead Investors"); ¶ 36 ("[D]istributions [to Investors] were paid not by profit generated from operations but new Investor funds that had been invested in the Fund."); ¶ 37 ("Many of [NRIA's] employees and contractors … were family members or friends of Salzano, Grabato, and other Insiders, who were 'overpaid' for services they may not even have rendered.").

Where the plaintiff's own pleadings establish the basis for invoking *in pari delicto*, the Court should dismiss a complaint, in whole or in part, on that basis.  *See, e.g., Nisselson v. Lernout*, 469 F.3d 143, 158 (1st Cir. 2006); *Lafferty*, 267 F.3d at 360; *In re Dublin Secs.*, 133 F.3d at 380.  As amply demonstrated above, the very allegations in the Complaint set out in detail the alleged Ponzi scheme operated by NRIA, and therefore, establish the basis for the Ciipolla Defendants' invocation of *in pari delicto* against the Liquidation Trustee and requires dismissal of Count V for that reason alone.

**C.    The Complaint Fails to State a Claim for Aiding and Abetting Fraud.**

Assuming, *arguendo*, that the Liquidation Trustee's claim for aiding and abetting fraud is not barred as an unlawfully assigned tort claim or by the doctrine of *in pari delicto*, Count V of the Complaint must be dismissed for failure to state a claim.

In order to plead a claim for aiding and abetting fraud, the Liquidation Trustee must sufficiently allege facts supporting the following elements:

(1) the party whom the defendant aids must perform a wrongful act that causes an injury;

(2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and]

(3) the defendant must knowingly and substantially assist the principal violation.

*Any Garment Union, LLC v. Dry Clean Express I, LLC*, No. A-3169-20, 2022 WL 14995413, at *11 (N.J. Super. Ct. App. Div. Oct. 27, 2022) (alteration in original) (quoting *State ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 904 A.2d 775, 784 (N.J. Super. Ct. App. Div. 2006)); *accord Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 415 (3d Cir. 2003) (applying New Jersey law).

The allegations in Count V are hopelessly vague and conclusory and do not meet the minimum pleading standards of Fed. R. Civ. P. 8(a)(2), let alone the heightened pleading requirements of Fed. R. Civ. P. 9(b) that apply to claims sounding in fraud.  Count V alleges in sweeping fashion that all "Defendants" aided and abetted NRIA's "Insiders" fraud.   The Liquidation Trustee requests judgment on Count V "against **Defendants** finding that they aided and abetted fraud and for money damages in an amount to be determined at trial."  Compl., at p. 47 (emphasis added).

Count V of the Complaint lumps all of the Cipolla Defendants together without particularizing each Defendant's role in aiding and abetting the allegedly fraudulent conduct.

Count V also repeatedly refers generally to NRIA's "Insiders," which term is defined in paragraph 21 of the Complaint as "Salzano, Grabato, and other co-conspirators." The Complaint does not identify the "other co-conspirators" or explain how or when any particular "Defendant" aided and abetted any particular "Insider."

"A complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012). "Shotgun" pleadings that group all defendants together and do not differentiate between defendants as to any action taken do not meet the standard of plausibility set forth in *Iqbal* and *Twombly* and are subject to dismissal pursuant to *Rule 12(b)(6)*. *Johansen v. Myers*, 2023 U.S. Dist. LEXIS 148979 at *10; 2023 WL 5498060 (D. Miss. August 24, 2023).

Further, a complaint that makes generalized assertions of wrongdoing against a grouping of defendants without explaining which defendant engaged in what activity does not satisfy the requirement of Fed. R. Civ. P. 8(a)(2) that a pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). *See Swift v. Pandey*, 2013 U.S. Dist. LEXIS 93245, at *10 (D.N.J. July 1, 2023) (instructing that plaintiff "must assert facts showing each defendant's actual participation in each of the alleged wrongs"). *See also Schiano v. MBNA*, 2013 U.S. Dist. LEXIS 81440, 2013 WL 2452681, at *7 (D.N.J. Feb. 11, 2013) (holding that plaintiff must "make clear which claims were being asserted specifically against which defendants, and the specific factual basis for each claim against each defendant, as well as the specific relief being sought and the grounds for that relief"); *Binsack v. Lackawanna Cnt. Prison*, 438 F. App'x 158, 160 (3d Cir. 2011) (district court did not abuse its discretion in dismissing complaint for failure to "provide a short and plain statement of each claim against each defendant").

The Complaint also fails to sufficiently allege that all Cipolla Defendants **knowingly and substantially assisted** the "Insiders" alleged fraud.  The Liquidation Trustee alleges in Count V that "Defendants actively aided and abetted the "Insiders'" fraudulent Ponzi [sic] by, among other things…."  Compl., ¶ 136.  The Complaint goes on to list four ways by which all Cipolla Defendants allegedly aided and abetted the Insiders' fraud, none of which supports a finding that any of the Cipolla Defendants knowingly and substantially assisted the alleged fraud.  Compl., ¶ 136.

The first way in which  all Cipolla Defendants allegedly aided and abetted the "Insiders'" fraud is by "[p]laying an active role in reviewing and revising PPMs that were used to fraudulently induce Investors to participate in the Ponzi Scheme."  Compl., ¶ 136(a).  As discussed above, that fanciful allegation is flatly contradicted by, and cannot be reconciled with, the exhibits to the Complaint, which show that: (1) the PPMs were prepared by NRIA's outside counsel; the reviews of the PPMs were performed pursuant to a *Kovel* Agreement between Cipolla & Co., NRIA's outside counsel and NRIA; and (3) the *Kovel* Agreement provides that work performed under the agreement "is intended for and restricted to the Law Firms solely to assist in the referenced matter" and "shall not be included in, summarized or referred to in any manner in any materials distributed to anyone not connected with this matter, or to the public, without [Cipolla & Co.]'s written permission." Compl., <u>Exhibit I</u>.  Specifically, <u>Exhibit L</u> to the Complaint is a document "Prepared at the Request of Counsel" that sheds light on the deficiencies in a draft PPM, which, under no circumstances, can be construed as knowingly and substantially assisting the Insiders further the alleged fraud.

The three (3) remaining instances of Cipolla Defendants alleged aiding and abetting fraud as set forth in paragraph 136 of the Complaint all relate to NRIA's payment of the $4.61 million of fee payments and the Cipolla Defendants' alleged "failure" to return those fees.  Compl., ¶

136(b)-(d).  As shown by the October 2021 Agreements attached to the Complaint, the fees were

paid to CFA Review Services in connection with a multi-period review engagement with respect

to NRIA's financial statements and to CFA Tax Services in connection with a two-year income

tax return compliance engagement.  Compl., <u>Exhibits. T and U</u>.  Thus the allegations that all

Cipolla Defendants aided and abetted NRIA's "Insiders'" fraud by reviewing and revising PPMs

and receiving and retaining the $4.61 million of fee payments are not only conclusory and

speculative, at best, they clearly contradict the exhibits attached to the Complaint, which control

for purposes of a motion to dismiss.

*Prudential Ins. Co. of Am. v. Bank of Am.*, 14 F. Supp. 3d 591 (D.N.J. 2014) is instructive.

In *Prudential*, the plaintiffs alleged that the defendants aided and abetted fraud in connection with

the sale of mortgage-backed securities to defendants.  The court dismissed the claim for aiding and

abetting fraud based on the conclusory nature of the allegations:

> The Complaint alleges that Defendants substantially assisted in various parts of the
> fraud, such . . . "preparing the Offering Materials." []  Setting aside for the moment
> the particularity requirements of Rule 9(b), the Complaint fails to plead sufficient
> facts to state a valid claim for relief.  The second count offers only conclusory
> assertions to support the claim that Defendants aided and abetted fraud.  These
> conclusory assertions are barely more than a "formulaic recitation of the elements
> of a cause of action" and are insufficient to raise the right to relief above a
> speculative level.  *Twombly*, 127 S. Ct. at 1965.  It is not at all clear who did what
> to aid and abet the making of which misrepresentations in the Offering Materials.

*Id*. at 616.

In the instant matter, as in *Prudential*, the Complaint offers only conclusory allegations

that every Cipolla Defendant aided and abetted the "Insiders'" fraud and does not specify "who

did what" to substantially assist the fraud.  Moreover, to the extent the Complaint attempts to

provide some specificity with respect to the claim for aiding and abetting fraud, those skimpy

allegations are contradicted by the exhibits attached to the Complaint.  Accordingly, Count V of

the Complaint fails to meet the pleading requirements of Rules 12(b)(6), 8(a)(2) and 9(b) of the

Federal Rules of Civil Procedure, which failure is an additional reason why Count V must be dismissed.

## V.    COUNT VI (AIDING AND ABETTING SECURITIES FRAUD) MUST BE DISMISSED

Count VI of the Complaint, alleges that "[a]ll Defendants" aided and abetted violations of the New Jersey Uniform Securities Act, N.J.S.A. § 49:3-47 *et seq*. ("NJUSA").  Count VI must be dismissed in its entirety and with prejudice because: (1) the Cipolla Defendants are not "agents" as defined in the NJUSA; (2) prejudgment tort claims are not assignable under New Jersey state law; (3) the claim is barred by the doctrine of *in pari delicto*; and (4) the Complaint fails to meet the applicable pleading requirements.

### A.    The Cipolla Defendants are Not "Agents" Under the NJSUA.

The Liquidation Trustee bases its claim for aiding and abetting securities fraud solely on the Cipolla Defendants' alleged status as "agents" under N.J.S.A. § 49:3-71, which governs actions for "deceit."  Shockingly, the allegation that the Cipolla Defendants are "agents" under N.J.S.A. § 49:3-71 completely ignores the express definition of "agent" in the NJUSA, which does not encompass the Cipolla Defendants in any way, shape or form.

First, the Liquidation Trustee quotes N.J.S.A. § 49:3-71(a), which states:

(a) Any person who

(1) Offers, sells or purchases a security in violation of subsection (b) of section 8, subsection (a) of section 9 or section 13 of P.L. 1967, c. 93 (C. 49:3-55, 49:3-56, or 49:3-60), or

(2) Offers, sells or purchases a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), or

(3) Offers, sells or purchases a security by employing any device, scheme, or artifice to defraud, or

(4) Offers, sells or purchases a security by engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, or

(5) Engages in the business of advising others, for compensation, either directly or through publications or writings, as to the value of securities, or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities (i) in willful violation of this act or of any rule or order promulgated pursuant to this act, or (ii) employs any device, scheme or artifice to defraud the other person or engages in any act, practice or course of business or conduct which operates or would operate as a fraud or deceit on the other person, is liable as set forth in subsection (c) of this section.

N.J.S.A. § 49:3-71(a).  *See* Compl., ¶ 144.[12]

Next, the Liquidation Trustee quotes and highlights § 49:3-71(d) for the proposition that "the NJUSA establishes a broad scope of parties that may be liable for violations of the act":

> (d) Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer, or director of such a seller, or investment adviser, every person occupying a similar status or performing similar functions, every employee of such a seller or investment adviser who materially aids in the sale or in the conduct giving rise to the liability, and every broker-dealer, investment adviser, investment adviser representative **or <u>agent</u> who materially aids in the sale or conduct are also liable jointly and severally with and to the same extent as the seller or investment adviser,** unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts under paragraphs (1) through (5) of subsection (a) of this section which give rise to liability. There is contribution as in cases of contract among the several persons so liable.

Compl., ¶ 145 (quoting N.J.S.A. § 49:3-71(d)) (emphasis in original).[13]

---

[12] The Complaint accurately quotes the text of subsections (1)-(5) of N.J.S.A. § 49:3-71(a), but inexplicably labels the subsection (a)-(e).  Compl., ¶ 144.  Also, the citation to N.J.S.A. § 49:3-71(a) in paragraph 144 of the Complaint is followed by the parenthetical, "emphasis added," but none of the quoted text is underlined, italicized or otherwise highlighted.

[13] Paragraph 145 of the complaint erroneously cites N.J.S.A. § 49:3-71(d) as N.J.S.A. § 49:3-71(a). This is characteristic of the slipshod nature of the Complaint.

The Liquidation Trustee then baldly asserts that "Defendants, as accountants, were agents of NRIA, and in that capacity, provided an assortment of auditing, accounting, and other advisory services to NRIA and the Debtors that materially aided the Insiders in their fraud." Compl., ¶ 146.

None of the Cipolla Defendants ever was an "agent" of NRIA for purposes of liability under N.J.S.A. § 49:3-71(d) and the Liquidation Trustee cannot plausibly allege otherwise. "Agent" (like "broker-dealer," "investment adviser" and "investment adviser representative") is a defined term in the NJUSA. *See* N.J.S.A. § 49:3-49(b), (c), (g) and (s). Specifically, N.J.S.A. § 49:3-49(b) states:

> 49:3-49. Definitions relative to Uniform Securities Law.
>
> When used in this act, unless the context requires otherwise:
> ….
>
> (b) ***"Agent" means any individual other than a broker-dealer, who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities.*** "Agent" does not include an individual who represents an issuer in (1) effecting transactions in a security exempted by paragraph (1), (2), (3), or (11) of subsection (a) of section 3 of P.L.1967, c.93 (C.49:3-50); (2) effecting transactions exempted by subsection (b) of section 3 of P.L.1967, c.93 (C.49:3-50); (3) effecting transactions with existing employees, partners, or directors of the issuer, if no commission or other remuneration is paid or given directly or indirectly for soliciting any person in this State; or (4) a broker-dealer in effecting transactions in this State limited to those transactions described in paragraph (2) of subsection (h) of section 15 of the "Securities Exchange Act of 1934," 15 U.S.C. s.78o(h)(2); or (5) such other persons not otherwise within the intent of this subsection (b), as the bureau chief may by rule or order designate. A partner, officer, or director of a broker-dealer or issuer, or a person occupying a similar status or performing similar functions, is an agent only if he otherwise comes within this definition. The bureau chief may by rule or order, as to any transaction, waive the requirement of agent registration. The bureau chief may by rule define classes of persons as "agents," if those persons are regulated as "agents" by the Securities and Exchange Commission or any self-regulatory organization established pursuant to the laws of the United States.

N.J.S.A. § 49:3-49(b) (emphasis added).

