**ICE MILLER LLP**
Louis T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
1500 Broadway, Suite 2900
New York, NY 10036
Phone: 212-835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

Counsel to AIRN Liquidation Trust Co., LLC
in its capacity as Liquidation Trustee of the
AIRN Liquidation Trust

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| NATIONAL REALTY INVESTMENT ADVISORS, LLC, | Case No. 22-14539 (JKS) |
| Debtor. | |
| AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST, | Adv. Pro. No. 24-01097 (JKS) |
| Plaintiff, | |
| v. | |
| JOSEPH CIPOLLA, et al., | |
| Defendants. | |

## LIQUIDATION TRUSTEE'S OPPOSITION TO MOTION OF CIPOLLA DEFENDANTS TO DISMISS PLAINTIFF'S ADVERSARY COMPLAINT PURSUANT TO RULE 7012 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

# <u>TABLE OF CONTENTS</u>

Background ........................................................................................................................1

    I.      Background of the Debtors' Chapter 11 Cases........................................................1

    II.     Procedural Background..........................................................................................2

    III.   Factual Background ...............................................................................................3

Motion to Dismiss Standard............................................................................................4

Argument ........................................................................................................................8

    I.      Counts I and III of the Complaint sufficiently plead actual fraudulent transfer
          claims. ...................................................................................................................8

    II.     Counts II and IV of the Complaint sufficiently plead constructive fraudulent
          transfer claims. ...................................................................................................11

          A.     The Complaint sufficiently alleges the transfers were for less than
               reasonably equivalent value.....................................................................11

          B.     The Complaint sufficiently alleges NRIA was insolvent at the time of
               the transfers. ............................................................................................13

    III.   Count V of the Complaint sufficiently pleads aiding and abetting fraud. .............15

          A.     The Liquidation Trustee has standing to assert aiding and abetting fraud
               (and all causes of action set forth in the Complaint). ...............................15

               1.     Defendants have waived the right to challenge assignability of
                    the state-law claims.......................................................................15

              2.     The claims at issue were transferred to the Liquidation Trust
                    notwithstanding any state law transfer restrictions.......................16

               3.     New Jersey's non-assignability of tort claims rule applies only
                    to personal injury claims................................................................18

           B.     The doctrine of *in pari delicto* does not require dismissal of Count V (or
               any cause of action set forth in the Complaint). .......................................19

              1.     The Complaint as pleaded does not establish the applicability of
                    *in pari delicto* on its face because it properly pleads a change in
                    corporate management before the Petition Date............................20

               2.     The Complaint as pleaded does not establish the applicability of
                    *in pari delicto* on its face because it properly pleads that the

fraudsters' conduct benefited them personally and not the
Debtors. ...................................................................................23

3.    Even if the face of the Complaint contains facts that may support
its application, Defendants' assertion of *in pari delicto* is
premature. ...............................................................................24

4.    *In pari delicto* does not impair claims assigned to the
Liquidation Trust by Investors. ...............................................26

C.    Count V of the Complaint satisfies the pleading requirements for aiding
and abetting fraud. ...............................................................................27

1.    All of the elements of aiding and abetting fraud are pleaded with
particularity. ............................................................................28

2.    The Complaint's use of narrative fact pleading and collective
reference to "Defendants" in the Counts do not merit dismissal. ..29

IV.    Count VI of the Complaint sufficiently pleads aiding and abetting securities
fraud. .........................................................................................................32

A.    The Liquidation Trustee has standing to assert the aiding and abetting
securities fraud claims in Count VI. .....................................................32

B.    The doctrine of *in pari delicto* does not merit dismissal of Count VI. ......32

C.    Count VI of the Complaint satisfies the pleading requirements for aiding
and abetting securities fraud. ...............................................................33

1.    The elements of aiding and abetting securities fraud are pleaded
with particularity. ....................................................................33

2.    The Complaint's use of narrative fact pleading and collective
reference to "Defendants" in the Counts do not merit dismissal. ..36

3.    The Complaint sufficiently pleads that Defendants are "agents"
under N.J.S.A. § 49:3-49(b). ..................................................36

V.    Count VII of the Complaint sufficiently pleads aiding and abetting breach of
fiduciary duty. ...........................................................................................37

A.    The Liquidation Trustee has standing to assert the aiding and abetting
breach of fiduciary duty claims in Count VII. ......................................37

B.    The doctrine of *in pari delicto* does not merit dismissal of Count VII. ......38

C.  Count VII of the Complaint pleads a claim for aiding and abetting breach of fiduciary duty as to each Defendant that is plausible on its face. ......................................................................................39

VI.  Count VIII of the Complaint sufficiently pleads accounting malpractice. ...........41

A.  The Liquidation Trustee has standing to assert the accounting malpractice claims in Count VIII. ..............................................................41

B.  The doctrine of *in pari delicto* does not merit dismissal of Count VIII. ...41

C.  Count VIII of the Complaint pleads a claim for accounting malpractice as to each Defendant that is plausible on its face. ......................................42

VII.  Count IX of the Complaint sufficiently pleads turnover of property of the estate. ...................................................................................................................44

VIII.  Count X of the Complaint sufficiently pleads conversion. ...................................46

A.  The Complaint states a claim for conversion that is plausible on its face. ..............................................................................................................46

B.  The Liquidation Trustee has standing to assert conversion in Count X. ...47

C.  The economic loss doctrine does not apply to the Liquidation Trustee's conversion claim. ...........................................................................47

IX.  Count XI of the Complaint sufficiently pleads fraudulent inducement. ................49

A.  The Complaint states a claim for fraudulent inducement that is plausible on its face. ................................................................................49

B.  The Complaint pleads fraudulent inducement with particularity. .............50

C.  The Complaint sufficiently states claims against all Defendants. .............50

X.  Count XII of the Complaint sufficiently pleads breach of contract. ......................51

XI.  Count XIII of the Complaint sufficiently pleads disallowance of claims. .............53

XII.  Count XIV of the Complaint sufficiently pleads equitable subordination. ...........53

XIII.  Count XV of the Complaint sufficiently pleads unjust enrichment. ......................54

Conclusion ..........................................................................................................................55

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A-1 Advanced Moving & Storage, Inc. v. NorVergence, Inc. (In re NorVergence, Inc.)*,
　424 B.R. 663 (Bankr. D.N.J. 2010) ................................................................6, 7

*Alston v. Penn State Health Milton S. Hershey Med. Ctr.*,
　No. 1:23-CV-00643, 2023 WL 5214071 (M.D. Pa. Aug. 14, 2023) ....................................30

*AV Design Servs., LLC. v. Durant*,
　No. CV 19-8688, 2021 WL 1186842 (D.N.J. Mar. 30, 2021)................................................47

*Banco v. Popular N. Am. V. Gandi*,
　184 N.J. 161 .................................................................................................51

*Bd. of Educ. v. N.J. Educ. Ass'n*,
　96 N.J.Super. 371 (N.J. Ch.1967) ............................................................................19

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007)...............................................................................5, 6, 29

*In re Bernard L. Madoff Inv. Sec. LLC*,
　458 B.R. 87 (Bankr. S.D.N.Y. 2011).....................................................................9

*Bondi v. Citigroup, Inc.*,
　32 A.3d 1158 (N.J. Super. App. Div. 2011) ...............................................................46

*Bondi v. Citigroup, Inc.*,
　No. BER-L-10902-04, 2005 WL 975856 (N.J. Super. Ct. Law Div. Feb. 28, 2005), appeal granted.........................................................................................19

*In re Butcher*,
　72 B.R. 447 (Bankr. E.D. Tenn. 1987) ..................................................................13

*In re California TD Investments, LLC*,
　489 B.R. 124 (Bankr. C.D. Cal. 2013).....................................................................24

*Caspersen as Trustee for Samuel M.W. Caspersen Dynasty Trust v. Martin Oring and Searchlight Minerals Corp.*,
　441 F. Supp. 3d 23 (D.N.J. 2020) ..........................................................................34

*In re CBI Holding Co., Inc.*,
　529 F.3d 432 (2d Cir. 2008)..............................................................................24

*Cevdet Aksut Ve Ogullari Koll. Sti v. Cavusoglu*,
   No. 14-3362, 2015 WL 4317750 (D.N.J. Jul. 14, 2015) .......................................................30

*In re Chiro Plus, Inc.*,
   339 B.R. 111 (D.N.J. 2006) ..............................................................................................52

*In re Complaint of Weeks Marine, Inc.*,
   No. 04–0494, 2006 WL 1843130 (D.N.J. 2006) ..............................................................2, 18

*In re Congoleum Corp.*,
   No. 03-51524, 2008 WL 4186899 (Bankr. D.N.J. Sept. 2, 2008) ...........................................17

*In re CTE 1 LLC*,
   No. 19-30256 (VFP), 2023 WL 5257940 (Bankr. D.N.J. Aug. 11, 2023) .............................25

*In re DBSI, Inc.*,
   No. 08-12687 PJW, 2011 WL 1810632 (Bankr. D. Del. May 5, 2011) ...........................8, 10

*DeFazio v. Wells Fargo Bank Nat'l Assoc.*,
   Case No. 20-375, 2020 WL 1888252 (D.N.J. Apr. 16, 2020) .................................................28

*In re E.S. Bankest, L.C.*,
   No. 04-17602-BKC-AJC, 2010 WL 2926203 (Bankr. S.D. Fla. July 23, 2010).....................22

*Fischer v. Fischer*,
   375 N.J. Super. 278, 867 A.2d 1190 (App. Div. 2005) ..........................................................45

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009).................................................................................................5

*Franklin Med. Assocs. v. Newark Pub. Schs.*,
   828 A.2d 966 (N.J. Super. Ct. App. Div. 2003).......................................................................41

*G&F Graphic Servs., Inc. v. Graphic Innovators, Inc.*,
   18 F. Supp. 3d 583 (D.N.J. 2014) ...................................................................................47, 48

*Heidt v. BV001 Reo Blocker LLC (In re Heidt)*,
   626 B.R. 777 (Bankr. D.N.J. 2021) ...................................................................................5, 6

*In re Hollis & Co.*,
   86 B.R. 152 (Bankr. E.D. Ark. 1988) .....................................................................................8

*Integrated Solutions, Inc. v. Service Support Specialties, Inc.*,
   124 F.3d 487 (3d Cir. 1997)................................................................................................17

*Inventory Recovery Corp. v. Gabriel*,
   No. 2:11-cv-01604, 2012 WL 2990693 (D.N.J. Jul. 20, 2012) .............................................32

*JRS Partners, GP v. Warren*,
No. 3:17-cv-01258, 2021 WL 1143829 (M.D. Tenn. Mar. 25, 2021) .................................... 14

*Kare Distribution, Inc. v. Jam Labels and Cards LLC*,
Civ. No. 09-00969 (SDW), 2009 WL 3297555 (D.N.J. Oct. 9, 2009) .................................... 50

*Kimball Int'l, Inc. v. Northfield Metal Prod.*,
760 A.2d 794 (Super. Ct. App. Div. 2000) .............................................................................. 18

*Kirschner v. Wachovia Cap. Markets, LLC*,
No. CV 08-1518, 2009 WL 10673082 (W.D. Pa. Sept. 16, 2009) ................................... 20, 22

*LaBracio Family P'ship v. 1239 Roosevelt Ave., Inc.*,
340 N.J.Super. 155, 773 A.2d 1209 (N.J. Super. Ct. App. Div. 2001) .................................... 42

*In re Lackawanna Med. Grp., P.C.*,
323 B.R. 626 (Bankr. M.D. Pa. 2004) ..................................................................................... 46

*In re Le-Nature's Inc.*,
No. 2:09-MC-00162, 2009 WL 3571331 (W.D. Pa. Sept. 16, 2009) ......................... 20, 21, 22

*In re Le-Nature's, Inc.*,
No. 8-1518, 2012 WL 363981 (W.D. Pa. Feb. 2, 2012) ........................................................... 20

*Levine v. Wiss & Co.*,
97 N.J. 242, 478 A.2d 397 (1984) ........................................................................................... 42

*Liquidating Tr. of the Amcast Unsecured Creditor Liquidation Trust v. Baker (In re Amcast Indus. Corp.)*,
365 B.R. 91 (Bankr. S.D. Ohio 2007) .................................................................................. 1, 45

*In re MacGregor Sporting Goods, Inc.*,
199 B.R. 502 (Bankr. D.N.J. 1995) ........................................................................................... 7

*In re MarketXT Holdings Corp.*,
376 B.R. 390 (Bankr. S.D.N.Y. 2007) ..................................................................................... 13

*McAdam v. Dean Witter Reynolds, Inc.*,
896 F.2d 750 (3d Cir. 1990) ..................................................................................................... 25

*State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*,
387 N.J. Super. 469 (App. Div. 2006) ................................................................................ 27, 39

*Meisels v. Fox Rothschild LLP*,
222 A.3d 649 (N.J. 2020) .................................................................................................. 46, 48

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
   945 F.2d 635 (3d Cir. 1991)........................................................................................12

*Merrill v. Abbott (In re Indep. Clearing House Co.)*,
   77 B.R. 843 (D. Utah 1987)........................................................................................12

*In re Modell's Sporting Goods, Inc.*,
   No. 20-14179 (VFP), 2023 WL 2961856 (Bankr. D.N.J. Apr. 14, 2023) ..............................31

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*,
   331 F.3d 406 (3d Cir. 2003)..........................................................................................7

*Murphy v. Hotwire Commc'ns, LLC*,
   No. CV 19-5901, 2020 WL 2128472 (E.D. Pa. May 5, 2020) ................................................30

*NCP Litig. Tr. v. KPMG LLP*,
   187 N.J. 353, 901 A.2d 871 (2006).............................................................................26, 42

*In re NJ Affordable Homes Corp.*,
   Case No. 05-60442 (DHS), 2013 WL 6048836 (Bankr. D.N.J. Nov. 8, 2013)
   ...........................................................................................................5, 19, 23, 31

*In re Norvergence, Inc.*,
   405 B.R. 709 (Bankr. D.N.J. 2009) ..........................................................................8, 25

*In re O.P.M. Leasing Serv. Inc.*,
   32 B.R. 199 (Bankr. S.D.N.Y. 1983) ..............................................................................8

*Oster v. Kirschner*,
   77 A.D.3d 51, 905 N.Y.S.2d 69 (2010) ..........................................................................37

*In re Palm Beach Financial Partners, L.P.*,
   588 B.R. 633 (Bankr. S.D. Fla. 2018) ............................................................................22

*Palmeri v. LG Elecs. USA, Inc.*,
   No. CIV.A.07-5706(JAG), 2008 WL 2945985 (D.N.J. July 30, 2008)..................................55

*Patrick v. Equifax Info. Servs., LLC*,
   No. CV 23-4092, 2024 WL 2077036 (D.N.J. May 9, 2024) ..........................................30, 31

*In re Petters Co., Inc.*,
   499 B.R. 342 (Bankr. D. Minn. 2013) ............................................................................14

*Phillips v. Cty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008)...................................................................................6, 9, 29

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
   594 B.R. 167 (Bankr. S.D.N.Y. 2018)............................................................................10

*Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*,
  942 F.3d 1200 (11th Cir. 2019) ................................................................31