An agent, as used in the NJUSA, must be an "***individual***," *i.e.,* a natural person. The NJUSA distinguishes between individuals and juridical persons such as corporations. *See N.J.S.A.*

§ 49:3-49((i) (defining "person" as "an individual, a corporation, a partnership, an association, a joint-stock company, a trust where the interests of the beneficiaries are evidenced by a security, an unincorporated organization, a government, or a political subdivision of a government."). Because an agent is necessarily an individual, defendants Cipolla & Co., CFA Assurance Services, CFA Tax Services and Cipolla Financial Advisors—each of which is a limited liability company—cannot be liable as agents under N.J.S.A. § 49:3-71(d).

Moreover, irrespective of whether only an individual may be an agent for purposes of the NJUSA, none of the Cipolla Defendants, including Cipolla, fall within the definition of an "agent" because there is no allegation that any of the Cipolla Defendants "represent[ed] a broker-dealer or issuer in effecting or attempting to effectuate purchase or sales of securities" as required under the statutory definition of "agent". *See* N.J.S.A. § 49:3-49(b).

*Conroy v. Schultz*, 80 N.J. Super. 43 (Ch. Div. 1963) is instructive on the question of whether a defendant "represents a broker-dealer or issuer in effecting or attempting to effectuate purchase or sales of securities."  In that case, the defendant personally solicited his business acquaintances and friends in connection with out-of-state promotions and also personally negotiated for the initial sale of participating units in New Jersey ventures as well as their assignments.  The court concluded that "[c]learly, such activity constituted the defendant an agent within the meaning of the act."  In the present case, the Liquidation Trustee does not allege that the Cipolla Defendants solicited investments from any investors.  Nor are the Cipolla Defendants alleged to have represented the Fund or any broker-dealer in the sale of securities.  There are absolutely no allegations that the Cipolla Defendants had any contacts whatsoever with investors or potential investors.

Courts construing similar definitions of "agent" found in other states' versions of the Uniform Securities Act have held that a defendant must do more than provide services to an issuer

or broker-dealer to qualify as an "agent."  For example, in *Baker, Watts & Co. v. Miles & Stockbridge,* 95 Md. App. 145, 620 A.2d 356 (Md. Ct. Spec. App. 1993), the court surveyed decisions construing the securities laws of Wisconsin, Indiana, Georgia, West Virginia and Oregon[14] in considering whether attorneys were "agents"  under the Maryland Securities Act and held:

> We agree with the approaches taken by the courts in these cases.  Therefore, we hold that an attorney could conceivably be considered an agent if he or she "represents a broker-dealer or issuer in effecting or attempting to effect the purchase or sale of securities."  In order to be considered an "agent," an attorney must act in a manner that goes beyond legal representation.  The definition of "agent" in § 11-101(b) does not include attorneys who merely provide legal services, draft documents for use in the purchase or sale of securities, or engage in their profession's traditional advisory functions.  ***To rise to the level of "effecting" the purchase or sale of securities, the attorney must actively assist in offering securities for sale, solicit offers to buy, or actually perform the sale.***
>
> Our holding is further supported by §§ 11-401 and -402 of the Maryland Securities Act, which require an agent to be registered with the Securities Commissioner of the Division of Securities and which make it unlawful for a person to transact business in the State of Maryland as an agent unless that person is registered, respectively.  An individual's registration or failure to register under the Maryland Securities Act is not dispositive of his, her or its status as an "agent"; however, we can infer from these sections that an "agent" as defined in the Act is something different from an agent at common law.

*Id*. at 171 (emphasis added). [15]

---

[14] The cases analyzed in *Baker, Watts* are *Rendler v. Markos*, 154 Wis.2d 420, 453 N.W.2d 202 (App. 1990) (Wisconsin law), *Ackerman v. Schwartz*, 733 F. Supp. 1231 (N.D. Ind.1989) (Indiana law), *aff'd in part and rev'd in part on other grounds*, 947 F.2d 841 (7th Cir. 1991), *In re N. Am. Acceptance Corp. Sec. Cases*, 513 F. Supp. 608 (N.D. Ga.1981) (Georgia law), *Excalibur Oil, Inc. v. Sullivan*, 616 F. Supp. 458 (N.D. Ill. 1985) (West Virginia law),  and *Ahern v. Gaussoin*, 611 F. Supp. 1465 (D. Or.1985) (Oregon law).

[15] The NJUSA, similar to the Maryland Securities Act, contains provisions requiring an agent to be registered with the New Jersey Bureau of Securities and making it unlawful for any person to act as an agent in New Jersey unless that person is registered or exempt from registration under the NJUSA.  *See* N.J.S.A. § 49:3-57 and N.J.S.A. § 49:3-56(a), respectively.  The notion that Cipolla was required to register as an agent with the Bureau of Securities is preposterous.

Turning to the factual allegations underlying the claim that the defendants/appellees were "agents" for purposes of liability under the Maryland Securities Act, the court reasoned:

> At no point did Baker, Watts assert that appellees took part in the solicitation of offers to sell the limited partnership interests in Partners '81. Nor does Baker, Watts allege that appellees had any direct contact with the investors. Baker, Watts makes a general allegation that appellees represented it in effecting the sale of the limited partnership interests, but offers no degree of detail. In addition, Baker, Watts alleges that Appellee Casgar prepared the Confidential Offering Memorandum and a tax opinion. Both these functions, however, are document preparation and are part of the legal services provided by an attorney in a securities offering. Finally, Baker, Watts refers to several transactions and negotiations, other than the solicitation of investors for Partners '81, in which appellees participated. This factual allegation is irrelevant because Baker, Watts failed to present any factual claims that appellees solicited investors in the Partners '81 limited partnership offering.

*Id.* at 171-72. *See also In re Infocure Secs. Litig. v. Infocure Corp.*, 210 F. Supp. 2d 1331 (N.D. Ga. 2002) (holding that the definition of "agent" in the South Carolina Uniform Securities Act, S.C. Code Ann. § 35-1-20(2), does not cover professionals such as attorneys engaged in their traditional advisory functions).

The above cases support dismissal of the Liquidation Trustee's claim for aiding and abetting securities fraud with prejudice. The Complaint lacks any allegations that the Cipolla Defendants actively assisted in the sale of securities or that they had any contact with the investors. In fact, any report or opinion provided "shall not be included in, summarized or referred to in any manner in any materials distributed to anyone not connected with this matter, or to the public, without CCO's written permission." Complaint, Exhibit I at 4 and Exhibit F at 3. The Cipolla Defendants provided traditional accounting services and did not represent NRIA or its affiliates in effecting or attempting to effect the sale of securities. The Liquidation Trustee's blatant disregard of the statutory definition of "agent" demonstrates the frivolous nature of the claim for aiding and abetting securities fraud, which could only have been asserted for the improper purpose of

defaming the Cipolla Defendants' reputation and good will through sensational allegations that have no basis in fact or in law.

**B.      The Claim for Aiding and Abetting Securities Fraud is a Non-Assignable Tort Claim.**

A claim for aiding and abetting securities fraud is a statutory tort claim.  *See Braunstein v. Benjamin Berman, Inc.*, No. 89-5344, 1990 WL 192547, at *22 (D.N.J. Sept. 12, 1990).  For the reasons set forth in Point IV.A, *supra*, Count VI of the Complaint should be dismissed with prejudice.

**C.      The Claim for Aiding and Abetting Securities Fraud is Barred by the Doctrine of *In Pari Delicto*.**

Count VI alleges that all "Defendants" aided and abetted NRIA and its "Insiders" in committing securities fraud.  Thus, for the reasons set forth in Point IV.B, *supra*, Court VI of the Complaint should be dismissed with prejudice under the doctrine of *in pari delicto*.

**D.      The Complaint Fails to Meet the Applicable Pleading Requirements.**

As with Count V of the Complaint, Count VI makes generalized allegations against "Defendants" without explaining each Defendant's role in the alleged misconduct.  Moreover, the Complaint does not plausibly allege, much less plead with the particularity required under Fed. R. Civ P. 9(b), that each of the Cipolla Defendants "materially aid[ed] in the sale or conduct" underlying the claim.  *See* N.J.S.A. § 49:3-71(d).  The Complaint alleges no specifics about the active role of each of the Cipolla Defendants in the alleged common-law fraud, aside from the conclusory assertion that Joseph Cipolla "played an active role in reviewing and revising the PPMs."  Compl., ¶ 2.  Accordingly, Count VI must be dismissed.

## VI.   COUNT VII (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY) MUST BE DISMISSED

Count VII of the Complaint, which alleges that "[a]ll Defendants" aided and abetted breach of fiduciary duty must be dismissed because: (1) prejudgment tort claims are not assignable under New Jersey state law; (2) the claim is barred by the doctrine of *in pari delicto*; (3) the Complaint fails to state a claim for aiding and abetting breach of fiduciary duty.

### A.   The Claim for Aiding and Abetting Breach of Fiduciary Duty is a Non-Assignable Tort Claim.

The Liquidation Trustee lacks standing to bring a claim for aiding and abetting breach of fiduciary duty because, as explained in Point IV.A, *supra*, New Jersey law prohibits the assignment of prejudgment tort claims. *Bondi v. Citigroup, Inc.*, No. BER-L-10902-04, 2005 WL 975856, at *18 (N.J. Super. Ct. Law Div. Feb. 28, 2005); *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 764 (D.N.J. 2013). Any such assignments are *void ab initio*. *Integrated Solutions, Inc.,* 124 F.3d at 488. Therefore, Count VII of the Complaint must be dismissed with prejudice.

### B.   The Claim for Aiding and Abetting Breach of Fiduciary Duty is Barred by the Doctrine of *In Pari Delicto*.

Point IV.B of this memorandum of law established the applicability of the doctrine of *in pari delicto* as a bar to the Liquidation Trustee's claim for aiding and abetting fraud. *In pari delicto* applies with equal force to the Liquidation Trustee's claim in Count VII for aiding and abetting breach of fiduciary duty. The wrongdoing of the Debtors' insiders that forms the basis of the claim for aiding and abetting breach of fiduciary duty is imputed to the Debtors and the Liquidation Trustee does not have any greater rights in the claim than the Debtors. Accordingly, Count VII must be dismissed with prejudice.

C.    **The Complaint Fails to State a Claim for Aiding and Abetting Breach of Fiduciary Duty.**

Dismissal of Count VII of the Complaint also is warranted because it contains only vague and conclusory allegations and fails to state a claim.  In New Jersey, a plaintiff asserting a claim for aiding and abetting breach of fiduciary duty must allege: "(1) a breach of fiduciary duty; (2) the defendant's knowledge of and substantial assistance in that breach; and (3) damages resulting from the breach."  *Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 307 (D.N.J. 2012) (citing *McCormac v. Qwest Communications Intern., Inc.*, 387 N.J. Super. 469, 482 (App. Div. 2006).  Once again, the Liquidation Trustee has lumped all of the "Defendants" together without specifying which Defendant allegedly aided and abetted which wrongful conduct and how.  The "Insiders" whom "Defendants" allegedly aided and abetted are not identified and the fiduciary duties of the Insiders and the Insiders' breaches of those duties are alleged in conclusory fashion.  As discussed in Point IV.C, *supra*, such "shotgun" pleadings are improper.  *See Swift v. Pandey*, *supra*, 2013 U.S. Dist. LEXIS 93245 at *14 (instructing that a plaintiff "must present sufficient facts establishing *each* defendant's liability for *each* claim asserted") (emphasis in original).

Further, the Liquidation Trustee offers not a scintilla of factual support for the bare allegation that "Defendants played an active and informed role in [the Insiders'] breaches." Compl., ¶ 155.  The Liquidation Trustee also baldly asserts that "Defendants did nothing to protect Investors" and that "[a]fter learning of the fraud, Defendants did not sound the alarm."  Compl., ¶¶ 155, 156.  Such alleged inaction does not constitute substantial assistance for purposes of aiding and abetting breach of fiduciary duty.  Although research has located no New Jersey case law directly on point, numerous cases from other jurisdictions hold that, absent a fiduciary relationship between the plaintiff and the alleged aider and abettor, inaction on the part of the aider and abettor does not give rise to claim for aiding and abetting breach of fiduciary duty. *See, e.g., Berdeaux v.*

*OneCoin Ltd.*, 561 F. Supp. 3d 379, 417 (S.D.N.Y. 2021) ("[I]naction constitutes substantial

assistance for the purpose of aiding and abetting liability only when the defendant owes a fiduciary

duty directly to the plaintiff."); *In re Nat'l Century Fin. Enters., Inv. Litig.*, 504 F. Supp. 2d 287,

320 (S.D. Ohio 2007) ("Typically, 'mere inaction' is not sufficient to support aider and abettor

liability, but when the aider and abettor owes a fiduciary duty to the plaintiff, his failure to act may

constitute substantial assistance."); *Dillworth v. Amerant Bank, N.A. (In re Bal Harbour Quarzo,

LLC*), 623 B.R. 903, 920 (Bankr. S.D. Fla. 2020) ("[M]ere inaction will constitute substantial

assistance only if the defendant owes a fiduciary duty directly to the plaintiff.") (internal quotations

omitted); *NCA Investors Liquidating Trust v. TD Bank, N.A. (In re Seabord Hotel Member Assocs.,

LLC*), 2019 Bankr. LEXIS 3632, at *30, No. 17-51857 (Bankr. D. Del. Nov. 25, 2019)

("Connecticut courts have recognized that 'the mere inaction' or 'continued participation in a

transaction' on the part of the defendant does not constitute substantial assistance."); *Rhode Island

Res. Recovery Corp. v. Van Liew Trust Co.*, 2012 R.I. Super. LEXIS 167, at *30, No. PB-10-4503

(R.I. Super. Ct. Nov. 5, 2012) ("[T]he mere inaction of an alleged aider and abettor constitutes

substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.").

In the instant matter, the Complaint contains no allegation that any of the Cipolla

Defendants owed a fiduciary duty to NRIA.  In the absence of such an allegation, the Cipolla

Defendants' alleged failure to "sound the alarm" cannot constitute, under any "theory" conjured

up by the Liquidation Trustee, the substantial assistance that is necessary to support a claim for

aiding and abetting breach of fiduciary duty.  Accordingly, Count VII must be dismissed for failure

to state a claim.