*Pinter v. Dahl*,
  486 U.S. 622 (1988)..................................................................................27

*In re Refco Inc. Sec. Litig.*,
  No. 07-MD-1902 (JSR), 2013 WL 12158586 (S.D.N.Y. Aug. 7, 2013)................18

*In re Resorts Int'l, Inc.*,
  181 F.3d 505 (3d Cir. 1999), *abrogated by Merit Mgmt. Grp., LP v. FTI
  Consulting, Inc.*, 583 U.S. 366, 138 S. Ct. 883, 200 L. Ed. 2d 183 (2018) ............19

*Rochez Bros., Inc. v. Rhoades*,
  527 F.2d 880 (3d Cir.1975)........................................................................23

*In re Rockefeller Ctr. Props. Secs. Litig.*,
  311 F.3d 198 (3d Cir.2002)..........................................................................7

*Scholes v. Lehmann*,
  56 F.3d 750 (7th Cir. 1995) .......................................................................20

*Sevenson Env't Servs., Inc. v. McDonald*,
  No. CV 08-1386, 2015 WL 13767999 (D.N.J. Sept. 14, 2015) .............................25

*Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*,
  554 F.3d 382 (3d. Cir. 2009)........................................................................53

*Smith v. CitiMortgage, Inc.*,
  No. CV 15-7629 (JLL), 2016 WL 8673066 (D.N.J. Aug. 5, 2016)........................27

*Stanziale v. Pepper Hamilton LLP (In re Student Finance Corp.)*,
  335 B.R. 539 (D. Del. 2005)........................................................................45

*Stella v. Dean Witter Reynolds, Inc.*,
  241 N.J. Super. 55, 574 A.2d 468 (App. Div. 1990) ....................................20, 27

*Stevens v. Wrigley Pharmaceutical*,
  9 N.J. Misc. 385 (N.J. Ch. Div. 1931) ..........................................................34

*Thor 725 8th Ave. LLC v. Goonetilleke*,
  Civil Action No. 17-318, 2019 U.S. Dist. LEXIS 180282 (D.N.J. Oct. 17,
  2019) ..................................................................................................11

*In re U.S. Mortgage Corp.*,
  491 B.R. 642 (Bankr. D.N.J. 2013) ..............................................................25

*United States of America v. Thomas Nicholas Salzano,*
No. 2:22-cr-00690–EP-1 (D.N.J.)............................................................................28

*Vibra-Tech Eng'rs, Inc. v. Kavalek,*
849 F. Supp. 2d 462 (D.N.J. 2012) .......................................................................41

*Warfield v. Byron,*
436 F.3d 551 (5th Cir. 2006) ..........................................................................12, 14

*Wiand v. Lee,*
753 F.3d 1194 (11th Cir. 2014) ...........................................................................14

*Wiatt v. Winston & Strawn LLP,*
838 F. Supp. 2d 296 (D.N.J. 2012) .......................................................................39

*Wootton v. Ravkind (In re Dixon),*
143 B.R. 671 (Bankr. N.D. Tex. 1992).................................................................13

*Worster-Sims v. Tropicana Ent., Inc.,*
No. CIV. 13-1981 .................................................................................................42

## Statutes

11 U.S.C. § 502(d) ...........................................................................................3, 5, 53

11 U.S.C. § 542(b) ...................................................................................................3

11 U.S.C. § 544(b)(1) ........................................................................................2, 3, 8

11 U.S.C. § 548(a)(1)(A) ...................................................................................2, 3, 8

11 U.S.C. § 550(a) ...............................................................................................2, 3

11 U.S.C. § 551(a) ...............................................................................................2, 3

11 U.S.C. § 1123(a) .........................................................................................15, 17

11 U.S.C. § 363................................................................................................17

N.J. Rev. Stat. § 25:2-25(a)(1).............................................................................2, 8

N.J. Rev. Stat. §§ 25:2-25(b) and 25:2-29(1) ...........................................................3

N.J. Rev. Stat. § 49:3-71 ..............................................................................*passim*

N.J. Rev. Stat. § 49:3-49(b) .............................................................................34, 36

N.J. Rev. Stat. § 2A:53A-25 .................................................................................41

**Other Authorities**

Bankruptcy Rule 7008(a) ................................................................................................................. 6

Civil Rule 8 ................................................................................................................. *passim*

Civil Rule 9 ................................................................................................................. *passim*

Civil Rule 12 ................................................................................................................. *passim*

Bankruptcy Rule 7012 ................................................................................................................. 1, 4

Bankruptcy Rule 3007(b) ................................................................................................................. 53

AIRN Liquidation Trust Co., LLC, in its capacity as Liquidation Trustee (the "Liquidation Trustee") of the AIRN Liquidation Trust (the "Liquidation Trust") established under the *First Amended Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* [Docket No. 3256] (as amended and supplemented, the "Plan") and the order confirming same [Docket No. 3599], by and through its undersigned counsel, hereby files this opposition (the "Opposition") to the *Motion Of Cipolla Defendants To Dismiss Plaintiff's Adversary Complaint Pursuant To Rule 7012 Of The Federal Rules Of Bankruptcy Procedure* [Docket No. 10] (the "Motion") and its accompanying Memorandum in Support ("Mem.") filed by Joseph Cipolla ("Cipolla"), Cipolla & Co., LLC, CFA Assurance Services LLC, CFA Review Services LLC, CFA Tax Services LLC, and Cipolla Financial Advisors LLC (each a "Cipolla Affiliate" and collectively the "Cipolla Affiliates" and with Cipolla and Does 1-100, the "Defendants"). In support of this Opposition, the Liquidation Trustee states as follows:

## BACKGROUND

**I.      Background of the Debtors' Chapter 11 Cases**

1.      On June 7, 2022, (the "Petition Date"), National Realty Investment Advisors, LLC ("NRIA"), along with over 130 affiliated entities (collectively with NRIA, the "Debtors"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' cases were jointly administered under Case No. 22-14539.[1]

2.      On June 30, 2022, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee"). *See* Notice of Appointment [Docket No. 94].

3.      Following several months of negotiations, the Debtors and the Committee jointly filed the Plan on July 25, 2023.

---

[1] Unless context dictates otherwise, all docket number references herein relate to Case No. 22-14539, the underlying bankruptcy case.

4.      The Court entered its order confirming the Plan on August 10, 2023 (the "Confirmation Order"). The Plan became effective on August 25, 2023 [Docket No. 3711] (the "Effective Date").

5.      Pursuant to Article IV.F of the Plan, the Liquidation Trustee retains all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors' or estates' causes of action and avoidance actions and any and all of the Contributed Claims of Contributing Investors (as those terms are defined in the Plan). Accordingly, the Liquidation Trustee has the authority to pursue claims on behalf of both the Debtors' and its investors, as well as to investigate litigation targets.

6.      In accordance with the Liquidation Trustee's duties, the Liquidation Trustee and its retained professionals have and will continue to diligently investigate the Debtors' affairs and identify those who benefited from or helped perpetuate the Debtors' insiders' fraudulent scheme.

## II.    **Procedural Background**

7.      On February 23, 2024, the Liquidation Trustee filed its complaint commencing this adversary proceeding (the "Complaint") against Defendants. [2]

8.      The Complaint alleges the following counts: (I) avoidance and recovery of actual fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551(a) against CFA Review Services, LLC, CFA Tax Services, LLC, Cipolla, and Does 1–100; (II) avoidance and recovery of constructive fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551(a) against CFA Review Services, LLC, CFA Tax Services, LLC, Cipolla, and Does 1–100; (III) avoidance and recovery of actual fraudulent transfers under 11 U.S.C. §§ 544(b)(1), 550(a), and 551(a) and N.J. Rev. Stat. § 25:2-25(a)(1) against CFA Review Services, LLC, CFA Tax Services, LLC, Cipolla,

---

[2] All capitalized terms not otherwise defined herein shall have the definition given to them in the Complaint.

and Does 1–100; (IV) avoidance and recovery of actual fraudulent transfers under 11 U.S.C.

§§ 544(b)(1), 550(a), and 551(a) and N.J. Rev. Stat. §§ 25:2-25(b) and 25:2-29(1) against CFA

Review Services, LLC, CFA Tax Services, LLC, Cipolla, and Does 1–100; (V) aiding and abetting

fraud against all Defendants; (VI) aiding and abetting securities fraud under N.J. Rev. Stat. § 49:3-

71 against all Defendants; (VII) aiding and abetting breach of fiduciary duty against all

Defendants; (VIII) accounting malpractice against all Defendants; (IX) turnover of property of the

estate under 11 U.S.C. § 542(b) against CFA Review Services, LLC, CFA Tax Services, LLC,

Cipolla, and Does 1–100; (X) conversion against all Defendants; (XI) fraud in the inducement

against all Defendants; (XII) breach of contract against CFA Review Services, LLC, CFA Tax

Services, LLC, and Cipolla; (XIII) disallowance of all claims under 11 U.S.C. § 502(d) against all

Defendants; (XIV) equitable subordination against all Defendants; and (XV) unjust enrichment

against all Defendants.

## III.   Factual Background

9.     The full factual background alleged in the Complaint is not recited herein but is

expressly incorporated by reference. A select background is set forth below.

10.     The Complaint is filled with detailed factual allegations about the Ponzi scheme

and related bad acts committed by NRIA's and the other Debtors' managers. *See* Complaint at

¶¶ 25–70. In addition, the Complaint specifically incorporates by reference both the Summary

Cease and Desist Order [Docket No. 60] issued by the New Jersey Bureau of Securities and the

Administrative Consent Order [Docket No. 1651] entered by this Court. This is the underlying and

pervasive fraud, pleaded in detail. Defendants do not appear to dispute that NRIA and its affiliated

Debtors were operated as a Ponzi scheme. Nor could they as Thomas Nick Salzano ("Salzano"),

one of the masterminds of the fraud, has now pleaded guilty to the criminal charges pending against

him and in doing so admitted to operating the Debtors as a Ponzi scheme.

11.     The Complaint also sets forth in extreme detail the role Defendants played in the Ponzi scheme. In short, Cipolla and certain of the Cipolla Affiliates were engaged by NRIA's counsel and later by Debtors as accountants and auditors. Defendants quickly learned about the scope of the fraud and Ponzi scheme, having been engaged originally as *Kovel* professionals, and then actively aided, abetted, and profited from the wrongdoing. With help from Salzano, Cipolla fraudulently induced NRIA into transferring $4.61 million to two newly formed entities for services that were never performed.

## MOTION TO DISMISS STANDARD

12.     Defendants' Motion, which attempts to address every Count of the Complaint, states it is filed under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Civil Rules"), as made applicable by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Mem. at 16. Specifically, it seeks dismissal of:

- Counts I and III (actual fraudulent transfers) on the basis that they are not pleaded with particularity under Civil Rule 9. Mem. at 19.

- Counts II and IV (constructively fraudulent transfers) on the basis that the Complaint fails to allege facts related to (1) reasonably equivalent value and (2) insolvency. Mem. at 22.

- Count V (aiding and abetting fraud) on the basis that (1) New Jersey law does not permit assignment of prejudgment tort claims; (2) *in pari delicto* bars the claim; and (3) the Complaint fails to state a claim under Civil Rules 8 and 9. Mem. at 27.

- Count VI (aiding and abetting securities fraud) on the basis that (1) Defendants are not "agents" as defined in the NJUSA; (2) New Jersey law does not permit assignment of prejudgment tort claims; (3) *in pari delicto* bars the claim; and (4) the Complaint fails to state a claim under Civil Rules 8 and 9. Mem. at 37.

- Count VII (aiding and abetting breach of fiduciary duty) on the basis that (1) New Jersey law does not permit assignment of prejudgment tort claims; (2) *in pari delicto* bars the claim; and (3) the Complaint fails to state a claim under Civil Rule 8. Mem. at 44.

- Count VIII (accounting malpractice) on the basis that (1) New Jersey law does not permit assignment of prejudgment tort claims; (2) *in pari delicto* bars the claim; and (3) the Complaint fails to state a claim under Civil Rule 8. Mem. at 46.

- Count IX (turnover of property of the estate) for failure to state a claim. Mem. at 49.

- Count X (conversion) on the basis that (1) the Complaint fails to state a claim under Civil Rule 8; (2) New Jersey law does not permit assignment of prejudgment tort claims; and (3) the economic loss doctrine bars the claim. Mem. at 51.

- Count XI (fraudulent inducement) on the basis that (1) the Complaint fails to state a claim under Civil Rule 8; (2) the Complaint fails to plead with particularity under Civil Rule 9; (3) the economic loss doctrine bars the claim; and (4) certain Defendants should be dismissed. Mem. at 53.

- Count XII (breach of contract) on the basis that the Complaint fails to state a claim under Civil Rule 8. Mem. at 57.

- Count XIII (disallowance of claim) on the basis that a section 502(d) claim is premature until judgment is entered. Mem. at 60.

- Count XIV (equitable subordination) on the basis that the Complaint fails to state a claim and that equitable subordination is not an available remedy. Mem. at 60.

- Count XV (unjust enrichment) on the basis that the Complaint fails to state a claim.  Mem at 61.

13.    As this Court has summarized, "[o]n a motion to dismiss, this court must assume the truth of all allegations in [the] complaint, their reasonable inferences, and any documents incorporated by reference therein." *In re NJ Affordable Homes Corp.*, Case No. 05-60442 (DHS), 2013 WL 6048836, at *3 (Bankr. D.N.J. Nov. 8, 2013).

14.    To survive dismissal under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Heidt v. BV001 Reo Blocker LLC (In re Heidt)*, 626 B.R. 777, 788 (Bankr. D.N.J. 2021) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). To determine whether a complaint is plausible on its face, a court must draw on its judicial experience and common sense to determine whether the factual content of a complaint plausibly gives rise to an entitlement to relief. *In re Heidt*, 626 B.R. at 788. This does not impose a "probability requirement" at the pleading stage but requires a showing of "enough facts to raise

a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* (citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233-34 (3d Cir. 2008) (quoting *Twombly*, 127 S.Ct. at 1965)). "The Third Circuit has interpreted *Twombly* as requiring that '[t]he allegations of the complaint should 'plausibly suggest' the pleader is entitled to relief.'" *A-1 Advanced Moving & Storage, Inc. v. NorVergence, Inc. (In re NorVergence, Inc.)*, 424 B.R. 663, 686 (Bankr. D.N.J. 2010) (quoting *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (citing *Twombly*, 127 S.Ct. at 1966)). This "requires a showing of 'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" *In re Heidt*, 626 B.R. at 788 (quoting *Phillips*, 515 F.3d at 233–34 (quoting *Twombly*, 127 S.Ct. at 1964)). *See, e.g.*, *Terry v. MEB Loan Trust II (In re Terry)*, Adv. Pro. No. 22-02093, 2023 WL 6052509, at *3 & n.6 (Bankr. D. Utah Sept. 14, 2023) ("'The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.'") (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (internal citation omitted)).

15.     In summary, in ruling on a motion to dismiss, a court must accept all well-pleaded allegations in the complaint as true, view them in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *See Phillips*, 515 F.3d at 233; *see also In re Heidt*, 626 B.R. at 788.