## VII.    COUNT VIII (ACCOUNTING MALPRACTICE) MUST BE DISMISSED

Count VIII of the Complaint, which purports to be a claim for accounting malpractice

against "[a]ll Defendants" must be dismissed because: (1) prejudgment tort claims are not

assignable under New Jersey state law; (2) the claim is barred by the doctrine of *in pari delicto*; and (3) it fails to meet the pleading standards to state a claim for accounting malpractice.[16]

### A.    The Claim for Accounting Malpractice is a Non-Assignable Tort Claim.

The Liquidation Trustee lacks standing to bring a claim for accounting malpractice because, as explained in Point IV.A, *supra*, New Jersey law prohibits the assignment of prejudgment tort claims.  A claim for accounting malpractice is a statutory tort claim.  *See* N.J.S.A. § 2A:53A-25; s*ee also Levine v. Wiss & Co.*, 478 A.2d 397, 399 (N.J. 1984).   Any such assignments are *void ab initio.  Integrated Solutions, Inc.,* 124 F.3d at 488.  Therefore, Count VIII of the Complaint must be dismissed with prejudice.

### B.    The Claim for Accounting Malpractice is Barred by the Doctrine of *In Pari Delicto*.

Point IV.B, *supra*, established the applicability of the doctrine of *in pari delicto* as a bar to the Liquidation Trustee's claim for aiding and abetting fraud.  *In pari delicto* applies with equal force to the Liquidation Trustee's claim in Count VIII for accounting malpractice.  *In pari delicto*

---

[16] Should the Liquidation Trustee's claim for accounting malpractice survive, the claim cannot be adjudicated by this Court without the Cipolla Defendants' consent.  The Bankruptcy Code divides claims into two principal categories: "core" claims and "non-core" claims.  28 U.S.C. § 157 (b)(1), (c)(1).  A bankruptcy court may "hear and determine" all core claims and "may enter appropriate orders and judgments" with respect to such claims.  28 U.S.C. § 157 (b) (1).  On the other hand, a bankruptcy court may hear non-core claims but, unless the parties otherwise agree, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court."  28 U.S.C. § 157 (c) (1).  Those findings are then subject to *de novo* review by the district court.  The Third Circuit has limited core proceedings to those that invoke a substantive right provided by title 11 or that by its nature could arise only in the context of a bankruptcy case.  *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.")*, 372 F.3d 154, 162-63 (3d Cir. 2004).  The Liquidation Trustee's accounting malpractice claim does not arise under title 11 and would have existed whether or not NRIA ever filed bankruptcy.  It is therefore a non-core claim.

The Cipolla Defendants have a Constitutional right to a jury trial under the Seventh Amendment, and that right, coupled with a refusal to consent to such trial before the Bankruptcy Court dictates that the claim must be adjudicated by an Article III court, not an Article I court.  *Young v. New Prime, Inc. (In re Transcon. Refrigerated Lines, Inc.)*, 494 B.R. 816, 819 (Bankr. M.D. Pa. 2013).

is applicable against bankruptcy trustees acting pursuant to section 541 of the Code. *Lafferty*, 267 F.3d at 356-57; *see also Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158-66 (2d Cir. 2003); *In re Dublin Sec., Inc.*, 133 F.3d 377, 381 (6th Cir. 1997); *Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d at 836-37 (8th Cir. 2005). The wrongdoing of the Debtors' insiders is imputed to the Debtors and the Liquidation Trustee does not have any greater rights in the claim than the Debtors. Accordingly, Count VIII must be dismissed with prejudice.

### C.    The Complaint Fails to State a Claim for Accounting Malpractice.

The Complaint cites to N.J.S.A. § 2A:53A-25(b)(2) for the purported standards of an accounting malpractice claim. Compl., ¶ 161. That sub-section of title 2A, chapter 53 (Torts), was intended to establish preconditions to the imposition of liability on an accountant to a *non-client* third party. *Cast Art Industries, LLC v. KPMG LLP*, 209 N.J. 208, 221 (N.J. 2012). It does not recite the elements of an accounting malpractice claim. There are three (3) elements that must be alleged and proven in order to succeed on a claim for professional negligence in New Jersey: (i) a duty of care owed by defendant to plaintiff; (ii) a breach of that duty by defendant; and (iii) an injury to plaintiff proximately caused by defendant's breach. *Finderne Management Co., Inc. v. Barrett*, 355 N.J. Super. 197, 208 (App. Div. 2002).

In the instant matter, assuming *arguendo* that a malpractice claim could even be brought by the Liquidation Trustee, the Complaint offers only conclusory and lumped allegations[17] that "Cipolla and the Cipolla Affiliates " assured NRIA of their accounting expertise (Compl., ¶ 163),

---

[17] Like other Counts in the Complaint discussed above, Count VIII of the Complaint lumps all of the Cipolla Defendants together without particularizing each Cipolla Defendant's purported role in the alleged accounting malpractice. For the reasons set forth in the discussion on "lumping defendants" in Point IV.C, *supra*, Count VIII of the Complaint should be dismissed.

"breached their duties in advising NRIA contrary to GAAP …" (Compl., ¶ 164), "overstated the potential consequences that NRIA would face if Cipolla's newly formed … Affiliates were not promptly retained" (Compl., ¶ 167)[18], and "Defendants' misrepresentations and breach of accepted accounting principles caused NRIA to suffer significant damages" (Compl., ¶ 169).

Critically, the Complaint's allegations do not specify:  (i) who, how or when any of the Cipolla Defendants breached a duty of care, (ii) who, how or when any the Cipolla Defendants allegedly "advised NRIA [to] book revenue for development fees upon initial execution of an agreement, rather than at the time NRIA satisfied its performance obligations," (Compl., ¶ 166)[19], (iii) who, how or when any of the Cipolla Defendants overstated the consequences of not retaining the Cipolla Defendants, (iv) what misrepresentations or breach of accounting principles caused NRIA damages, or (v) how NRIA was damaged.  In short, the Complaint provides absolutely no factual support for the bare allegations in Count VIII of the Complaint.  Accordingly, Count VIII of the Complaint fails to meet the pleading requirements of Rules 12(b)(6), and 8(a)(2) of the Federal Rules of Civil Procedure, which failure is an additional reason why Count VIII must be dismissed.

## VIII.    COUNT IX (TURNOVER) MUST BE DISMISSED

Count IX of the Complaint, which seeks turnover of the fee payments pursuant to Bankruptcy Code section 542(b), must be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Section 542(b) of the Bankruptcy Code states, in relevant part, that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on

---

[18] If the Liquidation Trustee is referring to the statements in Exhibit S, those were indisputably made by Grabato, not any of the Cipolla Defendants.

[19] Notably, ASC 606 cited by the Liquidation Trustee in paragraph 165 of the Complaint says nothing about the timing of entitlement to funds, it addresses only revenue recognition, which is an entirely different concept.  The Liquidation Trustee conflates those two concepts.

order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."  11 U.S.C § 542(b). Turnover under section 542 of the Bankruptcy Code is intended as a remedy to obtain what is acknowledged to be property of the bankruptcy estate.  It is not intended as a mechanism to determine disputed rights of parties to property.  *Jurista v. Amerinox Processing, Inc.*, 2013 U.S. Dist. LEXIS 44057, at *85-86 (D.N.J. March 28, 2013) (citing *In re Weinstock*, 1999 Bankr. LEXIS 616, at *30 n.14 (Bankr. E.D. Pa. May 25, 1999)).

Recovery under 11 U.S.C. § 542 is thus limited to assets that are undisputedly property of the bankruptcy estate.  *Liquidating Tr. of the Amcast Unsecured Creditor Liquidation Trust v. Baker (In re Amcast Indus. Corp.)*, 365 B.R. 91, 122 (Bankr. S.D. Ohio 2007) (citing *Stanziale v. Pepper Hamilton LLP (In re Student Finance Corp.)*, 335 B.R. 539, 554 (D. Del. 2005). Accordingly, a turnover action under section 542 of the Bankruptcy Code cannot be used to demand the return of assets subject to a title dispute or an unavoided transfer.  *Id.*

In the present case, the Liquidation Trustee seeks judgment in Count IX of the Complaint for turnover of $4.61 million "paid pursuant to the October 2021 Agreements."  The Liquidation Trustee has not alleged (and cannot allege) that the transfer of the property has already been avoided or that the property is otherwise the undisputed property of the bankruptcy estate.  The parties' respective rights to and interests in the fee payment is the subject of a contentious dispute. Therefore, the Liquidation Trustee's claim for turnover in Count IX of the Complaint must be dismissed.  *See Jurista v. Amerinox Processing, supra*, 2013 U.S. Dist. LEXIS 44057, at *86; *Liquidating Tr. of the Amcast Unsecured Creditor Liquidation Trust v. Baker, supra*, 365 B.R. at 122; *Stanziale v. Pepper Hamilton LLP, supra,* 335 B.R. at 554.

## IX.   COUNT X (CONVERSION) MUST BE DISMISSED

Count X of the Complaint, which asserts a claim for conversion against all "Defendants," must be dismissed because: (1) the Complaint fails to state a claim for the common law tort of conversion; (2) prejudgment tort claims are not assignable under New Jersey state law; (3) the claim is barred by the economic loss doctrine.

### A.   The Complaint Fails to State a Claim for Conversion.

The common law tort of conversion in New Jersey consists of the "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *AV Design Servs., LLC v. Durant,* 2021 U.S. Dist. LEXIS 60661 (D.N.J. March 30, 2021) (quoting *Chicago Title Ins. Co. v. Ellis,* 409 N.J. Super. 444, 454 (App. Div. 2009), *cert. denied*, 200 N.J. 506, 983 A.2d 1113 (2009)).   The tort of conversion has evolved to apply to "money, bonds, promissory notes, and other types of securities, as long as the plaintiff has an actual interest in the security and it is capable of misuse in a way that would deprive the plaintiff of its benefit." *Id.* (quoting C*argill Global Trading v. Applied Dev. Co*., 706 F.Supp.2d 563, 578 (D.N.J. 2010)).   The New Jersey Appellate Division has made clear that in order to establish conversion, the property converted "must have belonged to the injured party." *See, e.g.*, *Sun Coast Merchandice Corp. v. Myron Corp*., 393 N.J. Super. 55, 84 (App. Div. 2007).

When, as in the present case, money is the subject of a conversion claim, "New Jersey courts require that a plaintiff show something more than a contractual obligation on the part of a defendant to pay the plaintiff to establish conversion." *See id.* (citing *Advanced Enterprises Recycling, 869 A.2d at 472)*.   Specifically, "[t]he plaintiff must show that the money in question was identifiably the plaintiff's property or that the defendant was obligated to segregate such money for the plaintiff's benefit." *Id.* (citing *Communications Programming, Inc. v. Summit*

*Manufacturing, Inc.*, 1998 U.S. Dist. LEXIS 9006, at \*5 (D.N.J. June 16, 1998)).  The Liquidation

Trustee cannot make such a showing in this case.

NRIA paid the $4.61 million of fixed fees to CFA Tax Services and CFA Review Services

as required by the October 2021 Agreements.  The October 2021 Agreements govern the

Liquidation Trustee's claim to the return of the $4.61 million of fixed fees.  Each of the October

2021 Agreements specifically provides that the fixed fee "is non-refundable should you [Grabato]

or the Fund or NRIA or the later decide that any or all of the services contemplated by this

agreement are not desired or required."  The October 2021 Agreements also specify the very

limited situations in which NRIA may be entitled to a refund of any unused portion of the fee.

Thus, the Liquidation Trustee's remedy, if any, is in breach of contract and not in the common law

tort of conversion.  *See Longo v. Envtl. Prot. & Improvement Co.*, 2017 U.S. Dist. LEXIS 85681

at \*18; 2017 WL 2426864 (D.N.J. June 5, 2017) ("Because Longo's conversion claim asserts that

EPIC failed to honor its obligations under the Earn Out Agreement and Security Agreement,

Longo's claim is akin to his Breach of Contract claim against EPIC and is therefore dismissed.").

        **B.**        **Conversion is a Non-Assignable Tort Claim.**

Conversion is a common law tort under New Jersey law.  As discussed in Point IV.A,

*supra*, tort claims are non-assignable prior to judgment in New Jersey.  Accordingly, the

Liquidation Trustee's conversion claim must be dismissed with prejudice on that basis alone.  *See*

*Swift v. Pandey*, 2013 U.S. Dist. LEXIS 93245, at \*11 (D.N.J. July 1, 2023) (dismissing conversion

claim with prejudice where plaintiff did not dispute that he was asserting the claim only as an assignee of debtor's right, title and interest).

### C. The Economic Loss Doctrine Bars the Liquidation Trustee's Conversion Claim.

Relatedly, the Liquidation Trustee's conversion claim must likewise be dismissed based on the economic loss doctrine, which "generally bars a tort claim when no factual basis for the tort claim would exist had the defendant complied with the contract." *Viridian Res., LLC v. Inco Ltd.*, 2023 U.S. Dist. LEXIS 99466, at *39-40 (D.N.J. June 7, 2023) (quoting *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.,* 787 F.3d 716, 726 (5th Cir. 2015)).  *See id.* (dismissing plaintiff's conversion claim with prejudice where conversion allegations were inextricably tied to its breach of contract claim); *Longo v. Envtl. Prot. & Improvement Co.*, 2017 U.S. Dist. LEXIS 85681, at *18 (D.N.J. June 5, 2017) ("Because Longo's conversion claim asserts that EPIC failed to honor its obligations under the Earn Out Agreement and Security Agreement, Longo's claim is akin to his Breach of Contract claim against EPIC and is therefore dismissed.").

### X. COUNT XI (FRAUDULENT INDUCEMENT) MUST BE DISMISSED

The Liquidation Trustee's claim for fraudulent inducement in Count XI of the Complaint must be dismissed because: (1) the Complaint fails to plausibly allege all of the elements of a claim for fraudulent inducement; (2) the Liquidations Trustee has failed to plead Count XI with particularity; (3) the claim is barred by the economic loss doctrine.

### A. The Complaint Fails to Plausibly Allege All of the Elements of a Claim for Fraudulent Inducement.

Count XI of the Complaint seeks judgment against all the Cipolla Defendants ordering the October 2021 Agreements rescinded and/or declared void, or, alternatively, an award of monetary damages on the grounds that the Cipolla Defendants fraudulently induced NRIA into entering into those Agreements.  The elements of fraud in the inducement track those of common law fraud and

consist of: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Munenzon v. Peters Advisors, LLC,* 553 F. Supp. 3d 187 (D.N.J. 2021) (citing *Microbilt Corp. v. L2C, Inc.,* 2011 N.J. Super. Unpub. LEXIS 2280, 2011 WL 3667645, at *3 (App. Div. Aug. 23, 2011); *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 691 A.2d 350, 367 (1997)).