16.     Rule 8(a)(2) of the Civil Rules as made applicable by Rule 7008(a) of the Bankruptcy Rules, "states in relevant part that a pleading stating a claim for relief must also contain 'a short and plain statement of the claim showing that the pleader is entitled to relief,' . . . in order to provide 'the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"

*In re NorVergence, Inc.*, 424 B.R. at 687 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). "To comply with Rule 8(a)(2)'s notice pleading requirements and to prevent a dismissal of a complaint based on Rule 12(b)(6), '[a] plaintiff need not set out in detail the facts upon which he bases his claim, so long as he gives the defendant(s) fair notice of the claim' and the reasons giving rise to the claim to permit a defendant to answer and to prepare for trial." *In re NorVergence, Inc.*, 424 B.R. at 687 (quoting *In re Plassein Int'l Corp.*, 352 B.R. 36, 42 (Bankr. D. Del. 2006) (internal citations omitted)).

17.     Civil Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The purpose of the heightened pleading requirement of Civil Rule 9(b) "is to provide notice, not to test the factual allegations of the claim." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 n.2 (3d Cir. 2003). Generally, fraud allegations of date, place, and manner qualify for purposes of meeting the Rule 9(b) standard. *Seville Indus. Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984); *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir.2002) (who, what, when, where and how of events at issue may serve as adequate support for a fraud claim). A plaintiff is free, however, to use "alternative means of injecting precision and some measure of substantiation" into a fraud allegation. *Seville Indus. Mach. Corp.*, 742 F.2d at 791. It is also customary in the context of bankruptcy to interpret Civil Rule 9 liberally, particularly when a third-party outsider to the fraudulent transaction is bringing the action, as is true here. *In re NorVergence, Inc.*, 424 B.R. at 688; *see also In re MacGregor Sporting Goods, Inc.*, 199 B.R. 502, at 514–15 (Bankr. D.N.J. 1995) (". . . Rule 9(b) should be interpreted liberally, particularly when the trustee . . . is bringing

the action.") (citing *In re Hollis & Co.*, 86 B.R. 152, 156 (Bankr. E.D. Ark. 1988); *In re O.P.M.*

*Leasing Serv. Inc.*, 32 B.R. 199, 203 (Bankr. S.D.N.Y. 1983)).

## ARGUMENT

**I.    Counts I and III of the Complaint sufficiently plead actual fraudulent transfer claims.**

18.    Under sections 548(a)(1)(A) and 544(b)(1) of the Bankruptcy Code, and N.J.S.A.

§ 25:2-25(a)(1), a transfer by a debtor may be avoided if made with actual intent to hinder, delay

or defraud a creditor. A trustee does not have to plead a transferor's fraudulent intent with

particularity. *In re DBSI, Inc*., No. 08-12687 PJW, 2011 WL 1810632, at *3 (Bankr. D. Del. May

5, 2011). An actual intent to hinder, delay or defraud can be shown by pleading the debtor engaged

in a Ponzi scheme. *In re Norvergence, Inc*., 405 B.R. 709, 729 & 733 (Bankr. D.N.J. 2009) ("Upon

demonstrating successfully the Salzano Scheme qualifies as a Ponzi Scheme, the actual intent to

hinder, delay, or defraud creditors will be inferred").

19.    Defendants argue that Counts I and III of the Complaint fail to meet the particularity

requirements of Civil Rule 9. Yet Defendants do not (and cannot) contest that the Debtors were

operated as a Ponzi scheme. Rather, they argue that (in their view) the transfers at issue were not

made "in furtherance" of the Ponzi scheme. *See, e.g.*, Mem. at 22. Defendants' characterization of

the facts pleaded in the Complaint ignores the standard for ruling on a motion to dismiss. When

viewed in the light most favorable to the Liquidation Trustee, the Complaint more than adequately

asserts actual fraudulent transfer claims.

20.    Counts I and III relate to the $4.61 million in retainers paid under the October 2021

Agreements.[3]   The Complaint specifically alleges that CFA Review Services and CFA Tax

---

[3] As noted in paragraph 4 of the Complaint, the Liquidation Trustee is continuing its investigation
of the Defendants and reserves the right to assert additional claims, including claims to avoid any
other payments to the Defendants identified in this Complaint or otherwise, as more facts come to
light.

Services performed no work under these agreements. *See* Compl. at ¶ 99. Defendants' assertion that the "work product" of the October 2021 Agreements thus negates the fraudulent transfer claims in the Complaint makes no sense.

21.    The Complaint alleges throughout that Defendants, among other things, (i) played an active role in reviewing and revising Private Placement Memoranda ("PPMs") that were used to fraudulently induce Investors to participate in the Ponzi scheme; (ii) advised the Debtors to book revenue contrary to accepted principles, including Generally Accepted Accounting Principles ("GAAP"); (iii) were aware Investor funds were comingled (in violation of the terms of the PPMs) and used to pay Investor returns of capital, a clear indication NRIA was being operated as a Ponzi scheme; and (iv) were aware NRIA was making misrepresentations to Investors regarding the comingling of Investor funds. *See* Compl. at ¶¶ 2, 58, 60, 65, 78.

22.    Defendants' characterization of these facts makes no difference because, in ruling on a motion to dismiss, the Court must view all facts in the light most favorable to the Liquidation Trustee. *See Phillips*, 515 F.3d at 233. Applying that standard, the Complaint more than adequately demonstrates Defendants' knowledge of the Ponzi scheme and that work they performed helped facilitate it. Further, and perhaps more importantly, the Complaint expressly asserts that the $4.61 million was paid at the direction of Salzano and Grabato, the masterminds of the Ponzi scheme, to keep NRIA (and thus the Ponzi scheme) from collapsing. Compl. at ¶¶ 90–95.

23.    This is far from a situation where the transfers at issue are so unrelated to the Ponzi scheme that the presumption should not apply.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 105 (Bankr. S.D.N.Y. 2011) ("[W]hile it is conceivable that certain transfers may be so unrelated to a Ponzi scheme that the presumption should not apply, the Actual Fraudulent Transfers

at issue here . . . serve[d] to further [the] Ponzi scheme, and are therefore presumed fraudulent.")
(internal quotations omitted).

24.    Ultimately, the Complaint more than meets the pleading requirements of Civil Rule
9(b). Even though the Liquidation Trustee entered this litigation at an informational disadvantage,
the Complaint still pleads in great detail the date of each transfer, the amount of each transfer, the
identity of the transferor and transferee, and that the transfers were made in the furtherance of a
Ponzi scheme. *See In re DBSI, Inc*., No. 08-12687 PJW, 2011 WL 1810632, at *3 (Bankr. D. Del.
May 5, 2011) (discussing what a trustee must plead for a fraudulent transfer claim).

25.    To the extent Defendants argue the Complaint fails to allege Cipolla was the
transferee of any of the subject transfers in Counts I and III, they are mistaken. Section 550 permits
recovery from "(1) the initial transferee of such transfer <u>or the entity for whose benefit such transfer
was made</u>; or (2) <u>any immediate or mediate transferee of such initial transferee</u>."  The Complaint
specifically alleges Cipolla was the initial and/or subsequent transferee of the transferred payments
and/or the persons for whose benefit the transfers were made. Compl. at ¶¶ 107, 121.  As noted
throughout the Complaint, CFA Review Services and CFA Tax Services were incorporated just
days before the fraudulent transfers were made.  *See, e.g.*, Compl. at ¶¶ 14, 71, 82. It is more than
plausible to conclude at the pleading stage that the transfers to these shell companies were for
Cipolla's benefit. It is also likely that Cipolla has since moved funds from his shell entities to
himself or others. *See Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 195 (Bankr.
S.D.N.Y. 2018) (noting that "Rule 8(a) governs the portion of a claim to recover [subsequent
fraudulent transfers]" and "the plaintiff's burden at the pleading stage 'does not require dollar-for-
dollar accounting' of the exact funds at issue."). Discovery will likely reveal further facts to

support this, and to that end, with the filing of this opposition, the Liquidation Trustee is making

a written request to Defendants to provide a full accounting of the $4.61 million in retainers.

## II. Counts II and IV of the Complaint sufficiently plead constructive fraudulent transfer claims.

26.     Defendants next allege the Liquidation Trustee's "claims must be dismissed

because the Complaint does not adequately allege . . . (1) that the Debtor did not receive reasonably

equivalent value in exchange for the obligation incurred; and (2) that, at the time the obligation

was incurred, certain solvency-related events had occurred or were about to occur." Mem. at 22–

23. Both arguments fall short.

### A.     The Complaint sufficiently alleges the transfers were for less than reasonably equivalent value.

27.     Defendants attempt to portray an alternate reality—one in which a pre-bankruptcy

transfer of $4.61 million from a Ponzi scheme for accounting services that were *never performed*

could somehow be for reasonably equivalent value. Defendants do not appear to dispute that no

work was performed in connection with the October 2021 Agreements. Rather, they argue the

transfers were reasonable at the time they were made because of the complexity and scope of work

Cipolla agreed to but ultimately never performed.[4]

28.     "[A] party receives reasonably equivalent value for what it gives up if it gets

roughly the value it gave, considering the totality of the circumstances surrounding the disputed

transfer." *Thor 725 8th Ave. LLC v. Goonetilleke*, Civil Action No. 17-318, 2019 U.S. Dist. LEXIS

---

[4] And as explained in the Complaint and herein, as the company's *Kovel* accountant, with intimate knowledge of the Debtors' financial affairs, Cipolla and the other Defendants **knew** that Investor funds were being used to pay their nearly $5 million retainer while NRIA was operating as a Ponzi scheme, pursuant to an engagement letter (in which they also suspiciously raised their rates by nearly 30% from their engagement letter executed just a few months earlier) that was universally opposed by virtually all other professionals retained in connection with NRIA. Cipolla's specious defenses actually *buttress* the evidence of knowing participation in and profiteering from the fraud.

180282, at *15 (D.N.J. Oct. 17, 2019). As fraudulent transfer laws are intended to protect creditors and preserve the estate, "the question whether the debtor *received* reasonable value must be determined **from the standpoint of the creditors**." *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991) (emphasis added).

29.     Here, the Complaint alleges in detail why the transfers at issue were for less than reasonably equivalent value. It states "[t]he Debtors received no services or other consideration of any kind in exchange for the transfers of the retainers to CFA Tax Services and CFA Review Services" and "Cipolla never produced any work product to NRIA related to the October 2021 Agreements and never refunded the retainers." Compl. at ¶¶ 95, 99.

30.     To creditors, absolutely no value was provided to the Debtors. Indeed, after the transfers were made, both the Debtors and creditors were left worse off. When a transfer exacerbates harm to creditors, such transfer *cannot* be for reasonably equivalent. *See Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 859 (D. Utah 1987) ("In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value.'"); *see also Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006) ("The primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved. It takes cheek to contend that in exchange for the payments the [defendant] received, the RDI Ponzi scheme benefited from his efforts to extend the fraud by securing new investments.").

31.     Even if Defendants had performed all of the services outlined in the October 2021 Agreements, there would still be a legitimate question about whether reasonably equivalent value was provided as the $4.61 million retainer was nearly 50 times the retainer Cipolla requested for

his previous accounting services. Compl. at ¶ 184. Likewise, Defendants raised their hourly rates from $720 to $1,200. Compl. at ¶ 74. Collectively, these allegations exemplify the fact that the Debtors received no benefit from the transfers and that the Debtors and their creditors were harmed because of the transfers.

32.     To the extent Defendants argue the mere promise to perform future services is reasonably equivalent, no case law is cited in support. In fact, multiple courts have considered similar issues and found the payment of fees for a promise to perform future services <u>does not</u> provide reasonably equivalent value. *See, e.g., Wootton v. Ravkind (In re Dixon)*, 143 B.R. 671, 681 (Bankr. N.D. Tex. 1992) (finding fees paid for prospective legal representation were for less than reasonably equivalent value); *In re Butcher*, 72 B.R. 447, 450 (Bankr. E.D. Tenn. 1987) (finding an agreement to perform future legal services is outside the scope of "value").

33.     In sum, Defendants' fantastical argument fails as a matter of law.  If Defendants can somehow show that the Debtors received value on account of the October 2021 Agreements, such would still be a question of fact and would not warrant dismissal at this stage of litigation. *See In re MarketXT Holdings Corp.*, 376 B.R. 390, 421 (Bankr. S.D.N.Y. 2007) (finding whether a transfer is for reasonably equivalent value is largely a question of fact).

**B.      The Complaint sufficiently alleges NRIA was insolvent at the time of the transfers.**

34.     Defendants next argue the Complaint fails to plead insolvency at the time of the transfers, stating "paragraph 94 does not even allege that NRIA (the transferor) was insolvent; rather, it alleges generally that the 'Debtors were insolvent'" and that "[t]here is no allegation in the Complaint NRIA was insolvent."  Mem. at 26.

35.     To begin, Defendants attempt to cherry-pick language from the Complaint to make it appear insolvency is only generally alleged as to NRIA, the transferor. That is simply not the

case. Paragraph 94 states "Debtors transferred the $4.61 million in 'retainers' . . . at a time when the Debtors were insolvent." Compl. at ¶ 94.  Paragraph 1 of the Complaint defines "Debtors" as National Realty Investment Advisors, LLC ("NRIA") and its related debtor entities.  Paragraph 117 then specifically states that NRIA "(i) was insolvent, or became insolvent as a result of such transfers; (ii) was engaged in business or a transaction or was about to engage in business or a transaction, for which any property remaining with NRIA constituted unreasonably small capital; or (iii) intended to incur, or believed that it would incur, debts that would be beyond NRIA's ability to pay as such debts matured."  Compl. at ¶ 117.

36.     The Complaint makes several additional allegations to support the claim that NRIA was insolvent. *See, e.g.*, Compl. at ¶¶ 31 and 32 (stating respectively that "[n]either NRIA nor the Fund generated enough revenue from operations to cover distributions made to Investors" and "NRIA had little to no profits and used Investor funds to pay Investor distributions").

37.     As discussed above, the Complaint alleges that NRIA and its related debtor entities were operated as a Ponzi scheme at the time of the transfers. Compl. at ¶¶21–44. Because of its very nature, debtors who engage in a Ponzi scheme are presumed insolvent from the outset. *See, e.g., In re Petters Co., Inc.*, 499 B.R. 342, 357 (Bankr. D. Minn. 2013) ("Rather, given the inherent insolvency of a Ponzi scheme, the paying out of profits to the [recipient-defendant] not offset by further investments . . . conferred no benefit . . . but merely depleted their resources faster.") (internal citations omitted); *JRS Partners, GP v. Warren*, No. 3:17-cv-01258, 2021 WL 1143829, at *3 (M.D. Tenn. Mar. 25, 2021) (stating that "because [the company] was a Ponzi scheme, it was insolvent from its inception."); *Wiand v. Lee*, 753 F.3d 1194, 1201, n.3 (11th Cir. 2014) (finding insolvency is necessarily present in every Ponzi scheme); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (noting that "a Ponzi scheme . . . is, as a matter of law, insolvent from its

inception"). Because the Complaint more than adequately pleads the existence of a Ponzi scheme, it also sufficiently pleads that NRIA was insolvent at the time of the transfers.