The Liquidation Trustee lists various "advice and representations" in Count XI of the Complaint that Cipolla allegedly made to NRIA prior to entering into the October 2021 Agreements. *See* Compl., ¶ 181-193. The Complaint also alleges, in conclusory fashion, that "NRIA reasonably relied on the above advice and recommendations." Compl., ¶ 194. However, the Complaint is devoid of any allegations that the so-called advice and recommendations were false (let alone materially false) or that Cipolla had knowledge of their falsity. Thus, the Complaint fails to plausibly allege all of the elements of a claim for fraudulent inducement and Count XI must be dismissed.

### B.    The Complaint Fails to Plead Fraudulent Inducement with Particularity.

Claims for fraudulent inducement are subject to the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure. *Azzil Granite Materials, LLC v. Canadian Pac. Ry. Corp. (In re Lizza Equip. Leasing, LLC)*, 614 B.R. 653, 668 (Bankr. D.N.J. 2020). Accordingly, a plaintiff asserting a fraudulent inducement claim must: (1) specify the statements the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. *Id.* (citing *Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd*., 345 F. Supp. 3d 515, 525 (S.D.N.Y. 2018); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)).

The Liquidation Trustee's Complaint provides no specifics as to when, how or where the

"advise and representations" that supposedly give rise to a claim for fraudulent inducement were made. Simply, the Complaint does not explain why they were fraudulent. Finally, once again, the Liquidation Trustee fails to differentiate between the various Cipolla Defendants. Accordingly, Count XI must be dismissed.

### C.   The Economic Loss Doctrine Bars the Liquidation Trustee's Claim for Fraudulent Inducement.

The heart of Count XI of the Complaint appears to be the allegation in paragraph 198 that, "Upon information and belief, Cipolla and the Cipolla Affiliates never intended to, and in fact could not, complete the work agreed to in the October 2021 Agreements." This allegation falls squarely within New Jersey's economic loss doctrine and bars the Liquidation Trustee's claim for fraudulent inducement.

The United States District Court for the District of New Jersey has explained:

> The economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract. *Chen v. HD Dimension Corp.*, 2010 U.S. Dist. LEXIS 120599, 2010 WL 4721514, *8 (D.N.J. Nov. 15, 2010). In particular, "whether a tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties." *Id.* "Fraud claims can proceed alongside breach of contract claims where there exists fraud in the inducement of a contract or an analogous situation based on pre-contractual misrepresentations." *Barton v. RCI, LLC*, No. 10-3657, 2011 U.S. Dist. LEXIS 80134, 2011 WL 3022238, *7 (D.N.J. July 22, 2011). Specifically, "a plaintiff may be permitted to proceed with tort claims sounding fraud in the inducement so long as the underlying allegations involve misrepresentations unrelated to the performance of the contract, but rather precede the actual commencement of the agreement." *Chen*, 2010 U.S. Dist. LEXIS 120599, 2010 WL 4721514, at *8.

*RNC Sys. v. Modern Tech. Group, Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012).

Where "[a] pre-contractual misrepresentation relates to a defendant's future intent to perform under the contract, it will be considered intrinsic to the contract, and any related fraud claims will be dismissed." *Petric & Assocs., Inc. v. CCA Civ., Inc*., 2020 N.J. Super. Unpub.

LEXIS 1089, 2020 WL 3041418, at *10 (N.J. Super. Ct. App. Div. June 8, 2020) (citing *RNC,* 861 F. Supp. 2d at 451).  Moreover, a fraud or misrepresentation claim is not extraneous to the contract where there is no "independent duty imposed by law."  *Bergen Bev. Distribs.. LLC v. Eastern Distribs., Inc.,* 2022 U.S. Dist. LEXIS 50331; 2022 WL 833373 (D.N.J. March 21, 2022) (citing *Petric*, 2020 N.J. Super. Unpub. LEXIS 1089, 2020 WL 3041418, at *10).  "Finally, concurrent tort and contract claims are cognizable where a defendant causes 'harm to the plaintiff distinct from those caused by the breach of contract.'"  *Id.* (citing *Petric*, 2020 N.J. Super. Unpub. LEXIS 1089, 2020 WL 3041418, at *11).

In the instant case, the allegation that Cipolla and the Cipolla Affiliates never intended to complete the work agreed to in the October 2021 Agreements and could not complete such work directly relate to the performance of CFA Review Services and CFA Tax Services under those agreements.  The alleged misrepresentation is not extraneous to October 2021 Agreements and is not alleged to have caused any harm apart from the harm allegedly caused by the breaches of the October 2021 Agreements.  The Liquidation Trustee's fraudulent inducement claim is in essence a breach of contract claim and its right, if any, to a remedy flows from contract, not tort.  Accordingly, the economic loss doctrine affords another basis for granting the Cipolla Defendants' motion to dismiss Count XI of the Complaint.  *See RNC, supra,* 861 F. Supp. 2d at 852 (dismissing fraudulent inducement claim where the defendant's purported misrepresentations were addressed squarely within the language of the parties' License Agreement and were not "unrelated to the performance of the contract" as required under the economic loss doctrine).

> **D.**     **Even Assuming the Liquidation Trustee has a Viable Fraudulent Inducement Claim, the Claim Must be Dismissed as to Defendants Cipolla, Cipolla & Co., and Cipolla Financial Advisors.**

The Complaint alleges that NRIA was fraudulently induced into entering into the October 2021 Agreements.  Those Agreements were between NRIA, on the one hand, and CFA Review

Services and CFA Tax Services, on the other.  Therefore, to the extent, if any, that the Complaint

states a viable claim for fraudulent inducement, Count XI must be dismissed as against defendants

Joseph Cipolla, Cipolla & Co., Cipolla Assurance Services, LLC and Cipolla Financial Advisors,

none of whom are parties to the October 2021 Agreements that are the subject of Count XI.

**XI.     COUNT XII (BREACH OF CONTRACT) MUST BE DISMISSED**

Count XII of the Complaint, which asserts a breach of contract claim against CFA Review,

CFA Tax, and Joseph Cipolla, must be dismissed for failing to state a claim for breach of contract.

The party seeking to prove a breach of contract claim must prove: (i) the existence of a contract

with certain terms, (ii) the plaintiff's compliance with those terms, (iii) the defendant's breach of

one or more of them, and (iv) a loss to plaintiff caused by that breach.  *Goldfarb v. Solimine*, 245

N.J. 326, 338-39 (2021) (citations omitted).

As stated in Point IV.C., *supra*, the Liquidation Trustee is required to "make clear which

claims were being asserted specifically against which defendants, and the specific factual basis for

each claim against each defendant, as well as the specific relief being sought and the grounds for

that relief" and cannot make generalized assertions of wrongdoing against a grouping of

defendants without explaining which defendant engaged in what activity.  *Schiano v. MBNA*, 2013

U.S. Dist. LEXIS 81440, 2013 WL 2452681, at *7 (D.N.J. Feb. 11, 2013); *see Swift v. Pandey*,

2013 U.S. Dist. LEXIS 93245, at *10 (D.N.J. July 1, 2023).  Count XII alleges that "CFA Review

Services, LLC, CFA Tax Services, LLC, and [Joseph] Cipolla breached the October 2021

Agreements…." Compl., ¶ 205.  In a single breach of contract claim, the Liquidation Trustee

inappropriately maintains that three (3) different defendants each breached two independent

contracts, effectively alleging five (5) distinct charges under one count.  The Liquidation Trustee's

cluster violates all notions of an adequate pleading under Rule 8(a)(2).

The Liquidation Trustee also failed to plead each element of a breach of contract claim. *First,* the Complaint does not, nor could it, allege that NRIA complied with both the CFA Review Agreement and CFA Tax Agreement. Bankruptcy Case ECF No. 942 at 81 (pre-petition arbitration commenced by certain Cipolla Defendants due to NRIA's breach of the CFA Review Agreement and CFA Tax Agreement). *Second*, the Liquidation Trustee has not identified one or more provisions in either the CFA Review Agreement or CFA Tax Agreement that CFA Review or CFA Tax, respectively, violated. *Third*, the Complaint does not contain a single allegation with respect to CFA Tax's breach of the CFA Tax Agreement. As discussed below, the lone allegation in the Complaint with respect to breach of contract pertains only to CFA Review. Thus, the Complaint is facially deficient because it does not viably allege a breach of contract claim.

Rather, to support its breach of contract claim, the Liquidation Trustee relies on the lone allegation that:

> Immediately after executing the agreements, Cipolla informed NRIA that the tax and review work could not begin until other work was first performed (and most shockingly, paid for separately and not out of the new $4.61 million retainer)— a fact not previously disclosed to NRIA management. According to Cipolla, this additional work was not covered by the $4.61 million retainer.

Complaint, ¶ 96 (relying on <u>Exhibit CC</u> to the Complaint, which only references the CFA Review and is silent as to CFA Tax). The Liquidation Trustee, however, proves itself wrong because the CFA Review Agreement expressly provides that "our review engagement shall not commence until financial statements and related footnotes are produced by Client in substantially complete form for any of the reporting periods." Compl., <u>Exhibit U</u> at 13; Compl., <u>Exhibit T</u> at 11 ([The CFA Tax] engagement shall not commence until financial statements are related footnotes are produced by Client in substantially complete form for the 2020 year.").

Furthermore, as the Complaint recognizes, the $3.36 million flat fee under the CFA Review Agreement was allocated between the seven (7) reporting periods (*i.e.*, $625,000 per review

period).  Likewise, the $1.25 million flat fee under the CFA Tax Agreement was allocated between

the 2020 and 2021 tax years (*i.e.*, $625,000 per year).  Neither agreement provided for "other

work," which, contrary to paragraph 96 of the Complaint, NRIA was well aware at the time it

agreed to enter the October 2021 Agreements.

The Complaint also fails to plausibly allege that NRIA suffered losses.  The Complaint's

conclusory statement that "NRIA suffered monetary losses … including the $4.61 million" is,

again, contradicted by the express provisions of October 2021 Agreements.  The October 2021

Agreements, which are binding and valid contracts, provided that the fees were refundable to

NRIA *unless*:

> … (iv) *Client terminates the engagement* on the basis of any reason other
> than CFA's failure to timely issue a review report; or (v) such fee is non-
> refundable should you *or the Fund or NRIA later decide or determine that
> any or all of the services contemplated by this agreement are not desired or
> required*, or should we withdraw from this engagement because we are
> unable to perform due to circumstances beyond our control."

Compl., <u>Exhibit U</u> (emphasis added); *see also* Compl., <u>Exhibit T</u> (similar).  The Liquidation

Trustee, therefore, cannot prove that the $4.61 million was "lost by NRIA" because NRIA agreed

that such fees were nonrefundable.[20]

Counts XII alleges that Joseph Cipolla, in his individual capacity, breached both the CFA

Review Agreement and the CFA Tax Agreement.  However, the Joseph Cipolla was not a party to

either contract and, as a matter of law, could not have breached either contract.  *See* Compl.,

---

[20] The Liquidation Trustee seeks punitive damages on its breach of contract claim.  Compl., ¶ 207.
It is black-letter law that punitive damages are unavailable on a breach of contract claim. *Lightning
Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1194 (3d Cir. 1993) (punitive damages are not recoverable
under New Jersey law for breach of contract); *Cummings v. Premier Rehab Keller, PLLC*, 596
U.S. 212, 221-22 (2022) ("It is hornbook law that . . . punitive damages are generally not available
for breach of contract." (citations omitted)).  Accordingly, the Court should dismiss Count XII
with respect to the request for punitive damages, assuming, *arguendo*, Count XII even states a
claim for breach of contract in the first place.

Exhibit T and Exhibit U.  Therefore, to the extent, if any, that the Complaint states a viable claim

for breach of contract, Count XII must be dismissed as against Joseph Cipolla with prejudice.

## XII.   COUNT XIII (DISALLOWANCE OF CLAIMS) MUST BE DISMISSED

Count XIII of the Complaint seeks to disallow, pursuant to section 502(d) of the

Bankruptcy Code, claims asserted by "All Defendants" against the Debtors.  The Liquidation

Trustee's section 502(d) claim is premature.  "[S]ection 502(d) is triggered only after a judgment

has been entered requiring turnover of property to the estate."  *DHP Holdings II Corp. v. Home*

*Depot, Inc*, 435 D.R. 264, 272 (Bankr. D. Del. 2010) (citing *In re Odom Antennas, Inc*., 340 F.3d

705, 708 (8th Cir. 2003)).  The "purpose of section 502(d) is to ensure compliance with judicial

orders" after an entity is adjudged liable and does not provide affirmative relief of any kind.

*Sikirica v. US Foods, Inc*., 500 B.R. 729, 738-39 (Bankr. W.D. Pa. 2013) (dismissing 502(d) claim

as premature because defendant had not yet been found liable).  The Cipolla Defendants have not

been found liable—rendering section 502(d) unavailable to the Liquidating Trustee.

Moreover, as the Complaint fails to state a single viable claim for relief, the Liquidation

Trustee's request for disallowance of "any and all claims that Defendants may assert in these

Chapter 11 Cases" (Compl., ¶ 214)  need not be raised in an adversary proceeding (*see* Bankruptcy

Rule 7001) and should be brought by motion in the Bankruptcy Case (*see* Bankruptcy Rule 3007).

Accordingly, Count XIII of the Complaint must be dismissed.

## XIII.   COUNT XIV (EQUITABLE SUBORDINATION) MUST BE DISMISSED

Count XIV of the Complaint seeks to equitably subordinate the claims of  "All Defendants"

"to the claims of the Debtors' general unsecured creditors and Investors."  Compl., ¶ 216.  Three

conditions must be satisfied before exercise of the power of equitable subordination is appropriate:

"(1) [t]he claimant must have engaged in some type of inequitable conduct; (2) [t]he misconduct

must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on

the claimant; and (3) [e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code]." *Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*, 554 F.3d 382 (3d. Cir. 2009); s*ee also United States v. Noland*, 517 U.S. 535, 538-39, 116 S. Ct. 1524, 134 L. Ed. 2d 748 (1996).

"A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991). On the other hand, "[i]f the claimant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary." *In re Winstar Communs., Inc.*, 554 F.3d at 412 quoting *In re Fabricators, Inc.*, 926 F.2d at 1465.