**III.  Count V of the Complaint sufficiently pleads aiding and abetting fraud.**

**A.  The Liquidation Trustee has standing to assert aiding and abetting fraud (and all causes of action set forth in the Complaint).**

38.  Defendants allege "New Jersey state law unequivocally deems assignment of prejudgment tort claims *void ab initio*" and as a result, "the tort claims asserted in the Complaint are invalid and must be dismissed with prejudice." Mem. at 3. As a result, Defendants broadly assert that "[r]egardless of whether the Liquidation Trust's Counts sounding in tort originated with the Debtor or the Contributing Investors (as defined in the Plan), the Liquidation Trust lacks the requisite standing to bring any assigned prejudgment tort claims." Mem. at 28 (emphasis in original). Defendants repeat this argument throughout their Memorandum, arguing Counts V, VI, VII, VIII, and X should be dismissed, in part, because the tort claims are non-assignable under New Jersey law.

39.  Defendants' arguments lack merit because (i) they consented to the assignment of tort claims under the Plan and therefore, waived any arguments to contest the validity of such assignment; (ii) as this Court has specifically found, section 1123(a)(5) preempts New Jersey's tort restrictions when tort claims are transferred pursuant to a plan of reorganization; and (iii) New Jersey case law has limited the prohibition on the assignment of tort claims to claims for personal injury.

**1.  Defendants have waived the right to challenge assignability of the state-law claims.**

40.  The Plan provides, among other things, that if an "Excluded Party" (generally meaning a party not given a release under the Plan) fails to object to the assignment and transfer of creditor claims before confirmation of the Plan, such Excluded Party has consented to the

assignment of claims. As a result, such Excluded Party is barred from challenging the assignment

and transfer of such claims. Article IV.D.14 of the Plan states:

> If an Excluded Party fails to timely file an objection to the proposed
> assignment and transfer of the Contributed Claims or other terms of
> the Plan related to the Contributed Investor Settlement by the
> deadline for filing objections to the confirmation of this Plan, **that
> Excluded Party shall be deemed to have irrevocably consented
> to the assignment and transfer of Contributed Claims** and other
> Plan terms related to the Contributed Investor Settlement and will
> be forever barred from asserting that the assignment and transfer of
> the Contributed Claims or other Plan terms affect the ability of the
> Liquidation Trust to pursue the Contributed Claims against such
> Excluded Party.

Plan, Article IV.D.14, at 39 (emphasis added).

41.     On July 25, 2023, the Schedule of Excluded Parties was filed as Exhibit 2 to the

Plan (the "Schedule of Excluded Parties") [Docket No. 3260]. Page four of the Schedule of

Excluded Parties includes *all of the Defendants*. This should come as no surprise to Defendants as

they were served with the Plan. *See Certification of Service* [Docket No. 3528].

42.     Despite this, Defendants did not object to the Plan, nor did they raise any issue with

the assignment of claims. Now, more than nine months after entry of the Confirmation Order,

Defendants argue the Liquidation Trustee lacks standing to bring claims on behalf of defrauded

Investors or even on behalf of the Debtors. The Plan is clear—Defendants have consented to the

assignment of claims and waived any right to argue the assignability of claims is invalid. For this

reason alone, the Motion should be denied.

**2.     The claims at issue were transferred to the Liquidation Trust
notwithstanding any state law transfer restrictions.**

43.     Defendants' overly broad argument that "[r]egardless of whether the Liquidation

Trust's Counts sounding in tort originated with the Debtor or the Contributing Investors (as defined

in the Plan), the Liquidation Trust lacks the requisite standing to bring <u>any</u> assigned prejudgment

tort claims" is unequivocally wrong. *See* Mem. at 28.

44.     As this Court has expressly found, a debtor's claims are freely transferrable to one

or more entities under a bankruptcy plan notwithstanding transfer restrictions imposed by state

law. 11 U.S.C. § 1123(a)(5); *In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at *2

(Bankr. D.N.J. Sept. 2, 2008). Section 1123(a)(5) of the Bankruptcy Code provides that

"[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate

means for a plan's implementation, such as . . . transfer of all or any part of the property of the

estate to one or more entities . . . ." 11 U.S.C. § 1123(a). The language of section 1123(a) provides

for express preemption of inconsistent state law as it includes the introductory phrase

"[n]otwithstanding any other applicable nonbankruptcy law." *In re Congoleum Corp.*, 2008 WL

4186899, at *3 ("the Court finds that the language of § 1123(a) provides for express preemption.").

45.     The *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487 (3d

Cir. 1997) case cited by Defendants does not apply. In *Integrated Solutions*, a trustee tried to **<u>sell</u>**

tort claims to a purchaser under section 363 of the Bankruptcy Code. *Integrated Solutions, Inc.*,

124 F.3d at 488–89. The transfers at issue in *Integrated Solutions* were **<u>not</u>** made under section

1123(a)(5) of the Bankruptcy Code. In finding the tort claims could not be sold, the court expressly

noted the differences between sections 363 and 1123. *Id.* ("[t]he clear lack of Congressional intent

to preempt state law restrictions on transferring property of the estate is even more telling given

the explicit language that Congress uses when it intends to displace state nonbankruptcy law in

other provisions of the Bankruptcy Code. ***<u>See, e.g.</u>, <u>11 U.S.C. § 1123(a)</u>***.") (emphasis added).

46.    In short, the case that Defendants rely on is both inapplicable and shows why their argument must fail. All the claims at issue were properly assigned under the Plan and the Bankruptcy Code. The Motion's arguments on these points should be denied.

### 3. New Jersey's non-assignability of tort claims rule applies only to personal injury claims.

47.    As it relates to the assignment of Investor claims, even if the Plan did not properly assign these claims (it did), more and more courts "have indicated that the [New Jersey] non-assignability rule applies only to tort claims for personal injuries." *Kimball Int'l, Inc. v. Northfield Metal Prod.*, 760 A.2d 794, 802 n. 6 (Super. Ct. App. Div. 2000); *see also In re Complaint of Weeks Marine, Inc.*, No. 04–0494, 2006 WL 1843130, at *5 (D.N.J. 2006) (recognizing same); *In re Refco Inc. Sec. Litig.*, No. 07-MD-1902 (JSR), 2013 WL 12158586, at *16 (S.D.N.Y. Aug. 7, 2013), *report and recommendation adopted*, No. 07 MDL 1902 JSR, 2014 WL 1302988 (S.D.N.Y. Mar. 19, 2014) ("Moreover, New Jersey courts have recently indicated that the 'non-assignability rule applies only to tort claims for personal injuries'").

48.    Further, the public policy and equitable considerations underlying New Jersey's non-assignability of tort claims do not apply here. This is not a situation where "unscrupulous strangers" are "preying on the deprived circumstances of an injured person." *See Kimball Int'l*, 760 A.2d at 803. Rather, tort claims of defrauded Investors were assigned to a Liquidation Trust pursuant to a settlement (the "Contributing Investor Settlement" as set forth in the Plan and approved by the Confirmation Order) amongst the Contributing Investors (whose claims the Liquidation Trustee now holds) and the Debtors for their benefit to expeditiously pursue recoveries under the Plan. In turn, the Plan was filed publicly, provides creditors with the greatest potential recovery, was drafted jointly with the Committee, and was reviewed and approved by this Court.

      **B.**    **The doctrine of *in pari delicto* does not require dismissal of Count V (or any cause of action set forth in the Complaint).**

49.    Defendants assert that the doctrine of *in pari delicto* requires dismissal of Count V, as well as Counts VI, VII, and VIII. But assertion of *in pari delicto* is neither timely nor appropriate because, contrary to Defendants' Motion, the affirmative defense is premature, cannot be established on the face of the Complaint, and cannot defeat the claims of Investors.

50.    The doctrine of *in pari delicto*, shortened from the phrase *in pari delicto potior est conditio defendentis*, generally means that "[i]n a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." *In re Resorts Int'l, Inc.*, 181 F.3d 505, 512 (3d Cir. 1999), *abrogated by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 138 S. Ct. 883, 200 L. Ed. 2d 183 (2018) (alterations in original) (quoting Black's Law Dictionary 791 (6th ed.1990)). Because *in pari delicto* is an affirmative defense, Defendants bear the burden of persuasion. *Bondi v. Citigroup, Inc.*, No. BER-L-10902-04, 2005 WL 975856, at *14 (N.J. Super. Ct. Law Div. Feb. 28, 2005), appeal granted, cause remanded, 185 N.J. 32, 878 A.2d 850 (2005). At the same time, the defense is not all encompassing and incorporates several exceptions that preclude any imputation of fraud onto a trustee, such as the adverse interest exception. *Id.* ("Standing in their way . . . is an exception to the rule that enables institutional victims to pursue remedies if the culpable managers were acting for interests other than the entity."); *see also In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2013 WL 6048836, at *24 (Bankr. D.N.J. Nov. 8, 2013) ("The adverse interest exception bars imputation of fraudulent conduct if the officer's interests were adverse to, and not for the benefit of, the corporation."). Likewise, as a matter of public policy, "courts may disallow the *in pari delicto* defense if its invocation would produce an inequitable result." *Id.* at *24 (citing *Bd. of Educ. v. N.J. Educ. Ass'n,* 96 N.J.Super. 371, 388 (N.J. Ch.1967)). For example, "the defense of *in pari delicto* loses its sting when the person who is *in*

*pari delicto* is eliminated." *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995). Furthermore,

the "victim of a fraud is not *in pari delicto* with his victimizer, not even if the victim was deceived

into thinking that he was defrauding a third-party." *Stella v. Dean Witter Reynolds, Inc.*, 241 N.J.

Super. 55, 74, 574 A.2d 468, 477–78 (App. Div. 1990).

> **1.    The Complaint as pleaded does not establish the applicability of *in pari delicto* on its face because it properly pleads a change in corporate management before the Petition Date.**

51.    When there is a change in corporate management before a corporate debtor's filing

for bankruptcy, *in pari delicto* is not an applicable defense for claims brought by a trustee because

there is no longer any wrongdoing to be imputed to the trustee. This is because the change in

management "rid[s] itself of corrupting influence" and results in a "custodian who was not engaged

in any sort of fraudulent conduct" with "no fraud to impute." *See In re Le-Nature's Inc.*, No. 2:09-

MC-00162, 2009 WL 3571331, at *6 (W.D. Pa. Sept. 16, 2009); *see also Kirschner v. Wachovia

Cap. Markets, LLC*, No. CV 08-1518, 2009 WL 10673082, at *7 (W.D. Pa. Sept. 16, 2009); *In re

Le-Nature's Inc.*, No. 2:09-MC-00162, 2009 WL 3526569, at *2 (W.D. Pa. Oct. 23, 2009)

(reaffirming that the new management's "appointment and its complete and total authority to run

Le–Nature's prior to the bankruptcy filing . . . led me to conclude—as I shall reiterate here—there

was nothing to impute to the bankruptcy trustee at the time the bankruptcy was filed."); *In re Le-

Nature's, Inc.*, No. 8-1518, 2012 WL 363981, at *6 (W.D. Pa. Feb. 2, 2012) (calling *in pari delicto*

"murky area of law" that does not apply when the wrongdoers are replaced prior the bankruptcy

filing.).

52.    The Insiders were expelled before the Debtors' bankruptcy filings and were

replaced by Brian Casey ("Mr. Casey") and Casey Group, Ltd. (collectively with Mr. Casey, the

"Casey Group") on November 1, 2021. Compl. at ¶ 93. With the turnover, the Casey Group was

appointed as a manager, assuming broad control over the Debtors to start the process of

remediating the existing management conflicts. *See* Declaration in Support of Chapter 11 Petitions and First Day Pleadings, ¶¶ 14–16, 19 (Case No. 22-14539, Docket No. 16).

53.     Defendants likely recognized the impact that installation of the Casey Group would have. This is reflected by the fact that Defendants were especially aggressive in trying to execute the October 2021 Agreements barely one-week before the Casey Group would assume control (a fact which was already known to be forthcoming by Defendants). Compl. at ¶¶ 89–93. Indeed, the Casey Group immediately moved to address Defendants' improper conduct upon arrival and stem the financial fleecing that the October 2021 Agreements would cause. Compl. at ¶ 99. In any event, as a matter of law, because the Insiders were replaced by independent management before the Petition Date, *in pari delicto* is unavailable.

54.     The *Le-Nature's* case aligns closely with the Liquidation Trustee's case here. In *Le-Nature's*, the liquidation trustee of the Le-Nature's Liquidation Trust asserted multiple claims against various organizations for their role in a Ponzi scheme. *In re Le-Nature's Inc.*, No. 2:09-MC-00162, 2009 WL 3571331, at *2 (W.D. Pa. Sept. 16, 2009). The defendants worked with the former management of Le-Nature's to "engage[] in a form of a 'Ponzi' scheme—constantly raising money and incurring ever-increasing debts to refinance investors while cultivating the illusion of a legitimate profit-making business." *Id.* And after the minority shareholders learned of the Ponzi scheme, they quickly worked to appoint a custodian five days before the commencement of Le-Nature's involuntary bankruptcy proceedings. *Id.* at *3.

55.     In finding the temporal succession of management critical to the applicability of the *in pari delicto* defense, the *Le-Nature's* Court held that the company had "essentially rid itself of corrupt influence of certain corporate officers prior to the bankruptcy filing . . . [b]ecause KCZ was appointed before the filing of the bankruptcy case, and because Kirschner stepped into the

shoes of Le-Nature's which was then being run by this custodian who was not engaged in any sort

of fraudulent conduct, [so] there is no fraud to impute to Kirschner." *In re Le-Nature's Inc.*, No.

2:09-MC-00162, 2009 WL 3571331, at *6 (W.D. Pa. Sept. 16, 2009). Le-Nature's was "no longer

being operated by a corrupt management team . . . due to the minority shareholders who . . .

replace[d] the leadership" thus, there was "nothing to impute at the time of the bankruptcy filing,

and accordingly, the *in pari delicto* doctrine cannot apply." *Id.*; *see also Kirschner v. Wachovia

Cap. Markets, LLC*, No. CV 08-1518, 2009 WL 10673082, at *7 (W.D. Pa. Sept. 16, 2009); *In re

E.S. Bankest, L.C.*, No. 04-17602-BKC-AJC, 2010 WL 2926203, at *2 (Bankr. S.D. Fla. July 23,

2010) (holding that company replaced management prior to bankruptcy filing it had "rid itself of

the corrupt influence of certain corporate officers prior to the bankruptcy filing," leaving no fraud

to impute onto the liquidating trustee)*; In re Palm Beach Financial Partners, L.P.*, 588 B.R. 633,

647 (Bankr. S.D. Fla. 2018) (holding that "[b]ecause the wrongdoers were removed from control

of the debtors long before this bankruptcy case was filed on the petition date the debtors would not

have been subject to the *in pari delicto* defense and so neither is the plaintiff.").

56.     The change in management here mirrors closely with *Le-Nature's*, disrupting the

temporal succession between the Insiders and the Liquidating Trustee. The case is even more

compelling here since the change in management started months before the Petition Date instead

of a mere five days. Compl. at ¶ 93.