Whether or not the Liquidation Trustee can satisfy the three-prong test set out in *Winstar Communs.*, he cannot subordinate the Cipolla Defendants' claims below Investors' interests. The Third Circuit in *In re Winstar Communs., Inc.* found a clear distinction in section 510(c) of the Bankruptcy Codebetween claims and interests such that creditors' claims may not be equitably subordinated to equity interests. *Id.* at 414 (*quoting* COLLIER ON BANKRUPTCY at § 510.05 ("Under subsection (c)(1), claims may be subordinated to claims, and interests may be subordinated to interests, but claims may not be subordinated to interests.")). Yet, that is exactly what the Liquidation Trustee is trying to do here. The Liquidation Trustee wants to subordinate the Cipolla Defendants' claims below investors' interests and that relief is not available under section 510(c) on the Bankruptcy Code. Therefore, Count XIV must be dismissed.

## XIV.   COUNT XV (UNJUST ENRICHMENT) MUST BE DISMISSED

Count XV of the Complaint fails to adequately plead a claim for unjust enrichment and must be dismissed. The claim for unjust enrichment is asserted against "[a]ll Defendants," yet the claim does not allege how each of the Cipolla Defendants was unjustly enriched. Paragraph 221 of the Complaint asserts that "[e]ach of CFA Review Services, CFA Tax Services and Joseph

Cipolla were enriched and received economic benefits without justification as a result of their conduct, including but not limited to their receipt of the $4.61 million retainers." Notwithstanding the fact that $4.61 million was never a retainer, Joseph Cipolla is not a party to the October 2021 Agreements and the fee payments under those agreements were made to the contracting parties, CFA Review Services and CFA Tax Services. Joseph Cipolla must be dismissed.

Moreover, unjust enrichment is not an independent theory of liability, but is the basis for a claim of *quasi*-contractual liability. *National Amusements, Inc. v. New Jersey Turnpike Authority*, 261 N.J. Super. 468, 478 (N.J. Super. 1992) (*citing Callano v. Oakwood Park Homes Corp*., 91 N.J. Super. 105, 108, 219 A.2d 332 (App. Div. 1966)). "Recovery on the theory of *quasi*-contract was developed under the law to provide a remedy where none existed." *Callano*, 91 N.J. Super at 110. In *Callano*, the Appellate Division held that:

> Contracts implied by law, more properly described as *quasi* or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice. They rest solely on a legal fiction and are not contract obligations at all in the true sense, *for there is no agreement*; but they are clothed with the semblance of contract for the purpose of the remedy, and the obligation arises not from consent, *as in the case of true contracts*, but from the law or natural equity. Courts employ the fiction of *quasi* or constructive contract with caution. 17 *C.J.S. Contracts § 6, pp.* 566-570 (1963).

> In cases based on *quasi*-contract liability, the intention of the parties is entirely disregarded, while in cases of express contracts and contracts implied in fact *the intention is of the essence of the transaction. In the case of actual contracts the agreement defines the duty, while in the case of quasi-contracts the duty defines the contract.*

*Callano*, 91 N.J. Super. at 108 (emphasis added).

The October 2021 Agreements are express contracts that not only show the intention of the parties, they unambiguously created the duty for NRIA to make the payments that go to the heart of this litigation. *See* Exhibit T at 5, Exhibit U at 7. The October 2021 Agreements explicitly stated that the fees paid would not be refunded if "(iv) Client terminates the engagement on the

basis of any reason other than CFA's failure to timely perform; or (v) such fee is non-refundable should you or the Fund or NRIA later decide or determine that any or all of the services contemplated by this agreement are not desired or required …," *See* <u>Exhibit T</u> at 6, <u>Exhibit U</u> at 7 (similar).

Assuming, *arguendo*, that the Litigation Trustee could prove a substantive claim of unjust enrichment, the trustee would still not recover under a theory of *quasi*-contractual liability. "Restitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law." *National Amusements*, 261 N.J. Super. at 478.   Here, an adequate remedy at law exists.  The Liquidation Trustee can and has asserted a claim for breach of contract in connection with the October 2021 Agreements.  Compl., at 43.

It is important to keep in mind that NRIA was not an unsophisticated consumer negotiating with a professional accounting firm.  NRIA was a sophisticated business entity with counsel at the time it executed the October 2021 Agreements.  The Court cannot reform the parties' written contracts absent mutual mistake and there has been no allegation of mutual mistake in the Complaint.  *See Fox v. State Farm Fire & Cas. Co*., 2021 U.S. Dist. LEXIS 184787, *16 (D.N.J. Sept. 24, 2021) (under New Jersey law, "a court may reform a contract if it 'was created by the negotiations of the parties, but by mutual mistake is wanting in formal expression or execution, so as to evince the actual intent of the parties.'" *Id*. (quoting *Ill. Nat. Ins. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011) (quoting *Gross v. Yeskel*, 100 N.J. Eq. 293, 134 A. 737, 737 (N.J. Eq. 1926))).

Because of the existence of the October 2021 Agreements that required the payment of the fees at issue here, this is not a case of *quasi* contract and the Liquidation Trustee's unjust enrichment claim must be dismissed.

## <u>CONCLUSION</u>

**WHEREFORE**, for the reasons set forth above, the Cipolla Defendants respectfully request that the Court enter the Order, submitted herewith, dismissing the Complaint with prejudice.

Respectfully submitted,

Dated:  April 25, 2024                                    **GIBBONS P.C.**
Newark, New Jersey

By: */s/ Robert K. Malone*
    Robert K. Malone, Esq.
    Mark B. Conlan, Esq.
    Christopher P. Anton, Esq.
    Kyle P. McEvilly, Esq.
    One Gateway Center
    Newark, NJ 07102
    Telephone:  (973) 596-4500
    Email: rmalone@gibbonslaw.com
            mconlan@gibbonslaw.com
            canton@gibbonslaw.com
            kmcevilly@gibbonslaw.com

*Attorneys for the Cipolla Defendants*

# Exhibit A

(Executed Copy of Exhibit T – CFA Tax Services LLC Engagement Agreement)

# CFA Tax Services, LLC

851 Franklin Lake Rd.
Franklin Lakes, New Jersey 07417

**Joseph P. Cipolla, Jr.**
**Direct: 201-490-1117**

October 25, 2021

**Via Email**
Rey Grabato, CEO
National Realty Investment Advisors, LLC
1 Harmon Plaza, 9Th Floor
Secaucus, New Jersey 07094

RE: December 31, 2020 and December 31, 2021 Income Tax Compliance Services

Gentlemen:

You[1] have requested that we, CFA Tax Services, LLC ("CFA," "us," "we," or "our"), perform a two year income tax return compliance engagement with respect to the consolidated group of National Realty Investment Advisors, LLC ("NRIA"), including its controlled affiliates, NRIA Partners Portfolio Fund I, LLC including its investee entities ("the Fund"), and other affiliates controlled by NRIA (collectively the "Companies"). This confirms our acceptance and our understanding of this engagement by means of this letter, which also serves to document our respective understanding regarding the scope, rights, obligations, responsibilities and limitations of our engagement, including but not limited to:

1. Our affiliate, CFA Review Services, LLC, shall also perform the additional services of a 2018-March 31, 2022 review engagement for the Companies. These review services shall be pursuant to a separate engagement letter and are not within the scope of this income tax compliance engagement; Thomas Fierro, CFO is the Client Supervisor Liaison for these "Review Services."[2] Moreover, our affiliate, Cipolla & Co., LLC has been and shall continue to render Kovel forensic accounting services pursuant to a separate Kovel engagement letter with legal counsel; Thomas Fierro, CFO and John Collins, SVP are the Client Supervisor Liaisons[1] for these "Kovel Services."

---

[1] "You" and "Client" includes but is not limited to, the Companies, including NRIA in its capacity as manager for the Companies, and NRIA's 80% owner, Rey Grabato, with the specific reservation that we shall not render tax return compliance services to Mr. Grabato or other entities he may control.

[2] The Client Supervisor Liaison(s) is(are) responsible for evaluating the adequacy and results of the services performed and accepting responsibility for such services.

---

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 2 of 11

Thomas Fierro, CFO is the Client Supervisor Liaison[1] for this tax engagement performed by CFA Review Services, LLC. It is specifically acknowledged by Client that all fees previously paid to any CFA affiliate by Client are reasonable and Client hereby irrevocably waives any claim or cause action with respect to previously rendered services by any CFA affiliate.

2. You agree, acknowledge and represent that NRIA is the party financially responsible for the payment of our fees and that such payment of our fees is from NRIA's own funds and/or NRIA's own equity. You agree that this engagement will not be funded in any part by Fund investor funds and/or equity, and we cannot enter into this engagement if you do not agree to this fact.

3. We do not assume management responsibilities when providing non-attest services, such as, the income tax return compliance services contemplated by this engagement letter; we understand, and you must ensure, that you have made and will make informed judgments regarding the results of these non-attest services.

4. We shall establish and document in writing our understanding with you regarding any limitations of the engagement.

5. We understand that the person(s) designated by management to oversee our non-attest services understands the nature of the service being rendered.

**Our Responsibilities**

We shall work with Client's personnel to timely identify all Companies and all income taxing jurisdictions for which federal, state and local income tax return filing obligations exist for the tax years ended December 31, 2020 and 2021. We shall work with your accounting department to ensure to the best of our ability that all income tax return filing extensions and all income tax returns, to the extent not past-due, are timely filed in strict accordance with applicable income federal, state and local tax laws, regulation and other substantial authority. To the extent not clear, Client agrees that all tax return filing positions shall be conservatively interpreted for purposes of the preparation of the Companies' income tax returns.

We, in our sole professional judgment, reserve the right to refuse to perform any procedure or take any action that could be construed as assuming management responsibilities, since performing those procedures or taking such action would impair our independence. We may and shall assume that all information and documents we rely on are complete and accurate, including but not limited to documents and information provided by you or the Companies' personnel. We have no obligation to audit or investigate any information that we rely upon. This engagement is not designed to identify fraud, irregularities or noncompliance with any law or regulation, although we will bring to your attention any issues of this nature with respect to which we become aware.

This engagement does not include tax research, planning or consulting, assistance with tax audits and notices, assistance or responsibility with respect to sales and use tax, payroll tax, preparation of Forms W-3/W-2 or Forms 1096/1099, or any other compliance or advisory service whatsoever.

*Specializing in financial statement review services*

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 3 of 11

## Your Responsibilities

This engagement is to be performed and conducted on the basis that you acknowledge and understand that our role is to prepare, as accurately as possible and on a timely basis to the extent possible, the referenced income tax returns in accordance with applicable laws and other substantial authority. You have the following overall responsibilities that are fundamental to our undertaking the engagement:

1. The selection of accounting principles generally accepted in the United States of America as the financial reporting framework to be applied in the preparation of the financial statements.

2. The design, implementation, and maintenance of internal controls relevant to the preparation and fair presentation of the financial statements.

3. The prevention and detection of fraud.

4. To ensure that the entity complies with the laws and regulations applicable to its activities.

5. The accuracy and completeness of the records, documents, explanations, and other information, including significant judgments, you provide to us for the engagement.

6. To provide us with:
   a. Documentation, and other related information that is relevant to the preparation of the income tax returns,
   b. Additional information that may be requested for the purpose of the preparation of the income tax returns, and
   c. Unrestricted access to persons within the Companies with whom we determine it necessary to communicate.

7. The preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America and the inclusion of all informative disclosures that are appropriate for accounting principles generally accepted in the United States of America, as well as informative disclosures that may exceed those required by GAAP, determined at our discretion. Informative disclosures include, but are not limited to, subsequent events, such as governmental investigations, responses thereto, litigation and contingences related thereto and disclosure regarding *going concern*, including but not limited to, for example, the extent to which governmental investigations or the results thereof may prevent the execution of an established business model or cause a premature winding-up of the Fund's and/or NRIA's activities.

8. To provide us, at the conclusion of the engagement, with a letter that confirms certain representations made during the engagement. This will include, among other representations, that Fund investor funds and/or equity was not used to pay our fees.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 4 of 11

9. To ensure that you, your employees, agents, advisors and legal counsel, including but not limited, members of joint defense counsel in connection with any governmental investigations, accurately, truthfully and comprehensively comply with any reasonable request for information and documents regarding any matter, including governmental investigations and legal proceedings; such requests for information may be required by us to be made in writing, e.g., legal representation and/or opinion letter(s).

At the conclusion of this engagement you will be required to represent in writing, among other representations, that you are aware and have fulfilled the above responsibilities and the following responsibilities:

1. That management has responded fully and truthfully to all of CFA's inquiries;

2. That all transactions have been recorded and are reflected in the financial statements;

3. That management has disclosed to CFA its knowledge of fraud or suspected fraud affecting the entity involving:
   a. management,
   b. employees who have significant roles in internal control, or
   c. others when the fraud could have a material effect on the financial statements;

4. That management has disclosed to CFA its knowledge of any allegations of fraud or suspected fraud affecting the entity's financial statements communicated by employees, former employees, regulators, or others;

5. That management has disclosed to CFA all known instances of noncompliance or suspected noncompliance with laws and regulations whose effects should be considered when preparing financial statements;

6. About whether management believes that the effects of uncorrected misstatements are immaterial, individually and in the aggregate, to the financial statements as a whole: a summary of such items should be included in, or attached to, the written representation;

7. About whether management believes that significant assumptions used by it in making accounting estimates are reasonable;

8. That management has disclosed to CFA the identity of the entity's related parties and all of the related party relationships and transactions of which it is aware and it has appropriately accounted for and disclosed such relationships and transactions;

9. That all events occurring subsequent to the date of the financial statements and for which the applicable financial reporting framework requires adjustment or disclosure have been adjusted or disclosed to us; and

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 5 of 11

10. Any other matter or issue that we deem appropriate in our sole discretion.

You agree that the Companies' income tax returns shall be prepared in strict accordance with applicable laws and other substantial authority as determined by us. If, for any reason, determined at our sole discretion, we are unable or unwilling to complete the engagement, we will not do so. For example, if Client insists upon filing income tax returns that are not in complete compliance with applicable laws and other substantial authority, or there are issues or deficiencies with respect to the management representations and/or opinions determined in our sole discretion, we may withdraw and, as set forth below, any fees paid shall, in such limited circumstances, not be refunded.

Unless required by law or regulation to provide a third party with a copy of CFA's written communications with those charged with governance, we require the prior written consent of management or those charged with governance before doing so.  Moreover, the distribution of any income tax returns we prepare shall in each and every instance require our prior written consent unless required by law, regulation or pursuant to government inquiry or investigation, and unless we agree in writing otherwise.