57.     To hold that the *in pari delicto* defense could apply here, regardless of the break in

temporal succession, would expand the *in pari delicto* defense's application to absurd results and

reward Defendants for executing their fraud before new management had a chance to prevent them.

Given the change in management, the *in pari delicto* defense is inapplicable to the Liquidation

Trustee and the claims raised in the Complaint.

> **2.** **The Complaint as pleaded does not establish the applicability of *in pari delicto* on its face because it properly pleads that the fraudsters' conduct benefited them personally and not the Debtors.**

58.     The Third Circuit has recognized that the fraud of an officer or agent of a corporation may be imputed onto the corporation "when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation." *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 884 (3d Cir.1975).

59.     Yet "exceptions exist to the imputation of fraud and, therefore, to the application of the doctrine of *in pari delicto*." *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2013 WL 6048836, at *24 (Bankr. D.N.J. Nov. 8, 2013). This includes the adverse interest exception, which "bars imputation of fraudulent conduct if the officer's interests were adverse to, and not for the benefit of, the corporation." *Id.*

60.     The Complaint alleges that Salzano, Grabato, and other Insiders conducted a fraud for their own individual benefit—their interests were adverse to and did not benefit the Debtors or and the Investors. For example, the Complaint alleges, among other things, that:

- Salzano, Grabato, and their family members used Investor contributions to pay for their personal expenses. Compl. at ¶ 22.

- Salzano, Grabato, and the other Insiders created the NRIA Partners Portfolio Fund I LLC to make it more difficult for Investors to track the progress of properties and profits. Compl. at ¶ 25.

- Salzano, Grabato, Scuttaro, and others acted to conceal their role in the fraud and their criminal history. Compl. at ¶ 27.

- Salzano, alongside Defendants, insisted that NRIA retain Cipolla and the related Cipolla entities despite demands for services being unconscionable and excessively priced. Compl. at ¶¶ 76–78.

61.     Meanwhile, Defendants' references to the Complaint recognize that it was Salzano, Grabato, and other Insiders that were operating the fund improperly and for their own personal benefit—not for the benefit of the Debtors or the Investors. Mem. at 30–31.

62.     Despite Defendants' efforts to warp the Complaint, it remains clear that Salzano, Grabato, and other Insiders long abandoned the interests of the Debtors and Investors and instead put their own personal benefits above all, aided in part by Defendants. *See In re CBI Holding Co., Inc.*, 529 F.3d 432, 451 (2d Cir. 2008) ("[e]vidence that [a company] *actually benefitted* from . . . management's fraud does not make the bankruptcy court's finding that . . . management did not *intend to benefit* the company clearly erroneous" in upholding application of adverse interest exception). Benefits derived from the wrongdoer's fraud that are used to keep the company alive are insufficient to preclude the adverse interest exception. *Id.* at 453 ("the purported benefits that Appellees suggest the [company] *itself* received as a result of management's machinations are illusory. A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it.") (citations and quotations omitted).

63.     Courts have also recognized that a merely incidental benefit received by a corporate debtor from a fraudfeasor's conduct will not bar the applicability of the adverse interest exception nor will it perfect an invocation of *in pari delicto*. *See, e.g.*, *In re California TD Investments, LLC*, 489 B.R. 124, 130 (Bankr. C.D. Cal. 2013).

64.     Because the Complaint alleges a benefit to the Insiders and not the Debtors, the Motion should be denied.

### 3.     Even if the face of the Complaint contains facts that may support its application, Defendants' assertion of *in pari delicto* is premature.

65.     Given that *in pari delicto* is an affirmative defense, New Jersey courts have recognized that it generally "cannot be used to support dismissal of a complaint under Rule

12(b)(6)" and is rarely appropriate even when the complaint pleads facts that might support the defense. *In re CTE 1 LLC*, No. 19-30256 (VFP), 2023 WL 5257940, at *36 (Bankr. D.N.J. Aug. 11, 2023) (denying motion to dismiss on grounds that applicability of *in pari delicto* and its exceptions would require factual development). Further, courts have often recognized that findings related to *in pari delicto*—particularly when considering one of the exceptions—are fact issues for a jury. *See Sevenson Env't Servs., Inc. v. McDonald*, No. CV 08-1386 (RMB/AMD), 2015 WL 13767999, at *1 (D.N.J. Sept. 14, 2015); *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 758 n. 13 (3d Cir. 1990).

66.     Accordingly, "given the fact-intensive nature of the doctrine," courts often deny a motion to dismiss asserting an *in pari delicto* defense under New Jersey law, particularly when discovery has yet to even commence. *In re U.S. Mortgage Corp.*, 491 B.R. 642, 676 (Bankr. D.N.J. 2013); *see also In re Norvergence, Inc.*, 405 B.R. at 742, 749 (Bankr. D.N.J. 2009) ("The *in pari delicto* doctrine is an affirmative defense that must be raised by the parties" and as such is "not routinely considered on a motion to dismiss. . . . While the parties' pleadings . . . devote a significant portion to the aiding and abetting (and deepening insolvency causes of actions) . . . the applicability of the defense and the application of the imputation . . . is not established on the face of the Complaint. Dismissal . . . is premature at this time.").

67.     The New Jersey Supreme Court has expressly found that, even where a complaint pleads facts that could impute the fraud of corporate officers on a corporation, such does not merit granting a motion to dismiss:

> In this matter, there are allegations that support a finding that the fraudulent acts of Mortell and Wraback, high-ranking managers of PCN, did not benefit the corporation, but rather, led to the corporation's ultimate demise. According to the Trust's complaint, after the discovery of PCN's improper accounting practices, "PCN continually operated at a cash flow deficit and was in default on its bank debt," forcing the corporation to file for bankruptcy.

> Even if the fraud of Mortell and Wraback could be considered a "benefit" to the corporation, the limited record before the Court precludes us from definitively making such a determination. Moreover, any benefit would not be a complete bar to liability but only a factor in apportioning damages.

*NCP Litig. Tr. v. KPMG LLP*, 187 N.J. 353, 381–82, 901 A.2d 871, 888 (2006) (internal citations omitted).

68.     Because the Complaint alleges sufficient facts to show that the doctrine does not apply and that exceptions to the doctrine do, it is premature to dismiss at this stage.

### 4.     *In pari delicto* does not impair claims assigned to the Liquidation Trust by Investors.

69.     The Complaint asserts claims both on behalf of the Debtors and on behalf of Investors who contributed claims under the Plan.

70.     Under the Plan, "all Contributed Claims [are] irrevocably contributed to the Liquidation Trust" and are considered authorized "Liquidation Trust actions for all purposes." Plan at 37–38. Accordingly, the Liquidation Trustee is empowered and in fact obligated to pursue and litigate all causes of actions relating to the Contributed Claims. Plan at 14, 24. Under the Plan, the Liquidation Trustee can assert on behalf of Investors, among other things, "(a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of any investments in the Debtors, including any private placement memorandum, Joint Venture Agreements, or guarantees; (b) *all Causes of Action for unlawful dividend, fraudulent conveyance, fraudulent transfer, voidable transaction, or other avoidance claims under state or federal law*; (c) all Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; (d) *all Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation*

*of, any of the conduct* described in the Disclosure Statement, including in respect of any alleged

fraud related thereto. . . .” Plan at 4–5.

71.     Under New Jersey law, the “victim of a fraud is not *in pari delicto* with his

victimizer, not even if the victim was deceived into thinking that he was defrauding a third-party.”

*Stella v. Dean Witter Reynolds, Inc.*, 241 N.J. Super. 55, 74, 574 A.2d 468, 477–78 (App. Div.

1990) (holding that *in pari delico* was not a defense to investor claims); *see also Pinter v. Dahl*,

486 U.S. 622, 641 n. 17 (1988).

72.     The aiding and abetting fraud claim in Count V of the Complaint is one that

Investors have assigned to the Liquidation Trust and that they could have brought independently

of the Debtors. New Jersey law recognizes aiding and abetting fraud as a separate, cognizable civil

cause of action that can be brought by victims of the fraud. *See Smith v. CitiMortgage, Inc.*, No.

CV 15-7629 (JLL), 2016 WL 8673066, at *3 (D.N.J. Aug. 5, 2016); *State, Dep’t of Treasury, Div.

of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 387 N.J. Super. 469, 480 (App. Div. 2006).

As detailed in the Complaint, the Investors were directly damaged by the Ponzi scheme and

Defendants’ conduct. *See, e.g.*, Compl. at ¶ 132. And as is set forth below, aiding and abetting

fraud is properly pleaded in the Complaint.  On this point, the Motion should be denied.

   **C.     Count V of the Complaint satisfies the pleading requirements for aiding and
             abetting fraud.**

73.     Defendants argue that Count V must be dismissed because the Liquidation

Trustee’s allegations: (1) do not satisfy minimum pleading standards under Rule 8(a)(2) or

heightened pleading requirement under Rule 9(b); (2) do not differentiate between Defendants’

respective conduct; and (3) do not include facts sufficient to show that Defendants “knowingly

and substantially assisted” the underlying wrongdoing. *See Mem.* at 33–35. Each argument fails.

1.   **All of the elements of aiding and abetting fraud are pleaded with particularity.**

74.   A claim for aiding and abetting fraud survives dismissal if a complaint's allegations, which must be taken as true, plausibly show: (1) an underlying "wrongdoing" by the principal actor; (2) that the defendants knew of their "role in the tortious activity at the time it was committed;" and (3) that the defendants "knowingly and substantially assisted the principal violation." *DeFazio v. Wells Fargo Bank Nat'l Assoc.*, Case No. 20-375, 2020 WL 1888252, at *5 (D.N.J. Apr. 16, 2020) (internal quotations omitted). The Complaint here satisfies both the minimum pleading standards of Rule 8 and the heightened standard imposed under Rule 9(b).

75.   The Complaint outlines in significant detail how Salzano, Grabato, and their conspirators operated the Debtors as a massive Ponzi scheme. *See, e.g.*, Compl. at ¶¶ 21–44. In fact, on February 27, 2024, Salzano pleaded guilty to securities fraud, conspiracy to commit wire fraud, and conspiracy to defraud the United States in *United States of America v. Thomas Nicholas Salzano*, No. 2:22-cr-00690–EP-1 (D.N.J.). In his plea agreement and allocution, Salzano admitted to operating the Debtors as a Ponzi scheme by admitting under oath to each element of a Ponzi scheme. *See* Plea Agreement, [D.N.J. Case No. 22-cr-00690, Docket No. 86]; Plea H'rg Tr. at 39:9–21. Defendants' argument that the allegations of fraud are somehow vague or conclusory makes no sense.

76.   The Complaint also sets forth in detail the nature and scope, known-to-date, of Defendants' role in relation to the underlying fraud, their knowledge of what was happening, and that they knowingly and substantially assisted in the fraud. Examples of allegations supporting these elements include:  that Defendants were engaged as *Kovel* accountants and given access to the Debtors' books and records specifically to identify the fraud they then profited from; that Defendants actively reviewed and revised PPMs used and relied upon Investors to contribute their

money; that Defendants coerced NRIA to pay at least $4.61 million in allegedly non-refundable retainers to two newly created shell Cipolla Affiliates that provided no services to the Debtors; that Defendants included a unique provision in the October 2021 Agreements that required payment from non-Investor funds; that the Defendants advised the Debtors to book and document revenue in a manner contrary to GAAP to fund the $4.61 million in retainers and to inflate actual revenue; and that Defendants ultimately failed and refused to return the $4.61 million in retainers to the Debtors despite demands to do so. Compl. at ¶¶ 52, 54, 57–65. These allegations are specific, detailed, and more than enough to plausibly show that Defendants knew of their "role in the tortious activity at the time it was committed."

77.     Defendants attempt to frame the facts and exhibits to the Complaint in such a way to suggest that they played no role in the fraud. *See, e.g.*, Mem. at 35. But their characterization of facts or exhibits in the Complaint makes no difference at the motion to dismiss stage. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (in ruling on a motion to dismiss, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.") (citation and quotations omitted); *Twombly*, 550 U.S. at 555 (factual allegations "must be enough to raise the right to relief above the speculative level.").

78.     Collectively, the factual allegations in the Complaint are neither vague nor conclusory. They provide Defendants with more than sufficient notice of the nature and scope of the claims and alleged misconduct asserted against each of them.

### 2.     The Complaint's use of narrative fact pleading and collective reference to "Defendants" in the Counts do not merit dismissal.

79.     Defendants' characterization of the Complaint as somehow "lumping" them together is simply false. The Complaint specifically and exhaustively outlines who the Defendants

are, *see, e.g.*, Compl. at ¶¶ 9–19, 49–60, 65, and articulates the role of each Defendant or set of

Defendants as it relates to the services provided to the Debtors, as well as the actions and

misconduct attributable to each Defendant or set of Defendants, relative to the services provided

in furtherance of the underlying fraud. *See, e.g.*, Compl. at ¶¶ 50–51, 58, 60–61, 65. Defendants'

focus on the collective reference to "Defendants" in Count V of the Complaint, which starts at

paragraph 131, overlooks the extremely detailed factual recitation contained in the preceding 130

paragraphs.

80.     Federal courts in New Jersey and in the Third Circuit have repeatedly rejected

attacks on the narrative pleading format like the one launched by Defendants. *See, e.g., Patrick v.

Equifax Info. Servs., LLC*, No. CV 23-4092 (CPO/EAP), 2024 WL 2077036, at *4 (D.N.J. May 9,

2024) (rejecting argument that collective term "Defendants" rendered complaint a "shotgun"

pleading where narrative contained detailed factual allegations against each defendant, each count

incorporated the factual narrative by reference, and complaint provided defendants adequate notice

of challenged conduct); *Alston v. Penn State Health Milton S. Hershey Med. Ctr.*, No. 1:23-CV-

00643, 2023 WL 5214071, at *3 (M.D. Pa. Aug. 14, 2023) (rejecting argument that using a

narrative format is inappropriate "shotgun" pleading); *Murphy v. Hotwire Commc'ns, LLC*, No.

CV 19-5901, 2020 WL 2128472, at *6 (E.D. Pa. May 5, 2020) ("factual allegations are pleaded

with enough detail to establish the factual background of the claims" and are enough to give

"adequate notice of the claims and the grounds upon which they rest").

81.     Further, the Complaint here aligns with similar complaints alleging aiding and

abetting claims against related entities under New Jersey law. *See, e.g., Cevdet Aksut Ve Ogullari

Koll. Sti v. Cavusoglu*, No. 14-3362, 2015 WL 4317750, at *9 (D.N.J. Jul. 14, 2015) ("[T]he facts

alleged in the Plaintiff's Complaint, if proven, demonstrate that the Sunrise Defendants probably

knew they were assisting Cavusoglu's fraud. The special favors that Sunrise conferred upon Cavusoglu and the Cavusoglu Entities were not those that one corporation usually confers upon another in an arms-length relationship. If Sunrise and Cavusoglu had an arm's length relationship, Sunrise would probably not have been paying Cavusoglu's litigation expenses, paying the cost of Cavusoglu's warehouse rental directly to Cavusoglu's landlord, and offering Cavusoglu financial assistance to keep his operation going under the guise of a new shell entity when CNC became insolvent. A likely explanation for these favors was the fact that Cavusoglu offered Sunrise steeply discounted prices, and Sunrise, as a sophisticated purchaser, should have been aware that these prices were not the result of legitimate practices, especially when Sunrise knew that Cavusoglu had a long history of not paying exporters. The facts alleged do create the plausible inference that Sunrise knew of Cavusoglu's fraud and knowingly participated in it."). And this Court has specifically found that, when a complaint is alleging facts in connection with a Ponzi scheme, the format used by the Liquidation Trustee here is not "shotgun" pleading. *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2013 WL 6048836, at *54 (Bankr. D.N.J. Nov. 8, 2013).