**Other Relevant Information**

We will schedule the engagement based in part on the availability of your key personnel, deadlines, and working conditions. We will plan the engagement based on the assumption that your personnel, agents and counsel will cooperate and provide assistance by performing tasks such as preparing requested representation letters, schedules, retrieving supporting documents. If for any reason your personnel are unavailable to provide the necessary assistance in a timely manner, it may substantially increase the work we must do to complete the engagement within the established deadlines, resulting in an increase in fees.  One significant consideration is the timing of the completion of the bookkeeping, financial statements and footnote disclosures by you.

Albert Manzo, CPA and Kallie Knebl, CPA are responsible for supervising the engagement and signing the income tax returns or authorizing another individual to sign them.

Fee & Costs:  Our fee for these services is $625,000 for 2020 and $625,000 for 2021, which must be paid in advance.  It is specifically acknowledged by all parties to this agreement that CFA's scope of service includes two separate tax years enumerated herein and that CFA has not and would not agree to undertake a narrower scope of service, e.g., an engagement for only 2020. Should either you or CFA terminate this engagement prior to the completion of the engagement, any unused portion of the fee determined based upon a percentage of completion with equal dollar value assigned to each year ($625,000 per year) shall be refunded upon your request, within a reasonable period of time, unless one or more of the following circumstances occurs:  (i) Client is unwilling or unable to fulfill its responsibilities detailed above; (ii) Client insists upon tax or accounting and financial statement reporting positions that are not in accordance with the law or GAAP and/or with which we do not agree; (iii) Client fails to make full and complete disclosures in footnotes to the financial statements that are determined to be appropriate in our sole discretion

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 6 of 11

regardless of whether those disclosures; (iv) Client terminates the engagement on the basis of any reason other than CFA's failure to timely perform; or (v) such fee is non-refundable should you or the Fund or NRIA later decide or determine that any or all of the services contemplated by this agreement are not desired or required, or should we withdraw from this engagement because we are unable to perform due to circumstances beyond our control. It is not contemplated, nor are we required, to provide detailed billings as this engagement is priced at a fixed fee of $1,250,000, or $625,000 per reporting period. Reasonable out-of-pocket expenses, including but not limited to research and/or consulting costs, shall be invoiced separately. Our fee also does not include our time or any of our affiliates' time with respect to any pending, threatened or actual litigation, or with respect to any regulatory or governmental investigations, or any proceeding requiring our time and resources, or that of our affiliates or owners, arising from this engagement or any engagement between any CFA affiliate and any of you or your legal counsel, at the rates set forth above. which shall be invoiced at the following hourly rates invoiced at no less than one-quarter (1/4) of an hour, and increased from time to time but no less frequently than January 1 of each year:

| | |
|---|---|
| Joseph Cipolla | $1,200 |
| Principal | $900 |
| Experienced Manager | $800 |
| Manager | $595 |
| Experienced Staff Assoc. | $395 |
| Staff Associate | $335 |
| Paraprofessional | $195 |

While we acknowledge that Client has undertaken major, positive transformative changes in the last six months, including but not limited to the wholesale restructuring of the accounting department with qualified, experienced CPAs of integrity, new compliance counsel, a new CFO, a new Fund administrator and general manager, and other counselors and advisors, the Fees & Costs and Release, Hold-Harmless & Indemnification provisions of this agreement have been determined based upon all of the facts and circumstances including the following considerations:

1.  The considerable time and resources expected to be expended on this engagement, including the negative impact on other existing clients and client relationships due to the lack of availability. This necessitates a significant premium above what may be perceived to otherwise be a reasonable fee, as well as the other assurances and terms of this agreement.

2.  This engagement involves multi-year litigation risk (subpoenas, law suits, testimony, adverse expert, etc.[3] for potentially five to 15 years) from various potential adverse parties including the Department of Justice, the Securities Exchange Commission, the New Jersey Attorney General, investors, etc. This risk necessitates a higher fee because it is unclear and cannot be quantified or determined with any degree of certainty the extent of future costs, fees and lost fees from other client engagements (now and potentially into the distant

---

[3] Including potentially becoming embroiled in legal proceedings having little or nothing to do with the quality of our work.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 7 of 11

future) relating to this this engagement will arise. This uncertainty and risk also necessitate this multi-period engagement and the terms upon which our fee shall be refundable.

3. The withdrawal by and refusal of other firms to perform these services based upon the risk profile.

4. Reputation risk, including as a result of potentially becoming embroiled in legal proceedings (or the subject of investigative journalism which may present us in an unflattering, misinformed light) having little or nothing to do with the quality of our work.

5. Lack of adequate professional liability insurance protection under the circumstances, the cost of which will undoubtedly increase as a result of this engagement.

6. The various ongoing investigations and responses thereto by the Company(ies) and/or their owners and managers.

7. Other considerations.

Release, Hold-Harmless & Indemnification: You agree to hold us, including, but not limited to our affiliates, present and former members, managers, partners, owners, principals, directors, employees, subcontractors, agents, parent organizations and subsidiaries (collectively referred to as "Representatives"), harmless and to release, indemnify, defend and/or reimburse, us for and/or from any liability or costs, including but not limited to our attorneys' fees, our own professional time at the rates shown above as adjusted from time to time, expert fees, and consulting expert fees (including those services by a CFA affiliate at the billing rates described above) resulting from our good-faith conduct, or resulting from management's knowing misrepresentations to us or related to our good faith conduct; the foregoing applies to potential claims, causes of action or proceedings by you, third-parties, any federal, state or local government or agency, or any other litigation or proceeding in connection with this engagement, broadly construed, including litigation or actions we may feel compelled to initiate to protect our interests at our sole discretion. You also agree to hold Representatives harmless and to release, indemnify, defend and/or reimburse Representatives, from any liability, damages, fees, expenses and costs, including our attorneys' fees, our time at rates disclosed herein, expert fees, and consulting expert fees (including those services by a CFA affiliate) associated with any third-party claims arising from or relating to: (i) the Companies' material misrepresentations; (ii) false or materially incomplete and/or misleading information provided by you and any of the Companies' personnel, agents and counsel to us in the performance of its services to the Companies. You may not settle a claim without our consent, such consent not to be unreasonably withheld. Representatives shall not be liable to you or any other party, whether a claim be in tort, contract or otherwise, for any damages, including any direct, indirect, consequential, incidental, lost profit, punitive or similar special damages, relating to our services provided under this agreement or any other agreement between any CFA affiliate and the Fund, its owners, NRIA, its owners and/or legal counsel and/or any of the Companies or their owners and/or managers. The indemnification and hold-harmless provisions of this engagement letter shall also specifically apply to all engagement letters between any CFA affiliate and you, collectively or separately.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 8 of 11

Dispute Resolution: If a dispute or claim arises out of or relates to the engagement described herein, Client and Representatives agree to settle such dispute between them or claim by arbitration administered by the American Arbitration Association ("AAA") under its Arbitration Rules for Professional Accounting and Related Services Disputes ("Arbitration Rules") using three arbitrators with all AAA fees and other arbitration/litigation costs, including, but not limited to, arbitrator costs, all AAA administrative fees and costs, transcription costs, our reasonable attorney fees (including our legal contingency fees incurred), expert, expert consulting and forensic accounting fees (including but not limited to CFA and CFA affiliate forensic accounting and expert time[4]) and our professional time incurred by virtue of being a party to this or any legal proceeding at rates for this engagement as adjusted from time to time, chargeable to and payable by Client as costs and fees arise and are invoiced. Client and Representatives agree to this exclusive remedy, and to be bound by the results of arbitration. Client and Representatives acknowledge they had the right to consult, and in fact consulted, independent legal counsel regarding this agreement and this provision and expressly acknowledge and agree that by this provision each is waiving and relinquishing its respective right to a jury trial in any and all disputes, including with respect to fees, between the parties related to this agreement or the professional services to be rendered hereunder. Client and Representatives agree that any such arbitration hearing will be conducted remotely and virtually via Zoom or another similar video conferencing platform. The arbitration panel shall have no authority to award non-monetary or equitable relief. The arbitrators' decision shall be final and judgment may be immediately entered of the arbitrator's award in any court having jurisdiction and the signatories hereto agree to waive their right to appeal and that no appeals of the arbitrator's decision and award shall be taken. To the extent Client fails to pay any costs described in this paragraph on a timely basis, interest shall be charged at default interest rates described in this agreement.

Client agrees not to challenge the enforceability of this agreement in a court of law and proceed to arbitration without delay in the event of a dispute. In the event a party fails to proceed with arbitration, unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other party is entitled to costs of suit, including, but not limited to reasonable attorney fees, our associated professional fees at rates for this engagement as adjusted from time to time, including but not limited to forensic accounting and expert fees, etc. for having to compel arbitration or defend or enforce the award.

Client shall be responsible for and pay all reasonable costs of all disputes and litigation (including our costs), regardless of whether claims or counter-claims have been asserted against us, including but not limited to attorney fees, our time at this engagement's rates as adjusted from time to time, arbitration filing fees, arbitrator fees, arbitrator or/and court costs, expert fees and expert consulting costs to compel arbitration,[5] costs of litigation regarding the enforceability of

---

[4] Expert time and costs may be for CFA or one of its affiliates rendering expert, consulting expert and/or forensic accounting services at rates described in this engagement letter.

[5] Costs to compel arbitration include, but are not limited to, attorney fees, our time at this engagement's rates as adjusted from time to time, including but not limited to forensic accounting and expert fees, arbitration filing fees, arbitrator fees, arbitrator and/or court costs, etc., as well as default interest thereon.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 9 of 11

this engagement letter, [6] and default interest thereon at 1-1/2% per month, or fraction thereof, from the date the invoice is rendered until payment in full is received. Representatives shall be entitled to file a Uniform Commercial Code lien/security interest with respect to any unpaid fees or costs.

No Recording: Conversations with Joseph Cipolla and those he supervises shall not be recorded without our prior written consent.

## Engagement Limitations

1.  CFA is not a law firm. None of the services that we shall render shall be construed to be legal advice. In all matters requiring such a determination, we shall rely exclusively upon your attorney's determination rendered in the circumstances. In all other matters requiring an interpretation of, or application of, any federal and/or state statute, rule, regulation, court case, etc. with respect to this matter, we shall defer to your attorney. Notwithstanding the foregoing, we may review case law, statutes, rulings, legal articles and the like in the course of our work.

2.  None of the services that we shall provide are designed to investigate or discover fraud and/or other illegal activity. In the event that we discover fraud and/or other illegal activity, we shall promptly bring that matter to the attention of you or your attorney and take such other steps as may be appropriate under the circumstances.

3.  CFA shall be entitled to assume, without independent verification, that all representations, assumptions, information and data supplied by you, your personnel, agents and counsel will be complete and accurate to the best of your and/or their knowledge. CFA may use information and data furnished by others; however, CFA shall not be responsible for, and CFA shall provide no assurance regarding, the accuracy of any such information or data. Except as specifically provided, CFA shall not assume any responsibility for any financial reporting with respect to the services provided hereunder. You shall be responsible for all financial information and statements provided with respect to any services performed hereunder. CFA shall have no responsibility to address any legal matters or questions of law. CFA has not nor will we audit or compile the financial information provided to us and, accordingly, we express no audit opinion regarding this information.

4.  Workpapers. The workpapers prepared for this engagement are the property of CFA and constitute confidential information. All information and materials of any form or description collected by us in the course of our engagement shall constitute our work files and will at all times, during and after completion of our engagement, remain in our

---

[6] Costs of litigation regarding the enforceability of this engagement letter include, but are not limited to, attorney fees, our time at this engagement's rates as adjusted from time to time, including but not limited to forensic accounting and expert fees, arbitrator filing fees, arbitrator fees, arbitration and/or court costs, etc., as well as default interest thereon.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 10 of 11

exclusive possession. We shall have unlimited discretion to retain, discard, or dispose of our work files but will at all times maintain all information and materials provided to us in strictest confidence. Under our current retention policy, the workpapers for this engagement will be retained for seven (7) years.

5.    Applicable Law. All questions concerning the construction, validity, enforcement and interpretation of this agreement shall be governed by, and construed in accordance with, the laws of the State of New Jersey, without giving effect to any choice of law or conflict of law rules or provisions of any other jurisdiction that would cause the application of the laws of any other jurisdiction other than the State of New Jersey. In furtherance of the foregoing, the internal law of the State of New Jersey shall control the interpretation and construction of this agreement even though under some other jurisdiction's choice of law or conflict of law analysis, the substantive law of that other jurisdiction would ordinarily apply.

6.    Severability. Whenever possible, each provision of this agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this agreement is held to be invalid or unenforceable in any respect under any applicable law or rule in the State of New Jersey, this agreement shall be reformed, construed and enforced as if such invalid or unenforceable provision had never been contained herein.

7.    Waiver. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

8.    Execution. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument. Each counterpart may be delivered by facsimile signature and a faxed or signature via electronic mail shall have the same force and effect as an original signature.