82.    Similarly, the Complaint's occasional collective references to the Debtors or to Salzano and his co-conspirators, given all of the detailed allegations in the Complaint, likewise do not constitute "shotgun" pleading. *See, e.g., In re Modell's Sporting Goods, Inc.*, No. 20-14179 (VFP), 2023 WL 2961856, at *25 (Bankr. D.N.J. Apr. 14, 2023).

83.    Defendants have not requested a more definite statement under Civil Rule 12(e), and the Liquidation Trustee's alleged "shotgun" pleading has not prevented them from making a plethora of substantive arguments for dismissal. *See Patrick v. Equifax Info. Servs., LLC*, No. CV 23-4092 (CPO/EAP), 2024 WL 2077036, at *5 (D.N.J. May 9, 2024) (citing *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1208 (11th Cir. 2019) for the proposition that defendant's

choice to not file a motion for a more definite statement and ability to substantively attack merits of claim in a Rule 12(b)(6) motion evidenced that complaint was not a "shotgun" pleading).

84.     The narrative format adopted by the Complaint is a clear, articulate, and common method of pleading and is especially appropriate here given the complexities of the Ponzi scheme and Defendants' role in the fraud.

85.     Ultimately, at the pleading stage, a complaint must proffer allegations sufficient to put defendants on notice of the specific misconduct alleged and with which they are charge, which may be shown by injecting "precision or some measure of substantiation" into the allegations. *See, e.g.*, *Inventory Recovery Corp. v. Gabriel*, No. 2:11-cv-01604, 2012 WL 2990693 (D.N.J. Jul. 20, 2012). The Complaint here includes factual allegations to support of each element of each claim and is specific and particular enough to notify each of the Defendants of the misconduct believed to be attributable to their acts or omissions. As a result, the Motion should be denied.

**IV.     Count VI of the Complaint sufficiently pleads aiding and abetting securities fraud.**

**A.     The Liquidation Trustee has standing to assert the aiding and abetting securities fraud claims in Count VI.**

86.     As explained in Section III.A above, the Plan properly assigned all tort claims to the Liquidation Trust, including the aiding and abetting securities fraud claims in Count VI. On this point, the Motion should be denied.

**B.     The doctrine of *in pari delicto* does not merit dismissal of Count VI.**

87.     For the same reasons set forth in Section III.B above, assertion of *in pari delicto* is neither timely nor appropriate because, contrary to Defendants' Motion, the affirmative defense is premature, cannot be established on the face of the Complaint, and cannot defeat the claims of Investors.

88.    On this last point, the aiding and abetting securities fraud claim in Count VI is one that Investors have assigned to the Liquidation Trust and that they could have brought independently of the Debtors. As with aiding and abetting fraud, the Liquidation Trustee has standing to assert a claim for aiding and abetting securities fraud against Defendants. In their elevated role as accountant, Defendants, as agents of the Debtors, played a critical role in conveying information to Investors when making their investment decisions. Investors reasonably relied on Defendants to ensure that the offering documents provided to them did not contain materially false or misleading statements or omissions of fact. Compl. at ¶ 146. And, as is set forth herein, aiding and abetting securities fraud is properly pleaded in the Complaint.

89.    Given that the Investors could have sought their own claims to recover these damages, the Liquidation Trustee is authorized to raise them now under the Plan.  The Motion on this point should be denied.

**C.    Count VI of the Complaint satisfies the pleading requirements for aiding and abetting securities fraud.**

90.    Defendants assert that Count VI must be dismissed because the Complaint fails to plead aiding and abetting securities fraud with particularity under Rule 9(b) and makes only "generalized allegations" against Defendants "without explaining each Defendant's role in the alleged misconduct." Mem. at 43. Not so.

**1.    The elements of aiding and abetting securities fraud are pleaded with particularity.**

91.    New Jersey securities laws were designed to prevent New Jersey from being used as a base of operations for bad actors marauding outside the state and creates a cause of action against one who "[o]ffers, sells or purchases a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, . . . not misleading (the buyer not knowing of the untruth or omission)[.]" N.J.S.A. § 49:3-

71(a)(2). *See Stevens v. Wrigley Pharmaceutical*, 9 N.J. Misc. 385, 386 (N.J. Ch. Div. 1931). To succeed in a cause of action against a "primary actor" for violating New Jersey securities laws, a plaintiff must show the primary bad actor knew of the untruth or omission, intended to deceive the buyer, and that the buyer suffered a loss. N.J.S.A. § 49:3-71(a)(1)–(2); *see also Caspersen as Trustee for Samuel M.W. Caspersen Dynasty Trust v. Martin Oring and Searchlight Minerals Corp.*, 441 F. Supp. 3d 23, 41 (D.N.J. 2020).

92.     Section 49:3-71(d) then establishes *secondary* liability for aiding and abetting the primary actor's securities law violations for "every person . . . or **agent who materially aids in the sale or conduct are also liable jointly and severally** with and to the same extent as the seller or investment banker **unless the non-seller who is so liable sustains the burden of proof that he did not know**, **and** in the exercise of reasonable care **could not have known**," of the primary actor's violations under section 49:3-71(a).[5] N.J.S.A. 49:3-71(d) (emphasis added).

93.     So, once the statute is violated by a primary offender, a person may be liable for "aiding and abetting" if they assisted the primary offender in committing securities fraud and were broker-dealers or agents who materially aided the scheme. N.J.S.A. 49:3-71(d). N.J.S.A. 49:3-49(b) defines an "agent" as "any individual other than a broker-dealer, who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities."

94.     A plaintiff need not prove that the party accused of aiding and abetting the fraud perpetuated by the principal bad actor had scienter under N.J.S.A. 49:3-71(d). Rather, under New

---

[5] Section 49:3-71(a) establishes four grounds for securities law violations, including but not limited to offering or selling a security "by means of any untrue statement of material fact or any omission to state a material fact," and offering or selling a security "by employing any device, scheme, or artifices to defraud." N.J.S.A. 49:3-71(a) (1)–(2).

Jersey law, it is Defendants' burden to prove it "did not know, and in the exercise of reasonable care, could not have known" of the principal's bad acts. N.J.S.A. 49:3-71.

95.     The Complaint here sufficiently pleaded that the primary actors, Salzano, Grabato, and their co-conspirators, engaged in securities fraud. *See* Compl. at ¶¶ 21–44. As explained above, one means of committing securities fraud is through the sale of "a security by engaging in any act . . . which would operate as a fraud or deceit upon any person," N.J.S.A. § 49:3-71(a)(2). The Complaint alleges that the primary actors were selling securities and in doing so, "actively misrepresented information to Investors and failed to disclose their conflicts of interest and misuse of Investors funds, to the personal benefit of the Insiders and their families and friends," Compl. at ¶ 154, thus giving rise to a "fraud or deceit[.]" *Id*. The Complaint also alleges that they operated the Debtors as a Ponzi scheme and engaged in misrepresentations to perpetuate that scheme. Compl. at ¶ 133. The Complaint therefore more than plausibly alleges underlying securities fraud.

96.     The Complaint also sufficiently alleges that Defendants "materially aided" the Debtors through their reviewing and revising of the PPMs and provision of advising, accounting, and other advisory services to NIRA and the Debtors, which in turn facilitated the Insiders in the commission of the fraud. Compl. at ¶ 146. Defendants knew that the PPMs and other offering documents contained materially false and misleading information that concealed the truth about the ongoing Ponzi scheme but did nothing to prevent the distribution of PPMs or the ongoing solicitation of Investors. *Id.* Further, Defendants not only knew about but had themselves identified material misrepresentations that went to the very heart of the Ponzi scheme, including, but not limited to, failures to disclose (a) the co-mingling of Investor funds with general NRIA funds; (b) the ongoing related-party transactions; (c) the non-disclosure of Salzano's criminal record and true managerial, control-person role; (d) the Debtors' non-compliance with GAAP and other applicable

accounting principles; and (e) the risks associated with the lack of arm's length transactions. Compl. at ¶ 65.

97.   Because the Complaint plausibly pleads each element, the Motion should be denied.

**2.   The Complaint's use of narrative fact pleading and collective reference to "Defendants" in the Counts do not merit dismissal.**

98.   For the same reasons set forth in Section III.C.2 above, the Complaint properly pleads aiding and abetting securities fraud. The Complaint sets forth in detail the role each Defendant played in aiding and abetting the securities fraud allegations here. On this point, the Motion should be denied.

**3.   The Complaint sufficiently pleads that Defendants are "agents" under N.J.S.A. § 49:3-49(b).**

99.   Defendants allege that the Liquidation Trustee's claim for aiding and abetting securities fraud must be dismissed because "the Cipolla Defendants are not 'agents' as defined in the NJUSA." Mem. at 37. Their primary arguments are that (i) the definition of "agent" in New Jersey's Uniform Securities Law does not cover limited liability companies, and (ii) the Defendants do not fall within the statutory definition because the Complaint contains no allegations that any of the Defendants "represent[ed] a broker-dealer or issuer in effecting or attempting to effectuate purchase or sales of securities . . . ." Mem. at 40. Both are wrong.

100.   New Jersey statutory law establishes a broad scope of parties that may be liable for violating the Uniform Securities Law. An agent may be held liable under N.J.S.A. § 49:3-71(d) when an agent materially aids in the sale of securities. Within the Uniform Securities Law, "agent" is, in part, defined as "any individual other than a broker dealer, who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities." N.J.S.A. 49:3-49(b).

101.   Nothing in the statute expressly precludes an entity from being an agent, and individual is not defined. Under similar circumstances, a New York appellate court interpreting

New Jersey's Uniform Securities Law found both a law firm and its partner could be held liable as "agents" under N.J.S.A. § 49:3–71(a). In *Oster v. Kirschner*, it was alleged a law firm drafted private placement memorandums containing misrepresentations and omissions that were used to perpetrate a Ponzi scheme. *Oster v. Kirschner*, 77 A.D.3d 51, 905 N.Y.S.2d 69 (2010). Based on the factual allegations and the applicable law, the court found "[a]t this pleading stage plaintiff has adequately alleged that the law firm and Chapman were liable as 'agents[ ] who materially aid[ed] in the sale or conduct' constituting the violation within the meaning of the New Jersey statute [N.J.S.A. § 49:3–71(a)]." *Id.* at 59. Using this same logic, both Cipolla *and* his entities can be held liable as agents under New Jersey's Uniform Securities Law.

102.     Additionally, the Complaint adequately pleads that Defendants actively assisted in the sale of securities. The Complaint thoroughly alleges that Defendants reviewed and revised PPMs that were used to fraudulently induce investors; booked revenue contrary to GAAP; knew the PPMs contained various misrepresentations and omissions; and materially participated in facilitating, marketing, and promoting the sale of securities for their own personal gain. *See, e.g.,* Compl. at ¶¶ 2, 60, 62, 65, 147. Such allegations are more than enough to satisfy the Liquidation Trustee's burden to survive a motion to dismiss. *See Oster,* 77 A.D. 3d at 59.

**V.     Count VII of the Complaint sufficiently pleads aiding and abetting breach of fiduciary duty.**

**A.     The Liquidation Trustee has standing to assert the aiding and abetting breach of fiduciary duty claims in Count VII.**

103.     As shown in Section III.A above, the Plan properly assigned all tort claims to the Liquidation Trust, including the aiding and abetting breach of fiduciary duty claims in Count VII. On this point, the Motion should be denied.

B.    **The doctrine of *in pari delicto* does not merit dismissal of Count VII.**

104.    For the same reasons set forth in Section III.B above, assertion of *in pari delicto* is neither timely nor appropriate because, contrary to Defendants' Motion, the affirmative defense is premature, cannot be established on the face of the Complaint, and cannot defeat the claims of Investors.

105.    On this last point, the aiding and abetting breach of fiduciary duty claim in Count VII is one that Investors have assigned to the Liquidation Trust and that they could have brought independently of the Debtors. Here, the Insiders owed an array of fiduciary duties to its investors, including, but not limited to, (a) act in good faith with, (b) to act in the best interest of, (c) to be honest and candid with, and (d) to make complete and accurate disclosures to the Investors. Compl. at ¶ 153. In their role as accountants and advisors to the Debtors, Defendants were a critical component in the creation and circulation of financial information to Investors.  Defendants were expressly aware of the materials the Insiders intended to use to promote to current and prospective Investors. And Defendants knew that the Insiders were misrepresenting information to Investors, including a failure to disclose conflicts of interests and repeated misuse of Investor funds. Compl. at ¶ 154. Yet rather than working to stop the fraud, Defendants chose to take advantage of it by entering into the October 2021 Agreements while failing to take any meaningful steps to protect the Investors despite knowing of the misleading PPMs. Compl. ¶¶ 155–156.

106.    Given that the Investors could have sought their own claims to recover these damages, the Liquidation Trustee is authorized to raise them now under the Plan.  The Motion on this point should be denied.

C.     **Count VII of the Complaint pleads a claim for aiding and abetting breach of fiduciary duty as to each Defendant that is plausible on its face.**

107.     To survive a motion to dismiss a claim for aiding and abetting breach of fiduciary duty, a plaintiff must allege: (1) a fiduciary duty owed to Debtors or Investors was breached; (2) the Defendants had knowledge of and substantially assisted in the breach; and (3) damages. *Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 307 (D.N.J. 2012) (citing *McCormac v. Qwest Communications Intern., Inc.*, 387 N.J. Super. 469, 482 (App. Div. 2006)).