Please initial each page, sign and return the attached copy of this letter to indicate your acknowledgement of, and agreement with, the arrangements for our engagement to perform 2020 and 2021 income tax compliance services described herein and our respective responsibilities. Moreover, our engagement shall not commence until financial statements and related footnotes are produced by Client in substantially complete form for the 2020 year.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 11 of 11

Very truly yours,

**CFA Tax Services, LLC**


_____
 Joseph P. Cipolla, CPA/ABV/CFF/PFS, CFE
 Member of the Firm

**IN WITNESS WHEREOF**, this Agreement, consisting of eleven (11) pages has been read and
signed by the individuals listed below on dates set forth below:

*I have read, understand and agree to the scope and
terms of CFA's engagement as set forth hereinabove.
This agreement shall be governed by and construed in
accordance with the laws of the State of New Jersey
without giving effect to any choice of law or conflict
of law rules or provisions of any other jurisdiction
that would cause the application of the laws of any
other jurisdiction other than the State of New Jersey.
Should a dispute arise with respect to this agreement,
it is agreed that such dispute shall be resolved in
accordance with the Dispute Resolution provisions
contained herein, in accordance with the laws of the
State of New Jersey, and any rights that may exist to
pursue any other remedies, at law or in equity, in any
other venue, are waived.*


*Acknowledged and agreed on behalf of NRIA Partners Portfolio Fund I, LLC & National
Realty Investment Advisors, LLC, their controlled affiliates, investees, owners and managers:*


_____                    10/26/21
 Rey Grabato, NRIA Owner & CEO                       Date
 (Financially Responsible Party:  NRIA)
 *However, Mr. Grabato agrees to personally
 hold Mr. Cipolla harmless, consistent with page
 7.*                                                _____ 10/26/21
Copy:  Thomas Fierro, CPA, CFO                       GLENN LA MATTINA
                                                     CHIEF OPERATING OFFICER
     Brian Casey, NRIA PPFI, LLC

# EXHIBIT B

(Executed Copy of Exhibit U – CFA Review Services LLC Engagement Agreement)

# CFA Review Services, LLC

851 Franklin Lake Rd.
Franklin Lakes, New Jersey 07417

Joseph P. Cipolla, Jr.
Direct: 201-490-1117

October 25, 2021

**<u>Via Email</u>**
Rey Grabato, CEO
National Realty Investment Advisors, LLC
1 Harmon Plaza, 9Th Floor
Secaucus, New Jersey 07094

RE: December 31, 2018 through March 31, 2022 Review Services

Gentlemen:

You[1] have requested that we, CFA Review Services, LLC ("CFA," "us," "we," or "our"), perform a multi-period review engagement with respect to the consolidated financial statements of National Realty Investment Advisors, LLC ("NRIA"), including its controlled affiliates, NRIA Partners Portfolio Fund I, LLC including its investee entities ("the Fund"), and other affiliates controlled by NRIA (collectively the "Companies") which comprise the balance sheets as of:

1. December 31, 2018;
2. December 31, 2019;
3. December 31, 2020;
4. June 30, 2021;
5. September 30, 2021;
6. December 31, 2021; and
7. March 31, 2022

and the related statements of income, changes in owners' equity, and cash flows for the period then ended, and the related notes to the financial statements (the "Review Services"). This confirms our acceptance and our understanding of this engagement by means of this letter, which also serves to document our respective understanding regarding the scope, rights, obligations, responsibilities and limitations of our engagement, including but not limited to:

1. Our affiliate, CFA Tax Services, LLC, shall also perform the additional services of preparation of the 2020 and 2021 federal and state income tax returns for the Companies. These tax compliance

---

[1] "You" and "Client" includes but is not limited to, the Companies, including NRIA in its capacity as manager for the Companies, and NRIA's 80% owner, Rey Grabato.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 2 of 13

services shall be pursuant to a separate engagement letter and are not within the scope of this review engagement; Thomas Fierro, CFO is the Client Supervisor Liaison for these "Tax Services."[2]  Moreover, our affiliate, Cipolla & Co., LLC has been and shall continue to render Kovel forensic accounting services pursuant to a separate Kovel engagement letter with legal counsel; Thomas Fierro, CFO and John Collins, SVP are the Client Supervisor Liaisons[1] for these "Kovel Services."  Thomas Fierro, CFO is the Client Supervisor Liaison[1] for this review engagement performed by CFA Review Services, LLC.  It is specifically acknowledged by Client that all fees previously paid to any CFA affiliate by Client are reasonable and Client hereby irrevocably waives any claim or cause action with respect to previously rendered services by any CFA affiliate.

2.  You agree, acknowledge and represent that NRIA is the party financially responsible for the payment of our fees and that such payment of our fees is from NRIA's own funds and/or NRIA's own equity.  You agree that this engagement will not be funded in any part by Fund investor funds and/or equity, and we cannot enter into this engagement if you do not agree to this fact.  The same applies to the Escrow-Type Savings Account, described below, which is to be held in a segregated account for the benefit of NRIA as described hereinbelow.

3.  We do not assume management responsibilities when providing non-attest services; we understand, and you must ensure, that you have made and will make informed judgments regarding the results of these non-attest services.

4.  We shall establish and document in writing our understanding with you regarding any limitations of the engagement.

5.  We understand that the person(s) designated by management to oversee our non-attest services understands the nature of the service being rendered.

**Our Responsibilities**

The objective of our engagement is to obtain limited assurance as a basis for reporting whether we are aware of any material modifications that should be made to the financial statements in order for the statements to be in accordance with accounting principles generally accepted in the United States of America ("GAAP").

We will conduct our review engagement in accordance with Statements on Standards for Accounting and Review Services (SSARSs) promulgated by the Accounting and Review Services Committee of the AICPA and comply with the AICPA's Code of Professional Conduct, including ethical principles of integrity, objectivity, professional competence and due care.

A review engagement includes primarily applying analytical procedures to your financial data and making inquiries of Companies' management. A review engagement is substantially less in

---

[2] The Client Supervisor Liaison(s) is(are) responsible for evaluating the adequacy and results of the services performed and accepting responsibility for such services.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 3 of 13

scope than an audit engagement, the objective of which is the expression of an opinion regarding the financial statements as a whole. A review engagement does not contemplate obtaining an understanding of the entity's internal control; assessing fraud risk; testing accounting records by obtaining sufficient appropriate audit evidence through inspection, observation, confirmation, or the examination of source documents; or other procedures ordinarily performed in an audit engagement. Accordingly, we will not express an opinion regarding the financial statements.

Our engagement cannot be relied upon to identify or disclose any financial statement misstatements, including those caused by error or fraud, or to identify or disclose any wrongdoing within any entity or noncompliance with laws and regulations. However, we will inform the appropriate level of management of any material errors and of any evidence or information that comes to our attention during the performance of our review procedures that fraud may have occurred. In addition, we will report to you any evidence or information that comes to our attention during the performance of our review procedures regarding noncompliance with laws and regulations that may have occurred, unless they are clearly inconsequential or beyond the scope of our expertise given that we are not lawyers.

We, in our sole professional judgment, reserve the right to refuse to perform any procedure or take any action that could be construed as assuming management responsibilities, since performing those procedures or taking such action would impair our independence.

**Your Responsibilities**

The review engagement to be performed is conducted on the basis that you acknowledge and understand that our role is to obtain limited assurance as a basis for reporting whether we are aware of any material modifications that should be made to the financial statements in order for the statements to be in accordance with accounting principles generally accepted in the United States of America. You have the following overall responsibilities that are fundamental to our undertaking the engagement in accordance with SSARSs:

1. The selection of accounting principles generally accepted in the United States of America as the financial reporting framework to be applied in the preparation of the financial statements.

2. The design, implementation, and maintenance of internal controls relevant to the preparation and fair presentation of the financial statements.

3. The prevention and detection of fraud.

4. To ensure that the entity complies with the laws and regulations applicable to its activities.

5. The accuracy and completeness of the records, documents, explanations, and other information, including significant judgments, you provide to us for the engagement.

6. To provide us with:

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 4 of 13

<ul style="list-style-type: lower-alpha">
<li>a. Documentation, and other related information that is relevant to the preparation and presentation of the financial statements,</li>
<li>b. Additional information that may be requested for the purpose of the preparation of the financial statements, and</li>
<li>c. Unrestricted access to persons within all affiliated companies and controlled investees with whom we determine it necessary to communicate.</li>
</ul>

7.  The preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America and the inclusion of all informative disclosures that are appropriate for accounting principles generally accepted in the United States of America, as well as informative disclosures that may exceed those required by GAAP, determined at our discretion. Informative disclosures include, but are not limited to, subsequent events, such as governmental investigations, responses thereto, litigation and contingences related thereto and disclosure regarding *going concern*, including but not limited to, for example, the extent to which governmental investigations or the results thereof may prevent the execution of an established business model or cause a premature winding-up of the Fund's and/or NRIA's activities.

8.  To provide us, at the conclusion of the engagement, with a letter that confirms certain representations made during the review. This will include, among other representations, that Fund investor funds and/or equity was not used to pay our fees, and neither NRIA, nor the Fund, nor any of its controlled affiliates or investee companies have been advised by legal counsel or any federal or state regulatory agency that any of the Companies is required to register and/or is or has been subject to regulation and/or registration for any reporting period covered by this engagement letter by the Securities & Exchange Commission, the New Jersey Bureau of Securities or any other regulatory agency. In the event of such registration requirement or regulation, financial statements audited by a public accounting firm registered with and regulated by the Public Company Accounting Oversight Board (PCAOB) would be necessary for any such regulated entity; this engagement would not satisfy such requirement(s), nor can we perform an audit in such circumstances since we are not registered with PCAOB, nor do we intend to register with PCAOB or provide any audit services to companies regulated by the SEC or any similar state securities regulatory agency.

9.  To ensure that you, your employees, agents, advisors and legal counsel, including but not limited, members of joint defense counsel in connection with any governmental investigations, accurately, truthfully and comprehensively comply with any reasonable request for information and documents regarding any matter, including governmental investigations and legal proceedings; such requests for information may be required by us to be made in writing, e.g., legal representation and/or opinion letter(s).

10. To include CFA's review report in any document containing financial statements that indicates that such financial statements have been reviewed by us.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 5 of 13

In accordance with SSARS, at the conclusion of this engagement you will be required to represent in writing, among other representations, that you are aware and have fulfilled the above responsibilities and the following responsibilities:

1. That management has responded fully and truthfully to all of CFA's inquiries;

2. That all transactions have been recorded and are reflected in the financial statements;

3. That management has disclosed to CFA its knowledge of fraud or suspected fraud affecting the entity involving:
   a. management,
   b. employees who have significant roles in internal control, or
   c. others when the fraud could have a material effect on the financial statements;

4. That management has disclosed to CFA its knowledge of any allegations of fraud or suspected fraud affecting the entity's financial statements communicated by employees, former employees, regulators, or others;

5. That management has disclosed to CFA all known instances of noncompliance or suspected noncompliance with laws and regulations whose effects should be considered when preparing financial statements;

6. About whether management believes that the effects of uncorrected misstatements are immaterial, individually and in the aggregate, to the financial statements as a whole: a summary of such items should be included in, or attached to, the written representation;

7. That management has disclosed to CFA all known actual or possible litigation and claims whose effects should be considered when preparing the financial statements, and it has appropriately accounted for and disclosed such litigation and claims in accordance with the applicable financial reporting framework;

8. About whether management believes that significant assumptions used by it in making accounting estimates are reasonable;

9. That management has disclosed to CFA the identity of the entity's related parties and all of the related party relationships and transactions of which it is aware and it has appropriately accounted for and disclosed such relationships and transactions;

10. That all events occurring subsequent to the date of the financial statements and for which the applicable financial reporting framework requires adjustment or disclosure have been adjusted or disclosed; and

11. Any other matter or issue that we deem appropriate in our sole discretion.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 6 of 13

You are also responsible for including the following reference on each page of the financial statements including supplementary information: *"See Footnotes & Independent Accountant's Review Report."*

We will issue written reports upon completion of our review of NRIA and its consolidated affiliates financial statements. Our reports will be addressed to the board of directors of NRIA and/or NRIA including in its capacity as manager of the Fund, other consolidated affiliates and investee entities. We cannot provide assurance that an unmodified accountant's review report will be issued for any period. Circumstances may arise in which it is necessary for us to report known departures from accounting principles generally accepted in the United States of America, add an emphasis-of-matter or other-matter paragraph(s), or withdraw from the engagement. However, you agree that your financial statements and disclosures shall, at a minimum, be prepared in strict accordance with U.S. GAAP as determined by us. If, for any reason, determined at our sole discretion, we are unable or unwilling to complete the review of your financial statements, we will not issue a report on such statements as a result of this engagement.   For example, if the financial statements are not in accordance with GAAP, or we deem the footnote and/or other disclosures to be inadequate, or there are issues or deficiencies with respect to the management or legal representations and/or opinions determined in our sole discretion, we may withdraw and, as set forth below, any fees paid shall, in such limited circumstances, not be refunded.   Unless required by law or regulation to provide a third party with a copy of CFA's written communications with those charged with governance, we require the prior written consent of management or those charged with governance before doing so.   Moreover, should it come to our attention after the issuance of any report that there exists a material error or deficiency with respect to the financial statements and/or our report for any period, then, in such case and upon written notification from us: a) the future distribution of our review report(s) and related financial statements for the affected period and each subsequent period covered by this engagement shall in each and every instance require our prior written consent unless required by law, regulation or pursuant to government inquiry or investigation, and unless we agree in writing otherwise; b)  you shall apprise all banks and recipients/distributees of such financial statements of the errors or deficiencies; and  c) you agree to remove from any portal or electronic posting the affected financial statements.  You also expressly agree to not distribute financial statements without our review report and footnotes approved by us accompanying the financial statements.

**Other Relevant Information**

We will schedule the engagement based in part on the availability of your key personnel, deadlines, and working conditions.  We will plan the engagement based on the assumption that your personnel, agents and counsel will cooperate and provide assistance by performing tasks such as preparing requested representation or opinion letters, schedules, retrieving supporting documents, preparing confirmations. If for any reason your personnel are unavailable to provide the necessary assistance in a timely manner, it may substantially increase the work we must do to complete the engagement within the established deadlines, resulting in an increase in fees.  One significant consideration is the timing of the completion of the bookkeeping, financial statements and footnote disclosures by you.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 7 of 13

Joseph P. Cipolla, Jr., CPA is responsible for supervising the engagement and signing the report or authorizing another individual to sign it.