108.     The thrust of Defendants' Motion is that Complaint's allegations are conclusory and that inaction cannot give rise to a claim for aiding and abetting breach of fiduciary duty. To the contrary, the Liquidation Trustee has pleaded specific facts that more than plausibly show Defendants *actively* aided and abetted the Insiders' breaches of fiduciary duty, including:

- That Salzano, Grabato, and others operated a massive Ponzi scheme and used investor money to pay their own personal expenses and the personal expenses of their family members (Compl. at ¶¶ 22, 21-44);

- That Salzano, in collaboration with his son, charged NRIA, the Fund, and Investors undisclosed annual development fees and reported them contrary to GAAP, grossly inflating NRIA's revenue on its financial statements (Compl. at ¶ 39);

- That Cipolla and CCO billed at least $2,137,935 for purported work, most of which was paid from a trust account maintained by Salzano's criminal defense counsel, which Cipolla and CCO knew contained wrongfully diverted Investor money (Compl. at ¶¶ 57, 60);

- That Cipolla, who could have been acting on behalf of any of his entities, used the original engagements with CCO and CFA Assurance Services to pressure and extract a subsequent, $4.61 million allegedly nonrefundable retainer with his new shell entities, CFA Tax Services and CFA Review Services (Compl. at ¶¶ 51, 52, 57, 69-79, 80-95);

- That through their engagements with the Debtors, Cipolla, CCO, CFA Assurance Services, CFA Tax Services, and CFA Review Services had actual knowledge of the fraud, commingling of assets, noncompliance with GAAP, and Salzano's dealings with family members and used that knowledge to extract a huge retainer and increased fees (Compl. at ¶¶ 57-95 (describing in extensive detail the role of Cipolla and each entity in providing services to NRIA and in extracting additional money from NRIA));

- That Salzano through Grabato pressured NRIA to accept the new engagement with the new Cipolla entities even though he knew they were extremely objectionable and unreasonable (Compl. at ¶¶ 90-95; Ex. S);

- That Salzano insisted that NRIA engage the new Cipolla entities over the objection of virtually all other NRIA officers and their individual and corporate attorneys (Compl. at ¶¶ 77, 81-95);

- That his insistence was motivated by Cipolla's willingness to provide accounting and other financial advisory services that were inconsistent with accepted accounting standards (Compl. at ¶ 78);

- That Cipolla, Grabato, and Salzano led NRIA to believe that the business would crumble without Cipolla's work (Compl. at ¶ 91); and

- That none of the Insiders—who all owed fiduciary duties—ever revised the PPMs to disclose to investors that the Debtors were commingling funds and paying Investors with other Investors' money, all of which Cipolla, and by extension his entities, knew (Compl. at ¶¶ 58, 61-65).

109.    The Complaint states a plausible claim that the Insiders breached their fiduciary duties to the Debtors and Investors. It also sets forth facts that plausibly allege that Cipolla and the other Defendants gained intimate insight into the fraud and, rather than ensuring that the fraud was reported to Investors, pressured the Debtors with help from Salzano to enter into a new engagement for services that were never performed. In fact, the act of Grabato (at the direction of Salzano) entering into those agreements would alone constitute a breach of his fiduciary duty. Because of this conduct, the Debtors and Investors were damaged. The Liquidation Trustee has more than plausibly alleged that Cipolla and the other Defendants aided and abetted breaches of fiduciary duties.

110.    Defendants respond by claiming that mere inaction cannot constitute aiding and abetting breach of fiduciary duty. Mem. at 45–46. But this is beside the point because the Complaint alleges that they actively participated in the breach of duty. And they went much further—the Complaint plausibly alleges that Cipolla used his knowledge of the Ponzi scheme to extract millions from the Debtors. This is a textbook aiding and abetting breach of fiduciary duty

claim. *See Franklin Med. Assocs. v. Newark Pub. Schs.*, 828 A.2d 966, 970, 975-76 (N.J. Super.

Ct. App. Div. 2003) (holding that "a person who" "intentionally causes or assists an agent to violate

a duty to his principal is subject to liability to the principal" and that "a person who bribes an agent

of a principal has 'aided and abetted' the agent in the breach of the agent's fiduciary duty of loyalty

to the principal" (citations omitted)); *Vibra-Tech Eng'rs, Inc. v. Kavalek*, 849 F. Supp. 2d 462, 490

(D.N.J. 2012) ("It is well-settled in New Jersey that one who provides assistance to an agent to

further the agent's breach of duty may be held liable to the principal.").

111.    Because the complaint sufficiently states a claim for aiding and abetting breach of

fiduciary duty, the Motion should be denied.

## VI.    Count VIII of the Complaint sufficiently pleads accounting malpractice.

### A.    The Liquidation Trustee has standing to assert the accounting malpractice claims in Count VIII.

112.    As shown in Section III.A above, the Plan properly assigned all tort claims to the

Liquidation Trust, including the accounting malpractice claims in Count VII.  On this point, the

Motion should be denied.

### B.    The doctrine of *in pari delicto* does not merit dismissal of Count VIII.

113.    For the same reasons set forth in Section III.B above, assertion of *in pari delicto* is

neither timely nor appropriate because, contrary to the Motion, the defense is premature, cannot

be established on the face of the Complaint, and cannot defeat the claims of Investors.

114.    On this last point, the accounting malpractice claim in Count VIII is one that

Investors have assigned to the Liquidation Trust and that they could have brought independently

of the Debtors. *See* N.J.S.A. § 2A:53A-25. Further, the New Jersey Supreme Court has limited *in pari delicto* in actions against accountants to only apply when wrongdoers stand to benefit from a

recovery, which is not the case here. *See NCP Litig. Trust v. KPMG LLP*, 187 N.J. 353 (2006). For these reasons, the Motion should be denied.

### C.   Count VIII of the Complaint pleads a claim for accounting malpractice as to each Defendant that is plausible on its face.

115.   Defendants argue that the Liquidation Trustee's accounting malpractice claim fails to state a claim because the allegations do not specify (i) who, how or when any of the Defendants breached a duty of care; (ii) who, how or when Defendants allegedly "advised NRIA [to] book revenue for development fees upon initial execution of an agreement, rather than at the time NRIA satisfied its performance obligations;" (iii) who, how or when any of the Defendants overstated the consequences of not retaining the Defendants; (iv) what misrepresentations or breach of accounting principles caused NRIA damages; or (v) how NRIA was damaged. Mem. at ¶ 49.

116.   In short, Defendants essentially complain that the Complaint fails to plead accounting malpractice with particularity under Rule 9(b). But Rule 9(b) does not apply to this claim. Instead, Rule 8 applies, and the Liquidation Trustee has far exceeded its requirement to plead "a short and plain statement of the claim showing that the pleader is entitled to relief."

117.   To survive a motion to dismiss, a plaintiff need only plead facts to plausibly show that: (1) Cipolla and the Cipolla Affiliates owed a duty of care to the Debtors; (2) that Cipolla and the Cipolla Affiliates breached that duty; and (3) the breach proximately caused injury to the Debtors. *Worster-Sims v. Tropicana Ent., Inc.*, No. CIV. 13-1981 RBK/JS, 2014 WL 2468602, at *4 (D.N.J. June 3, 2014) (citing *LaBracio Family P'ship v. 1239 Roosevelt Ave., Inc.*, 340 N.J.Super. 155, 773 A.2d 1209, 1212 (N.J. Super. Ct. App. Div. 2001)).

118.   As to the first, accountants owe their clients a duty of care. *Levine v. Wiss & Co.*, 97 N.J. 242, 246, 478 A.2d 397, 399 (1984) ("An accountant must exercise reasonable care in preparing reports, verifying underlying data, and examining the methods employed in arriving at

financial statements. An incorrect financial statement, negligently prepared by an accountant and justifiably relied upon, may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance.") (internal quotations omitted). The Liquidation Trustee has plausibly pleaded that it engaged Cipolla and *all* the Cipolla Affiliates:

- That on March 26, 2021, Cipolla executed an engagement letter on behalf of CCO to perform accounting services for the benefit of NRIA (Compl. at ¶ 51);

- That on March 30, 2021, Cipolla executed an agreement under which he would provide accounting services to NRIA, but CFA Assurance Services would be paid for the work (Compl. at ¶ 52);

- That payments for services were sent to Cipolla Financial Advisors LLC, CFA Review Services, LLC, CFA Tax Services, LLC, and Cipolla himself as sole member of the foregoing entities (Compl. at ¶¶ 57, 9–13);

- That, in preparing work product for NRIA, Cipolla failed to identify the entity on behalf of which he was working (*see* Compl. Ex. K, L); and

- That, in preparing work product for NRIA, Albert Manzo—a Managing Director at CCO and Cipolla Financial Advisors, LLC, failed to identify the entity on behalf of which he was working (*see* Compl. Ex. M).

119. Far more than "bald" factual assertions, the Liquidation Trustee has plausibly alleged privity and direct involvement of Cipolla and all Defendants sufficient to plausibly claim that each owed a duty to the Debtors.

120. The Liquidation Trustee has also plausibly alleged that Defendants breached their duty of care by, among other things, providing services contrary to GAAP and using information they gained through their engagement to extract money from the Debtors, including:

- That Cipolla, CFA Tax Services LLC, and CFA Review Services LLC were engaged under a $4.6 million retainer after Cipolla used information obtained through the engagement to pressure NRIA to engage his newly formed entities to perform services he had already been performing (Compl. at ¶¶ 69–79);

- That Cipolla, CFA Tax Services LLC, and CFA Review Services LLC leveraged their knowledge of the fraud to obtain higher rates and a higher retainer (Compl. at ¶¶ 69–79);

- That Cipolla, who could have been acting on behalf of any of his entities, advised NRIA that the development fees it received for real estate projects could be recognized as revenue as soon as a deal was executed rather than waiting until the company satisfied its performance obligations in contravention of GAAP, which was contrary to the PPMs and inflated revenues (Compl. at ¶¶ 39, 78–79, 164–170; Compl. Ex. S; *see also* Summary Cease and Desist Order at 2 [Docket No. 60]); and

- That Cipolla, who could have been acting on behalf of any of his entities, lied to NRIA in order to obtain higher fees and a larger retainer (Compl. at ¶¶ 66–72, 80–95).

121.    Defendants also claim that the Complaint fails to show "how NRIA was damaged." Mem. at 49. Yet the Complaint is rife with facts that support the Liquidation Trustee's contention that Defendants used their engagement—and non-GAAP-compliant advice—to extract Investor funds from the Debtors:

- Cipolla, who could have been acting on behalf of any of his entities, used the original engagements with CCO and CFA Assurance Services to pressure and extract a subsequent, $4.61 million nonrefundable retainer engagement with his new entities, CFA Tax Services and CFA Review Services (Compl. at ¶¶ 51, 52, 57, 69–79, 80–95);

- That NRIA "received no services or other consideration of any kind in exchange for the transfer of the retainers to CFA Tax Services and CFA Review Services" (Compl. at ¶ 95);

- That Cipolla agreed to refund the retainer and never did and never produced any work product related to the retainers (Compl. at ¶¶ 97-99); and

- That Cipolla and CCO billed tens of thousands of dollars of services that amounted to mere meetings, discussions, and document reviews (Compl. at ¶ 57).

122.    In sum, Defendants' Motion simply ignores most relevant facts pleaded in the Complaint and asserts that the Liquidation Trustee must satisfy some higher, nebulous pleading standard of Defendants' own invention. Properly evaluated under Rule 8, the Complaint plausibly alleges accounting malpractice against each Defendant. On this point, the Motion should be denied.

## VII.   Count IX of the Complaint sufficiently pleads turnover of property of the estate.

123.    Defendants next argue that Count IX should be dismissed because section 542 only applies to assets that are undisputedly property of the bankruptcy estate, and the Complaint does

not allege that the transfers at issue have been avoided. Defendants' primary citation for this proposition is the case of *Liquidating Tr. of the Amcast Unsecured Creditor Liquidation Trust v. Baker (In re Amcast Indus. Corp.)*, 365 B.R. 91, 122 (Bankr. S.D. Ohio 2007) (citing *Stanziale v. Pepper Hamilton LLP (In re Student Finance Corp.)*, 335 B.R. 539, 554 (D. Del. 2005)). In that case, the court held that a turnover action cannot proceed until a transfer to the defendant "has been avoided and ownership is no longer in dispute." *In re Amcast Indus. Corp.*, 365 B.R. at 122. This case is different than *Amcast* for one key reason.

124.    In *Amcast*, the trustee was attempting to claw back transfers made to the defendant in contravention of the terms of certain agreements. *Id.* at 121. The trustee argued that the transfers were not payable under the agreements and therefore "wrongful" and remained property of the estate. *Id.* The recipient argued that the debtor didn't retain any legal or equitable interest in the funds after the transfers. *Id.* The court agreed with the recipient, finding that "the funds are not considered property of the estate until the Liquidating Trustee obtains a judgment that the transfers were fraudulent transfers." *Id.*

125.    Here, the Liquidation Trustee does not assert that the $4.61 million transferred to CFA Review Services, LLC, CFA Tax Services, LLC, and Cipolla are property of the estate because they are avoidable. Instead, the Liquidation Trustee contends that they are property of the estate as a matter of law because *they are retainers*.

126.    The Complaint alleges that the $4.61 million paid to CFA Review Services, LLC, CFA Tax Services, LLC, and Cipolla were retainers, were paid by NRIA, and were thus property of the estate. Compl. at ¶ 172.

127.    When a professional receives a retainer it improperly claims is non-refundable, that retainer remains property held for the benefit of the client. *See Fischer v. Fischer*, 375 N.J. Super.

278, 287, 867 A.2d 1190, 1196 (App. Div. 2005) (finding non-refundable retainer provision of

attorney fee agreement unenforceable and directing that the retainer be returned to client); *In re*

*Lackawanna Med. Grp., P.C.,* 323 B.R. 626, 630 (Bankr. M.D. Pa. 2004) ("The general rule is

that, unless shown to be otherwise, a retainer constitutes funds held in trust for the benefit of the

debtor, i.e., a security retainer.") (internal quotations omitted).

128.    Because the Complaint properly pleads that the $4.61 million constitute retainers

that remained property of the estate, the Motion on this point should be denied.

**VIII.   <u>Count X of the Complaint sufficiently pleads conversion.</u>**

**A.     The Complaint states a claim for conversion that is plausible on its face.**

129.    To state a claim for conversion under New Jersey law, a plaintiff must allege the

defendant intentionally exercised "dominion or control over a chattel which so seriously interferes

with the right of another to control it that the actor may justly be required to pay the other the full

value of the chattel." *Meisels v. Fox Rothschild LLP*, 222 A.3d 649, 660 (N.J. 2020) (quoting *Chi.*

*Title Ins. Co. v. Ellis*, 978 A.2d 281 (N.J. Super. App. Div. 2009)). A defendant may be liable

for conversion even when "he acted in good faith and in ignorance of the rights or title of the

owner." *Id.* (citations omitted). "Thus, intentional or negligent acts can give rise to

a conversion cause of action." *Id.* (citations omitted).

130.    Defendants essentially argue that the Liquidation Trustee's conversion claim is

subsumed into its breach of contract claim and that "New Jersey courts require that a plaintiff show

something more than a contractual obligation on the part of a defendant to pay the plaintiff to

establish conversion." Mem. at ¶ 51. Indeed, to avoid transforming an average breach of contract

into a conversion claim, New Jersey courts have held that "[a]n action for conversion will not lie

in the context of a mere debt." *Bondi v. Citigroup, Inc.*, 32 A.3d 1158, 1190 (N.J. Super. App. Div.

2011) (citations omitted). Even so, "where the [tortious conduct] is extrinsic to the contract . . . the

plaintiff is not prohibited from pursuing simultaneous tort and contract claims." *G&F Graphic Servs., Inc. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 591 (D.N.J. 2014) (quoting *Lithuanian Com. Corp. v. Sara Lee Hosiery*, 219 F.Supp.2d 600, 607 (D.N.J. 2002)).