Fee & Costs: Our fee for these services is $3,360,000, which must be paid in advance. It is specifically acknowledged by all parties to this agreement that CFA's scope of service includes seven (7) separate reporting periods enumerated herein and that CFA has not and would not agree to undertake a narrower scope of service, e.g., a review engagement for only 2018 through 2020. Should either you or CFA terminate this engagement prior to the completion of the Review Services, any unused portion of the fee determined based upon a percentage of completion with equal dollar value assigned to each reporting period ($480,000 per reporting period) shall be refunded upon your request, within a reasonable period of time, unless one or more of the following circumstances occurs:   (i) Client is unwilling or unable to fulfill its responsibilities detailed above; (ii) Client insists upon accounting and financial statement reporting positions that are not in accordance with GAAP and/or with which we do not agree; (iii) Client fails to make full and complete disclosures in footnotes to the financial statements that are determined to be appropriate in our sole discretion regardless of whether those disclosures exceed typical GAAP disclosures; (iv) Client terminates the engagement on the basis of any reason other than CFA's failure to timely issue a review report; or (v) such fee is non-refundable should you or the Fund or NRIA later decide or determine that any or all of the services contemplated by this agreement are not desired or required, or should we withdraw from this engagement because we are unable to perform due to circumstances beyond our control. It is not contemplated, nor are we required, to provide detailed billings as this engagement is priced at a fixed fee of $3,360,000, or $480,000 per reporting period. Reasonable out-of-pocket expenses, including but not limited to industry expert fees and costs, industry research costs, and other research, expert and investigative and/or consulting costs, shall be invoiced separately. Our fee also does not include our time or any of our affiliates' time with respect to any pending, threatened or actual litigation, or with respect to any regulatory or governmental investigations, or any proceeding requiring our time and resources, or that of our affiliates or owners, arising from this engagement or any engagement between any CFA affiliate and any of you or your legal counsel, at the rates set forth above. which shall be invoiced at the following hourly rates invoiced at no less than one-quarter (1/4) of an hour, and increased from time to time but no less frequently than January 1 of each year:

| | |
|---|---|
| Joseph Cipolla | $1,200 |
| Principal | $900 |
| Experienced Manager | $800 |
| Manager | $595 |
| Experienced Staff Assoc. | $395 |
| Staff Associate | $335 |
| Paraprofessional | $195 |

Escrow Type Savings Account:   In addition to the fee, NRIA shall transfer to CFA $2,850,000 which will be held in a savings account for the benefit of NRIA with Flushing Bank[3] or another large U.S. bank with branches in the New York Metropolitan area established and set aside from CFA's operating accounts. Such segregated funds, which shall constitute an asset of the NRIA

---

[3] 99 Park Avenue, New York, NY.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 8 of 13

until funds are disbursed, with NRIA's consent which will not be unreasonably withheld, pursuant to this paragraph, shall only be used to fulfill the Release, Hold-Harmless and Indemnification obligations set forth below as well as the Dispute Resolution obligations herein should the Release, Hold-Harmless & Indemnification and Dispute Resolution provisions of this agreement not be satisfied on a current basis. We reserve all rights to seek reimbursement and indemnification through arbitration while simultaneously using this designated balance to pursue reimbursement and indemnification in arbitration while simultaneously using such funds to pay any and all fees and costs enumerated in both the Release, Hold-Harmless & Indemnification provision and Dispute Resolution provision of this agreement. The balance of this Escrow Type Savings Account shall be returned no later than 15 years from date of engagement (or sooner if appropriate) unless there then exists active or actively threatened or pending litigation, in which case such funds shall be returned upon the completion, resolution or cessation of such pending, threatened or actual litigation. Notwithstanding the foregoing, the necessity of this account shall be evaluated every thirty-six (36) months and terminated and refunded at our discretion.

While we acknowledge that Client has undertaken major, positive transformative changes in the last six months, including but not limited to the wholesale restructuring of the accounting department with qualified, experienced CPAs of integrity, new compliance counsel, a new CFO, a new Fund administrator and general manager, and other counselors and advisors, the Fees & Costs, Release, Hold-Harmless & Indemnification and Escrow Type Savings Account provisions have been determined based upon all of the facts and circumstances including the following considerations:

1. The considerable time and resources expected to be expended on this engagement, including the negative impact on other existing clients and client relationships due to the lack of availability. This necessitates a significant premium above what may be perceived to otherwise be a reasonable fee, as well as the other assurances and terms of this agreement.

2. This engagement involves multi-year litigation risk (subpoenas, law suits, testimony, adverse expert, etc.[4] for potentially five to 15 years) from various potential adverse parties including the Department of Justice, the Securities Exchange Commission, the New Jersey Attorney General, investors, etc. This risk necessitates a higher fee because it is unclear and cannot be quantified or determined with any degree of certainty the extent of future costs, fees and lost fees from other client engagements (now and potentially into the distant future) relating to this this engagement will arise. This uncertainty and risk also necessitate this multi-period engagement and the terms upon which our fee shall be refundable.

3. The withdrawal by and refusal of other firms to perform these services based upon the risk profile.

---

[4] Including potentially becoming embroiled in legal proceedings having little or nothing to do with the quality of our work.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 9 of 13

4. Reputation risk, including as a result of potentially becoming embroiled in legal proceedings (or the subject of investigative journalism which may present us in an unflattering, misinformed light) having little or nothing to do with the quality of our work.

5. Lack of adequate professional liability insurance protection under the circumstances, the cost of which will undoubtedly increase as a result of this engagement.

6. The various ongoing investigations and responses thereto by the Company(ies) and/or their owners and managers.

7. Other considerations.

Release, Hold-Harmless & Indemnification: You agree to hold us, including, but not limited to our affiliates, present and former members, managers, partners, owners, principals, directors, employees, subcontractors, agents, parent organizations and subsidiaries (collectively referred to as "Representatives"), harmless and to release, indemnify, defend and/or reimburse, us for and/or from any liability or costs, including but not limited to our attorneys' fees, our own professional time at the rates shown above as adjusted from time to time, expert fees, and consulting expert fees (including those services by a CFA affiliate at the billing rates described above) resulting from our good-faith conduct, or resulting from management's knowing misrepresentations to us or related to our good faith conduct; the foregoing applies to potential claims, causes of action or proceedings by you, third-parties, any federal, state or local government or agency, or any other litigation or proceeding in connection with this engagement, broadly construed, including litigation or actions we may feel compelled to initiate to protect our interests at our sole discretion. You also agree to hold Representatives harmless and to release, indemnify, defend and/or reimburse Representatives, from any liability, damages, fees, expenses and costs, including our attorneys' fees, our time at rates disclosed herein, expert fees, and consulting expert fees (including those services by a CFA affiliate) associated with any third-party claims arising from or relating to: (i) the Companies' material misrepresentations; (ii) false or materially incomplete and/or misleading information provided by you and any of the Companies' personnel, agents and counsel to us in the performance of its services to the Companies. You may not settle a claim without our consent, such consent not to be unreasonably withheld. Representatives shall not be liable to you or any other party, whether a claim be in tort, contract or otherwise, for any damages, including any direct, indirect, consequential, incidental, lost profit, punitive or similar special damages, relating to our services provided under this agreement or any other agreement between any CFA affiliate and the Fund, its owners, NRIA, its owners and/or legal counsel and/or any of the Companies or their owners and/or managers. The indemnification and hold-harmless provisions of this engagement letter shall also specifically apply to all engagement letters between any CFA affiliate and you, collectively or separately.

Dispute Resolution: If a dispute or claim arises out of or relates to the engagement described herein, Client and Representatives agree to settle such dispute between them or claim by arbitration administered by the American Arbitration Association ("AAA") under its Arbitration Rules for Professional Accounting and Related Services Disputes ("Arbitration Rules") using three arbitrators with all AAA fees and other arbitration/litigation costs, including, but not limited

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 10 of 13

to, arbitrator costs, all AAA administrative fees and costs, transcription costs, our reasonable attorney fees (including our legal contingency fees incurred), expert, expert consulting and forensic accounting fees (including but not limited to CFA and CFA affiliate forensic accounting and expert time[5]) and our professional time incurred by virtue of being a party to this or any legal proceeding at rates for this engagement as adjusted from time to time, chargeable to and payable by Client as costs and fees arise and are invoiced.  Client and Representatives agree to this exclusive remedy, and to be bound by the results of arbitration.  Client and Representatives acknowledge they had the right to consult, and in fact consulted, independent legal counsel regarding this agreement and this provision and expressly acknowledge and agree that by this provision each is waiving and relinquishing its respective right to a jury trial in any and all disputes, including with respect to fees, between the parties related to this agreement or the professional services to be rendered hereunder.  Client and Representatives agree that any such arbitration hearing will be conducted remotely and virtually via Zoom or another similar video conferencing platform. The arbitration panel shall have no authority to award non-monetary or equitable relief.  The arbitrators' decision shall be final and judgment may be immediately entered of the arbitrator's award in any court having jurisdiction and the signatories hereto agree to waive their right to appeal and that no appeals of the arbitrator's decision and award shall be taken.  To the extent Client fails to pay any costs described in this paragraph on a timely basis, interest shall be charged at default interest rates described in this agreement.

Client agrees not to challenge the enforceability of this agreement in a court of law and proceed to arbitration without delay in the event of a dispute.  In the event a party fails to proceed with arbitration, unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other party is entitled to costs of suit, including, but not limited to reasonable attorney fees, our associated professional fees at rates for this engagement as adjusted from time to time, including but not limited to forensic accounting and expert fees, etc. for having to compel arbitration or defend or enforce the award.

Client shall be responsible for and pay all reasonable costs of all disputes and litigation (including our costs), regardless of whether claims or counter-claims have been asserted against us, including but not limited to attorney fees, our time at this engagement's rates as adjusted from time to time, arbitration filing fees, arbitrator fees, arbitrator or/and court costs, expert fees and expert consulting costs to compel arbitration,[6] costs of litigation regarding the enforceability of this engagement letter, [7] and default interest thereon at 1-1/2% per month, or fraction thereof, from the date the invoice is rendered until payment in full is received.  Representatives shall be

---

[5] Expert time and costs may be for CFA or one of its affiliates rendering expert, consulting expert and/or forensic accounting services at rates described in this engagement letter.

[6] Costs to compel arbitration include, but are not limited to, attorney fees, our time at this engagement's rates as adjusted from time to time, including but not limited to forensic accounting and expert fees, arbitration filing fees, arbitrator fees, arbitrator and/or court costs, etc., as well as default interest thereon.

[7] Costs of litigation regarding the enforceability of this engagement letter include, but are not limited to, attorney fees, our time at this engagement's rates as adjusted from time to time, including but not limited to forensic accounting and expert fees, arbitrator filing fees, arbitrator fees, arbitration and/or court costs, etc., as well as default interest thereon.

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 11 of 13

entitled to file a Uniform Commercial Code lien/security interest with respect to any unpaid fees or costs.

No Recording: Conversations with Joseph Cipolla and those he supervises shall not be recorded without our prior written consent.

**Engagement Limitations**

1.    CFA is not a law firm.  None of the services that we shall render shall be construed to be legal advice. In all matters requiring such a determination, we shall rely exclusively upon your attorney's determination rendered in the circumstances.  In all other matters requiring an interpretation of, or application of, any federal and/or state statute, rule, regulation, court case, etc. with respect to this matter, we shall defer to your attorney.  Notwithstanding the foregoing, we may review case law, statutes, rulings, legal articles and the like in the course of our work.

2.    None of the services that we shall provide are designed to investigate or discover fraud and/or other illegal activity.  In the event that we discover fraud and/or other illegal activity, we shall promptly bring that matter to the attention of you or your attorney and take such other steps as may be appropriate under the circumstances.

3.    CFA shall be entitled to assume, without independent verification, that all representations, assumptions, information and data supplied by you, your personnel, agents and counsel will be complete and accurate to the best of your and/or their knowledge.  CFA may use information and data furnished by others; however, CFA shall not be responsible for, and CFA shall provide no assurance regarding, the accuracy of any such information or data. Except as specifically provided, CFA shall not assume any responsibility for any financial reporting with respect to the services provided hereunder. You shall be responsible for all financial information and statements provided with respect to any services performed hereunder. CFA shall have no responsibility to address any legal matters or questions of law.  CFA has not nor will we audit or compile the financial information provided to us and, accordingly, we express no audit opinion regarding this information.

4.    Workpapers.  The workpapers prepared for this engagement are the property of CFA and constitute confidential information. All information and materials of any form or description collected by us in the course of our engagement shall constitute our work files and will at all times, during and after completion of our engagement, remain in our exclusive possession.  We shall have unlimited discretion to retain, discard, or dispose of our work files but will at all times maintain all information and materials provided to us in strictest confidence.  Under our current retention policy, the workpapers for this engagement will be retained for seven (7) years.

5.    Applicable Law.  All questions concerning the construction, validity, enforcement and interpretation of this agreement shall be governed by, and construed in accordance with,

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 12 of 13

the laws of the State of New Jersey, without giving effect to any choice of law or conflict of law rules or provisions of any other jurisdiction that would cause the application of the laws of any other jurisdiction other than the State of New Jersey. In furtherance of the foregoing, the internal law of the State of New Jersey shall control the interpretation and construction of this agreement even though under some other jurisdiction's choice of law or conflict of law analysis, the substantive law of that other jurisdiction would ordinarily apply.

6.  Severability. Whenever possible, each provision of this agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this agreement is held to be invalid or unenforceable in any respect under any applicable law or rule in the State of New Jersey, this agreement shall be reformed, construed and enforced as if such invalid or unenforceable provision had never been contained herein.

7.  Waiver. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

8.  Execution. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument. Each counterpart may be delivered by facsimile signature and a faxed or signature via electronic mail shall have the same force and effect as an original signature.

Please initial each page, sign and return the attached copy of this letter to indicate your acknowledgement of, and agreement with, the arrangements for our engagement to perform reviews of the seven (7) financial statement reporting periods enumerated herein with respect to the financial statements described herein and our respective responsibilities. Moreover, our review engagement shall not commence until financial statements and related footnotes are produced by Client in substantially complete form for any of the reporting periods.

Very truly yours,

**CFA Review Services, LLC**

Joseph P. Cipolla, CPA/ABV/CFF/PFS, CFE
Member of the Firm

---

*Specializing in financial statement review services*

NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC
October 25, 2021
Page 13 of 13

**IN WITNESS WHEREOF**, this Agreement, consisting of thirteen (13) pages has been read and signed by the individuals listed below on dates set forth below:

*I have read, understand and agree to the scope and terms of CFA's engagement as set forth hereinabove. This agreement shall be governed by and construed in accordance with the laws of the State of New Jersey without giving effect to any choice of law or conflict of law rules or provisions of any other jurisdiction that would cause the application of the laws of any other jurisdiction other than the State of New Jersey. Should a dispute arise with respect to this agreement, it is agreed that such dispute shall be resolved in accordance with the Dispute Resolution provisions contained herein, in accordance with the laws of the State of New Jersey, and any rights that may exist to pursue any other remedies, at law or in equity, in any other venue, are waived.*

*Acknowledged and agreed on behalf of NRIA Partners Portfolio Fund I, LLC & National Realty Investment Advisors, LLC, their controlled affiliates, investees, owners and managers:*

10/26/2021
Date

Rey Grabato, NRIA Owner & CEO
(Financially Responsible Party:  NRIA)
*However, Mr. Grabato agrees to personally hold
Mr. Cipolla harmless, consistent with pages 8 &9.*

Copy:  John Collins, SVP

Thomas Fierro, CPA, CFO

Brian Casey, NRIA PPF I, LLC

GLENN LA MATTINA
CHIEF OPERATING OFFICER

10/26/21