131.    The Liquidation Trustee's conversion claim goes beyond mere breach of contract. As stated above, the $4.61 million payments were retainers. The Motion correctly notes that a conversion claim is proper if a plaintiff can "show that the money in question was identifiably the plaintiff's property or that the defendant was obligated to segregate such money for the plaintiff's benefit." Mem. at ¶ 51 (citing *AV Design Servs., LLC. v. Durant*, No. CV 19-8688 (RBK/KMW), 2021 WL 1186842, at *11 (D.N.J. Mar. 30, 2021)). This is exactly what the Complaint asserts.

132.    The Liquidation Trustee further alleges that NRIA was fraudulently induced into turning over the retainer funds and that Cipolla and his newly formed entities failed to return the retainers after a proper demand. Compl. at ¶¶ 180–203. This is different from a breach of contract claim.

133.    In short, the Complaint properly pleads that CFA Review Services, LLC, CFA Tax Services, LLC, and Cipolla converted retainers. On this point, the Motion should be denied.

**B.      The Liquidation Trustee has standing to assert conversion in Count X.**

134.    As shown in Section III.A above, the Plan properly assigned all tort claims to the Liquidation Trust, including the conversion claim in Count X. On this point, the Motion should be denied.

**C.      The economic loss doctrine does not apply to the Liquidation Trustee's conversion claim.**

135.    Defendants assert that the economic loss doctrine precludes a conversion claim. This argument fails for many of the same reasons that their Civil Rule 12(b)(6) fails. Generally, the economic loss doctrine helps to maintain distinction between tort and contract actions. *G&F*

*Graphic Services*, 18 F. Supp. 3d at 588–89 (quoting *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 310, 314 (N.J. 2002)). "Essentially, the economic loss doctrine functions to eliminate recovery on 'a contract claim in tort claim clothing.'" *G&F Graphic Services*, 18 F. Supp. 3d at 588–89 (quoting *SRC Constr. Corp. v. Atl. City Hous. Auth.*, 935 F. Supp. 2d 796, 801 (D.N.J. 2013)). But if "a plaintiff asserts that a defendant breached a 'duty owed to the plaintiff that is independent of the duties that arose under the contract,' . . . the economic loss doctrine does not apply." *G&F Graphic Services*, 18 F. Supp. 3d at 588–89 (quoting *Saltiel*, 170 N.J. at 317).

136.    New Jersey courts accordingly recognize a "fraud in the inducement" exception to the economic loss doctrine. Under even the narrowest interpretation of that exception, Plaintiff's conversion claim survives:

> District Courts in this Circuit have interpreted [the relevant caselaw] as requiring the conclusion that where the fraud alleged is contained within the four corners of the contract, that is, where it concerns the nonfulfillment of a warranty or a guarantee contained in the contract, the plaintiff is prohibited from pursuing a separate tort claim; but, where the fraud is extrinsic to the contract, that is, where it more closely resembles a 'fraud in the inducement' claim, then the plaintiff is not prohibited from pursuing simultaneous tort and contract claims.

*G&F Graphic Services*, 18 F. Supp. 3d at 591 (quoting *Lithuanian Commerce*, 219 F. Supp. 2d at 607). Plaintiff's conversion claim is not based on the "nonfulfillment of a warranty or a guarantee contained in the contract." Indeed, it is based on Defendants' tortious conduct and the fraudulent inducement that led to the execution of the contracts.

137.    Once NRIA made a demand for the return of the $4.61 million retainers and Defendants refused to return the money, Defendants' actions gave rise to a cause of action for conversion. *See Meisels*, 222 A.3d at 661 ("The demand is the linchpin that transforms . . . possession into a setting of tortious conduct."). The economic loss doctrine simply does not apply. On this point, the Motion should be denied.

IX.   **Count XI of the Complaint sufficiently pleads fraudulent inducement.**

A.   **The Complaint states a claim for fraudulent inducement that is plausible on its face.**

138.   Defendants contend that "the Complaint fails to plausibly allege all of the elements of a claim for fraudulent inducement." Mem. at 53. Yet the Motion contains virtually no discussion of the elements of a fraudulent inducement claim. Instead, it contends that the Complaint fails to state a claim for fraudulent inducement because "the Complaint is devoid of any allegations that the so-called advice and recommendations" that Defendants made to NRIA were false, or that they knew of their falsity. Mem. at 54.

139.   Defendants appear to have overlooked several allegations that plausibly show Defendants' advice and misrepresentations were false or made with knowledge of their falsity.

140.   As recounted in the Complaint, Cipolla (acting on his own but also as a representative of the Cipolla Affiliates) stated that he would perform certain work under the October 2021 Agreements and that NRIA would suffer dire financial consequences if he and the newly established Cipolla Affiliates were not immediately retained. Compl. at ¶¶ 189–192. This was false. The Complaint also alleges that Cipolla, on his own and through the Cipolla Affiliates, advised NRIA that it could pay the $4.61 million in retainers from development fees booked as revenue upon initial execution of the October 2021 Agreements rather than when NRIA satisfied its performance obligations, despite knowing that doing so violated accepted accounting standards. Compl. at ¶ 188. Again, false. And Cipolla made these representations despite knowing that, at the time, NRIA was commingling Investor funds, misrepresenting the availability and source of funds to Investors, and using Investors funds to pay distributions to other Investors. Compl. at ¶ 187.

141.   In all, the Complaint outlines the scheme undertaken by Cipolla to induce NRIA into fronting $4.61 million in retainers, why NRIA relied on such inducement, and how, ultimately,

Cipolla and the other Defendants misrepresented their intention to have Defendants complete the work under the October 2021 Agreements.

### B.    The Complaint pleads fraudulent inducement with particularity.

142.    Defendants next claim that the Complaint fails to allege Count XI with sufficient particularity under Rule 9(b). Defendants also assert that the fraudulent inducement claim fails because the Complaint must, but does not, differentiate between each Cipolla defendant. Both arguments fail.

143.    As is set forth above and in detail in the Complaint, Cipolla with the help of Salzano pressured NRIA into entering into the October 2021 Agreements.

144.    Also as explained above, the allegations in the Complaint do not resemble the "shotgun" pleadings at issue and found insufficient in the authorities cited by Defendants. Instead, Plaintiffs have provided a plethora of facts in a logical narrative format that lays out in detail the conduct of Defendants.

145.    The particularity requirement is enforced to ensure that defendants are given adequate notice of their alleged misconduct and a chance to respond. The Complaint does just that.

### C.    The Complaint sufficiently states claims against all Defendants.

146.    Defendants lastly contend that because the October 2021 Agreements were allegedly only entered between NRIA, CFA Review Services, and CFA Tax Services, the Liquidation Trustee's claim for fraudulent inducement must be dismissed as against defendants Cipolla, Cipolla & Co., Cipolla Assurance Services, and Cipolla Financial Advisors. Defendants, however, cite no authority to support this blanket assertion. A claim for fraudulent inducement—as acknowledged by Defendants already—mirrors a claim for fraud, which does not depend on a contractual relationship, or proof that certain named parties were in privity with a particular agreement. *See Kare Distribution, Inc. v. Jam Labels and Cards LLC*, Civ. No. 09-00969 (SDW),

2009 WL 3297555, at *4 (D.N.J. Oct. 9, 2009) ("The standard for establishing a claim of common

law fraud . . . and fraudulent inducement under New Jersey law is the same . . . .") (citing *Banco*

*v. Popular N. Am. V. Gandi*, 184 N.J. 161, 172–173 (internal citations omitted)).

147.    Cipolla is the mouthpiece for all the Cipolla Affiliates. He personally made the

statements alleged in Count XI. At the same time, Cipolla & Co., Cipolla Assurance Services, and

Cipolla Financial Advisors had been engaged and were being paid by NRIA. Yet despite having

provided services under his existing entities, Cipolla incorporated two new ones just before

entering into the October 2021 Agreements.

148.    Cipolla essentially asks for the Court to restrict liability to one set of Defendants

solely because those Defendants are the parties to the October 2021 Agreements. But context

dictates that Cipolla could have been speaking for himself or for the entities already employed by

NRIA at the time the statements were made.

149.    It is premature to permit Defendants to silo liability, especially given the

Liquidation Trustee's informational disadvantage as a third party to the Debtors' transactions with

Defendants. Given the liberal pleading standards afforded trustees, the Court should deny the

Motion as to this point.

**X.**    **Count XII of the Complaint sufficiently pleads breach of contract.**

150.    Defendants first challenge the breach of contract claim in Count XII under their

"shotgun" pleading theory. As explained above, the allegations in the Complaint do not resemble

the "shotgun" pleadings at issue and found insufficient in the authorities cited by Defendants.

151.    Next, Defendants try to excuse their breach by reference to provisions in the

October 2021 Agreements stating that their obligations to perform would not commence until

certain financial statements had been complete. This is a red herring.

152.    In Cipolla's October 28, 2021 email, not only does he refuse to perform work under the October 2021 Agreements—he states that he is *stopping all work*. *See* Exhibit CC to the Complaint. This includes the work he and the other Defendants were already contractually obligated to do, which he admits in his email must be done, before NRIA can complete its financial statements. In other words, Defendants are arguing that they were relieved of the obligation to perform based on failure of a condition that Cipolla himself orchestrated. New Jersey contract law does not permit this. *See In re Chiro Plus, Inc.*, 339 B.R. 111, 114 (D.N.J. 2006) ("The prevention doctrine provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition").

153.    Defendants also argue that there are no damages for their alleged breach because the retainers are nonrefundable based on certain provisions of the contracts. But that argument suffers from the same defect. The relevant language reads:

> … (iv) Client terminates the engagement on the basis of any reason other than CFA's failure to timely issue a review report; or (v) such fee is nonrefundable should you or the Fund or NRIA later decide or determine that any or all of the services contemplated by this agreement are not desired or required, or should we withdraw from this engagement because we are unable to perform due to circumstances beyond our control.

Exhibit U to the Complaint; *see also* Exhibit T to the Complaint (using similar language).

154.    Defendants' reliance on subpart (iv) is misplaced for two reasons. First, the breach alleged in the Complaint occurred before termination, so subpart (iv) could not preclude a finding of damages. Second, subpart (iv) does not apply at all because, as noted above, Defendants refused to perform.

155.    Defendants' reliance on subpart (v) is equally misplaced. That provision only applies to circumstances beyond Defendants' control. But as noted above, the circumstances giving rise to the breach were entirely caused by Defendants' conduct.

156.    The Complaint is clear—Cipolla, CFA Tax Services, and CFA Review Services promised to perform certain services, were given a retainer for those services, failed to perform those services, and did not return the retainer. Compl. at ¶ 66–102. Cipolla himself made it abundantly clear how important it was that he perform these services. *See, e.g.,* Compl. at ¶ 89. Yet they did not and kept the retainers anyway. On this point, the Motion should be denied.

## XI.    Count XIII of the Complaint sufficiently pleads disallowance of claims.

157.    Defendants next argue that the Liquidation Trustee's request to disallow Defendants' claims under section 502(d) of the Bankruptcy Code should be dismissed because Defendants have not yet been found liable. This is meritless.

158.    Rule 3007(b) expressly permits claim objections to be brought in an adversary proceeding, and in fact requires it when an objection is combined with other requests for relief.

159.    Defendants' Motion on this point should be denied.

## XII.    Count XIV of the Complaint sufficiently pleads equitable subordination.

160.    Defendants next argue that Plaintiff's request to equitably subordinate the claims of Defendants should be dismissed.

161.    For equitable subordination to apply, "(1) [t]he claimant must have engaged in some type of inequitable conduct; (2) [t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) [e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code]." *Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*, 554 F.3d 382 (3d. Cir. 2009). The Complaint pleads a plethora of facts about Defendants' inequitable conduct and misconduct; a truth the Motion does not appear to challenge.

162.    Instead, Defendants assert that dismissal is appropriate because the Liquidation Trustee is improperly attempting to subordinate debt to equity. Defendants are wrong.

163.     The Complaint seeks to subordinate the claims of Defendants to those of general unsecured creditors and Investors. Compl. at ¶ 216.

164.     As often happens in many Ponzi scheme cases, Investors have claims that sound like both debt and equity. Notwithstanding these distinctions, the Plan is clear that Investor claims are "Claims" and not "Interests." *See* definition of "Investor Claim" in Article I.A of the Plan ("For purposes of the Plan and except as expressly provided herein, an Investor Claim shall be treated as a 'Claim', regardless of whether such Investor Claim arises from a Claim asserted against one or more of the Debtors or an Equity Interest asserted in one or more of the Debtors."). Further, Investor Claims are treated as "Claims" in Class 5 and not Equity Interests in Class 8. *See* Articles II.A and II.B.5 of the Plan.

165.     Defendants did not object to the classification or treatment of Investor Claims in the Plan and cannot now assert, after confirmation, that they should be considered interests for purposes of section 510(c). On this point, the Motion should be denied.

## XIII.   <u>Count XV of the Complaint sufficiently pleads unjust enrichment.</u>

166.     Defendants assert that the Complaint fails to state a claim for unjust enrichment because: (1) the Complaint does not allege how each Defendant was unjustly enriched; and (2) the Liquidation Trustee can and has claimed breach of contract, rendering a claim for quasi-contractual liability unavailable. Mem. at 61–62. Both arguments fail.

167.     The Complaint plainly and plausibly alleges how the three applicable Defendants were unjustly enriched at NRIA's expense. Cipolla created two shell entities, CFA Review Services and CFA Tax Services, which collectively received $4.61 million in retainers for his benefit. As the Complaint makes clear, Defendants received these funds because of the coercion of Cipolla and Salzano. Compl. at ¶ 223. CFA Review Services and CFA Tax Services are wholly owned by Cipolla, who was the ultimate beneficiary of these transfers.

168.    Defendants' actions here, as alleged, were not motivated by an effort to provide accounting and financial services to NRIA, but to materially benefit and profit from the fraud. *Id.* at ¶¶ 52, 57–5, 222–224.

169.    New Jersey law permits an unjust enrichment claim to be pleaded alongside a breach of contract claim. *See, e.g., Palmeri v. LG Elecs. USA, Inc.*, No. CIV.A.07-5706(JAG), 2008 WL 2945985, at *6 (D.N.J. July 30, 2008) (rejecting Defendants' exact argument). That Defendants legitimately think they can argue the October 2021 Agreements, which Grabato signed, permit them to walk away with $4.61 million dollars without having done or having to do a scintilla of work is precisely why a count of unjust enrichment is appropriate.

170.    As to this point, the Motion should be denied.

## CONCLUSION

WHEREFORE, for the reasons stated above in this Opposition, the Liquidation Trustee submits that the Court should deny the Motion in its entirety, and respectfully requests that the Court grant the Liquidation Trustee such other relief that the Court deems just and proper.

Dated: June 10, 2024
New York, New York

**ICE MILLER LLP**

*/s/ Louis T. DeLucia*
Louis T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
Ryan Hibbard, Esq. (admitted *pro hac vice*)
1500 Broadway, Suite 2900
New York, NY 10036
Phone: (212) 835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com
ryan.hibbard@icemiller.com

John C. Cannizzaro (admitted *pro hac vice*)
250 West Street, Suite 700
Columbus, OH 43215
Phone: (614) 462-2700
john.cannizzaro@icemiller.com

*Counsel to the AIRN Liquidation Trust Co., LLC in its capacity as Liquidation Trustee of the AIRN Liquidation Trust*