**GIBBONS P.C.**
Robert K. Malone, Esq.
Mark B. Conlan, Esq.
Christopher P. Anton, Esq
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey  07102
Telephone:  (973) 596-4500
Email: rmalone@gibbonslaw.com
         mconlan@gibbonslaw.com
         canton@gibbonslaw.com
         kmcevilly@gibbonslaw.com

*Attorneys for the Cipolla Defendants*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC,<br><br>          Debtor. | Chapter 11<br><br>Case No. 22-14539 (JKS)<br><br>Hon. John K. Sherwood |
| AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>          Plaintiff,<br><br>   v.<br><br>JOSEPH CIPOLLA, CIPOLLA & CO., LLC, CFA ASSURANCE SERVICES LLC, CFA REVIEW SERVICES LLC, CFA TAX SERVICES LLC, CIPOLLA FINANCIAL ADVISORS LLC, and DOES 1-100,<br><br>          Defendants. | Adv. Pro. No. 24-01097-JKS |

## REPLY BRIEF IN SUPPORT OF MOTION OF CIPOLLA DEFENDANTS TO DISMISS PLAINTIFF'S ADVERSARY COMPLAINT PURSUANT TO RULE 7012 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. v

PRELIMINARY STATEMENT ......................................................................... 1

ARGUMENT .................................................................................................... 6

I.      THERE IS NO JUSTIFICATION FOR APPLYING A RELAXED PLEADING
        STANDARD UNDER FED. R. CIV. P. 9(B) ...................................................... 6

II.     THE COMPLAINT IS FATALLY DEFICIENT BECAUSE IT FAILS TO
        DISTINGUISH BETWEEN ESTATE CLAIMS AND INVESTOR CLAIMS ................ 7

III.    THE LIQUIDATION TRUSTEE'S AVOIDANCE CLAIMS IN COUNTS I
        AND III ARE INSUFFICIENTLY PLEADED AND SHOULD BE DISMISSED .......... 9

IV.     COUNTS II AND IV (CONSTRUCTIVELY FRAUDULENT TRANSFERS)
        MUST BE DISMISSED ................................................................................. 10

        A.      The Liquidation Trustee Failed to Plead Receipt of Less Than Reasonably
                Equivalent Value ............................................................................. 10

        B.      The Liquidation Trustee fails to plead that NRIA was insolvent at the time
                of the transfers ............................................................................... 14

V.      COUNT V (AIDING AND ABETTING FRAUD) MUST BE DISMISSED ................ 15

        A.      The Liquidation Trustee is judicially estopped from asserting claims
                outside of Chapter 5 of the Bankruptcy Code ................................... 16

                1.      The Cipolla Defendants Have Suffered From Irreconcilably Inconsistent
                        Positions ................................................................................. 17

                2.      The Change in Positions Were Undertaken in Bad Faith .............. 18

                3.      Judicially Estopping the Liquidation Trustee is Appropriate ........ 19

        B.      The Cipolla Defendants did not waive their right to contest the assignment
                of any claim to the Liquidation Trust .............................................. 20

        C.      Bankruptcy Code Section 1123(a) does not preempt New Jersey's
                prohibition on the assignment of the Investors' prejudgment tort claims. .......... 22

        D.      New Jersey's bar on assignment of prejudgment tort claims is not limited
                to personal injury claims ................................................................ 24

i

Table of Contents (continued)

Page

E.   Count V (along with Counts VI, VII and VIII) is deficient because the
     Complaint does not identify the Contributing Investors on whose behalf
     the Liquidation Trustee purports to assert claims and does not allege facts
     showing that the investors are entitled to recover damages .................................. 25

F.   The Claim for Aiding and Abetting Fraud is Barred by the Doctrine of In
     Pari Delicto ......................................................................................................... 27

     1.   Raising the in pari delicto doctrine at the pleading stage is not premature
          ..................................................................................................................... 27

     2.   The Appointment of Brian Casey does nothing to cleanse the Liquidation
          Trust of the Debtors' bad acts .................................................................. 28

     3.   The Adverse Interest Exception to In Pari Delicto is inapplicable .......... 31

G.   The Complaint Does Not Meet the Pleading Requirements for Aiding and
     Abetting Fraud ..................................................................................................... 34

H.   The Complaint Fails to Plead Fraud with Particularity. ....................................... 36

VI.   COUNT VI (AIDING AND ABETTING SECURITIES FRAUD) MUST BE
      DISMISSED ................................................................................................................. 37

A.   As Corporate Entities, Cipolla & Co., CFA Tax, CFA Review CFA
     Assurance Services LLC and Cipolla Financial Advisors LLC Cannot be
     Liable as "Agents" Under the NJUSA .................................................................. 37

B.   The Cipolla Defendants did not Represent a Broker-Dealer or Issuer in
     Effecting or Attempting to Effect Purchases or Sales of Securities and,
     therefore, are not "Agents" under the NJUSA ...................................................... 39

C.   The Claim for Aiding and Abetting Securities Fraud is a Non-Assignable
     Tort Claim. ........................................................................................................... 40

D.   Count Six is deficient because the Complaint does not identify the
     Contributing Investors on whose behalf the Liquidation Trustee purports
     to assert claims and does not allege facts showing that the investors are
     entitled to recover damages .................................................................................. 40

E.   The Claim for Aiding and Abetting Securities Fraud is Barred by the
     Doctrine of In Pari Delicto .................................................................................... 40

F.   The Complaint Fails to Meet the Applicable Pleading Requirements .................. 41

VII.  COUNT VII (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY)
      MUST BE DISMISSED ............................................................................................... 42

Page

A.    The Claim for Aiding and Abetting Breach of Fiduciary Duty is a Non-Assignable Tort Claim. ........................................................................................ 43

B.    Count Seven is deficient because the Complaint does not identify the Contributing Investors on whose behalf the Liquidation Trustee purports to assert claims and does not allege facts showing that the investors are entitled to recover damages ................................................................................. 43

C.    The Claim for Aiding and Abetting Breach of Fiduciary Duty is Barred by the Doctrine of In Pari Delicto ................................................................. 43

D.    The Complaint Fails to State a Claim for Aiding and Abetting Breach of Fiduciary Duty ........................................................................................ 43

VIII.    COUNT VIII (ACCOUNTING MALPRACTICE) MUST BE DISMISSED ................. 45

A.    The Claim for Accounting Malpractice is a Non-Assignable Tort Claim. ........... 45

B.    Count VIII is deficient because the Complaint does not identify the Contributing Investors on whose behalf the Liquidation Trustee purports to assert claims and does not allege facts showing that the investors are entitled to recover damages. ................................................................................. 46

C.    The Claim for Accounting Malpractice is Barred by the Doctrine of In Pari Delicto. ................................................................................................. 46

D.    The Complaint Fails to State a Claim for Accounting Malpractice ..................... 46

1.    The Liquidation Trustee's GAAP allegations are a red herring. .............. 47

2.    The Complaint's exhibits directly contradict the Complaint's false allegations that the Cipolla Defendants "pressured" NRIA to enter the October 2021 Agreements. ....................................................................... 49

3.    The Cipolla Defendants were not privity with Debtors in connection with the Kovel work and did not prepare or review the Debtors' financial statements. ................................................................................... 50

IX.    COUNT IX (TURNOVER) MUST BE DISMISSED .................................................... 51

X.    COUNT X (CONVERSION) MUST BE DISMISSED ................................................. 54

A.    The Complaint Fails to State a Claim for Conversion. ......................................... 54

B.    The Economic Loss Doctrine Bars the Liquidation Trustee's Conversion Claim. ................................................................................................................. 55

XI.    COUNT XI (FRAUDULENT INDUCEMENT) MUST BE DISMISSED .................... 55

Table of Contents (continued)

Page

A.   The Complaint Fails to Plausibly Allege All of the Elements of a Claim
for Fraudulent Inducement....................................................................... 55

B.   The Complaint Fails to Plead Fraudulent Inducement with Particularity............. 56

C.   Even Assuming the Liquidation Trustee has a Viable Fraudulent
Inducement Claim, the Claim Must be Dismissed as to Defendants
Cipolla, Cipolla & Co., and Cipolla Financial Advisors. ..................................... 57

XII.    COUNT XII (BREACH OF CONTRACT) MUST BE DISMISSED ............................ 58

XIII.   COUNT XIII (DISALLOWANCE OF CLAIMS) MUST BE DISMISSED.................. 59

XIV.    COUNT XIV (EQUITABLE SUBORDINATION) MUST BE DISMISSED ................ 60

XV.     COUNT XV (UNJUST ENRICHMENT) MUST BE DISMISSED.............................. 61

CONCLUSION .................................................................................................... 61

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Trust v. Goldman Sachs & Co.*,
748 F.3d 110 (2d Cir. 1024)............................................................16

*AIRN Liquidation Trust Co., LLC v. Media Effective*,
Bankr. D.N.J. Adv. Pro No. 23-13335................................................2

*Alcman Services Corp. v. Samuel H. Bullock, P.C.*,
925 F. Supp. 252 (D.N.J. 1996) ......................................................45

*Amash v. Home Depot U.S.A., Inc.*,
503 B.R. 232 (Bankr. NDNY 2013) ...................................................19

*Archer v. Defenders, Inc.*,
2020 WL 3128029 (Bankr. D. Del. June 12, 2020)...............................17

*ATS Claim, LLC v. Epson (In re TFT-LCD Antitrust Litig.)*,
2009 U.S. Dist. LEXIS 93448 (N.D. Cal. Oct. 6, 2009).........................26

*Banco Popular N. Am. v. Gandi*,
184 N.J. 161 (2005) ......................................................................56

*Bartol v. Barrowclough*,
251 F. Supp. 3d 855 (E.D. Pa. 2017) ................................................36

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 127 S. Ct. 1955, 1965 (2007).......................................15

*Bogie v. Rosenberg*,
705 F.3d 603 (7th Cir. 2013) ..........................................................53

*Braunstein v. Benjamin Berman, Inc.*,
No. 89-5344, 1990 WL 192547 (D.N.J. Sept. 12, 1990)........................39

*In re Butcher*,
72 B.R. 447 (Bankr. E.D. Tenn. 1987) ..............................................12

*Cast Art Industries, LLC v. KPMG LLP*,
209 N.J. 208 (2012) ......................................................................50

*In re Chiro Plus, Inc.*,
339 B.R. 111 (D.N.J. 2006) ............................................................58

v

*Claybrook v. Broad and Cassel, P.A. (In re Scott Acquisition Corp.)*,
    364 B.R. 572 (Bankr. D. Del. 2007) ..................................................................31

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004).......................................................................20, 23

*In re Complaint of Weeks Marine, Inc.*,
    2006 U.S. Dist. LEXIS 52838 (D.N.J. August 1, 2006)........................................23

*In re Congoleum*,
    2008 Bankr. LEXIS 2375 (Bankr. D.N.J. Sept. 2, 2008)..................................22, 23

*Connecticut Nat'l Bank v. Giacomi*,
    242 Conn. 17, 699 A.2d 101 (Conn. 1997)............................................36, 37, 38

*Conopco, Inc. v. McCreadie*,
    826 F. Supp. 855 (D.N.J. 1993) ......................................................................45

*Danise v. Saxon Mortg. Servs. Inc.*,
    738 F. App'x 47 (3d Cir. 2018) .......................................................................18

*DHP Holdings II Corp. v. Home Depot, Inc*,
    435 D.R. 264, 272 (Bankr. D. Del. 2010) ........................................................58

*Diamond v. Mesisca Riley & Kreitenberg, LLP*,
    2017 Bankr. LEXIS 1462 (9th Cir. BAP May 31, 2017) ......................................10

*East Orange Lumber Co. v. Christian Feiganspan*,
    120 N.J.L. 410, 199 A. 778 (N.J. Sup. Ct. 1938), *aff'd*, 124 N.J.L. 127, 10
    A.2d 732 (1940) ...........................................................................................24

*Fischer v. Fischer*,
    375 N.J. Super. 2789 (App Div. 2005) ............................................................52

*G-I Holdings, Inc. v. Reliance Inc. Co.*,
    586 F.3d 247 (3d Cir. 2009).........................................................................16

*Giuliano v. Nursing Corp.*,
    339 B.R. 570 (Bankr. D. Del. 2006) ................................................................59

*Glenfed Financial Corp. v. Penick Corp.*,
    276 N.J. Super. 163 (App. Div. 1994) .............................................................53

*Glenn v. First Nat. Bank in Grand Junction*,
    868 F.2d 368 (10th Cir. 1989) ..................................................................36, 57

*Grunwald v. Bronkesh*,
    131 N.J. 483, 621 A.2d 459 (1993)................................................................45

vi

*Gujja v. Inpatient Servs. of N.J.*,
   2022 U.S. Dist. LEXIS 129011 (D.N.J. July 20, 2022) ........................................................60

*Integrated Solutions, Inc. v. Service Support Specialties, Inc.*,
   124 F.3d 487 (3d Cir. 1997) ....................................................................................23, 25, 45

*Kare Distribution, Inc. v. Jam Labels and Cards LLC*,
   2009 WL 3297555 (D.N.J. Oct 9, 2009) ..........................................................................56

*Kimball Intern., Inc. v. Northfield Metal Products*,
   334 N.J. Super. 596 (App. Div. 2000) ...............................................................................23

*Kirschner v. KPMG LLP*,
   15 N.Y.3d 446, 938 N.E.2d 941, 912 N.Y.S.2d 512 (N.Y. 2010) .........................................31

*Krommenhoek v. Natural Resources Recovery*,
   166 B.R. 701 (Bankr. D. Idaho 1994) .....................................................................10, 12, 13

*Kyrstal Cadillac-Oldsmobile GMC Truck, Inc., Inc. v. GMC*,
   337 F.3d 314 (3d Cir. 2003) ................................................................................16, 17, 18, 19

*La. Farmers' Protective Union v. Great Atl. & Pac. Tea Co. of Am.*,
   40 F. Supp. 897 (D. Ark. 1941), *rev'd for failure to allow amendment*, 131
   F.2d 419 (8th Cir. 1942) .................................................................................................26

*In re Lackawanna Med. Group, P.C.*,
   323 B.R. 626 (Bankr. M.D. Pa. 2004) ...............................................................................52

*In re Le-Nature's Inc.*,
   2009 WL 3526569 (W.D. Pa. Oct. 23, 2009) ......................................................................30

*In re Le-Nature's Inc.*,
   2009 WL 3571331 (W.D. Pa. Sept. 16, 2009) .....................................................................30

*Levine v. Wiss &*,
   97 N.J. 242 (1984) .........................................................................................................50

*Montrose Med Grp. Participating Savings Plan v. Bulger*,
   243 F.3d 773 (3d Cir. 2001) .......................................................................................16, 19

*N. Cal. Monument Dealers Ass'n v. Interment Ass'n. of Cal.*,
   120 F. Supp. 93 (N.D. Cal. 1954) .....................................................................................26

*Nisselson v. Lernout*,
   469 F.3d 143 (1st Cir. 2006) ............................................................................................32

*In re NorVergence, Inc.*,
   424 B.R. 663 (Bankr. D.N.J. 2010) ....................................................................................6

*Official Comm of Unsecured Creditors v. R.G. Lafferty & Co., Inc.*,
  267 F.3d 340 (3d Cir. 2001)............................................................ *passim*

*Official Committee of Unsecured Creditors of Cooper Tile, Inc. v. Coopers &
  Lybrand*,
  322 F.3d 147 (2d Cir. 2003)........................................................2, 17, 32

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
  848 F.2d 414 (3d Cir. 1988).............................................................16, 20

*Ortlieb v. Hudson Bank*,
  312 F.Supp.2d 705 711 (E.D. Pa. 2004) ..........................................17, 19

*Oster v. Kirschner*,
  77 A.D.3d 51, 905 N.Y.S.2d 69 (App. Div., 1st Dep't, 2010) ...............38

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008)....................................................................33

*Picard v. HSBC Bank PLC*,
  457 B.R. 25 (S.D.N.Y. 2011) *opinion amended by In re Bernard L. Madoff
  Inv. Sec. LLC*, 2011 WL 3477177 (S.D.N.Y. Aug. 8, 2011) ...................32

*PNC Bank v. Housing Mortgage Corp.*,
  899 F. Supp. 1399 (W.D. Pa. 1994).......................................................33

*Schpok v. Fodale*,
  64 Mich. App. 441, 236 N.W.2d 97 (1975) ...........................................38

*Sikirica v. US Foods, Inc.*,
  500 B.R. 729 (Bankr. W.D. Pa. 2013) ...................................................58

*Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders in Het
  Kapitaal Van Saybolt Int'l B.V. v. Schreiber*,
  407 F.3d 34 (2d Cir. 2005)......................................................................24

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*,
  906 A.2d 168 (Del. Ch. 2006).................................................................7

*United States v. Kovel*,
  296 F.2d 918 (2d Cir. 1961)........................................................ *passim*

*Village of Ridgewood v. Shell Oil Co.*,
  289 N.J. Super. 181, 673 A.2d 300 (App. Div. 1996) ...........................24

*Viridian Res., LLC v. Inco Ltd.*,
  2023 U.S. Dist. LEXIS 99466 (D.N.J. June 7, 2023) ...........................54

*Watts & Co. v. Miles & Stockbridge*,
    95 Md. App. 145, 620 A.2d 356 (Md. Ct. Spec. App. 1993)....................................41

*Weiland v. Palm Beach Cty. Sheriff's Office*,
    792 F.3d 1313 (11th Cir. 2015) ..................................................36

*In re Winstar Communs., Inc.*
    554 F.3d 382 (3d. Cir. 2009)......................................................59

*Wootton v. Ravkind*,
    143 B.R. 671 (Bankr. N.D. Tex. 1992)........................................12, 13

*Zazzali v. Hirschler Fleischer, P.C.*,
    482 B.R. 495 (D. Del. 2012)........................................................7

**Statutes**

11 U.S.C. 101(16) ..............................................................................59

11 U.S.C. § 101(14) ............................................................................52

11 U.S.C. § 502(d) ..................................................................8, 58, 59

11 U.S.C. § 541(a)(1) ....................................................................20, 22

11 U.S.C. § 548(a)(1)(A) ....................................................................8

11 U.S.C. § 548(a)(1)(B) ....................................................................8

11 U.S.C. § 548(d)(2)(a) ..............................................................12, 13

11 U.S.C. § 550(a) ..............................................................................8

11 U.S.C. § 551(a) ..............................................................................8

11 U.S.C. § 1123(a)(5).....................................................................21, 22

N.J.S.A. 2A:25-1.............................................................................23, 24

N.J.S.A. 25:2-25(a)(1) .......................................................................8

N.J.S.A. 25:2-25(b)...........................................................................8

N.J.S.A. 25:2-29(1)...........................................................................8

N.J.S.A. 49:3-71................................................................................8

N.J.S.A. § 2A:25-1.........................................................................24, 25

N.J.S.A. § 2A:53A-25 .........................................................................................49

N.J.S.A. § 25:2-25(a)(1)(A) ....................................................................................8

N.J.S.A. § 49:3-47 ..............................................................................................36

N.J.S.A. § 49:3-49(i) ...........................................................................................37

N.J.S.A. § 49:3-49(b) ..............................................................................36, 37, 38, 39

N.J.S.A. § 49:3-56(a) ..........................................................................................39

N.J.S.A. § 49:3-57 ..............................................................................................39

N.J.S.A. § 49:3-71(d) ..........................................................................................40

**Rules**

FED. R. BANKR. P. 7012 ..........................................................................................3

FED. R. BANKR. P. 9016 ..........................................................................................6

FED. R. CIV. P. 8 ...............................................................................................46

FED. R. CIV. P. 8(a)(2) ...............................................................................35, 36, 50

FED. R. CIV. P. 12(b)(6) ................................................................................. *passim*

FED. R. CIV. P. 15(a)(1)(B) .....................................................................................1

FED. R. CIV. P. 9(b) ...................................................................................... *passim*

N.J. Court R. 5:3-5(b) .........................................................................................52

Joseph Cipolla ("**Cipolla**"), Cipolla & Co., LLC ("**Cipolla & Co.**"), CFA Assurance Services LLC, CFA Review Services, LLC ("**CFA Review**"), CFA Tax Services, LLC ("**CFA Tax**") and Cipolla Financial Advisors, LLC (collectively, the "**Cipolla Defendants**") hereby submit this Reply Brief in further support of the *Motion of Cipolla Defendants to Dismiss Plaintiff's Adversary Complaint Pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure* [ECF No. 10] (the "**MTD**")[1] and, in support thereof, respectfully state as follows:

## PRELIMINARY STATEMENT

The MTD presents a virtual roadmap of the plethora of legal and factual deficiencies in the Complaint.  The Liquidation Trustee has ignored that road map and, foregoing the opportunity to amend as of right under FED. R. CIV. P. 15(a)(1)(B), has opposed the MTD with equally deficient arguments in a vain attempt to justify its filing of a frivolous and fatally flawed Complaint, with 32 exhibits that largely contradict its baseless allegations.

The Liquidation Trustee blatantly ignores the timeline of events because they contradict its skewed version of the "facts" of this case.  Specifically, the fact that the Cipolla entities were engaged and commenced services after, and in response to, governmental investigations and Salzano's March 2021 arrest.  Moreover, the commitments that NRIA requested and CFA Tax and CFA Review agreed to in the October 2021 Agreements (including but not limited to the preparation of hundreds of tax returns and financial statements for seven (7) reporting periods, including two financial statements to be restated/corrected) were necessary from NRIA's perspective and were contracted for seven and one-half (7½) months *after* Salzano's arrest.  It is beyond dispute that the reviews in accordance with Generally Accepted Accounting Principles ("**GAAP**") and tax compliance engagement would have inured to the benefit of all stakeholders,

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the MTD.

including the Investors, had the Debtors not breached those same agreements by, among other failures, never restating substantially erroneous financial statements for 2018 and 2019, not posting the $2.85 million escrow that was required as part of the October 2021 Agreements, and failing to honor hold-harmless and indemnification obligations under the October 2021 Agreements.  *See* Compl., Ex. U at 8.

Instead, with contrived, conclusory and fanciful storytelling, the Liquidation Trustee is using this litigation against the Cipolla Defendants as a form of extortion by engaging in vexatious litigation through the use of malicious allegations that are unsupported by the actual facts, most of which are obvious from the Complaint's numerous exhibits.  The Liquidation Trustee does not get to manufacture facts to suit a biased and conflicted narrative with impunity, as it is doing here and elsewhere before this very Court.[2]  A careful review of the exhibits filed with the Complaint (which control when contrary to the Complaint's allegations), along with other pleadings filed by the Liquidation Trustee (or its counsel during its representation of the Official Committee of Unsecured Creditors (the "**Committee**")), goes a long way towards exposing a pattern of deceit and the truth.

The Liquidation Trustee's Opposition Brief does nothing to address the myriad discrepancies that were highlighted in the MTD.  Many of the Complaint's purported allegations of "fact" are demonstrably inconsistent with the exhibits that were attached to the Complaint. Those exhibits, in large measure, undermine the Complaint's distorted version of the facts.  As set forth in the MTD, when there is a discrepancy between a factual allegation in a complaint and an exhibit to a complaint, the law is clear—the exhibit controls.

---

[2] *See generally AIRN Liquidation Trust Co., LLC v. Media Effective*, Bankr. D.N.J. Adv. Pro No. 23-13335 (Liquidation Trustee submitted false declaration).

The Liquidation Trustee's Opposition Brief also fails miserably to address or clarify one of the most fiercely disputed issues raised in the MTD: the Liquidation Trustee's persistent, intentionally misleading and false use of the word "retainer."  Whether or not the fees paid constituted a "retainer" is a legal conclusion, not an allegation of fact.  Persistent repetition of the word does not magically transform a legal conclusion into a fact.  A quick review of Ex. T and Ex. U make abundantly clear that the transfers constituted completed in-full payments by NRIA of the contracts, with far reaching irrevocable commitments by CFA Review and CFA Tax, refundable only in narrowly negotiated circumstances.

The Complaint's allegations that the Cipolla Defendants were "aiding and abetting" the Debtors in any way is contrary to the content of the Complaint's exhibits and ignores the fact that Cipolla & Co, CFA Assurance Services LLC, CFA Review and CFA Tax all commenced an arbitration against NRIA and the Partners Portfolio Investors Fund I, LLC (the "**Fund**") in 2021. AAA Case No. 1-21-0017-5529.[3]  The omission of that fact from the Complaint appears to have been intentional with reckless disregard for the truth and done with clear intent to mislead this Court.

Neither the Complaint nor the Opposition Brief explain how accountants that provided privileged and confidential comments to a draft of an amended Private Placement Memorandum ("**PPM**"), at the request of NRIA's defense and regulatory counsel pursuant to a *Kovel* agreement, could possibly have done anything beyond just that—prepare a list of the draft amended PPM's disclosure deficiencies from an accounting perspective and provide those comments to NRIA's counsel that was responsible for drafting the amended PPM.  *See* Compl., Ex. K and Ex. L.

---

[3] For the Court's information, a copy of the *Amended Statement of Claim* (the "**Statement of Claim**") filed in the AAA arbitration is attached to the *Declaration of Joseph P. Cipolla, Jr. in Support of Motion of the Cipolla Defendants to Dismiss Plaintiff's Adversary Complaint Pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure* submitted herewith as **Exhibit A**.

Notably, while the Liquidation Trustee continues its quixotic crusade against the Cipolla Defendants, it has not commenced suit against the law firm that actually drafted the amended PPM at issue, or certain other NRIA officers or professionals that were brought in, like certain Cipolla Defendants, after Salzano's arrest.  All of the Complaints' aiding and abetting counts (Count 5 through Count 7) are predicated on the Liquidating Trustee's unsupported supposition that Cipolla & Co., which was clearly engaged *after* Salzano's arrest as part of the solution to address myriad shortcomings, including but not limited to causing the restatement of the 2018 and 2019 consolidated financial statements that woefully overstated revenue and understated expenses, was somehow free to breach the confidential and privileged terms of the *Kovel* engagement agreement and make a whistleblower call to securities regulators.  *See* Compl., <u>Exs. E & I</u>.  The comments set forth in <u>Ex. L</u> were self-evidently designed to improve the level of factual disclosure and transparency to investors and potential investors that reviewed the amended PPM, if any were subsequently distributed to investors.  Those comments are the antithesis of aiding and abetting any wrongdoing.  The Opposition Brief does not even try to explain the factual disparities between the allegations in the Complaint and its exhibits because the truth does not support the hypothesis being put forth by the Liquidation Trustee.

The Liquidation Trustee also alleges that NRIA was coerced into the October 2021 Agreements and manipulated to maintain its own books and records in a manner that was beneficial to the Cipolla Defendants.  <u>Ex. U</u> makes clear that NRIA and its affiliates were solely responsible for their own financial statements that CFA Review agreed to review and report on.  <u>Ex. U</u> at 6. <u>Ex. U</u> also establishes that other accounting firms were pursued by NRIA to perform the reviews and they refused to do so.  <u>Ex. U</u> at 8.  This is hardly a case of coercion.

The Liquidation Trustee must distinguish between the Debtors' and purported Investors' claims. The Opposition Brief does nothing to clean up the mess created by the Liquidation Trustee's combined pleading of Debtors' claims, which are indisputably subject to imputation of the Debtors' bad acts (among other defenses), and the purportedly assigned Investor claims, which are barred under New Jersey law (among other defenses). The Complaint, on its face, deprives the Cipolla Defendants of due proces; the Liquidation Trustee has failed to identify who is bringing what charges against the Cipolla Defendants.

Similarly, in nine (9) out of fifteen (15) counts, the Liquidation Trustee names "All Defendants," yet the Complaint fails to articulate which defendant did what to plausibly state a claim against any defendant. For example, the Complaint names Mr. Cipolla in all fifteen (15) counts merely because he was the "mouthpiece" of certain Cipolla Defendants. Opposition Brief, ¶ 147. There are no plausible allegations of fact that support naming Mr. Cipolla in any count individually—all counts against him must be dismissed.

The Complaint is nothing more than a back-door, unfounded attempt by the Liquidation Trustee to divest the Debtors' former accountants of contractual payments that were clearly bargained for, and to which CFA Review and CFA Tax were fully entitled to pre-petition, under binding written agreements, which did not require fifteen (15) defamatory and sensationalized counts in a publicly filed Complaint.

For these reasons, and those stated below, the appropriate remedy is obvious, the Court must dismiss the Complaint in its entirety.

## ARGUMENT

I.    **THERE IS NO JUSTIFICATION FOR APPLYING A RELAXED PLEADING STANDARD UNDER FED. R. CIV. P. 9(B)**

Counts 1 through 6 and 11 are subject to the heightened pleading standard mandated by FED. R. CIV. P. 9(b).  The Liquidation Trustee repeatedly asks this Court to apply FED. R. CIV. P. 9(b) "liberally" because a "trustee" is bringing the claims.  The Court should reject that request.  First, the "trustee" here is not one appointed pursuant to either section 1104 or 701 of the Bankruptcy Code.  The Liquidation Trustee appointed under the confirmed Plan is represented by the very same counsel that represented the Committee that was appointed in this case by the Office of the United States Trustee over two (2) years ago.  ECF No. 94.  Additionally, two of the three members of the Trust Oversight Committee are former members of the Committee.  *Compare* Notice of Appointment of Official Committee of Unsecured Creditors [ECF No. 94] *with* the Liquidation Trust Agreement [ECF No. 2732-1 at 22].

The Liquidation Trustee's counsel has taken extensive discovery in the underlying bankruptcy case over the last two (2) years.  Cipolla & Co. voluntarily produced[4] approximately 136,000 pages of discovery to the Committee more than a year before the Complaint was filed.  Indeed, during the fourteen (14) month period from the Committee's appointment on June 30, 2022, through the Plan Effective Date on August 23, 2023, Ice Miller's professionals issued nearly one hundred (100) Rule 2004 Subpoenas and alone billed in excess of 10,000 hours and almost $5.5 million dollars working on the NRIA chapter 11 cases.  *See* ECF No. 3772 at 5.  Incredibly, almost 3,000 of those hours, at a cost of $1,379,050 were spent on *Litigation and Avoidance Action Analysis/Rule 2004 Discovery*.  *Id.*

---

[4] The Cipolla Defendants voluntarily made the document production in the spirit of cooperation despite the fact that the Committee's Rule 2004 Subpoena has never as of this date been properly served as required by FED. R. BANKR. P. 9016.

The Liquidation Trustee's reliance on *In re NorVergence, Inc.*, 424 B.R. 663, 688 (Bankr. D.N.J. 2010), which involved a chapter 7 trustee, is misplaced.  Neither the Liquidation Trustee nor its counsel is standing in the shoes of a chapter 7 trustee that just parachuted into the case. They have been in this case almost from the beginning and spent close to $1.4 million and counting on litigation and discovery. The Liquidation Trustee's counsel also actively negotiated, drafted and proposed the *Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* [ECF No. 2558] and the *Liquidation Trust Agreement* [ECF No. 2732-1].  Thus, the Liquidation Trustee better positioned than most, if not all, plaintiffs alleging fraud to meet the standards of FED. R. CIV. P. 9(b).  *See Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495 (D. Del. 2012) (citing *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 211 (Del. Ch. 2006)).  In sum, having been deeply engrossed in this case for more than two (2) years, there is no justification for the Court to give the Liquidation Trustee the benefit of relaxed pleading standard; FED. R. CIV. P. 9(b) mandates that the Liquidation Trustee plead with particularity.

## II.    THE COMPLAINT IS FATALLY DEFICIENT BECAUSE IT FAILS TO DISTINGUISH BETWEEN ESTATE CLAIMS AND INVESTOR CLAIMS

The Complaint purportedly asserts fifteen (15) counts on behalf of the Debtors' substantively consolidated estates and/or the "Contributing Investors" (as defined in the Plan). However, the Complaint and the Opposition Brief make absolutely no attempt to distinguish between whose claims are being asserted, *i.e.*, the Debtors' claims or the Contributing Investors' claims, count by count, which raises due process concerns because the defenses may differ based on whose claim is asserted.  The Complaint should be dismissed on this basis alone.  The Cipolla Defendants are nevertheless addressing the specific counts based on their assumptions about whether each count asserts estate claims, investor claims, or both.

As best as the Cipolla Defendants can discern from the vague and conclusory allegations in the Complaint (and arguments in the Opposition Brief), it appears that the Liquidation Trustee is asserting the following claims on behalf of the Debtors' estates only:  (1) Avoidance and Recovery of Actual Fraudulent Transfers (Counts 1 & 3); (2) Avoidance and Recovery of Constructively Fraudulent Transfers (Counts 2 & 4); Turnover (Count 9); Conversion (Count 10); Fraud in the Inducement (Count 11); Breach of Contract (Count 12); Disallowance of Claim (Count 13); and Unjust Enrichment (Count 15).  On behalf of the Contributing Investors (only), it appears that the Liquidation Trust is asserting Aiding & Abetting Fraud (Count 5); and Aiding & Abetting Securities Fraud (NJ) (Count 6); and Aiding & Abetting Breach of Fiduciary Duty (Count 7).  Finally, it appears that the Liquidation Trust is bringing the following claims on behalf of the Debtors' estates and the Contributing Investors:  Accounting Malpractice (Count 8); and Equitable Subordination (Count 14).  A tabular breakdown of the Counts in the Complaint therefore reflect the following:

| Count | Alleged Cause of Action | Estate Claim | Investor Claim |
|---|---|---|---|
| 1 & 3. | Actual Fraudulent Transfer (11 U.S.C. §§ 548(a)(1)(A), 550(a) and 551(a)) and N.J.S.A. 25:2-25(a)(1) | X | |
| 2 & 4. | Constructively Fraudulent Transfer (11 U.S.C. §§ 548(a)(1)(B), 550(a) and 551(a)) and N.J.S.A. 25:2-25(b) and 25:2-29(1) | X | |
| 5. | Aiding & Abetting Fraud | | X |
| 6. | Aiding & Abetting Securities Fraud Pursuant to N.J.S.A. 49:3-71 | | X |
| 7. | Aiding & Abetting Breach of Fiduciary Duty | | X |
| 8. | Accounting Malpractice | X | X |
| 9. | Turnover Of Property of the Estate | X | |
| 10. | Conversion | X | |
| 11. | Fraud in the Inducement | X | |
| 12. | Breach of Contract | X | |
| 13. | Disallowance of All Claims Pursuant to 11 U.S.C. § 502(d) | X | |
| 14. | Equitable Subordination | X | X |
| 15. | Unjust Enrichment | X | |

Of course, had the Plan and Complaint been properly structured with full and clear disclosures, the Cipolla Defendants and the Court would not be left to guess which hat the Liquidation Trustee is wearing with respect to each asserted claim.

### III.  THE LIQUIDATION TRUSTEE'S AVOIDANCE CLAIMS IN COUNTS I AND III ARE INSUFFICIENTLY PLEADED AND SHOULD BE DISMISSED

As set forth at length in the MTD, Counts I and III of the Complaint, which seek to avoid and recover the $4.61 million of fee payments as actual fraudulent transfers pursuant to sections 548(a)(1)(A), 550(a) and 551(a) of the Bankruptcy Code and N.J.S.A. § 25:2-25(a)(1)(A), must be dismissed because the Liquidating Trustee failed to adequately plead that the transfers were made "in furtherance of" the Ponzi scheme.  A cursory review of the Complaint reveals that there is not a single non-conclusory allegation of fact that indicates the transfers at issue were in furtherance of a Ponzi scheme.  Counts I and III of the Complaint simply recite two identical paragraphs that consist of nothing more than rote conclusory recitals of the statutory elements:

> each transfer was made with actual intent to hinder, delay, or defraud creditors because, among other things, they were made in furtherance of and perpetuated the Ponzi scheme….

Compl., ¶¶ 108, 122.  The Opposition Brief also points to two (2) equally conclusory allegations of "in furtherance of" in the Facts section of the Complaint.  Compl., ¶¶ 19, 94.  These allegations fall far short of meeting Fed. R. Civ. P. 9(b)'s particularity requirement (and the relaxed pleading standard the Liquidation Trustee requests).

Contrary to the conclusory allegations in the Complaint, the exhibits to the Complaint show that the tax returns and financial review for which CFA Tax and CFA Review were engaged would have cast a bright light on the Debtors' disclosures and operations, including restated financial statements that never occurred after NRIA's breaches and abrogation of the contracts,  and would

have been indisputably detrimental to a Ponzi scheme, not in furtherance of one.[5]  Because the

Liquidation Trustee's actual fraudulent transfer claims are premised solely on the Ponzi

presumption, without a scintilla of factual allegations showing how the transfers at issue were in

furtherance of a Ponzi scheme, Counts I and III must be dismissed.  As an additional ground for

dismissing these counts as against Mr. Cipolla, it is undisputed that he is not an initial transferee

and the Complaint merely alleges in vague and conclusory fashion that "CFA Review Services,

CFA Tax Services., and Cipolla were the initial and/or subsequent transferees and/or were the

persons for whose benefit the transfers were made."  Compl., ¶¶ 102, 121.  This is not enough

under any pleading standard.

## IV.   COUNTS II AND IV (CONSTRUCTIVELY FRAUDULENT TRANSFERS) MUST BE DISMISSED

### A.   The Liquidation Trustee Failed to Plead Receipt of Less Than Reasonably Equivalent Value

As set forth in the MTD, the Complaint fails to plausibly allege any facts in support of its

conclusory allegation that the Debtors received less than reasonably equivalent value in exchange

for the October 2021 Agreements.  The Liquidation Trustee's Opposition Brief fails to show

otherwise.

Courts have held that an enforceable executory promise may constitute reasonably

equivalent value in the fraudulent transfer context.  *See Diamond v. Mesisca Riley & Kreitenberg,*

*LLP*, 2017 Bankr. LEXIS 1462 (9th Cir. BAP May 31, 2017) (law firm's promise in fee agreement

to provide future litigation services to debtor constituted reasonably equivalent value for debtor's

execution of a $635,000 promissory note and deeds of trust encumbering five of debtor's

---

[5] CFA Tax and CFA Review reluctantly agreed to provide the services described in the October 2021 Agreements more than seven (7) months after Salzano's arrest in order to help all stakeholders get through the fallout from the governmental regulatory investigations without losing everything.

properties); *Krommenhoek v. Natural Resources Recovery*, 166 B.R. 701 (Bankr. D. Idaho 1994) (debtor's contractual right to obtain a wood pallet production plant was reasonably equivalent value for two installment payments totaling $54,667 made by the debtor even though the contract was never completed due to the debtor's default).

In the present case, the promise of CFA Tax and CFA Review to perform valuable tax and financial statement (and restatement) review services pursuant to GAAP under the October 2021 Agreements constituted reasonably equivalent value for the fixed fees paid by NRIA, despite NRIA's default.[6]  CFA Tax agreed to prepare and file hundreds of federal, state and local tax returns for tax years 2020 and 2021.  Compl., Ex. T at 2; *see also* Bankruptcy Case ECF No. 16 at 22 (NRIA Corporate Organizational Chart depicting the scope of the number of entities involved). In connection with the CFA Review Agreement, CFA Review agreed to conduct a review engagement on a consolidated basis for seven (7) separate accounting periods from 2018 to 2022 (including reviews of restated financial statements for $29 million of overstated revenue and tens of millions of understated expenses Cipolla identified and mandated for 2018 and 2019—these irregularities eventually made their way into public pleadings of the government).  Compl., Ex. U at 1.

---

[6]The CFA Review Agreement required NRIA, in addition to the payment of the fees, to post an escrow in the amount of $2,850,000 to provide for CFA Review's anticipated fees and expenses incurred in connection with "any pending, threatened or actual litigation, or with respect to any regulatory or governmental investigations, or any proceeding requiring our time and resources … arising from this engagement or any engagement between any CFA affiliate and any of you or your legal counsel…."  Compl., Ex. U at 8.  Even though the Complaint fails to state that NRIA never posted the escrow, which constituted NRIA's material breach of the CFA Review engagement agreement, it is obvious from the fact that the Complaint does not look to avoid or recover the $2,850,000 escrow fee.  The Statement of Claim describes NRIA's other breaches, including unilateral abrogation of the contracts and unpaid fees and costs consistent with hold-harmless and indemnification clauses in the these agreements.

In addition to these massive undertakings, the fixed fees under the CFA Tax Agreement and the CFA Review Agreement state that the fees reflect, among other things, (i) the amount of time and resources that would need to be spent on the engagements, including the negative impact those engagements would have on other existing Cipolla clients; (ii) the multi-year risk of becoming embroiled in litigation, including investigations by regulatory authorities, (iii) the known withdrawal by and refusal of other accounting firms to provide the requested tax and review services, (iv) the reputational risk of doing accounting work for NRIA and being associated with the review of NRIA's financial statements, and (v) the professional liability exposure for taking on "known risks" with the engagement, in light of the then ongoing investigations of management without the ability to obtain adequate insurance.  Compl., Ex. T at 6-7.

The cases cited in the Liquidation Trustee's opposition brief dealing with executory promises, *In re Butcher*, 72 B.R. 447 (Bankr. E.D. Tenn. 1987) and *Wootton v. Ravkind*, 143 B.R. 671 (Bankr. N.D. Tex. 1992), are readily distinguishable.  In *Butcher*, the defendant law firms agreed to perform future legal services for the debtor's wife and children in exchange for a $50,000 prepetition transfer by the debtor.  The law firms maintained that the debtor received value because the debtor's duty to support his wife and children included an obligation to pay their legal fees.  In rejecting that argument, the court citied the definition of "value" in Bankruptcy Code section 548, which includes "property, or satisfaction or securing of a present antecedent debt of the debtor, *but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor*…."  *Id.* at 450 (quoting 11 U.S.C. § 548(d)(2)(a)) (emphasis added).  The court held that agreement to perform future legal services on behalf of the debtor's family is outside the scope of "value" as defined in section 548.  The present case, unlike *Butcher*, does not involve a promise

12

to furnish support to a relative of a debtor.  Thus, the agreements to perform accounting services under the October 2021 Agreements fall within the scope of "value" under section 548.[7]

In *Wootton*, the debtor's bankruptcy trustee sought to void and recover the debtor's transfer of $200,000 of cash and $100,000 of art to his criminal defense attorney.  The debtor agreed to employ the attorney to represent him in all criminal matters that might arise in connection with two financial institutions for a flat fee.At the time of the transfers, the debtor was not a defendant in any criminal proceedings.  The debtor was not indicted until approximately three and one-half years after the transfers occurred and more than three years after he filed his chapter 11 petition. The bankruptcy court held that the fee arrangement violated Bankruptcy Code sections 329 and 330.  The court also noted in *dicta* that even if the transfers were not made in contemplation of or in connection with the debtor's chapter 11 case, "the Defendant's retainer would be vulnerable to disgorgement under § 548(a)(2)" because the debtor was insolvent and the transfers were for less than a reasonably equivalent value.

Significantly, the *Wootton* court based its determination that the defendant's agreement to provide future legal representation did not constitute reasonably equivalent value on a fundamentally flawed reading of the definition of "value" in Bankruptcy Code section 548(d)(2)(A).  Ignoring the import of the specific reference in section 548(d)(2)(A) to an unperformed promise to furnish support to the debtor or a relative of the debtor, the court erroneously interpreted the definition of "value" as excluding *all* unperformed future considerations.  *Id.* at 681.  The *Wootton* court cited to 4 COLLIER ON BANKRUPTCY ¶ 548.07 at

---

[7]In *Krommenhoek*, *supra*, the court noted that the exclusion of a promise "to furnish support to the debtor or to a relative of the debtor" from the definition of value strongly implies that any other kind of enforceable executory promise is value for purposes of section 548.  *Id.* at 705 (citing 2 David Epstein, Steve Nickles, and James White, Bankruptcy § 6-49 at 21 (1992)).

548-77 (15th ed. 1987) in support of this dubious interpretation.  However, the current edition of

the Collier treatise notes that "with only limited exceptions, 'any . . . kind of enforceable executory

promise is value for purposes of section 548.'" 5 COLLIER ON BANKRUPTCY ¶ 548.03[5] (16th

2024) (quoting *Krommenhoek*, *supra*, 166 B.R. at 705).  The treatise further notes that "one such

exception would be unperformed contracts for support, which the statute explicitly excludes from

the concept of value." *Id*. at n. 58.

In any event, that facts in *Wootton* are plainly distinguishable from those in the present

case.  NRIA paid the fixed fees to CFA Tax and CFA Review in exchange for well-defined services

for which there was an immediate need and not for services that were not rendered for three and

one-half years and that may never have been required at all.

In sum, the Liquidation Trustee's reliance on inapposite and wrongly decided case law

cannot cure the failure to plead the Cipolla Defendants' receipt of less than reasonably equivalent

value.

### B.    The Liquidation Trustee fails to plead that NRIA was insolvent at the time of the transfers

As set forth in the Cipolla Defendants' MTD, the Complaint also fails to plausibly allege

that NRIA was insolvent on October 26, 2021, the date the subject transfer were made.  Compl.,

Ex. AA.  The Liquidation Trustee's Opposition Brief cannot and does not cure this fatal defect.

The Opposition Brief accuses the Cipolla Defendants of "cherry-picking" language from

the Complaint to make it appear that insolvency is only alleged generally and points to paragraph

94 of the Complaint where it states that the "*Debtors* transferred the $4.61 million … to CFA Tax

Services and CFA Review Services … at a time when *the Debtors were insolvent*."  Opp. Brief,

¶ 13-14; Compl., ¶94 (emphasis added).  Whether or not "the Debtors" were insolvent on a

consolidated basis is not the point.  Ex. AA to the Complaint establishes that NRIA was the

transferor, not the "Debtors." <u>Ex. T</u> (at 3) and <u>Ex. U</u> (at 3) both include NRIA's express representation that the fees were paid from NRIA's own funds.

The Opposition Brief goes on to point to the allegations contained in paragraph 117 of the Complaint, which alleges in full:

> On the date of the transfers, NRIA (i) was insolvent, or became insolvent as a result of such transfers; (ii) was engaged in business or a transaction or was about to engage in business or a transaction, for which any property remaining with NRIA constituted unreasonably small capital; or (iii) intended to incur, or believed that it would incur, debts that would be beyond NRIA's ability to pay as such debts matured.

Compl., ¶ 117.  There is no plausible allegation of fact in the Complaint that NRIA was insolvent on October 26, 2021, the date of the transfers.  More is required under the *Twombly-Iqbal* pleading standards, however, than parroting the elements of a claim and a rote formulaic conclusion of law. In *Twombly*, the Supreme Court said that on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007) (internal citations and quotations omitted).  This is precisely what the Liquidation Trustee has done in its Complaint, which the Court must reject.

Finally, the Liquidation Trustee cites a number of cases for the proposition that Ponzi schemes are inherently insolvent.  However, none of the cited cases say that a plaintiff is excused from plausibly alleging facts in support of a constructively fraudulent transfer claim that show that the transferor NRIA was insolvent on the date of the transfers.  The Liquidation Trustee's formulaic recital of the elements of insolvency allegations in the Complaint do not meet the bar required by *Twombly* and *Iqbal*.

## V.     COUNT V (AIDING AND ABETTING FRAUD) MUST BE DISMISSED

The MTD established that: (1) prejudgment tort claims are not assignable under New Jersey state law; (2) the claim is barred by the doctrine of *in pari delicto*; and (3) the Complaint fails to

state a claim for aiding and abetting fraud.  The Liquidation Trustee has responded by asserting that (i) the Defendants waived the right to challenge the assignability of the state law claims; (ii) the claims at issue were assigned to the Liquidation Trust notwithstanding any state law transfer restrictions, and (iii) New Jersey's prohibition on the assignment of tort claims only applies to personal injury claims.  None of those arguments save the Liquidation Trustee's defective Complaint.  Moreover, as a threshold issue, the Plan failed to appropriately identify the claims asserted in the Complaint, and therefore, the Liquidation Trustee is judicially estopped from asserting them.

### A.      The Liquidation Trustee is judicially estopped from asserting claims outside of Chapter 5 of the Bankruptcy Code

The Plan, Disclosure Statement and *Non-Exclusive Description of Preserved Liquidation Trust Actions* (the "Preserved Action List") [ECF No. 2732-4] fail to specifically identify a claim against the Cipolla Defendants, judicially estopping the Liquidation Trustee from bringing the claims in the Complaint.  The equitable doctrine of judicial estoppel preserves the integrity of the judicial system by barring a party that has previously asserted a legal position from asserting an inconsistent or contrary legal position in a later proceeding.  *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988); *Adelphia Recovery Trust v. Goldman Sachs & Co.*, 748 F.3d 110, 118 (2d Cir. 1024) (In bankruptcy, "the position taken by the debtor or plan proponent in the disclosure statement or official schedules may be read into the plan that the court confirms and therefore also may be 'adopted' by the court upon plan confirmation.").

While there is no rigid test for judicial estoppel, the Third Circuit has established a three (3) prong analysis for determining when judicial estoppel is warranted: (i) the two legal positions taken by the party must be irreconcilably inconsistent, (ii) bad faith must be the basis for the change in position, and (iii) judicial estoppel is not to be used unless that remedy is tailored to address the

harm identified and no lesser sanction is adequate for that purpose. *Montrose Med Grp. Participating Savings Plan v. Bulger*, 243 F.3d 773, 777-778 (3d Cir. 2001); *Krystal Cadillac-Oldsmobile GMC Truck, Inc., Inc. v. GMC*, 337 F.3d 314, 323 (3d Cir. 2003); *G-I Holdings, Inc. v. Reliance Inc. Co*., 586 F.3d 247, 262 (3d Cir. 2009).  Each of the three (3) prongs are satisfied here.

### 1.    The Cipolla Defendants Have Suffered From Irreconcilably Inconsistent Positions

Full and honest disclosure in bankruptcy—an affirmative and ongoing duty—is of paramount purpose.  When plan proponents have enough information "prior to confirmation to suggest that it may have a possible cause of action, then that is a 'known' cause of action such that it must be disclosed." *Krystal*, 337 F.3d at 323.  "A party has knowledge of a potential claim when the events underlying the claim have occurred prior to the filing of the bankruptcy petition." *Archer v. Defenders, Inc*., 2020 WL 3128029, at *5 (Bankr. D. Del. June 12, 2020) (citing *Krystal*, 337 F.3d at 323).  General "boilerplate language is simply not adequate to provide the level of notice required." *Krystal*, 337 F.3d 321.  Plan proponents must specify any possible claims that are known and attempt to place a monetary value on them. *Id.*  Judicial estoppel may be applied when plan proponents "completely failed to mention [ ] contingent claims" or when plan proponents "merely failed to adequately characterize [ ] contingent claims." *Ortlieb v. Hudson Bank*, 312 F.Supp.2d 705 711 (E.D. Pa. 2004) (citing *Krystal*, 337 F.3d at 317-319).  The Plan proponent here made no mention of the claims now asserted against the Cipolla Defendants and, to the extent the Court finds that the plan proponents did, the claims were mischaracterized beyond apprehension.

Under binding Third Circuit precedent, the Plan proponents (which includes the Official Committee of Unsecured Creditors (the "Committee") that had the same counsel as the Liquidation

Trustee) were required to place the Cipolla Defendants on notice of known claims. Rather than disclose claims against the Cipolla Defendants, the plan proponents opted to include the Cipolla Defendants on the Excluded Party List [ECF No. 3260] with four hundred and twenty (420) parties and make general references thereto in the Preserved Action List. This falls well short of adequately placing the Cipolla Defendants on notice; the Plan proponents were required to name the Cipolla Defendants as potential defendants on the Preserved Action List for specific causes of action.

The plan proponents recognized the duty to expressly name potential targets because they *listed by name* numerous other parties in the Preserved Action List against which they purport to hold the same claims asserted in the Complaint. *See* Preserved Action List, ECF No. 2732-4 (listing specific parties, by name, that may be potential defendants). Moreover, the Preserved Action List is effectively a treatise of boilerplate causes of action that fails to reveal anything specific about the Cipolla Defendants. Simply, the Plan, Disclosure Statement and Preserved Action List are silent on the Cipolla Defendants being culpable parties as the Complaint asserts. The failure to name the Cipolla Defendants as potential defendants in the Preserved Action List, while the plan proponents had complete knowledge of their alleged claims, constitutes irreconcilable inconsistent statements because they were relied upon by the Court and the Cipolla Defendants, among others.[8]

### 2.    The Change in Positions Were Undertaken in Bad Faith

The Plan proponents engaged in bad faith by deliberately concealing the claims asserted against the Cipolla Defendants in the Complaint. A "rebuttable inference of bad faith arises when averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that

---

[8] The only satisfactory disclosure involving certain Cipolla Defendants is the AAA arbitration and related Statement of Claim. ECF No. 942 at 81.

claim in the face of an affirmative duty to disclose." *Krystal*, 337 F.3d at 321; *Danise v. Saxon Mortg. Servs. Inc.*, 738 F. App'x 47, 50, 51 (3d Cir. 2018) (a motive to conceal is evidenced by the litany of damages sought). The Third Circuit does not mandate that the offending party benefit from its inconsistent statements; however, a benefit received supports a finding of bad faith. *Krystal*, 337 F.3d at 324. The Plan proponents played fast and loose with the duty to disclose with irrefutable knowledge of the alleged claims in the Complaint at the time of confirmation of the Plan.

As set forth above, although the Liquidation Trustee attempts to hide behind a relaxed pleading standard, its counsel has been intimately involved in this case since its inception and conducted a "scorched earth" investigation as Committee counsel prior to confirmation of the Plan. The Plan proponents consciously chose not to list the Cipolla Defendants on the Preserved Action List (despite listing many other parties) with full knowledge of the claims now asserted in the Complaint. The reason is clear: conceal potential causes of action against the largest unsecured creditors, the Cipolla Defendants, to blindside them at a later date with a Complaint asserting fifteen (15) counts and a litany of concocted damages. The potential benefit conferred upon the Investors (who are not receiving a 100% distribution, the only class to vote on the Plan, and the Liquidation Trustee's true constituency) is indisputable. The Plan proponents' bad faith conduct by deliberately listing certain parties on the Preserved Action List and hiding others on the Excluded Party List, such as the Cipolla Defendants, should not be rewarded; the Liquidation Trustee is judicially estopped from bringing the Complaint.

### 3.    Judicially Estopping the Liquidation Trustee is Appropriate

The Plan proponent's double-dealing demands application of judicial estoppel to bar the Complaint. To determine whether judicial estoppel is appropriate, a court must consider (1) whether judicial estoppel is tailored to address the harm identified, and (2) whether any lesser

sanction would adequately remedy the damage done by the party to be estopped. *Krystal*, 337 F.3d at 320 (quoting *Montrose*, 243 F.3d at 779-80). In this case, the "knowing failure" to disclose the potential claims against the Cipolla Defendants "throughout the proceedings in . . . this very court, coupled with [the] subsequent filing in this court, constitutes the exact type of 'affront to the court's integrity' that judicial estoppel is meant to protect. *Hudson Bank*, 312 F.Supp.2d at 715 (E.D. Pa. 2004) (quoting *Montrose*, 243 F.3d at 785). "To preserve the requisite reliability of disclosure statements and to provide assurances to creditors regarding the finality of plans which they have voted to approve," which here the Cipolla Defendants did not, the Plan proponent's failure to adequately disclose the claims asserted against the Cipolla Defendants precludes their prosecution at this time. *Amash v. Home Depot U.S.A., Inc.*, 503 B.R. 232, 238 (Bankr. NDNY 2013) (quoting *Oneida Motor Freight*, 848 F.2d at 418). Accordingly, the Court should exercise its inherent equitable power to dismiss the Complaint for the failure to disclose the claims now asserted against the Cipolla Defendants.

**B.      The Cipolla Defendants did not waive their right to contest the assignment of any claim to the Liquidation Trust**

The Liquidation Trustee asserts that because the Cipolla Defendants failed to object to the assignment "of claims" in the Plan, they waived their right to do so now. This argument fails for two (2) simple reasons: (i) the Court did not (nor could it) opine on the validity of the assignment and purported waiver because the claims allegedly assigned were (and are) beyond the Court's subject matter jurisdiction and, therefore, (ii) the Liquidation Trustee may not use the affirmative defense of waiver to validate an assignment that violates the United States Constitution, the Bankruptcy Code and New Jersey state law. Because the assignment is *ultra vires*, so, too, is the purported waiver to contest the assignment's validity.

By definition, "Contributed Claims" are "all Causes of Action that a Contributing Investor has against any Person or Entity…" (*i.e.*, non-debtor third-party claims). Plan, at 4-5. The Plan purports to assign the Contributed Claims to a non-debtor, the Liquidation Trust. Plan at 26, 37-38. As discussed below, no Contributed Claims were ever property of the Debtors' estate, as the Plan purports to assign the non-debtor third party claims to a non-debtor. *Id.*; *see also* 11 U.S.C. § 541(a)(1). Further, the Contributed Claims are not "related to" the Debtors' bankruptcy cases to render them within the Court's subject matter jurisdiction. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 226 (3d Cir. 2004). Because the Contributed Claims were not property of the Debtors, and the Contributed Claims' subject matter is not within the Court's jurisdiction, the assignment is a legal nullity. It logically follows that the Court could not have sanctioned the Cipolla Defendant's waiver to contest the validity of an assignment that is itself void as a matter of law. The Liquidation Trustee cannot create subject matter jurisdiction and standing out of thin air and simultaneously claim the Cipolla Defendants waived their rights to contest such pure fictions.

To the extent the Court credits the Liquidation Trustee's assertion that the Cipolla Defendants waived their right to contest the assignment in the Plan, it is critical to distinguish between Debtor or Estate claims and Contributed Claims. As with the Complaint, the Liquidation Trustee conflates issues of great import. By the Plan's express language, the Contributed Investor Settlement (as defined in the Plan), related assignment of Contributed Claims, and purported waiver to contest the assignment, only pertain to claims held by Investors (*i.e.*, Contributed Claims) and not Debtor or Estate claims. The Liquidation Trustee incorrectly relies on the assignment to argue that the Cipolla Defendants "waived any right to argue the assignability of claims is invalid." Opposition Brief, ¶ 42. The Liquidation Trustee inappropriately mischaracterizes the assignment; there is no language in the Plan or elsewhere to support that the

Cipolla Defendants waived their right to contest the assignment of the Debtor's or Estate's claims to the Liquidation Trust. Debtor claims and Contributed Claims are not one and the same.

### C.    Bankruptcy Code Section 1123(a) does not preempt New Jersey's prohibition on the assignment of the Investors' prejudgment tort claims.

The Liquidation Trustee's reliance on 11 U.S.C. § 1123(a)(5) for the proposition that it preempts New Jersey's bar on the assignment of tort claims is equally misplaced. According to the Opposition Brief, the "aiding and abetting claim in Count V of the Complaint is one that Investors have assigned to the Liquidation Trust and that they could have brought independently of the Debtors," thereby conceding that Count V, along with Counts VI, VII, and VIII, is not based on any claims assigned to the Liquidation Trust by the Debtors. Opp. Brief, ¶ 72.

The relief provided by section 1123(a)(5) of the Bankruptcy Code is expressly limited to property of the estate, which the Contributed Claims never were and could never be.[9] By operation of the Plan, "[u]pon the Effective Date, without further action or order of the Bankruptcy Court, each Contributing Investor shall be deemed to have (a) contributed its Contributed Claims to the Liquidation Trust …." Although Bankruptcy Code section 1123(a) begins with the phrase "[n]otwithstanding any otherwise applicable non-bankruptcy law, a plan shall …," it goes on to address in subpart (5) various means for retaining or transferring *property of the estate*. 11 U.S.C. § 1123(a)(5) (emphasis added). It does not save any Contributing Investor claims from New Jersey's longstanding prohibition on the assignment of the prejudgment tort claims because Contributed Claims were never "property of the estate." *Id.*

The Liquidation Trustee's reliance on *In re Congoleum¸* 2008 Bankr. LEXIS 2375 (Bankr. D.N.J. Sept. 2, 2008), for the proposition that "[a]ll the claims at issue were properly assigned

---

[9] *See* 11 U.S.C. § 541(a)(1) limiting property of the estate to "all legal and equitable interest of the debtor in property *as of the commencement of the case*." *Id.* (emphasis added). No claims of any Investors were property of the estate as of the commencement of the case (June 7, 2022).

under the Plan and the Bankruptcy Code," is perplexing.  Opp. Brief, ¶¶ 44-46.  In *Congoleum*,

Judge Ferguson held that insurance policies may be assigned to a section 524(g) trust under section

1123(a), notwithstanding anti-assignment clauses in insurance policies.  *Congoleum¸* 2008 Bankr.

LEXIS 2375, * at 5-6.  *Congoleum* had nothing to do with the assignment of tort claims or the

prohibition thereof under New Jersey state law.  Moreover, the Liquidation Trustee conveniently

overlooks the "two stage analysis" set forth in *Congoleum*—the same two stage analysis described

in the preceding paragraph.  *Id.*  "The first stage required a determination of whether the insurance

policies became property of the estate . . . That determination turned on § 541 . . . The second stage

required a determination of what could be done with the insurance policies once they were property

of the estate. That determination turned on § 1123…."  *Id.* (citing *In re Combustion Engineering,*

*Inc.*, 391 F.3d 190 (3d Cir. 2004)).  Section 1123 of the Bankruptcy Code is only available to

transfer property pursuant to a plan once there is a determination that the property to be transferred

is property of the bankruptcy estate under section 541.  *See* 11 U.S.C. § 1123.  The Contributed

Claims were never property of the Debtors' bankruptcy estate; therefore, section 1123(a) is not

available to the Liquidation Trustee to save the Plan's impermissible assignment of Contributing

Investors' tort claims.

Although *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 488

(3d Cir. 1997) does distinguish between the assignment of claims under Bankruptcy Code sections

363 and 1123, the Liquidation Trust's reliance on it is also seriously misplaced.  It would only

help the Liquidation Trust if it held assigned estate causes of action, but the Opposition makes

clear that the claims asserted in Count V and others are assigned Investor claims.  Compl., ¶ 72

("The aiding and abetting fraud claim in Count V of the Complaint is one that Investors have

assigned to the Liquidation Trust and that they could have brought independently of the Debtors.").

Neither *Integrated Solutions* nor Bankruptcy Code section 1123(a) save Count V from dismissal with prejudice.

**D.    New Jersey's bar on assignment of prejudgment tort claims is not limited to personal injury claims**

The Liquidation Trustee asserts that New Jersey's prohibition on the assignment of prejudgment tort claims applies only to personal injury claims, citing *Kimball Intern., Inc. v. Northfield Metal Products*, 334 N.J. Super. 596 (App. Div. 2000). Although *Kimball Intern.* did involve a personal injury, the Appellate Division got around New Jersey's prohibition on assigning prejudgment tort claims by holding that the indemnification claim at issue was assignable because the court viewed it as "a 'chose[] in action arising on contract' within the intent of N.J.S.A. 2A:25-1." *Id*. at 613. Similarly, in *In re Complaint of Weeks Marine, Inc*., 2006 U.S. Dist. LEXIS 52838 (D.N.J. August 1, 2006), which dealt with the assignment of an insurance subrogation claim, Judge Wolfson, after discussing a trend to limit the tort assignment prohibition to personal injury claims, said that "I need not rule on that question because I find that the chose in action assigned by Lexington to Plaintiff in this case arose out of contract, and, as a matter of law, is assignable." *Id*. at 12, n.6. As such, the cases the Liquidation Trustee relies upon did not limit the prohibition on the assignment of prejudgment tort claims to personal injury claims, each found the subject cause of action arose in contract.

In *Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34 (2d Cir. 2005), the Second Circuit, after surveying the cases that suggested a shift in New Jersey's lower courts toward limiting the application of New Jersey's prejudgment tort assignment ban to personal injury cases concluded that "under New Jersey law, the assignment of the legal malpractice claim to Stichting would be barred."

In *Stichting* the Second Circuit found that there is a long-standing consensus among New

Jersey state courts that, for reasons of public policy, tort claims generally are not assignable, citing,

*East Orange Lumber Co. v. Christian Feiganspan*, 120 N.J.L. 410, 412, 199 A. 778 (N.J. Sup. Ct.

1938) (holding that common law rule of non-assignability applied in New Jersey), *aff'd*, 124 N.J.L.

127, 10 A.2d 732 (1940); *Village of Ridgewood v. Shell Oil Co*., 289 N.J. Super. 181, 195, 673

A.2d 300 (App. Div. 1996) (stating that in New Jersey "[a] tort claim cannot be assigned prior to

judgment" and applying the principle in personal injury, trespass, and nuisance context).

The relevant New Jersey statute dealing with assignability of claims is *N.J.S.A.* 2A:25-1,

which provides in pertinent part:

> All *contracts* for the sale and conveyance of real estate, all judgments and decrees
> recovered in any of the courts of this state or of the United States or in any of the
> courts of any other state of the United States and all choses in action *arising in
> contract* shall be assignable, and the assignee may sue thereon in his own name.

N.J.S.A. § 2A:25-1 (emphasis added).  Because the statute does not address causes of action arising

from tort claims, courts in New Jersey have consistently held that, as a public policy matter, tort

claims cannot be assigned before judgment.  The Third Circuit also rejected the argument that New

Jersey's non-assignability rule applied differently for intentional torts or in the bankruptcy context:

"New Jersey law clearly forbids the assignment of prejudgment tort claims, and applies to the tort

claims at issue here [in the bankruptcy context]."  *Integrated Solutions*., 124 F.3d at 490.

**E.  Count V (along with Counts VI, VII and VIII) is deficient because the
Complaint does not identify the Contributing Investors on whose behalf the
Liquidation Trustee purports to assert claims and does not allege facts
showing that the investors are entitled to recover damages**

Counts Five, Six, Seven and Eight (the "**Assigned Tort Claims**") purport to assert claims

on behalf of Contributing Investors.  The Opposition Brief asserts that the Liquidation Trust holds

"all of the Contributed Claims of Contributing Investors (as those terms are defined in the Plan)."

Opp. Brief, ¶ 5.  Critically, the Opposition Brief points to Article IV. F of the Plan for this authority,

but does not point to any allegation in the Complaint supporting this statement because it is not there.  In each of the Assigned Tort Claims, the Liquidation trustee seeks to recover damages on behalf of those investors (except Count eight that only asserts damages on behalf of NRIA (Compl., ¶ 169)).

Even if the Assigned Tort Claims survive New Jersey's anti-assignment rule and *in pari delicto*, they still need to be dismissed because, decisively, the Complaint fails to identify any of the Contributing Investors on whose behalf the Liquidation Trustee purports to sue.  Furthermore, the Complaint does not plead in any way the nature of the actual damages that the Cipolla Defendants allegedly caused any of the Contributing Investors.

The failure to identify the Contributing Investors or to allege the damages they incurred and what caused their harm requires dismissal of those assigned claims.  When a plaintiff sues by assignment, the plaintiff stands in the shoes of the assignor, and must "allege facts showing that the assignor would be entitled to relief."  *ATS Claim, LLC v. Epson (In re TFT-LCD Antitrust Litig.)*, 2009 U.S. Dist. LEXIS 93448 (N.D. Cal. Oct. 6, 2009) (dismissing complaint that asserted antitrust claim by assignment where complaint did not identify assignor).  This requirement cannot be met without identifying the assignor, the damages that the assignor allegedly sustained, and how the defendant allegedly caused those damages.  *See, e.g.*, *N. Cal. Monument Dealers Ass'n v. Interment Ass'n. of Cal.*, 120 F. Supp. 93, 94 (N.D. Cal. 1954) (dismissing antitrust claims brought by a trade association, as assignee of its members, where complaint did not identify members and did not allege amount of damages suffered by any assignor or facts from which the damages for any particular assignor could be ascertained); *La. Farmers' Protective Union v. Great Atl. & Pac. Tea Co. of Am.*, 40 F. Supp. 897, 907 (D. Ark. 1941) (dismissing trade association's suit on behalf

of assigning members, where the complaint did not state the damages each member had allegedly

incurred), *rev'd for failure to allow amendment*, 131 F.2d 419 (8th Cir. 1942).

Here, the Complaint utterly fails to allege even the most basic facts needed to establish a

plausible claim on behalf of any given Contributing Investor. Assuming *arguendo* that the Court

allows the Liquidation Trustee to amend its Complaint, the Liquidation Trustee should be required

to identify each Contributing Investor, the NRIA investment purchased by the Investor, the date

of the purchase, the purchase price, the documents or representations relied upon by the Investor

in making the purchase, the return that the Investor received on the investment, the amount of loss

claimed on the investment, and the theory on which Liquidation Trustee and the Investor claim

that the Cipolla Defendants is liable for such loss. This would allow the Cipolla Defendants to

ascertain the exact nature of the claims being asserted and reasonably prepare a response. Because

the Liquidation Trustee has not alleged any of these essential facts, Counts Five, Six, Seven and

Eight of the Complaint must be dismissed.

> **F.      The Claim for Aiding and Abetting Fraud is Barred by the Doctrine of *In Pari Delicto***

The Opposition brief asserts that the doctrine of *in pari delicto* is not appropriate because

(i) it is premature, (ii) cannot be established from the face of the Complaint because there was a

pre-petition change in management, and (iii) cannot defeat the claims of Investors. Opp. Brief,

¶ 49.

> **1.      Raising the *in pari delicto* doctrine at the pleading stage is not premature**

To the extent that the Liquidation Trustee asserts that the equitable defense of *in pari*

*delicto* is premature, the Third Circuit disagrees. In the leading case on *in pari delicto*, *Official*

*Comm of Unsecured Creditors v. R.G. Lafferty & Co., Inc.*, 267 F.3d 340, 359 (3d Cir. 2001), the

Third Circuit affirmed the dismissal of a law firm defendant on the basis of *in pari delicto* at the pleading stage.

Because the allegations in the Complaint undeniably establish that NRIA and its management actively participated in wrongdoing, the doctrine of *in pari delicto* prevents the Liquidation Trustee from pursuing claims against third-parties like the Cipolla Defendants for allegedly failing to prevent the wrongdoing.  The Liquidation Trustee stands in the Debtors' shoes with respect to those claims and the claims are "subject to the same defenses as could have been asserted … had the action been instituted by the debtor."  *See R.F. Lafferty*, 267 F.3d at 356-57.

### 2. The Appointment of Brian Casey does nothing to cleanse the Liquidation Trust of the Debtors' bad acts

The Opposition Brief broadly asserts that when there is a change in management before a corporate debtor's filing for bankruptcy it nullifies the *in pari delicto* defense because the debtor's bad acts are not imputed to the trustee.  Opp. Brief, ¶ 51.  The Opposition Brief then claims that the Debtors' insiders were expelled pre-bankruptcy and replaced by Brian Casey and the Casey Group, Ltd.  Opp. Brief, ¶ 52 (citing Compl., ¶ 93).  But the Complaint itself does not allege that Mr. Casey replaced management, and he, in fact, did not; rather, it merely states that the "Casey Group Ltd. ("**Casey**") was appointed to assume *certain* management functions for the Debtors effective as of November 1, 2021." Compl., ¶ 93 (emphasis added).  Argument to the contrary in the Opposition Brief does nothing to change the actual allegations in the Complaint.

Indeed, Mr. Casey's First Day Declaration describes the role of the Casey Group as making sure the Fund used its assets appropriately, providing consent to actions taken by NRIA and becoming an "Additional Manager."  ECF No. 16, ¶¶ 14-16.  The Casey Group did not by any means replace NRIA Management.  In fact, the specious nature of the Liquidation Trustee's assertion that Casey Group replaced NRIA management is evident from the Complaint: "Shortly

before the bankruptcy filing, Grabato stepped down as Manager, President, and Chief Executive Officer of NRIA, and, upon information and belief, has fled the country."  Complaint, ¶ 29.

According to the *Summary Cease & Desist Order*, which is expressly referenced in the Complaint (Compl. ¶22):

> the "primary power" of the Casey Group will be "to ensure that the proceeds from the [NRIA Fund's] offerings of its preferred interests and convertible promissory notes (collectively the 'Offering Proceeds') will be used by the Company and/or its Initial Manager in accordance with the 'Use of Proceeds' section in the Company's Confidential Private Placement Memorandum …"  For these services, the Casey Group was to be paid $35,000 a month over the period of its twelve-month appointment.  *Accordingly, the NRIA Fund's investors will be paying a consultant $420,000 simply to ensure that the NRIA Fund's management will not further misuse investors' money.*

Summary Cease & Desist Order, ¶ 17 (emphasis added).  Casey's retention to merely to ensure that the Debtors management did not misuse investors' money hardly qualifies as replacing management.

Moreover, it appears that Mr. Casey was not unblemished by NRIA's management's offenses.  At the hearing held in this case on the *Debtors' Motion For Entry of An Order Authorizing the Private Sale of Certain Properties Free and Clear of Liens, Claims, Encumbrances and Interests* [ECF No. 36] ("**Private Sale Motion**"), Casey, the then purported "Independent Manager" of the Debtors, displayed a profound lack of knowledge about the Private Sale Motion and advised the Court that he had relied on NRIA's pre-existing management in seeking the relief contained in the Private Sale Motion.  Perhaps more damning, it was only on cross-examination that Casey revealed that one of the brokerage firms being used in the proposed private sales had a relationship with Salzano:

> Q:   The brokers listed with this property were Compass and Elgin (phonetic) Real Estate.  Did you conduct any investigation to their relationship with insiders or affiliates?

A:      Only to the degree that I became aware the end of 2021 that one of the members of Compass was *possibly related* to Nicholas Salzano.  I didn't see any conflict with the other broker that you named.

Q:      And with respect to that conflict because I am aware that Compass is a broker in multiple of these properties, has there, have you taken any action to void that contract or have you had any discussions with the brokerage firm about that?

A:      Not to the present, no.

*See* June 21, 2021 Hrg Tr., ECF No. 1832 at 37:16-38:3 (emphasis added).  It turned out that the "possibly related" broker was Thomas N. Salzano, Nick Salzano's son.  Thus, absent objections to the Private Sale Motion, the son of the convicted mastermind of NRIA fraud would have earned a handsome fee, a situation that the Court said "would have been outrageous."  June 21, 2021 Hrg. Tr., ECF No. 1832 at 54:12.

Moreover, the Plan proponents *Notice of Filing Plan Supplement* in this case [ECF No. 2732-4] expressly preserves the following claims against Mr. Casey:  (i) the Estates' claims for bad faith, gross negligence or willful misconduct, if any, and the (ii) claims and causes of action that could be asserted directly by investors, creditors, or other third parties, to the extent such claims may be pursued pursuant to the Plan by the Liquidation Trust.

By Order entered on August 10, 2022, this Court directed Mr. Casey to resign.  *See* ECF No. 288, ¶ 11 "[e]ffective upon entry of the Proposed Order, Brian J. Casey shall resign as the Independent Manager of the Debtors."  Based on the record in this case, it does not appear that Mr. Casey had any role in "remediating the existing management conflicts."  Opp. Brief, ¶ 53.

The Liquidation Trustee's reliance on *In re Le-Nature's Inc.*, 2009 WL 3571331 (W.D. Pa. Sept. 16, 2009) and *In re Le-Nature's Inc.*, 2009 WL 3526569 (W.D. Pa. Oct. 23, 2009) is completely misplaced.  In *Le-Nature's*, the Delaware Chancery Court "ordered a complete usurpation of corporate authority rendering [Le-Nature's chief executive officer, majority

shareholder, and chairman of its board, and other insiders] impotent to run Le-Nature's" and installed a custodian that, unlike Casey, had "complete and total authority to run Le-Nature's prior to the bankruptcy filing." *Le-Nature's Inc*., 2009 WL 3571331, at *6; *Le-Nature's Inc*., 2009 WL 3526569, at * 12.   The Liquidation Trustee's incredulous representations that the "change in management here mirrors closely with *Le-Nature's*" should give the Court pause.  Opp. Brief, ¶ 56.

The Liquidation Trustee's silence on *Lafferty*, "the seminal *in pari delicto* case in this Circuit," is telling.  *Le-Nature's Inc*., 2009 WL 3526569, at * 12 (citing *Official Comm of Unsecured Creditors v. R.G. Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir. 2001)).  As the MTD makes clear, *Lafferty* is controlling, analogous to the current case and, contrary to the Liquidation Trustee's position that *in pari delicto* is inappropriate at the motion to dismiss stage, affirmed a district court decision granting a motion to dismiss based on *in pari delicto*.  Lafferty, 267 F.3d at 360; Opp. Brief, ¶ 49.

**3.      The Adverse Interest Exception to *In Pari Delicto* is inapplicable**

The Liquidation Trustee hopes to avoid imputation by *in pari delicto* by hiding behind the "adverse interest exception" to *in pari delicto* which directs a court not to impute to a corporation the bad acts of its agent when the fraud was committed solely for personal benefit.  Opp. Brief, ¶ 50.  However, "this most narrow of exceptions" is reserved for cases of "outright theft or looting or embezzlement . . . where the fraud is committed *against* a corporation rather than on its behalf." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 938 N.E.2d 941, 952, 912 N.Y.S.2d 512 (N.Y. 2010).  However, there is absolutely no fair reading of the Complaint that could plausibly suggest that NRIA is the victim here.

The $600 million the Liquidating Trustee alleges that NRIA raised for the Fund between 2018 and 2022 (Compl., ¶ 30) clearly precludes the invocation of the "adverse interest exception"

to the *in pari delicto* doctrine.  The exception applies only when fraudulent conduct was committed

by an officer whose "interests were adverse to the corporation and not for the benefit of the

corporation."  *Official Comm of Unsecured Creditors v. R.G. Lafferty & Co., Inc.*, 267 F.3d 340,

359 (3d Cir. 2001).  In the case at bar, however, the Liquidating Trustee alleges that NRIA and the

Fund were operated exclusively for a fraudulent purpose—a Ponzi Scheme.  *See, e.g.*, Compl.,

¶¶ 21 and 22 ("NRIA operated as a Ponzi scheme") and 31 ("NRIA manipulated the Fund's

financial statements and financial information included within marketing materials to mislead

investors").   As such, when Salzano, Scuttaro, Grabato and O'Brien and other Insiders were

effectuating the Ponzi scheme, they were plainly acting on behalf of NRIA, which (together with

the Fund) was alleged to be operated as a Ponzi scheme.  Compl., ¶¶ 21, 22.  Moreover, the $600

million NRIA derived from its activities could not, under any circumstances be characterized as

*de minimis.  See, Claybrook v. Broad and Cassel, P.A. (In re Scott Acquisition Corp.)*, 364 B.R.

572, 574 (Bankr. D. Del. 2007) ("Because the Debtors received some benefit from the Insider's

actions, the 'adverse interest' exception does not apply and the acts of the Insiders are therefore

imputed to the Debtors").

Instructive on the question of adverse interest is *Picard v. HSBC Bank PLC*, 457 B.R. 25,

37 (S.D.N.Y. 2011) *opinion amended by In re Bernard L. Madoff Inv. Sec. LLC*, 2011 WL 3477177

(S.D.N.Y. Aug. 8, 2011).  In reaching his decision, District Judge Jed Rakoff noted that the

"overwhelming wrongdoing of Madoff and his now-defunct company . . . [was] abundantly clear

from the face of the Trustee's own complaint" and flatly rejected the trustee's vague assertion of

the adverse interest exception.  *Picard*, 454 B.R. at 37.  Because the alleged "overwhelming

wrongdoing" of NRIA, the Fund and the individuals that controlled them is "abundantly clear"

from the very allegations in the Complaint, this Court should similarly reject any invocation of the adverse interest exception to the *in pari delicto* doctrine.

The Liquidating Trustee's allegations in paragraphs 21, 22, 26, 27, 28 and 38 of the Complaint to the effect that Salzano, Scuttaro, Grabato, O'Brien and other Insiders exercised absolute control over the Debtor and the Fund further compels the application of the *in pari delicto* doctrine against the Liquidating Trustee. Those allegations state a claim that Salzano, Scuttaro, Grabato, O'Brien and other Insiders constituted a joint "sole actor" exercising complete control over the activities of the Debtor and the Fund. Courts have applied the *in pari delicto* in actions by parties standing in the shoes of a debtor like the Liquidating Trustee where one or more agents of a debtor have exercised "complete control" or dominion over the debtor or who were allowed to act without supervision. *See, e.g.*, *Nisselson v. Lernout*, 469 F.3d 143, 155 (1st Cir. 2006) ("[I]n pari delicto cases often result in imputation of fraudulent conduct to a corporation when those responsible for the scheme are the "sole decision-makers[s] for such entity, exercising complete control over its management); *Official Committee of Unsecured Creditors of Cooper Tile, Inc. v. Coopers & Lybrand*, 322 F.3d 147, 164-65 (2d Cir. 2003) (imputing fraudulent conduct to debtor when complaint established that its controlling shareholders "dominated and control[ed] the corporation" and were responsible for "orchestrat[ing] the fraudulent conduct"); *Lafferty*, 267 F.3d at 360 (recognizing that "[c]ourts have … applied the [sole actor] exception to cases in which the agent "dominated" the corporation") (quoting *PNC Bank v. Housing Mortgage Corp.*, 899 F. Supp. 1399, 1405-60 (W.D. Pa. 1994)) (dismissing corporation's claims against accountants because sole shareholders and officers of corporation participated in alleged fraud).

The rationale underlying the sole actor exception "is that the sole agent has no one to whom he can impart his knowledge or from whom he can conceal it, and the corporation must bear the

responsibility for allowing an agent to act without accountability." *Lafferty*, 267 F.3d at 359.  From

the allegations in the Complaint of the complete control over the Debtors and the Fund by Salzano,

Scuttaro, Grabato, O'Brien and other Insiders it can be logically concluded that there existed no

person at NRIA or the Fund to which their knowledge of the Ponzi scheme could have been

disclosed or concealed; they controlled the Debtors, including the Fund.  Consequently, the

rationale underlying the sole actor exception means that the Liquidating Trustee, as the successor

to the Debtors (and the Fund), must bear the responsibility for the lack of accountability with which

the Debtors and the Fund allowed Salzano, Scuttaro, Grabato, O'Brien and other Insiders to

operate.

### G.    The Complaint Does Not Meet the Pleading Requirements for Aiding and Abetting Fraud

Contrary to the Liquidation Trustee's arguments (Opp. Brief, ¶¶ 73-85), the allegations for

aiding and abetting fraud do not satisfy the requirements of FED. R. CIV. P. 9(b) and in large respect

fail to conform to the controlling exhibits attached to the Complaint.  *See* MTD at 1-15.  The

Liquidation Trustee tries to minimize this by citing to *Phillips v. Cnty. of Allegheny*, 515 F.3d 224,

233 (3d Cir. 2008), which merely cites the standards under FED. R. CIV. P. 12(b)(6).  The

Liquidation Trustee also fails to address that its *own exhibits* contradict and take precedence over

the Complaint's fanciful allegations.

Critically, the Complaint fails to sufficiently allege that all Cipolla Defendants ***knowingly***

***and substantially assisted*** the "Insiders" alleged fraud.  *See* MTD at 33-37.  The Liquidation

Trustee alleges in Count V that "Defendants actively aided and abetted the "Insiders'" fraudulent

Ponzi [sic] by, among other things…." And lists four ways by which all Cipolla Defendants

allegedly aided and abetted the Insiders' fraud, none of which supports a finding that any of the

Cipolla Defendants *knowingly and substantially assisted* the alleged fraud.  Compl., ¶ 136.

The first way in which all Cipolla Defendants purportedly aided and abetted the Insiders' fraud was by "[p]laying an active role in reviewing and revising PPMs that were used to fraudulently induce Investors to participate in the Ponzi Scheme."  Compl., ¶ 136(a).  That fanciful allegation is flatly contradicted by Ex. K and Ex. L to the Complaint that unequivocally show that in the context of its *Kovel* engagement, Cipolla & Co. merely provided confidential comments to a draft amended PPM to compliance counsel—comments that were obviously intended to improve transparency and expand disclosure of the amended PPM.[10]  There is not one allegation in the Complaint that any PPM on which Cipolla & Co. commented was later solicited to potential investors or that Cipolla & Co. had any role whatsoever in marketing any PPM.  As Ex. K and Ex. L make clear, Cipolla & Co merely provided confidential comments to the Debtors' securities counsel that actually drafted the amended PPMs after commencement of, and in response to, governmental investigations.  Notably, the firm that received the comments and actually drafted the PPMs has not been sued by the Liquidation Trustee.

The second and fourth alleged means of aiding and abetting fraud in paragraph 136(b) and (d) of the Complaint concern the $4.61 million of transfers and have nothing to do with the knowing and substantial assistance of fraud.

The third allegation in paragraph 136(c), while still focused on the October 26, 2021 transfers, not the fraud, does merit further discussion.  It makes the naked allegations that defendants advised the Debtors to book revenue contrary to GAAP in order to artificially inflate and generate revenue for NRIA.  That myth is contrary to and quickly dispensed with by reference to Ex. U, the October 2021 Agreement between NRIA and CFA Review.  The scope of the

---

[10] Throughout the Complaint and the Opposition Brief, counsel for the Liquidation Trustee has demonstrated a fundamental misunderstanding of *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961).

proposed work in the agreement was to "perform a multi-period review engagement with respect to the *consolidated financial statements*" of NRIA for 2018 through Q1 2022 (including restated-corrected 2018 and 2019 financials).  Ex. U at 1 (emphasis added).  Cipolla & Co. was engaged to review and opine on NRIA's books and financial statements, the Fund and all other controlled entities on a consolidated basis, which makes intercompany revenue recognition completely irrelevant.  *See also* Point VIII(D)(1), *infra.*  Moreover, it is evident from the Liquidating Trustee's own pleadings that NRIA's books and financial statements are its own.

Count V of the Complaint fails to meet the pleading requirements of Rules 12(b)(6), 8(a)(2) and 9(b) of the Federal Rules of Civil Procedure, which failure is an additional reason why Count V must be dismissed.

### H.    The Complaint Fails to Plead Fraud with Particularity.

The Opposition Brief fails to rebut the Cipolla Defendants' position that Count V does not meet the heightened pleading requirements of Rule 9(b) because the allegations in the Complaint fail to differentiate between the various Cipolla Defendants.  MTD at 33-34.  Even in response to this contention, the Opposition Brief continues to refer to the Cipolla Defendants collectively.  Opp. Brief, ¶¶ 73-85.

This style of "shotgun pleadings" runs afoul of FED. R. CIV. P. (8)(a)(2) and/or Rule 10(b) violate the "spirit, if not the letter," of the Federal Rules.  *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015); *see also, e.g., Bartol v. Barrowclough*, 251 F. Supp. 3d 855 (E.D. Pa. 2017) (affirming dismissal after the district court ordered plaintiffs to amend their "shotgun pleading" and "state[] clearly how each and every defendant is alleged to have violated plaintiffs' legal rights."); *Glenn v. First Nat. Bank in Grand Junction*, 868 F.2d 368, 371 (10th Cir. 1989) ("The law recognizes a significant difference between notice pleading and 'shotgun' pleading.").  The Opposition Brief does nothing to fix the Complaint's shotgun pleading.

36

Accordingly, since the Liquidation Trustee has not met its elevated pleading burden under Rule 9(b), Count V must be dismissed.

## VI.   COUNT VI (AIDING AND ABETTING SECURITIES FRAUD) MUST BE DISMISSED

### A.   As Corporate Entities, Cipolla & Co., CFA Tax, CFA Review CFA Assurance Services LLC and Cipolla Financial Advisors LLC Cannot be Liable as "Agents" Under the NJUSA

The MTD established that, based on a plain reading of the New Jersey Uniform Securities Act, N.J.S.A. § 49:3-47 *et seq*. ("**NJUSA**"), only natural persons fall within the definition of "agent" found in N.J.S.A. § 49:3-49(b). The Liquidation Trustee should have responded by withdrawing its claims against corporate Cipolla Defendants for aiding and abetting liability under the NJUSA. Not surprisingly, however, the Liquidating Trustee is blindly holding fast to those specious claims based on nothing more than an intermediate appellate decision from a New York court that did not discuss the definition of "agent" or analyze its scope in the slightest.

The exclusion of corporations and other artificial entities from the statutory definition of "agent" is supported by *Connecticut Nat'l Bank v. Giacomi*, 242 Conn. 17, 699 A.2d 101 (Conn. 1997). In that case, Connecticut's highest court thoroughly analyzed a substantially similar definition of "agent" in the Connecticut Uniform Securities Act ("**CUSA**") and held that a bank could not be an agent of a person who is liable for fraudulent conduct in connection with a securities transaction because the definition is limited to natural persons. Following "well established principles of statutory construction," the court found that the definitional language in § 36-471(2) of the CUSA (which is virtually identical to *N.J.S.A.* § 49:3-49(b)) "strongly suggests that an 'agent' cannot be an artificial person." Id. at 32. The court reasoned:

> In addition to the term "agent" being defined in the first sentence of § 36-471 (2) as an "individual," the word "agent" is used in combination with the term "individual" again in the second sentence, which provides that an "'agent' shall not include an individual who . . . ." Moreover, in the last sentence of the definition in

§ 36-471 (2), the word "agent" is linked to "[a] general partner, officer or director of a broker-dealer or issuer, or a person occupying a similar status or performing similar functions . . . ." These are terms that, in general, refer to natural persons, rather than artificial entities.

*Id.* at 32.

Next, the *Giacomi* court carefully examined the meaning of the word "individual," which is not defined in the CUSA (or in the NJUSA). The court determined that "individual," as commonly understood, means a natural person and does not include artificial entities like the plaintiff bank. *Id.* at 32-33. The court also found that the definition of "person" in the CUSA indicated a legislative intent to limit agency liability to natural persons. Section 36-471(10) of the CUSA (like N.J.S.A. § 49:3-49(i)) defines "person" as "an individual, a corporation, a partnership, an association, a joint-stock company, a trust where the interests of the beneficiaries are evidenced by a security, an unincorporated organization, a government, or a political subdivision of a government." The court reasoned that construing "individual" to include not only both natural and artificial persons would make the word "individual" in the definition of "person" redundant. *Id.* at 33-34.

Lastly, the *Giacomi* court was guided by *Schpok v. Fodale*, 64 Mich. App. 441, 444, 236 N.W.2d 97 (1975), in which the Michigan Court of Appeals interpreted the term "agent" in Michigan's version of the Uniform Securities Act to exclude corporations. The *Giacomi* court noted the lack of any out-of-state authorities to the contrary, observing: "We can identify no other sources that construe this definitional language in a manner that would contradict these very strong linguistic and precedential indicators." *Id.* at 34-35. That conclusion applies with equal force to the NJUSA.

In the face of the plain language of the NJUSA and the abundant weight of authorities construing substantially similar language in other states' versions of the Uniform Securities Act,

the Liquidating Trust cites to a single case, *Oster v. Kirschner*, 77 A.D.3d 51, 905 N.Y.S.2d 69

(App. Div., 1st Dep't, 2010), to support its argument that corporate entities may be liable as agents

under the NJUSA.  In that case, the court mentioned—barely in passing—that it was reinstating

claims against a law firm and one of its partners under the NJUSA for aiding and abetting securities

law violations.  *See id.* at 59.  The court did not cite, much less discuss, N.J.S.A. § 49:3-49(b).  The

case contains no analysis of the meaning of "agent" under the NJUSA or any other statute and it

does not appear that the issue of whether an artificial entity can qualify as an agent under the

NJUSA was even presented to the court.  This Court should not disregard the plain meaning of the

NJUSA and the clear weight of authority based on this dubious, non-precedential decision of

another jurisdiction.

### B.    The Cipolla Defendants did not Represent a Broker-Dealer or Issuer in Effecting or Attempting to Effect Purchases or Sales of Securities and, therefore, are not "Agents" under the NJUSA

The Liquidation Trustee has failed to rebut the Cipolla Defendants' argument that they

cannot be considered agents under the NJUSA because the Complaint does not allege that they

"represent[ed] a broker-dealer or issuer in effecting or attempting to effect purchases or sales of

securities."  *See* N.J.S.A. § 49:3-49(b) (definition of "**agent**").  The Cipolla Defendants provided

traditional accounting services to NRIA.  They did not "represent" anyone and the Complaint does

not plausibly allege otherwise.  There is not a single allegation that any of the Cipolla Defendants

had any contacts with investors.  The March 2021 and May 2021 engagement letters expressly

state that any report or opinion provided "shall not be included in, summarized or referred to in

any manner in any materials distributed to anyone not connected with this matter, or to the public,

without . . . written permission."  Compl., Ex. I at 3 and Ex. F at 3.  There also is no allegation that

the Cipolla Defendants ever registered as agents with the New Jersey Bureau of Securities or that

they were required to do so.[11]   In sum, the Cipolla Defendants never were agents within the

meaning of N.J.S.A. § 49:3-49(b) and could not have provided (and did not provide) material

assistance in any sale or conduct giving rise to liability under the NJUSA.

      **C.**      **The Claim for Aiding and Abetting Securities Fraud is a Non-Assignable Tort Claim.**

A claim for aiding and abetting securities fraud is a statutory tort claim.  *See Braunstein v.*

*Benjamin Berman, Inc.*, No. 89-5344, 1990 WL 192547, at *22 (D.N.J. Sept. 12, 1990).  To the

extent that Count VI is asserting the claims of Contributing Investors, Count VI of the Complaint

should be dismissed with prejudice for the reasons set forth in Point V(C) and (D), *supra*, and the

MTD at 27-28.

      **D.**      **Count Six is deficient because the Complaint does not identify the Contributing Investors on whose behalf the Liquidation Trustee purports to assert claims and does not allege facts showing that the investors are entitled to recover damages**

To the extent that Count VI is asserting the claims of Contributing Investors, Count VI of

the Complaint must likewise be dismissed for the reasons set forth in Point V(E), *supra*.

      **E.**      **The Claim for Aiding and Abetting Securities Fraud is Barred by the Doctrine of *In Pari Delicto***

To the extent that Count VI is asserting the claims of the Debtors' estates, Court VI of the

Complaint should be dismissed with prejudice under the doctrine of *in pari delicto* for the reasons

set forth in Point V (F), *supra*, and the MTD at 28-32.

---

[11] The NJUSA requires an agent to be registered with the New Jersey Bureau of Securities and makes it unlawful for any person to act as an agent in New Jersey unless that person is registered or exempt from registration under the NJUSA.  *See* N.J.S.A. § 49:3-57 and N.J.S.A. § 49:3-56(a), respectively.

**F.      The Complaint Fails to Meet the Applicable Pleading Requirements**

As set forth in the MTD, Count VI of the Complaint also must be dismissed because the

Complaint: (1) makes generalized allegations against "Defendants" without explaining each of the

Cipolla Defendant's role in the alleged misconduct; and (2) does not plausibly allege, much less

plead with the particularity as required under FED. R. CIV P. 9(b), that each of the Cipolla

Defendants "materially aid[ed] in the sale or conduct" underlying the claim.  *See* N.J.S.A. § 49:3-

71(d).  In response, the Liquidation Trustee asserts that "[t]he Complaint sets forth in detail the

role each Defendant played in aiding and abetting the securities fraud allegations" and that "the

Complaint adequately pleads that Defendants actively assisted in the sale of securities."   The

Liquidation Trustee is wrong on both scores.

The Complaint does not properly delineate each of the Cipolla Defendants' alleged roles

and simply lumps them all together in shotgun fashion.  Simply saying that the Complaint sets

forth each Cipolla Defendant's particular role in narrative fashion does not make it so.

Moreover, claiming that the Cipolla Defendants "actively assisted in the sale of securities"

by reviewing and commenting on PPMs for the consideration of regulatory counsel (in connection

with the *Kovel* engagement) and rendering similar consulting services after the fraud was exposed

is insufficient to establish their liability as "agents."  *See Watts & Co. v. Miles & Stockbridge,* 95

Md. App. 145, 620 A.2d 356 (Md. Ct. Spec. App. 1993) (surveying cases from various

jurisdictions and holding that the definition of "agent" in the Maryland Securities Act does not

include attorneys who merely provide legal services, draft documents for use in the purchase or

sale of securities, or engage in their profession's traditional advisory functions).  As the *Watts*

court observed, "[t]o rise to the level of 'effecting' the purchase or sale of securities, the attorney

must actively assist in offering securities for sale, solicit offers to buy, or actually perform the

sale." The Cipolla Defendants did none of these things, nor does the Complaint allege, with particularity, any of the foregoing. They had no role whatsoever in NRIA's sales efforts.

Even if the act of reviewing and commenting on a PPM, for the benefit of regulatory counsel pursuant to a *Kovel* agreement (and after Salzano's arrest), is sufficient to establish active assistance—which it is not—there is no allegation, much less any proof, that any Investors relied on any draft amended PPM where the Cipolla Defendants contributed comments to counsel. Again, it is undisputed that the amended PPMs were prepared for NRIA's counsel pursuant to *Kovel* engagement letters. The May 2021 engagement letter explicitly provides that "Distribution of any report and associated results . . . is intended for and restricted to the Law Firms solely to assist in the referenced matter." Compl., Ex. I at 2. Yet, it does not appear that the Liquidation Trustee has sued any of the attorneys, law firms or others that actually handled the draft PPMs for aiding and abetting securities fraud. The absence of such claims is a clear indication that the Liquidation Trustee's claims against the Cipolla Defendants are nothing but a shakedown, sham and selective prosecution.

## VII.   COUNT VII (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY) MUST BE DISMISSED

The Cipolla Defendants' MTD established that Count VII of the Complaint, which alleges that "[a]ll Defendants" aided and abetted breach of fiduciary duty must be dismissed because: (1) the Contributing investors' prejudgment tort claims are not assignable under New Jersey state law; (2) the Debtors' tort claims are barred by the doctrine of *in pari delicto*; and (3) the Complaint fails to state a claim for aiding and abetting breach of fiduciary duty.

**A.**    **The Claim for Aiding and Abetting Breach of Fiduciary Duty is a Non-Assignable Tort Claim.**

To the extent that Count VII is asserting the claims of Contributing Investors, Count VII

of the Complaint must likewise be dismissed with prejudice for the reasons set forth in Point V(C)

and (D), *supra*, and the MTD at 27-28.

**B.**    **Count Seven is deficient because the Complaint does not identify the Contributing Investors on whose behalf the Liquidation Trustee purports to assert claims and does not allege facts showing that the investors are entitled to recover damages**

To the extent that Count VII is asserting the claims of Contributing Investors, Count VII

of the Complaint must likewise be dismissed for the reasons set forth in Point V(E), *supra*.

**C.**    **The Claim for Aiding and Abetting Breach of Fiduciary Duty is Barred by the Doctrine of *In Pari Delicto***

To the extent that Count VII is asserting the claims of the Debtors' estates, Court VII of

the Complaint must likewise be dismissed with prejudice under the doctrine of in pari delicto for

the reasons set forth in Point V(F), *supra*, and the MTD at 28-32.

**D.**    **The Complaint Fails to State a Claim for Aiding and Abetting Breach of Fiduciary Duty**

As set forth in the MTD, Count VII of the Complaint also must be dismissed because the

Complaint: (1) makes generalized allegations against "Defendants" without explaining each of the

Cipolla Defendant's role in any alleged misconduct; and (2) does not plausibly allege with non-

conclusory allegations of fact that each of the Cipolla Defendants "substantially assisted with the

insiders" alleged breach of fiduciary duty.  In response, the Liquidation Trustee asserts that "in

their role as accountants and advisors to the Debtors, Defendants were a critical component in the

creation and circulation of financial information to Investors."  Opp. Brief, ¶ 105.  However, the

Opposition Brief cannot point to a single non-conclusory allegation of fact in the Complaint to

suggests the Cipolla Defendants had anything to do with circulating financial information to Investors.

Moreover, neither the Complaint nor the Opposition Brief make any attempt to distinguish between Cipolla & Co.'s confidential *Kovel* work that was done for the Debtors' outside counsel (*see* Exs. E & I), pursuant to which comments to the PPM were provided, and the separate tax and accounting consulting services that were rendered to the Debtors. Instead, the Opposition Brief points to 10 bullet points in paragraph 108 that try to clean up and improve upon the Complaint's insufficient allegations. Like the Complaint, the bullet points are a collection of: (i) conclusory allegations, (ii) references to the insiders' action, and (iii) statements that are plainly contradicted by the exhibits attached to the Complaint. Not one of the alleged facts demonstrate substantial assistance by the Cipolla Defendants in the Debtors' alleged fraudulent scheme.

As set forth in response to Count VI above, even if the act of reviewing and commenting on PPMs at the request of counsel is sufficient to establish substantial assistance—which it is not— *Kovel* accountants retained by the Debtors' outside counsel are not engaged as market regulators or the police. The May 2021 engagement letter explicitly provides that "Distribution of any report and associated results … is intended for and restricted to the Law Firms solely to assist in the referenced matter." Compl., Ex. I at 2. The *Kovel* engagement letter goes on to clearly state that "[t]he services we shall provide cannot be relied upon by the Law Firms or their client NRIA to discover any or every occurrence of Fraud or other illegality." Ex. I at 4. Cipolla & Co. could not have "sounded the alarm" in the way the Complaint suggests. A quick review of Exs. I, K, L and M together make it crystal clear that Cipolla & Co. was sounding the alarm to the law firm responsible for amending NRIA's PPM. They reported the disclosure deficiencies they found to

the Debtors' PPM counsel, as Ex. L plainly shows.  Anything beyond that would have constituted

a breach of the *Kovel* engagement agreement.  Ex. I.

Regardless of the Opposition Brief's revisionist description of the Complaint's actual

allegations in the instant matter, the Complaint contains no colorable allegation of fact that any of

the Cipolla Defendants provided the substantial assistance that is necessary to support a claim for

aiding and abetting breach of fiduciary duty.  Accordingly, Count VII must be dismissed for failure

to state a claim.

## VIII.   COUNT VIII (ACCOUNTING MALPRACTICE) MUST BE DISMISSED

Count VIII of the Complaint exemplifies the confusion caused by the failure of the Plan,

the consolidated Liquidation Trust and the Complaint to treat the claims of the Debtors' estate and

the Contributing Investors separately.  As drafted, Count VIII of the Complaint is clearly intended

to only assert claims that originated with the NRIA estate.  Tellingly, paragraph 169 of the

Complaint only asserts that NRIA was damaged, *not* the investors.  Out of nowhere, the Opposition

Brief now asserts that "the accounting malpractice claim in Count VIII is one that Investors have

assigned to the Liquidation Trust …," with absolutely not one allegation about how or if investors

were damaged.  Opp. Brief, ¶ 114.  Through all the fog, one thing is clear, not even the Liquidation

Trustee knows whether it is asserting claims on behalf of the Debtors' estates or the Contributing

Investors, which makes a difference to the Cipolla Defendants because the defenses are clearly

different.

### A.      The Claim for Accounting Malpractice is a Non-Assignable Tort Claim.

To the extent that the Liquidation Trustee now believes that Count VIII is asserting the

claims of Contributing Investors, Count VIII of the Complaint must be dismissed with prejudice

for the reasons set forth in Point V(C) and (D), *supra*, and the MTD at 27-28.  As set forth above,

in *Integrated Solutions*, 124 F.3d at 490, the Third Circuit held that New Jersey law prohibits

prejudgment assignment of tort claims, including intentional torts. Moreover, under New Jersey law, professional malpractice claims sound in tort. *See Grunwald v. Bronkesh*, 131 N.J. 483, 492, 621 A.2d 459 (1993). Taking these two principles together, New Jersey federal district courts have concluded that the general ban on assignment of tort claims in New Jersey renders professional malpractice claims unassignable under New Jersey Law. *See e.g., Alcman Services Corp. v. Samuel H. Bullock, P.C.*, 925 F. Supp. 252, 257-58 (D.N.J. 1996); *Conopco, Inc. v. McCreadie*, 826 F. Supp. 855, 866-67 (D.N.J. 1993). Assuming arguendo that such claims were assignable, the Complaint (as opposed to the Opposition Brief) would need to allege that Contributing Investors were damaged and that those damages were proximately caused by the Cipolla Defendants' negligence. *Alcman Services*, 925 F. Supp. at 257. The Complaint does neither.

**B.      Count VIII is deficient because the Complaint does not identify the Contributing Investors on whose behalf the Liquidation Trustee purports to assert claims and does not allege facts showing that the investors are entitled to recover damages.**

To the extent that Count VIII is asserting the claims of Contributing Investors, Count VIII of the Complaint must likewise be dismissed for the reasons set forth in Point V(E), *supra*.

**C.      The Claim for Accounting Malpractice is Barred by the Doctrine of *In Pari Delicto*.**

To the extent that Count VIII is asserting the claims of the Debtors' estates, Court VIII of the Complaint must be dismissed with prejudice under the doctrine of *in pari delicto* for the reasons set forth in Point V(F), *supra*, and the MTD at 28-32.

**D.      The Complaint Fails to State a Claim for Accounting Malpractice.**

The MTD establishes that the Complaint fails to meet the pleading standards of FED. R. CIV. P. 8 because of its reliance on conclusory and lumped allegations against all the Cipolla

Defendants, without any plausible allegations of fact to show the Liquidation Trust is entitled to relief.

If the Liquidation Trustee is pursuing the malpractice claim in Count VIII on behalf of Contributing Investors, as the Opposition Brief now claims (Opp. Brief, ¶ 114), Count VIII of the Complaint has no allegations alleging that the Cipolla Defendants owed the Contributing Investors a duty of care, that they breached that duty or that the Cipolla Defendants caused the investors damages.  Therefore, Count VIII can be dismissed on that basis alone.

If the Liquidation Trustee is pursuing the malpractice claim in Count VIII on behalf of the Debtors' estate, then the Complaint still suffers from the pleading deficiencies set forth in the MTD.  For example, there is no allegation of fact that states which of the lumped Cipolla Defendants purportedly gave advice to NRIA that was contrary to GAAP (Compl., ¶ 164).  *See* Section V(H), *supra*.

The thrust of the Opposition Brief with respect to the malpractice claim is that the Cipolla Defendants purportedly gave NRIA bad advice contrary to GAAP regarding the recognition of revenue with respect to subsidiary development projects (Opp. Brief, ¶ 120; Compl., ¶¶ 136(c), 164), somehow "pressured" the NRIA to enter into the October 2021 Agreements, thereby extracting a $4.61 million fee (Opp. Brief, ¶ 121; Compl., ¶ 167).  The Complaint fails to state a claim for accounting malpractice for the additional reasons that follow.

### 1.    The Liquidation Trustee's GAAP allegations are a red herring.

The Complaint alleges that the Cipolla Defendants advised the Debtors to book revenue contrary to GAAP in order to artificially inflate and generate revenue for NRIA.  That fabrication is contrary to and quickly dispensed with by reference to Ex. U, other allegations in the Complaint, as well as well-known and generally accepted accounting standards.  First, the scope of the proposed work in the CFA Review agreement was to "perform a multi-period review engagement

with respect to the *consolidated financial statements*" of NRIA for 2018 through Q1 2022.  Ex. U at 1 (emphasis added), including for restated 2018 and 2019 financial statements.  CFA Review was engaged to review these consolidated financial statements prepared by NRIA with respect to NRIA, the Fund and all other entities NRIA controlled.  The consolidated nature of the financial statements makes revenue received from a controlled reporting entity a non-event.

When a company prepares consolidated financial statements and when fees or money are paid from a controlled subsidiary or affiliate to the parent or controlling company, the transaction is eliminated as if it did not exist, and as if all the reporting entities were a single economic entity.  Financial Accounting Standards Board ("**FASB**") ASC 810.  Thus, the financial statements are prepared as if the fee payment from the controlled affiliate never happened.  Not only does FASB ASC 810 moot the Liquidation Trust's conjured revenue recognition issue, it also means that there is no plausibly alleged breach of a duty of care.

Moreover, financial statements and the accompanying general ledger "books" of a company are the responsibility of the company and its management, not a consultant or an accountant that was retained to perform a review engagement.  FASB AU 101.03.

Interestingly, in contradiction to the allegations in Count VIII, the Complaint itself asserts that:

> at Salzano's direction and in collaboration . . . his son, Dustin Salzano, NRIA charged the Fund annual development fees of up to 4.5 percent of the overall value of any given project and failed to disclose the *development fees were paid at the outset of the projects*, not when performance obligations were met as required by standard business practices and Generally Accepted Accounting Principles.  See Accounting Standards Codification Topic 606, Revenue from Contracts with Customers ("ASC 606").  This practice grossly inflated NRIA's revenue on its financial statements, with any references to GAAP departures buried in a footnote.

Compl., ¶ 39 (emphasis added).  Thus, as the Complaint makes clear, Salzano directed NRIA's

recognition of development fees, not the Cipolla Defendants, and this was long before the Cipolla

Defendants rendered any services.

The CFA Review engagement letter expressly states, " . . . you agree that all *your* financial

statements and disclosures shall . . . be prepared in strict accordance with U.S. GAAP …"  Ex. U

at 7 (emphasis added).  It also states that "[y]ou agree, acknowledge and represent that NRIA is

the party financially responsible for the payment of our fees and that such payment of our fees is

from NRIA's own funds and/or NRIA's own equity . . . and will not be funded in any part by Fund

investor funds…."  Ex. U at 3.  Moreover, the engagement letter also states, "You have the

following overall responsibilities . . . [7].  The preparation and fair presentation of the financial

statements in accordance with accounting principles generally accepted on the United States…"

Ex. U at 5.

Accordingly, and notwithstanding the gross misrepresentations and fanciful allegations of

the Complaint, any revenue recognition with respect to the development fees paid to NRIA was

beyond the scope of Cipolla's services.  These decisions were made by and were the responsibility

of NRIA and its directors and officers.  NRIA was not damaged by payment of a contractual flat

fee in the October 2021 Agreements in exchange for the bargained for services.

        **2.**      **The Complaint's exhibits directly contradict the Complaint's false allegations that the Cipolla Defendants "pressured" NRIA to enter the October 2021 Agreements.**

Paragraph 167 of the Complaint (and again, contrary to the controlling exhibits) alleges

that the Cipolla Defendants intentionally overstated the consequences NRIA would face if the

proposed tax and review work was not promptly undertaken and completed.  However, throughout

the Complaint all allegations of pressure to enter into the October 2021 Agreements point to Ex.

S (*see e.g*., Compl., ¶¶ 69, 78, 89 and 90), which is an October 25, 2021 e-mail from Rey Grabato

to defense counsel and copies management at NRIA.  It is not from any of the Cipolla Defendants.
In fact, none of the Cipolla Defendants are even copied on it.  Thus, the allegation in paragraph
167 is proven false by the Liquidation Trustee's own Ex. S and, in conjunction with Ex. U, actually
demonstrates the opposite—CFA Review only agreed to the review engagement after the
withdrawal or refusal of other CPA firms.  Compl., Ex. U at 8.  Again, as Ex. U demonstrates, a
host of CPA firms were pursued to perform the review services during the (7) seven months after
the March 2021 arrest of Salzano; only after each one declined, on October 26, 2021, did CFA
Review finally relent and agree to negotiated terms upon advice of counsel to both parties.

### 3. The Cipolla Defendants were not privity with Debtors in connection with the *Kovel* work and did not prepare or review the Debtors' financial statements

N.J.S.A. § 2A:53A-25 was adopted by the New Jersey's Legislature in 1995 as "The
Accountant Liability Act" (the "**Act**") which prohibits third parties from bringing negligence
claims against accountants except in narrowly described circumstances.  The Act's legislative
history indicates that it was enacted to "limit accountants' liability to third parties for the
accountants' negligent acts.  The bill restores the concept of privity to accountants' liability
towards third parties …," *Senate Commerce Committee Statement to Senate Bill No. 826* (Oct. 13,
1994).  The Act was intended to establish preconditions to the imposition of liability on an
accountant to a *non-client* third party.  *Cast Art Industries, LLC v. KPMG LLP*, 209 N.J. 208, 221
(2012).

The Opposition Brief cites the pre-Act decision in *Levine v. Wiss & Co.*, 97 N.J. 242 (1984)
for the proposition that "[a]n incorrect financial statement, negligently prepared by an accountant
and justifiably relied upon, "may be the basis for recovery of damages for economic loss or injury
sustained as a consequence of that reliance."  Opp. Brief, ¶ 118.  The pleading failure here is that
the Complaint does not allege that Cipolla Defendants prepared any financial statements for the

Debtors. In fact, to the contrary, the Complaint alleges that the financial statements were prepared or manipulated by NRIA's insiders. Compl., ¶¶ 31, 133.

The Litigation Trustee points to Exs. K, L & M (exhibits regarding the PPMs) in support its specious argument that those exhibits and the Complaint plausibly alleged privity between the Cipolla Defendants and the Debtors. Opp. Brief, ¶ 118-19. Read in context, Exs. I, K, L & M cannot be logically construed as anything other than *Kovel* work done by Cipolla & Co at the direction of Reed Smith under the *Kovel* engagement pursuant to Ex. I. Ex. K is a cover e-mail from Cipolla to John Collins and Thomas Fierro (new CPA-CFO) at NRIA who were collecting comments from professionals for submission to compliance counsel, Reed Smith. Ex. L is the attachment to Ex. K that provides a *Preliminary List of Major Non-Tax Disclosures* that Cipolla & Co was recommending that Reed Smith incorporate into future PPMs. Each page is captioned "Prepared at the Request of Counsel: Preliminary & Tentative DRAFT." Ex. M is an e-mail that provides additional comments less than two (2) weeks later. Those exhibits do not plausibly allege any privity whatsoever between the Cipolla Defendants and the Debtors.

Accordingly, Count VIII of the Complaint fails to meet the pleading requirements of Rules 12(b)(6), and 8(a)(2) of the Federal Rules of Civil Procedure, which failure is an additional reason why Count VIII must be dismissed.

## IX.   COUNT IX (TURNOVER) MUST BE DISMISSED

As set forth in the MTD, Count IX of the Complaint, which seeks turnover of the fee payments pursuant to Bankruptcy Code section 542(b), must be dismissed for failure to state a claim under FED. R. CIV. P. 12(b)(6). Turnover under section 542 of the Bankruptcy Code is intended as a remedy to obtain what is acknowledged to be property of the bankruptcy estate, not as a means of determining disputed rights of parties to property. MTD at 50.

The Liquidation Trustee's Opposition Brief asserts that the $4.61 million in fees paid to CFA Tax and CFA Review are not property of the estate because they are available; rather the Liquidation Trustee says they are subject to turnover because they are "retainers."  Of course, whether or not the flat fee can somehow be construed as "retainers" is one of the most hotly contested issues raised in the MTD (*see* MTD at 11-12).  Remarkably, the Opposition Brief fails to address this issue.  Rather, the Liquidation Trustee just assumes, without anything to substantiate this characterization, that the fixed flat-fees paid in advance, refundable in very narrow and limited circumstances, are "retainers."

Contrary to the Complaint's relentless use of the word "retainer," the CFA Review and CFA Tax engagements were both done on a flat-fee basis, with the fees paid in advance, and earmarked for specific work.  The October 2021 Agreements provide that the fees are refundable only if certain circumstances exist (they do not) and do not provide that the fixed fees thereunder are in the nature of a retainer or that NRIA retains any property interest in the monies.  *See generally*, Ex. T and Ex. U.  The CFA Review contract was priced at a flat fee of $480,000 per reporting period (totaling $3,360,000) and the CFA Tax contract was priced at a flat fee of $625,000 per tax year (totaling $1,250,000).  The Cipolla Defendants did not receive or ever hold "retainers" in connection with the October 2021 Agreements.

The Liquidation Trustee boldly and misleadingly asserts that "[w]hen a professional receives a retainer it improperly claims is non-refundable, that retainer remains property held for the benefit of the client," Opp. Brief, ¶ 127 citing *Fischer v. Fischer*, 375 N.J. Super. 2789, 287 (App Div. 2005).  The Liquidation Trustee chooses to misrepresent the holding in *Fischer*.  What the Liquidation Trustee fails to say is that the *Fischer* case involved an attorney, not just any "professional" and it was decided based on the application of *N.J. Court R*. 5:3-5(b), which applies

52

to withdrawing lawyers in family law cases, *not* accountants.  The Cipolla Defendants are not withdrawing attorneys in a family law case; indeed, they are not even lawyers.  Neither the Cipolla Defendants nor any other accountants are subject to *N.J. Court R*. 5:3-5(b)'s prohibition on non-refundable retainers in family law cases.

The second authority cited by the Liquidation Trustee stands for the unremarkable proposition that a law firm that was owed fees for pre-petition work was not disinterested under 11 U.S.C. § 101(14) and therefore the court exercised its discretion to deny compensation for unpaid pre-petition work. *In re Lackawanna Med. Group, P.C.*, 323 B.R. 626, 634 (Bankr. M.D. Pa. 2004).  In *dicta*, and a footnote, the court said that "[t]he general rule is that, unless shown to be otherwise, a retainer constitutes funds held in trust for the benefit of the debtor, *i.e.*, a security retainer." *Id*. at 630, n. 5.  That statement says nothing about accountants and sheds no light whatsoever on whether a non-refundable payment to accountant based upon negotiated, mutual commitments and promises constitutes a retainer as a matter of law.

The Liquidation Trustee argues that it met its pleading standard here by making a completely unsupported allegation in paragraph 172 of the Complaint that the funds paid to CFA Tax and CFA Review were retainers.  Opp. Brief, ¶ 126.  Of course, the Complaint's allegation that the fees paid to CFA Tax and CFA Review constituted "retainers" is a legal conclusion, not an allegation of fact that distinguishes non-refundable fee agreements with refundable retainers. As set forth in the MTD, "[w]hen an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit controls, even when considering a motion to dismiss." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).  Here Ex. T and Ex. U make abundantly clear that the payments at issue here were not retainers.  They were never retainers.  There is certainly no allegation in the Complaint that flat fee arrangements are prohibited in accounting engagement agreements.

The Liquidation Trustee has not cited a single authority in the Opposition brief that stands for the proposition that accountants are held to the same standard as a family law attorney with respect to fee payments or that non-refundable payments to an accountant constitutes a retainer. Accordingly, the Liquidation Trustee's claim for turnover in Count IX of the Complaint must also be dismissed.

## X.    COUNT X (CONVERSION) MUST BE DISMISSED

### A.    The Complaint Fails to State a Claim for Conversion.

The MTD established that the Complaint fails to state a claim for the tort of conversion because the Liquidation Trustee cannot show that the fixed fees CPA Tax and CPA Review received under the October 2021 Agreements remained NRIA's property and that those defendants had an obligation to segregate the monies for NRIA's benefit.  *See Glenfed Financial Corp. v. Penick Corp.*, 276 N.J. Super. 163, 170 (App. Div. 1994) (finding that defendant converted plaintiff's property by "diverting payments from customers which it had agreed to place in a blocked account for [plaintiff's] benefit into [defendant's] operating accounts").

Merely calling the fixed fees a "retainer" as the Liquidation Trustee repetitively does in the Complaint and Opposition Brief does not make it so.  The exhibits to the complaint tell the true story and control for purposes of a motion to dismiss.  The October 2021 Agreements provide that the fees are to be paid in full and that they are refundable only if certain circumstances exist.  The October 2021 Agreements do not provide that the fixed fees thereunder are in the nature of a retainer or that NRIA retains any property interest in the monies.  They impose no obligation on CFA Tax and CFA Review to segregate the fees for NRIA's benefit.  Accordingly, Count X fails to state a claim and must be dismissed.

### B.     The Economic Loss Doctrine Bars the Liquidation Trustee's Conversion Claim.

The Liquidation Trustee does not dispute that the economic loss doctrine may bar a claim for conversion.  *See Viridian Res., LLC v. Inco Ltd.*, 2023 U.S. Dist. LEXIS 99466, at *39-40 (D.N.J. June 7, 2023) (economic loss doctrine "generally bars a tort claim when no factual basis for the tort claim would exist had the defendant complied with the contract") (citation omitted). Here, the economic loss doctrine applies to the Liquidation Trustee's conversion claim because Count X of the Complaint seeks the return of monies that were paid to CFA Tax and CFA Review pursuant to the October 2021 agreements.  Thus, the claim sounds in contract, not in tort. The Liquidation Trustee argues, however, that the economic loss doctrine does not apply in this case due to an exception for fraud in the inducement.  That argument is unavailing.  The alleged exception cannot apply because, as discussed in the MTD and in Point XI, *infra*, the Complaint fails to state a claim for fraudulent inducement.

## XI.     COUNT XI (FRAUDULENT INDUCEMENT) MUST BE DISMISSED

### A.     The Complaint Fails to Plausibly Allege All of the Elements of a Claim for Fraudulent Inducement.

The MTD demonstrated that Count XI of the Complaint must be dismissed due to the Liquidation Trustee's failure to plausibly allege two (2) elements of a claim for fraudulent inducement.  Specifically, the Complaint is devoid of any allegations that Cipolla knew that certain "advice and recommendations" on which NRIA allegedly relied in entering into the October 2021 Agreements were false and that Cipolla had knowledge of their falsity.   In response, the Liquidation Trustee asserts that "Defendants appear to have overlooked several allegations that plausibly show Defendants' advice and misrepresentations were false or made with knowledge of their falsity."  Opp. Brief at p. 49.  However, the Liquidation Trustee proceeds to refer to the very same defective allegations that the Cipolla Defendants identified in the MTD, specifically,

paragraphs 187-192 of the Complaint. *Compare* Opp. Brief at 49 *with* MTD at 54. None of those paragraphs allege that the so-called advice and recommendations were false or that Cipolla knew or believes of their falsity. This is but another example of the Liquidation Trustee's propensity to cite to something that simply does not support the proposition for which it supposedly stands. Accordingly, Count XI must be dismissed for failure to state a claim.

**B.    The Complaint Fails to Plead Fraudulent Inducement with Particularity.**

The Opposition Brief fails to establish with specific references to allegations in the Complaint that the Complaint pleads fraudulent inducement with the requisite particularity under Rule 9(b). In response to the Cipolla Defendants' contention that the Complaint provides no specifics as to when, how or where the "advise and representations" that supposedly give rise to a claim for fraudulent inducement were made, or why they were fraudulent. Rather, the Opposition Brief simply states: "As set forth above and in detail in the Complaint, Cipolla with the help of Salzano pressured NRIA into entering into the October 2021 Agreements." Opp. Brief at 50. Pressuring someone to enter into an agreement, where there is no credible evidence; does not constitute fraudulent inducement. Moreover, Salzano is alleged in the Complaint to have been the true, undisclosed manager of the Fund and the Debtors, including NRIA. Compl., ¶ 27. If, as the Liquidation Trustee contends, Salzano participated in the conduct that allegedly gives rise to the Liquidation Trustee's fraudulent inducement claim, the claim must be dismissed because it is axiomatic that a person in control of an entity cannot fraudulently induce that entity in to entering into its own contract.

In addition to all of these deficiencies, the Opposition Brief fails to rebut the Cipolla Defendants' position that Count XI does not meet the heightened pleading requirements of Rule 9(b) because the allegations in the Complaint fail to differentiate between the various Cipolla Defendants. The Liquidation Trustee simply asserts, without reference to any specific allegations

of the Complaint, that "Plaintiffs have provided a plethora of facts in a logical narrative format that lays out in detail the conduct of Defendants." Opp. Brief at 50. Because the Liquidation Trustee has not met its elevated pleading burden under Rule 9(b), Count XI must be dismissed.

### C. Even Assuming the Liquidation Trustee has a Viable Fraudulent Inducement Claim, the Claim Must be Dismissed as to Defendants Cipolla, Cipolla & Co., and Cipolla Financial Advisors.

To the extent, if any, that the Complaint states a viable claim for fraudulent inducement, Count XI must also be dismissed as against Joseph Cipolla, Cipolla & Co., Cipolla Assurance Services, LLC and Cipolla Financial Advisors because *none* of these defendants are parties to the October 2021 Agreements. The two (2) cases cited on pages 50-51 of the Opposition Brief do not hold otherwise. In *Kare Distribution, Inc. v. Jam Labels and Cards LLC*, 2009 WL 3297555 (D.N.J. Oct 9, 2009), the fraudulent inducement claim (which the court dismissed under FED. R. CIV. P. 12(b)(6)) was asserted in a counterclaim by one of the defendants against the lone plaintiff, with whom the defendant had contracted. Thus, the case does not involve, much less countenance, a claim for fraudulent inducement against nonparties to a contract. The other case cited by the Liquidation Trustee, *Banco Popular N. Am. v.  Gandi*, 184 N.J. 161 (2005), does not mention fraudulent inducement at all. Moreover, the Liquidation Trustee cites no authority for the bare assertion in the Opposition Brief that because "Cipolla is the mouthpiece for all the Cipolla Affiliates" a fraudulent inducement claim may lie against Joseph Cipolla and the other Cipolla Defendants who are not parties to the October 2021 Agreements.[12]

---

[12]The Opposition Brief does not address the Cipolla Defendants' argument in Point X(C) of the MTD that the economic loss doctrine bars the Liquidation Trustee's claim for fraudulent inducement. Therefore, the Cipolla Defendants will not address that argument further in this Reply.

## XII.    COUNT XII (BREACH OF CONTRACT) MUST BE DISMISSED

The Liquidation Trustee's efforts to save its breach of contract claim are futile.  *First*, the Liquidation Trustee ignores the most fatal flaw of its breach of contract claim—the Liquidation Trustee failed to plead each element of breach of contract under New Jersey law for each relevant contract.  MTD, at 58.  Specifically, the Liquidation Trustee failed to allege that: (i) NRIA complied with the CFA Review Agreement and the CFA Tax Agreement, and (ii) CFA Review and CFA Tax violated a single provision of the CFA Review Agreement or CFA Tax Agreement, respectively.  In fact, the Complaint is devoid of any allegation that CFA Tax breached the CFA Tax Agreement and Ex. CC, upon which the Liquidation Trustee relies, only pertains to the CFA Review Agreement.

*Second*, should the Court find other counts in the Complaint survive the Liquidation Trustee's "shotgun" approach, the breach of contract count cannot.  Count XII asserts that three (3) different defendants each breached two (2) independent contracts, effectively alleging five (5) distinct charges under one count.  This cluster (which asserts breach of contract against defendants that were not a party to the contract(s)) is inappropriate under any pleading standard.

*Third*, the Liquidation Trustee refers to the express provisions in the CFA Review Agreement and CFA Tax Agreement that the "engagement[s] shall not commence until financial statements and related footnotes are produced by Client in substantially complete form…." as a "red herring."  The Liquidation Trustee may not dismiss the terms of CFA Review Agreement and CFA Tax Agreement simply because it does not like them: the four corners control.  The same holds true that the Liquidation Trustee has failed to properly plead damages because the terms of the CFA Review Agreement and CFA Tax Agreement provide that the payments were non-refundable.  As such, under the express provisions of the valid and binding agreements, NRIA has

not suffered a loss due to any act of the Cipolla Defendants, thereby precluding any breach of contract claim.

*Lastly*, the Liquidation Trustee's reliance on *In re Chiro Plus, Inc*., 339 B.R. 111, 114 (D.N.J. 2006), is to no avail.  The Liquidation Trustee cites *Chiro* to argue the merits of its breach of contract claim(s).  The Liquidation Trustee must first properly plead its breach of contract claim(s) before the merits are raised.  For the foregoing reasons and those set forth in the MDT, Count XII must be dismissed.

## XIII.   COUNT XIII (DISALLOWANCE OF CLAIMS) MUST BE DISMISSED

Count XIII of the Complaint seeks to disallow the approximately $2.2 million of claims filed by some of the defendants.  Compl., ¶ 210.  The MTD asserts that, until this Court enters an order against the Cipolla Defendants finding them liable, section 502(d) of the Bankruptcy Code is unavailable to the Liquidation Trustee.  This is because "section 502(d) is triggered only after a judgment has been entered requiring turnover of property to the estate." *DHP Holdings II Corp. v. Home Depot, Inc*, 435 D.R. 264, 272 (Bankr. D. Del. 2010); *Sikirica v. US Foods, Inc*., 500 B.R. 729, 738-39 (Bankr. W.D. Pa. 2013) (dismissing 502(d) claim as premature because defendant had not yet been found liable).  The Liquidation Trustee side-steps the merits of the Cipolla Defendants' argument and cites Bankruptcy Rule 3007 for an incorrect proposition.  Bankruptcy Rule 3007 does not require a claims objection to be brought in an adversary proceeding when other affirmative relief is sought against the same party.  *See* Bankruptcy Rule 3007 ("may include the objection in an adversary proceeding").  Setting aside yet another false representation, because the Liquidation Trustee's fraudulent transfer and turnover claims must be dismissed, so too must its disallowance of claim count.  *Giuliano v. Nursing Corp.*, 339 B.R. 570 (Bankr. D. Del. 2006) (dismissing section 502(d) claim because it is dependent on dismissed fraudulent transfer claims).

## XIV.   COUNT XIV (EQUITABLE SUBORDINATION) MUST BE DISMISSED

The MTD establishes that controlling Third Circuit law bars the equitable subordination of creditors' claims to equity interests, as the Liquidation Trustee is attempting to do in this case.  *In re Winstar Communs., Inc.* 554 F.3d 382, 414 (3d. Cir. 2009).  The Liquidation Trustee wants to subordinate the Cipolla Defendants' claims below investors' equity interests and that relief is expressly not available under section 510(c) on the Bankruptcy Code.

The Opposition Brief seems to assert that, because the Plan treats "Investor Claims" as a "Claim" (Opp. Brief, ¶ 164), the express mandate of section 510(c)(1) of the Bankruptcy Code does not apply in this case, which is completely false.

The Plan provides that a "Claim" means a 'claim' as defined in section 101(5) of the Bankruptcy Code."  ECF No. 3260-1 at 5.  Bankruptcy Code section 101(5) does not treat equity interests as a "claim."  The Plan also defines "Equity Interests" to include "Membership Interests." ECF No. 3260-1 at 7.  "Membership Interests" means a membership interest in any of the Debtors. ECF No. 3260-1 at 11.

Paragraph 20 to the Plan proponents' confirmation brief underscores the point that the Membership Interests are "equity securities" (11 U.S.C. 101(16)) that are subject to mandatory subordination under Bankruptcy Code section 510(b):

> [S]eparate classification of Investor Claims in Class 5 from Non-Investor General Unsecured Claims in Class 4 is necessary and appropriate.  *All of the Investor Claims arise from or are for damages related to such Investors' purchases of equity securities of the Debtors.*  Accordingly, such Claims are subject to mandatory subordination under section 510(b) of the Bankruptcy Code.

ECF No. 3259, ¶ 20 (emphasis added).

Regardless of how the Plan treats "Investor Claims," the PPMs attached to the Complaint make clear that the investors were purchasing equity interests in the Debtors.  By way of example:

(i)      investments were treated as "Capital Contributions" (Ex. Q at 10);

(ii)    the value of investment is adjusted based on "Equity Multiple" and "Preferred Rate of Return" (Ex. Q at 12);

(iii)   the company established a "Capital Account" for each investor/member (Ex. Q at 20);

(iv)    the "Term" of the investment is flexible (Ex. Q at 22-23); and

(v)     "All investments risk the loss of capital." (Ex. Q at 37).

The foregoing makes abundantly clear that the Investor Claims (as defined in the Plan) are equity interest securities and thus, it logically follows that the Cipolla Defendants claims cannot be subordinated to those interests.  Accordingly, Count XIV of the Complaint must be dismissed.

## XV.    COUNT XV (UNJUST ENRICHMENT) MUST BE DISMISSED

The Liquidation Trustee argues in the Opposition Brief that New Jersey law allows an unjust enrichment claim to be pleaded alongside a breach of contract claim.  Opp. Brief, at 55. While plaintiffs sometimes are permitted to plead unjust enrichment and breach of contract in the alternative, "[c]ourts in this District regularly dismiss unjust enrichment claims that are duplicative of a complaint's breach of contract claims when the governing agreement is undisputed." *Gujja v. Inpatient Servs. of N.J.*, 2022 U.S. Dist. LEXIS 129011, at *6 (D.N.J. July 20, 2022).

In the instant case, there is no dispute that the non-refundable contractual payments that are the subject of the Liquidation Trustee's unjust enrichment claim were paid to CFA Tax and CFA Review pursuant to enforceable and binding contracts.  Copies of the agreements are attached as exhibits to the Complaint.  Comp., Exs. T and U.  Accordingly, the Liquidation Trustee's duplicative claim for unjust enrichment should be dismissed.

## CONCLUSION

**WHEREFORE**, for the reasons set herein and in MTD, the Cipolla Defendants respectfully request that the Court grant the MTD and dismiss the Complaint with prejudice.

Respectfully submitted,

Dated:  July 2, 2024                              **GIBBONS P.C.**
Newark, New Jersey


By: */s/ Robert K. Malone*
    Robert K. Malone, Esq.
    Mark B. Conlan, Esq.
    Christopher P. Anton, Esq.
    Kyle P. McEvilly, Esq.
    One Gateway Center
    Newark, NJ 07102
    Telephone:  (973) 596-4500
    Email: rmalone@gibbonslaw.com
         mconlan@gibbonslaw.com
         canton@gibbonslaw.com
         kmcevilly@gibbonslaw.com

*Attorneys for the Cipolla Defendants*

# **EXHIBIT A**

**GIBBONS P.C.**
Robert K. Malone, Esq.
Mark B. Conlan, Esq.
Christopher P. Anton, Esq
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Email: rmalone@gibbonslaw.com
          mconlan@gibbonslaw.com
          canton@gibbonslaw.com
          kmcevilly@gibbonslaw.com

*Attorneys for the Cipolla Defendants*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC,<br><br>          Debtor. | Chapter 11<br><br>Case No. 22-14539 (JKS)<br><br>Hon. John K. Sherwood |
| AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>          Plaintiff,<br><br>     v.<br><br>JOSEPH CIPOLLA, CIPOLLA & CO., LLC, CFA ASSURANCE SERVICES LLC, CFA REVIEW SERVICES LLC, CFA TAX SERVICES LLC, CIPOLLA FINANCIAL ADVISORS LLC, and DOES 1-100,<br><br>          Defendants. | Adv. Pro. No. 24-01097-JKS |

**DECLARATION OF JOSEPH P. CIPOLLA, JR. PURSUINT TO 28 U.S.C. § 1746 IN SUPPORT OF MOTION OF CIPOLLA DEFENDANTS TO DISMISS PLAINTIFF'S ADVERSARY COMPLAINT PURSUANT TO RULE 7012 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

**JOSEPH P. CIPOLLA, Jr.**, of full age, under penalty of perjury, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.       I am a Certified Public Accountant (CPA) in the States of New Jersey and New York, hold designations from the American Institute of Certified Public Accounts for being Accredited in Business Valuations (ABV), Certified in Financial Forensics (CFF) and a Personal Financial Specialist (PFS), and a Certified Fraud Examiner (CFE). I am a former trustee of the New Jersey Society of Certified Public Accountants (NJSPCA) and was the inaugural Chair of the Valuation and Liquidation Services Resource Group of the NJSCPA.

2.       I make this declaration in support of the *Motion of the Cipolla Defendants to Dismiss Plaintiff's Adversary Complaint Pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure*. Unless otherwise stated, I have personal knowledge of the facts set forth herein.

3.       Attached hereto at **Exhibit A** is a true and correct copy of the *Amended Statement of Claim*, dated and submitted June 6, 2022 in the arbitration styled *Cipolla & Co. LLC, et al. v. National Realty Investment Advisors, LLC, et al.*, Case No.: 01-21-0017-5529, pending before the American Arbitration Association. The Amended Statement of Claim was prepared at my direction and is based upon information supplied to my counsel in the arbitration which commenced approximately seven months prior to the Debtors' filing of their Chapter 11 petitions.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 2, 2024

Joseph P. Cipolla, Jr.

2

# **EXHIBIT A**

**AMERICAN ARBITRATION ASSOCIATION**

----------------------------------------------------------------x

In the Matter of the Arbitration between       Case No.:  01-21-0017-5529

CIPOLLA & CO. LLC, CFA ASSURANCE SERVICES,
LLC, CFA REVIEW SERVICES, LLC and CFA TAX     **AMENDED**
SERVICES, LLC,                               **STATEMENT OF CLAIM**

           Claimants,

     -and-

NATIONAL REALTY INVESTMENT ADVISORS,
LLC and NRIA PARTNERS PORTFOLIO FUND I,
LLC,

           Respondents.

----------------------------------------------------------------x

Pursuant to the American Arbitration Association's Accounting and Related Services
Arbitration Rules ("AAA Accounting Rules"), Claimants, Cipolla & Co., LLC ("CCO"), CFA
Assurance Services, LLC, ("CAS"), CFA Review Services, LLC ("CRS") and CFA Tax
Services, LLC ("CTS") (hereinafter collectively referred to as the "Claimant"), hereby submit
their Demand for Arbitration and Statement of Claim against Respondents, National Realty
Investment Advisors, LLC ("NRIA"), NRIA Partners Portfolio Fund I, LLC (the "Fund"), and
aver as follows.

## THE PARTIES AND THEIR PRINCIPALS

1.      CCO, CAS, CRS and CTS are all affiliated New Jersey limited liability
companies with offices in New Jersey.  Together, they render traditional tax, accounting and
consulting services as well as business valuation and litigation support services to businesses,
individuals and their attorneys.

2.      Joseph Cipolla, CPA/ABC/CFF/PFS, is the principal and sole member of each of
the Claimants. Mr. Cipolla is formerly a Senior Manager in Arthur Andersen's New York City
office where he worked for nine years in both the audit and tax departments.  He has substantial
expertise as a court-appointed CPA and in *Kovel* white-collar criminal defense matters both
domestically and internationally. He also has substantial expertise in litigation services and
forensic work in commercial litigation matters and has worked with some of the leading
attorneys and law firms in these areas of law.

3.      NRIA is a Delaware limited liability company with approximately 80 employees,
many of whom are former mortgage brokers.  NRIA operates from one centralized location in
Secaucus, New Jersey.  NRIA is owned 80% by Rey Grabato (who is NRIA's President) and

20% by Coley O'Brien (through a wholly owned C Corporation).

4.      NRIA was formed in 2006 and initially developed residential real estate exclusively in Philadelphia.  In these initial projects, referred to as "deeded properties," NRIA received a fee for locating, obtaining financing for, and developing real estate for investors who took title to the property from the outset of the project.

5.      In February 2018 NRIA formed the Fund, a Delaware limited liability company, through which it subsequently raised approximately $600 million from approximately 2,000 investors.  The Fund has invested in 20 residential real estate development projects in Brooklyn, Northern New Jersey, Philadelphia and Palm Beach County.  It has also invested in commercial mortgage-backed securities through its wholly-owned subsidiary, NRIA Structured Credit Strategies, LLC ("Structured Credit").

6.      T. Nicholas Salzano was the founder of NRIA and has a history of business failures and related government investigations, as well as operating businesses through "front-men" from behind the scenes.  At some point in 2017, Salzano was removed from NRIA's payroll and became a non-employee "Senior Advisor" to NRIA although his wife and daughter continued to be paid significant compensation on Salzano's behalf in an apparent effort to evade an IRS collection action regarding a prior failed business of Salzano's.  However, Salzano continued to be the driving force and *de facto* leader of NRIA.

7.      As set forth in more detail in Section II below, Salzano was arrested on or around March 4, 2021, and charged by the U.S. Attorney's Office with wire fraud in connection with his actions with respect to the Fund.  Additionally, on or around June 7, 2021, the SEC filed a complaint against Salzano alleging that he violated sections 17(a)(1) and (3) of the Securities Act of 1933.

8.      NRIA, together with various officers, employees and members, have engaged multiple law firms to represent them in the various regulatory and criminal proceedings and investigations into their activities related to NRIA (hereinafter referred to collectively as the "White-Collar Group" or "WCG").  The White-Collar Group is comprised of: (a) Pashman Stein Walder Hayden, P.C. ("Pashman Stein") (criminal defense counsel for NRIA); (b) Sonnenblick Parker & Selvers, P.C. (SEC controversy counsel for NRIA): (c) Critchley Kinum & Lauria, LLC (counsel for Grabato); and (d) Rubin, Winston, Diercks, Harris & Cooke, L.L.P. (counsel for Salzano).

9.      In or about the beginning of April 2021, NRIA also engaged Reed Smith LLP as its SEC compliance counsel to replace Weingold Law PLLC which had previously performed that role.  Prior to engaging Reed Smith LLP, NRIA had hired Cole Schotz P.C. to replace Weingold Law PLLC.  However, NRIA's relationship with that firm ended upon arrest of Salzano and subsequent FBI raid of NRIA's office.

10.      In or about April 2021, the WCG caused NRIA to retain Brian Casey and his company, Casey Group, Ltd., as a litigation consultant to help value the development properties

owned by the Fund and SPEs.  Upon information and belief, Mr. Casey has real estate appraisal experience and has served as a court-appointed expert in the U.S. Bankruptcy Court and/or other venues.

11.    NRIA was originally the sole manager of the Fund.  However, effective November 1, 2021, Casey's role was converted from that of a consultant to the WCG to that of the co-manager of the Fund with sole authority over the expenditure of Fund money.  Casey, upon information and belief, continues to report to the WCG, acts at its behest and controls and/or approves the disbursement of the Fund's money.

## FACTS GIVING RISE TO THE CAUSES OF ACTION

### I.

### THE FUND

#### A.  The Fund's Investments

12.    The Fund currently makes investments primarily in the following two categories of assets: (i) property development including multifamily, townhome, condominium, and mixed-use properties ("Development Projects"), and (ii) real estate related structured credit investments with a focus on Commercial Mortgage Backed Securities and Freddie Mac Multifamily (Residential) Mortgage Backed Securities (together "CMBS").

13.    In September 2020 the Fund and NRIA formed NRIA Structured Credit Strategies, LLC ("Structured Credit") to deploy excess investor cash between development projects in CMBS on a leveraged basis through securitized financing transactions known as "repurchase agreements," similar in many respects to a secured loan, with the sole counter-party in 2020 being Royal Bank of Canada.  As of September 30, 2021, the Fund had more than $100 million invested through Structured Credit.

#### B.  The Fund's Investors

14.    The Fund has raised approximately $600 million from outside third-party "preferred" equity investors.  These investors are entitled to receive 30% of their initial investment in monthly payments over a 60-month period with the remaining 70% distributed on the 61st month together with a minimum return of 12% or, if higher, a preferred target return of between 16 and 21% as determined based upon the investment amount and calculations initially described in the June 14, 2021 PPM, i.e., the "Equity Multiple."  All net profit remaining after obligations to preferred investors are satisfied inures to NRIA as the common equity owner of the Fund.

15.    This financing model has been referred to as a "cash recycling" scheme in one of the recent unflattering news articles about NRIA and the high-profile criminal and regulatory investigations.  An example of the scheme is as follows: An investor invests $1 million with the

3

expectation of receiving $5,000 per month for 60 months totaling $300,000. On the 61st month the investor expects to receive the remaining $700,000 of the original investment together with up to 21%, or $210,000, for each of the five years for a total payment of $1,050,000 on the 61st month (this is only approximate as it ignores the declining investment balance each month but also ignores the compounding effect of the accrual of 21% each year).

16.     NRIA paid about $43 million of investors' funds in advertising costs through 2020 to attract ever-increasing amounts of new investor money, as well as disbursing a very significant amount of investors' funds as compensation to employees, many of whom were salespeople focused on raising new investor money (although these salespeople were given the deliberately misleading title of "Project Managers"). From 2018 through 2020 the total operating costs related to the Fund were approximately $100 million. Given that real estate development projects of this nature typically take a minimum of three to five years to complete, all (or essentially all) of the returns paid thus far to investors have been funded collectively by the investors themselves rather than by any profits on the Development Projects or other investments. This was not explicitly disclosed in the Fund's Private Placement Memorandum ("PPM") until a June 2021 revised PPM was issued. The amount of the massive advertising expenditure was also not disclosed to prospective investors in the PPMs, nor was it explicitly disclosed that the investors themselves were paying for these expensive TV and radio spots on such outlets as CNBC and Sirius Satellite Radio. Consequently, the U.S. Department of Justice ("DOJ") has investigated NRIA, its owners, the Fund and dozens of their controlled affiliates as potentially perpetrating a Ponzi scheme.

## C. SEC Registration Status of NRIA and the Fund

17.     NRIA has never been registered as an investment adviser with the Securities and Exchange Commission (the "SEC") or with any states. The Fund has never registered with the SEC as an Investment Company under the Investment Company Act of 1940.

## D. The Fund's Indirect Ownership of Development SPEs

18.     The initial February 5, 2018 PPM, as well as the subsequent four amended PPMs, indicate that the Fund would own a 10% to 20% non-voting equity interest in the special purpose entities ("SPEs") formed for each Development Project. The Fund's investment holdings were restated in June 2021 so that the Fund purports to own 80 percent of the real estate SPEs with the remaining 20 percent nominally owned by NRIA. However, Claimant discovered during the course of its engagement that neither of these structures reflects the economic reality of the developments in which NRIA owned all of its interest in the development projects through the Fund as a residual interest subordinate to the economic rights of the Fund "preferred" investors.

## E. NRIA's Management and Development Fees

19.     The seven versions of the PPM issued by NRIA over the last four years contained an ever-changing, ever-increasing fee structure whereby NRIA's annual fees and development fees were constantly changed without seeking or obtaining consent of the existing investors.

4

This was one of many issues Claimant had to investigate and provide advice upon during the course of its engagements.

## II.

## THE CRIMINAL AND REGULATORY INVESTIGATIONS
## INTO NRIA AND ITS PRINCIPALS

### A.  The Criminal Investigations and Prosecutions

20.    NRIA and its principals are currently the subject of investigation and prosecution by the United States Attorney's Office for the District of New Jersey ("USAO").  On March 4, 2021, the USAO charged Salzano with wire fraud and aggravated identity theft in connection with his activities at NRIA.  One day later, on March 5, 2021, the USAO issued a subpoena to NRIA to testify and produce documents before a grand jury of the District of New Jersey.  The following day, March 6, 2021, the USAO executed a search warrant and the FBI raided NRIA's offices in Secaucus, New Jersey, and seized computers and other records.

### B.  The Securities Investigations

21.    NRIA is also being investigated by the United States Securities and Exchange Commission ("SEC"), and the securities regulators in the states of New Jersey, Illinois and Alabama.  In August 2020 the New Jersey Bureau of Securities ("NJBOS") first served on NRIA a subpoena for the production of documents and information.  In February 2021, the Illinois Securities Department served on NRIA a request for documents and information.  Thereafter, during April and May 2021 the SEC served two separate subpoenas for the production of documents on NRIA, the NJBOS served a second subpoena for the production of documents and information on NRIA and the Alabama Securities Commission served a request for information on NRIA. Upon information and belief, additional subpoenas have subsequently been served by the SEC and the state securities regulators.

22.    Thereafter, on June 7, 2021, the SEC filed a Complaint against Salzano in the United States District Court for the District of New Jersey, alleging various securities violations by Salzano in connection with his activities at NRIA including providing fraudulent loan documents to a potential investor falsely purporting to show that NRIA had obtained a loan in the amount of $25 million.  Notwithstanding his criminal prosecution and SEC civil suit, Salzano continued to be the ultimate decision-maker (through Grabato) at NRIA until at least the end of September 2021.

23.    It subsequently emerged that the SEC investigation likely originated from a whistleblower disclosure filed with the SEC on or about August 7, 2020, by twice-convicted felon, Barry Minkow.  In his complaint, Minkow alleged, among other things, that NRIA/the Fund is a fraudulent investment scheme, such as a Ponzi scheme, the business model is untenable, and its advertising costs paid by investors are too high.  Minkow also alleged that this is "easily proven if the company's bank records reveal new, incoming money is being used to

pay previous investors" which, per the Fund's current PPM, is true. In the complaint, Minkow also indicated that all of the other investment fraud complaints he brought to the attention of the SEC resulted in temporary restraining orders and/or indictments.

III.

**OVERVIEW OF THE PRE-OCTOBER 26 CLAIMANT ENGAGEMENTS**

### A. Web Services Tax Engagement

24.     On or about March 1, 2021, Thomas Fierro, CPA, who was formerly employed by Claimant for approximately seven years, left to join the accounting staff at NRIA. Within weeks of joining, Fierro was given the responsibility of heading NRIA's accounting department and thereafter was given the title of NRIA's Chief Financial Officer approximately two months later. Shortly after he joined, Fierro hired two additional CPAs who were also former employees of Claimant.

25.     As soon as he began working at NRIA, Fierro discovered that the company's accounting, tax and financial reporting situation was in complete disarray and that its books and records, including its general ledgers, were in shambles. He contacted Claimant and urgently sought its assistance with the preparation and filing of an income tax return for an NRIA affiliate, Web Marketing. On March 17, 2021, Claimant prepared and filed the income tax returns, received a modest fee for the work, and that engagement ended.

### B. *Kovel* Engagement – McCarter & English

26.     Several days later, Fierro again contacted Claimant and sought its help in dealing with the full scope of the company's accounting and tax issues and the criminal investigation of NRIA that had been launched by the USAO in the aftermath of the arrest and criminal charges of Salzano.

27.     At Claimant's recommendation, NRIA engaged the law firm of McCarter & English to assist it in responding to the investigation. On March 22, 2021, the Claimant began providing consulting services in conjunction with the engagement of McCarter & English and to assist the law firm in understanding the issues involved. The focus of the engagement was to fact-find and evaluate NRIA's financial, tax and accounting landscape as well as that of its affiliates and principals.

28.     On March 26, 2021, Claimant provided an engagement letter to McCarter. However, four days later, on March 30, 2021, NRIA terminated McCarter's services and the engagement letter was never signed.

## C. **Client Accounting and Consulting Engagement**

29.     On March 30, 2021 – the same day McCarter & English was terminated – Claimant CAS and NRIA entered into an engagement agreement for Claimant to perform tax and consulting services.   Over the course of the following eight months Claimants provided these services to NRIA on an almost-daily basis.  The intense and unrelenting demands of this work required Claimant to prioritize NRIA's work over all other clients during the engagement.

30.     Mr. Cipolla and his team worked virtually on a daily basis directly with CFO Fierro and his team to provide accounting and tax advice to enable them to (a) evaluate, update, correct and complete the bookkeeping for NRIA, the Fund and their affiliates; (b) perform the accounting required to correct 2018 and 2019 consolidated financial statements and bring them into conformity with Generally Accepted Accounting Principles ("GAAP"); (c) create 2020 financial statements in conformity with GAAP; and (d) investigate and evaluate other potential problems from a tax, accounting, financial and investor reporting perspective.

31.     This required Fierro and Claimant to uncover, learn and evaluate the tax, accounting, financial, investor and lender reporting problems that existed at NRIA from as far back as 2013.  This "deep dive" demanded by NRIA's management was imperative because the NRIA accounting department had previously been run by a bookkeeper with no accounting credentials (who is Grabato's cousin) and was inadequately staffed. Moreover, it immediately became clear that there were no internal controls in place from an accounting perspective.  In short, NRIA's bookkeeping and accounting was in complete shambles and it required a major overhaul of its tax and accounting functions.

32.     Together with CFO Fierro and the new NRIA accounting team, Claimant evaluated the inadequacies of the historical accounting, the various disclosed and undisclosed GAAP departures in the consolidated reviewed financial statements of NRIA affiliated entities, including deciphering and piecing together historical transactions that were not accounted for correctly, and evaluating and correcting potentially problematic practices of NRIA (including but not limited to depreciation sharing agreements with investors, redemption agreements with investors, and rollover agreements with investors).  Claimant also analyzed income tax returns for NRIA and its affiliates' going back to 2006[1] when NRIA was formed and identified material tax issues with previously filed income tax returns.   Claimant also analyzed Grabato's income tax returns for the same purpose.

33.     Claimant also evaluated various sensitive and problematic accounting issues with Fierro, including, but not limited to, investment company treatment of the Fund for GAAP purposes (which NRIA's accounting department and prior assurance had failed to consider or reflect), the treatment of tens of millions of dollars of advertising costs (which had been treated inconsistently and improperly for both financial reporting and tax purposes in previous years),

---

[1] Claimant reviewed accounting records and income tax returns from the inception of NRIA as part of its work in evaluating the breadth and materiality of the issues and potential scope for any corrections.

and GAAP revenue recognition policies (with respect to which NRIA reported a GAAP departure in 2018 and 2019).

34.     Claimant also evaluated with Fierro the proper accounting treatment of various items to provide consistency with the Fund PPMs and operating agreements, including, but not limited to, fees due and payable to NRIA, treatment of the underlying SPE real estate entities and the allocation of NRIA expenses to the Fund and pre-fund SPEs.  Simultaneously, Claimant evaluated the related income tax implications of these issues on NRIA, the Fund, investors, and NRIA owners, in addition to other income tax issues such as syndication costs, substantial economic effect and partnership loss limitations, recourse debt and qualified non-recourse debt issues.

35.     Once the breadth of the tax, accounting and financial reporting issues were understood, Claimant evaluated how to proceed in accordance with the governing accounting standards by means of financial statement restatements.  For example, Claimant concluded that for calendar year 2019 NRIA's revenue in its CPA reviewed financial statements was overstated by more than $19 million and its expenses were understated by at least $11 million.[2]  Thus, even assuming that the Fund was properly presented for accounting purposes as an operating company (as opposed to an investment company) as NRIA and its previous outside accountants had been doing, it should have reported a loss of more than $28 million instead of the $1.5 million of net income reported to investors, prospective investors and lenders.  Claimant also discovered that the misstated financial statements were a consequence of pressure placed by Salzano on NRIA's outside CPAs who ultimately relented.

### D.  Work Performed by Claimant for Reed Smith and Pashman Stein

#### (i)     The *Kovel* Doctrine

36.     Pursuant to the *Kovel* doctrine, first set forth in *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961), the attorney-client privilege can extend to communications between a client and a non-attorney third party if "the communication [is] made in confidence for the purpose of obtaining legal advice from the lawyer." *Id*. at 922.  In applying this rule, the court found that the privilege could reasonably extend to an accountant assisting a law firm in an investigation into an alleged federal income tax violation where the accountant plays a "translating or interpreting function" because such communications help the attorney better understand and convey information to be used in providing legal advice. *Id*.

37.     However, privilege does not attach under the *Kovel* doctrine when it is the accountant's or consultant's services or advice that is sought "rather than the lawyer's."  *UPMC v. CBIZ, Inc.*, No. 3:16-CV-204, 2018 WL 1542423, at *7–8 (W.D. Pa. Mar. 29, 2018), *on reconsideration in part*, No. 3:16-CV-204, 2018 WL 2107777 (W.D. Pa. May 7, 2018) *citing Cottillion United Refining Co.*, 279 F.R.D. 290, 299 (W.D. Pa. 2011); *United States v.*

---

[2] Furthermore, for calendar year 2018 Cipolla discovered that NRIA's revenue in its CPA reviewed financial statements was overstated by approximately $10 million.

8

*ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1072 (N.D. Cal. 2002) (stating that privilege does not attach where accountant is hired, not as "translator," but to give legal advice about tax code, even if advice assists attorney); *In re Grand Jury Matter*, 147 F.R.D. 82, 85 (E.D. Pa. 1992) ("when a client's ultimate goal is not legal advice, but rather accounting … advice, the privilege is inapplicable"). Indeed, the *Kovel* case itself made this explicitly clear: "[i]f what is sought is not legal advice but only accounting service ... or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." *Kovel*, 296 F.2d at 922.

38.    Moreover, "a dual-purpose document" – for example a document prepared for use in preparing tax returns and for use in litigation – is not privileged; "otherwise, people in or contemplating litigation would be able to invoke, in effect, an accountant's privilege, provided that they used their lawyer to fill out their tax returns." *United States v. Frederick*, 182 F.3d 496, 501 (7th Cir. 1999).

## (ii)    **Work Performed by Claimant for Reed Smith**

39.    In or about early April 2021 NRIA terminated its previous SEC compliance counsel and engaged the law firm of Reed Smith to be its SEC compliance counsel going forward. At that point, in addition to the extensive and ongoing work Claimant was performing directly for NRIA with Fierro and his team set forth above, Claimant began working in conjunction with Reed Smith to assist the law firm in rendering advice regarding (a) whether either the Fund or its Structured Credit subsidiary were Investment Companies under the securities laws and therefore required to register with the SEC (which was an independent analysis from the accounting analysis performed by Claimant regarding whether they were investment companies for GAAP accounting purposes); and if so (b) whether either was entitled to an exemption from registration with the SEC and state regulators under the securities laws. Although these were legal questions, the answers to the questions also involved certain complex financial and accounting issues on which Claimant provided analysis and advice to Reed Smith. This was an example of work that – were it performed by an accounting firm on a standalone basis and otherwise handled correctly by the attorneys by use of a *Kovel* engagement agreement and "ring fencing" of the staff involved – would almost certainly have qualified as *Kovel*-privileged work.

40.    Claimant also provided analysis and advice to Reed Smith in evaluating and identifying inaccuracies, inconsistencies and misrepresentations in the various versions of the private placement memorandum ("PPM") that had been provided to investors in the Fund together with evaluating potential changes to be implemented to the PPM to try to address these going forward.

## (iii)    **Work Performed by Claimant for Hayden and WCG**

41.    On April 2, 2021, Joseph Cipolla had an initial conversation with NRIA's lead criminal defense attorney, Joseph Hayden of the Pashman Stein firm. However, Hayden did not ask Cipolla to perform any work for his firm or the rest of the WCG at that stage. Indeed, on April 5, 2021, Hayden's associate introduced Cipolla in an email as "NRIA's new tax

professional," a recognition of the reality of Cipolla's engagement as an outside accountant providing accounting advice directly to the client.

42.　　Indeed, on March 18, 2021, Pashman Stein had previously hired the Withum accounting firm to be its "Kovel" accountants in connection with the firm's defense of the criminal and regulatory investigations (although Grabato thereafter fired Withum). Notably, as with Claimant, NRIA requested (with the knowledge and approval of the WCG) that the Withum firm perform both *Kovel* consulting and non-*Kovel* accounting/assurance work for the client, including seeking to have Withum perform an audit of Structured Credit.

43.　　Throughout the month of April Claimant continued performing work directly with Fierro and providing accounting advice directly to NRIA. It was not until early May that the White-Collar Group first asked for a meeting with Claimant regarding the work Claimant was performing and the preliminary findings and conclusions it had reached. Claimant provided this information to the entire White-Collar Group at a so-called "joint defense" meeting held via Zoom on May 5, 2021.

44.　　Thereafter Claimant attended regular weekly joint defense meetings with the WCG through the end of July and sporadically thereafter. At these meetings Claimant identified issues his firm had uncovered while performing accounting and other consulting work to assist Fierro and reported on the findings and the advice it had provided. Claimant also reported on the solutions he had recommended Fierro implement to correct the books from an accounting perspective. However, for the vast majority of the work performed by Claimant, neither Hayden nor any other attorneys in the WCG instructed Claimant regarding the work it should perform.

45.　　Based on the information uncovered by Claimant as a result of the advisory services it performed directly for NRIA and its management, Claimant assisted the white-collar criminal attorneys in understanding the history and structure of the Fund (including, but not limited to, returns to investors, fees to NRIA and the ownership structure), NRIA's organizational/operational structure (including reporting on information obtained in interviews of Salzano and O'Brien), the history of NRIA's financial reporting (including reporting on interviews of Jack Gutierrez of the Van Duyne, Robert Valas of Cullari Currico CPA firm and Matthew Barbella and William Carroll of the WIPFLI CPA firm), and potentially inaccurate or problematic representations that NRIA had made to the public, investors, prospective investors and government agencies via tax returns, financial statements, PPMs, advertising (including Sirius Radio, CNBC and billboard advertising), sales pitches (or otherwise).

46.　　As a result of these meetings, the WCG was fully aware that Claimant was continuing to perform the essential function of NRIA's outside CPA firm in advising Fierro on a daily basis regarding measures to be implemented to correct the bookkeeping and accounting at the company, as well as ongoing and retrospective tax compliance irregularities and issues. Although much of this work was reported to the WCG at the weekly joint defense meetings, almost none of it was directed or requested by Hayden or the WCG.

47.    For example, in providing advice to NRIA, Claimant concluded that NRIA and the Fund should be expensing substantial advertising expenses in the tens of millions of dollars per year, as opposed to capitalizing and amortizing them over a number of years.  Claimant meticulously researched the issue and provided Fierro with a comprehensive technical memorandum citing Generally Accepted Accounting Principles ("GAAP") and other authoritative guidance.  The opinion documented in this memorandum was followed by NRIA, which resolved to restate its 2019 financial statements and, in conjunction with restating its revenues, to expense such costs, as well as expensing such costs beyond 2019.  Claimant's technical memorandum was neither requested by, nor provided to, the WCG.  This is one of numerous clear examples of sensitive technical advice provided directly to NRIA that cannot be protected under the *Kovel* doctrine.

**(iv)    The Lawyers Belatedly Enter into a *Kovel* Engagement Agreement with Claimant**

48.    Notwithstanding that a certain portion of the work performed by Claimant could potentially qualify for *Kovel* privilege protection if handled correctly by the attorneys, neither Pashman Stein nor Reed Smith requested that Claimant enter into a new *Kovel* engagement agreement with their law firms despite such a direct engagement agreement being one of the factors courts look to in evaluating the application of the privilege.  This represented a fundamental error on the part of the lawyers and was indicative of the myriad ways in which the lawyers carelessly failed to take basic steps to try to establish and protect the client's *Kovel* privilege – even after the SEC served a subpoena on Claimant in late July 2021 and the issue became front and center in the focus of the White-Collar Group's joint defense meetings.

49.    Indeed, it was only at the suggestion of Mr. Cipolla himself that the Reed Smith and Pashman Stein law firms belatedly entered into an engagement agreement directly with Claimant on May 17, 2021.  The agreement purported to have a retroactive "effective date" of March 26, 2021 (before Reed Smith had even been engaged and a week prior to Claimant's first conversation with Hayden at Pashman Stein) but this legal fiction is unlikely to help establish *Kovel* privilege for any work performed before the agreement was signed or with respect to advisory services rendered directly to NRIA.

**(v)    Claimant is Served with an SEC Subpoena as Part of its Ongoing Investigation of NRIA**

50.    On July 26, 2021, Claimant was served with a subpoena by the SEC as part of its ongoing investigation of NRIA and its principals.  This event appears to have caught the WCG completely by surprise – although the likelihood that this would occur could and should have easily been foreseen by them if they were exercising due care and attention in the representation of their clients.

51.    The following day, on July 27, the WCG convened a call with Claimant to determine how to respond to the subpoena.  During the call, Hayden of Pashman Stein openly admitted that Claimant had been performing services both for the lawyers and directly for the

11

client, and that the work performed directly for the client would likely not be covered by any *Kovel* privilege. Moreover, he admitted that his firm and Reed Smith only sought to document the *Kovel* services "after the fact" by having Claimant sign an engagement agreement directly with their law firms.

52.     Grabato's lawyers in the group, Michael Critchley, advocated that NRIA broadly assert the *Kovel* privilege and force the SEC to go to court to contest the claim. Hayden, on the other hand, fully understood the tenuous nature of the privilege for much of Claimant's work and argued they could not claim that everything was subject to a *Kovel* privilege. Indeed, he warned the group that doing so was "an easy way to get into trouble." No decision regarding NRIA's stance on the *Kovel* privilege was made during the meeting.

## IV.

## THE OCTOBER 2021 AGREEMENTS FOR CIPOLLA TO PERFORM ASSURANCE AND TAX WORK AND FOR NRIA TO PROVIDE ADDITIONAL INDEMNIFICATION AND ESCROW FUNDS

### A.  NRIA and the WCG Place Increasing Pressure on Claimant to Perform Assurance Services

53.     During the course of its engagement, NRIA and the White-Collar Group increasingly began pressuring Claimant to perform financial statement "CPA reviews" (the "Assurance Work") for NRIA and certain controlled affiliates for the calendar year 2020 and for the restatement of 2018 and 2019 financial statements. Such a review is the process by which a CPA obtains limited assurance, primarily by performing analytical procedures and inquiries, as a basis for reporting whether the accountant is aware of any material modifications that should be made to the financial statements for them to be in accordance with the applicable financial reporting framework (in this case GAAP) and report on the financial statements as a whole. Although a financial statement review provides a lower level of assurance than an audit it nevertheless provides a significant level of assurance and one which NRIA believed would be acceptable to prospective investors and lenders and enable it to obtain financing for its business and development projects.

54.     As a result of the arrest of Salzano, the FBI raid and the myriad criminal and regulatory investigations, NRIA also found itself without a CPA tax return preparer for 2020. By the beginning of September 2021 NRIA was therefore under increasing pressure to find a CPA firm willing to prepare tax returns for the consolidated NRIA group of companies for the 2020 and 2021 tax years ("Tax Compliance Services") and in turn began pressing Claimant to perform these services too.

55.     Claimant resisted NRIA's pressure to perform the Assurance Work and Tax Compliance Services, and instead encouraged NRIA to seek another accounting firm to perform these services while Claimant continued to perform its ongoing consultancy work. Claimant

made very extensive efforts working with Fiero and NRIA's management team to identify a CPA firm that would be willing to perform the Assurance Work for NRIA and its affiliates. As a result of this search – and after a host of CPA firms had declined the engagement – Claimant helped NRIA source the CPA firm of Raich Ende & Malter ("REM") which agreed on September 7, 2021 to perform the Assurance Work for the 2020 fiscal year.

56.    In late August or early September 2001 Grabato was subpoenaed by the NJBOS to provide testimony as part of its investigation of NRIA and its principals. Grabato asserted his Fifth Amendment rights and refused to answer any questions on the grounds it may incriminate him in criminal conduct. This information was communicated to Claimant and the WCG by Hayden during a joint defense meeting of the WCG held on September 8, 2021. The minority owner of NRIA (O'Brien) and other NRIA employees also asserted their Fifth Amendment privileges and refused to testify.

57.    By letter dated September 21, 2021, REM abruptly resigned from its assurance engagement. In its resignation letter REM cited "a growing conflict of interest in our services to your company and other clients we serve." Upon information and belief, REM had learned that Grabato had pleaded the Fifth and had grown increasingly concerned about the reputational damage that would result from its assurance work for NRIA as a result of this and the increasing publicity of the regulatory and criminal investigations of NRIA and its principals.

58.    Mr. Cipolla informed the WCG of REM's resignation at a joint defense meeting of the WCG on September 24, 2021. At that point Claimant was still assisting NRIA management in attempting to find a replacement CPA firm to perform the assurance services but it was becoming increasingly unlikely that they would be able to find a firm that was willing to do so. Mr. Cipolla reiterated his reluctance to have his firm perform such work. The WCG discussed how few options remained and Hayden and Critchley told Cipolla that NRIA may not have any choice but to have Claimant perform the Assurance Work despite concerns this might further jeopardize the *Kovel* privilege.

59.    After further pressure by NRIA management on Claimant to perform the assurance services, Grabato sent the following email to Mr. Cipolla at 10:30 am on September 30, 2021 and copied the WCG attorneys:

> At this point with the REM conflict of interest withdrawal, I need you to do the Financials.
>
> ***The priority is 2020 Reviewed Consolidated Financials for NRIA. I can no longer wait for financials. I no longer care about you maintaining a [Kovel] protection. We must proceed to get loans and be building. NRIA can wait no longer for this top priority.***
>
> Structured Credit as far as I am concerned can just get reviewed. IF we cannot pull off an audit for that subsidiary at this point so be it …. That is a much lower priority than the company's main

business which is constructing these projects. ***We need loans to do
that***.

Please confirm you will immediately proceed to perform our
financials for us [i.e. perform the Assurance Work].

Lastly, having our financials done even on a reviewed basis will
stop a lot of wagging tongues. ***I need these financials now. We
cannot delay any longer even 1 week.***  (emphasis added)

60.    Less than four hours later, at 2:00 pm on September 30, 2021, the WCG held a
joint defense meeting which was also attended by John Collins and Fierro on behalf of NRIA's
management, Joseph Cipolla and Albert Manzo from Claimant and Lawrence Lustberg at
Gibbons P.C., Claimant's attorney with respect to the regulatory investigations of NRIA.  Mr.
Cipolla reported that he and NRIA management were still pursuing discussions and making last-
ditch attempts to find another CPA firm that would be willing to perform the Assurance Work,
including for the restated 2018 and 2019 financial statements but so far to no avail.  Collins
reiterated Grabato's concerns that there was an urgent business need to perform these reviews
and Hayden agreed that at some point they should make a decision to prioritize the review work
over *Kovel* protection for Claimant's work.  The meeting concluded with the WCG and NRIA
management setting a "drop dead" deadline of October 15 to obtain a CPA firm to perform the
review work and a decision that Claimant would need to perform the Assurance Work if no other
firm had agreed to do so by that date.

61.    Over the course of the following two weeks significant additional efforts were
made to find another CPA firm that would be willing to perform the CPA review services but
ultimately no firm would agree to do so.  By October 15, 2021, the list of firms that had refused
the engagement included but were not limited to: BDG, Smolin, Lupin & Co, REM, RSM
McGladrey US LLP, Wilkin & Guttenplan, Ernst & Young and Moore Stephens.

62.    Mr. Cipolla remained very reluctant to agree to have Claimant perform the
Assurance Work and Tax Compliance Services and Joseph Hayden of the WCG therefore had
discussions directly with Claimant's counsel, Lawrence Lustberg, for the purpose of trying to
persuade Claimant to undertake the engagement.

**B.    Negotiation of the Terms on Which Claimant Would Agree to
    Undertake the Assurance Work and Tax Compliance Services**

63.    After all efforts to find another CPA firm failed, Mr. Cipolla finally relented and
reluctantly began discussing with NRIA management the terms on which he would be willing to
perform these services.  These terms included the following: (a) payment by NRIA of two fixed
fees that were not refundable in the event NRIA or the Fund cancelled or terminated the
engagement for any reason other than Claimant's failure to timely perform the services; (b)
additional indemnifications by NRIA in favor of Claimant; (c) funding by NRIA of an escrow-
type bank account ("Escrow-Type Account") in Claimant's name to better secure Claimant and

help cover the new and existing indemnifications of Claimant.  The fixed fees ultimately agreed upon by the parties in the October 26 Engagement Agreements were $3.36 million for the Assurance Work and $1.25 million for the Tax Compliance Services.  The amount NRIA agreed to fund to the Escrow-Type Account was $2.85 million.

64.     Claimant's insistence on the amount and non-refundability of the fees, the amount and requirements of the Escrow Type Savings Account and the requirements of the Hold-Harmless and Indemnification provisions was based on his consideration of a number of factors including, but not limited to, the following:

    a.  **Commitment to dedicate the considerable time and resources** expected to be expended on this engagement which would negatively impact other existing clients and client relationships due to the lack of manpower availability across the public accounting industry.

    b.  **Embroilment in Litigation and Regulatory Proceedings**.  The Assurance Work involved multi-year litigation risk for potentially five to 15 years.  This included potentially being forced to respond to subpoenas for documents and testimony in numerous criminal, civil and regulatory proceedings and being dragged into litigation as a defendant by investors and others having little or nothing to do with the quality of Claimant's work but instead based upon it being viewed as a viable target with a pot of insurance money.  Moreover, it was impossible to quantify or determined with any degree of certainty the extent of future costs, fees and lost fees from other client engagements relating to this risk.

    c.  **Commitment to Perform services others refused to perform**.  Claimant was committing to perform services that no other CPA firms would provide based upon the risk profile.

    d.  **Reputational risk.**  The engagements carried enormous reputational risk, including the risk of being the CPA firm that provided Assurance Work for a client who may be subject to criminal prosecution and conviction and regulatory enforcement proceedings.  This risk was heightened by the prospect of being the subject of ongoing press stories and investigative journalism which may present Claimant in a highly unflattering and misinformed light having nothing to do with the quality of the firm's work and compounded by the responses to the investigations by the clients and/or their owners and managers pleading the Fifth.

    e.  **Lack of adequate professional liability insurance protection.**  It was not possible to offset most of these risks with an adequate

> level or scope of professional liability insurance (which, in any
> event, would not mitigate any of the reputational risk, risk to
> relationships with other clients or the risk of losing millions of
> dollars of professional time becoming embroiled in responding to
> subpoenas and as a party to litigation).

All of these factors were contemporaneously documented by Claimant in the October 26
Engagement Agreements that were subsequently executed by the NRIA and the Fund.

65.      These contractual terms were also designed to provide Claimant with additional
protection for the services it had already performed and was continuing to perform pursuant to
the earlier engagement agreements.

### C. **The WCG Opposes Claimant's Financial Terms Out of Fear it Would Diminish the Funds Available for Payment of Their Own Fees but NRIA Rejects Their Advice and Enters into the October 26 Engagement Agreements**

66.      As soon as the WCG learned of the amount of the fees and escrow sought by
Claimant for the new engagements and the non-refundable nature of the fees, they immediately
pivoted and verbally attacked Claimant at a joint defense group meeting on October 19, 2021
accusing him of "blackmail."   At the same time, however, they readily acknowledged that
Claimant had not sought out the engagement and, to the contrary, had helped the client try to
locate another accounting firm willing to perform the work.  Indeed, Claimant had warned
Collins and Fierro prior to preparing a proposed engagement letter for NRIA that his firm's total
fee for the Assurance Work and Tax Compliance Services would be in the $5 million dollar
range and that NRIA should therefore make every attempt to have another firm provide the
services.

67.      Grabato remained steadfast at the October 19 meeting that NRIA had an
overriding and urgent business need to obtain the Assurance Work and that it would be in grave
jeopardy if it could not quickly obtain CPA reviewed financial statements.  He also reminded the
WCG of the enormous amount of work Claimant had performed side-by-side with his CFO and
accounting staff while working 80-hour weeks and the inability of NRIA or Claimant to find
another accounting firm willing to undertake the Assurance Work.

68.      During the evening of October 19, 2021, following the earlier conference call
with the WCG, Hayden called Lustberg and told him that the WCG were strongly recommending
that NRIA not agree to any non-refundable or fixed fee for the new engagements or to provide
any escrow-type funds and not sign any engagement agreements that contained any such
provisions.  However, Hayden also acknowledged to Lustberg that the WCG recognized that the
client may not follow their advice and that it was up to client to make a business decision.

69.      Between October 20 and October 25, 2021, Claimant and its counsel negotiated
the terms of the engagement agreements with NRIA's management and counsel and agreed to
certain changes that were requested by NRIA.  As of October 25, Claimant presented NRIA with

16

its bottom-line position which included a reduction of the fixed-fee for the Assurance Work from $3.975 million to $3,360,000 with an increase of the funds to be deposited in escrow-type account from $2.34 million to $2.85 million.  He also agreed to review the continued need for the escrow-type funds every 36 months.

70.     On October 25, 2021, Grabato emailed the WCG explaining his reasons for his decision to enter into the new engagement agreements with Claimant and emphasizing that the reviewed financial statements were needed to secure borrowing which was critical to the business.  He told the WCG that NRIA's compliance counsel, Reed Smith, had advised him that without the ability to borrow the funds it urgently needed (which they could not secure without reviewed financial statements that only Claimant was willing to prepare) NRIA and the Fund's business model would not be sustainable and it would need to lay off all of its staff and cease doing business.  If the projects were not debt financed, PPM disclosures and the business model would need to change to reflect that projects were now entirely investor-financed, which in turn would not result in enough earnings to meet investor return expectations and would cause fundraising to cease within 30 days.  In sum, he told the WCG that if NRIA could not obtain reviewed financial statements within the next 60 days then the company was "cooked."

71.     Grabato also reminded the WCG in his October 25 email that NRIA had been unable to find any other CPA firm willing to undertake the Assurance Work and that even if they were able to find one it would take too long to bring them up to speed.  Claimant, on the other hand, was already very familiar with the company's accounting having worked with the company over the last six months to help correct many of the accounting issues.  Moreover, he argued that in opposing the financial terms required by Claimant the WCG was failing to recognize the substantial risks Claimant was undertaking which no other firm was willing to undertake.

72.     On October 26, 2021, Grabato signed the October 26 Engagement Agreements on behalf of NRIA and the Fund and NRIA wired the $4.61 million in fees for the Assurance Work and Tax Compliance engagements to Claimant.

**D.  NRIA's default and improper repudiation of the October 2021
     Engagement Agreements and at the behest of the WCG**

73.     Claimant CRS hired and began training a new staff member for the Assurance Work, began preparatory work for both new engagements and initiated the redesign of its website which NRIA requested be undertaken prior to issuance of its reviewed financial statements.

74.     On October 29, 2021, Mr. Cipolla emailed Grabato, Collins and Fierro requesting that NRIA fund the escrow-type account pursuant to the terms of the executed October 26 Engagement Agreements.

75.     At the same time, as soon as Grabato executed the October 26 Engagement Agreements and paid the fees due under these agreements, the WCG began pressuring Grabato

to cancel and repudiate the agreements.  Grabato initially resisted the pressure from the WCG but finally succumbed to their pressure on October 30, 2021.

76.    On the evening of October 30, 2021, Collins emailed Mr. Cipolla purporting to "cancel" the October 26 Engagements.  Collins' email stated: "On behalf of NRIA, I am formally canceling our engagements between NRIA and CFA Review Services/CFA Tax Services for both "Review" dated October 25th 2021, signed October 26th 2021 and "Tax" dated October 25th 2021, signed October 26th 2021."  Collins also falsely asserted in his email that Mr. Cipolla had agreed in a telephone conversation to return the fees that had been paid pursuant to these two agreements and demanded that "the monies (totaling $4,610,000) [be] wired back to NRIA by the close of business on Monday November 1st 2021."

77.    However, as set forth above, the October 26 Engagement Agreements expressly provided that the fixed fees were ***not refundable*** in the event that "NRIA later decide[d] or determined that any or all of the services contemplated by this agreement are not desired or required."  Indeed, as further set forth above, this non-refundability was the fundamental "*quid pro quo"* provided in exchange for Claimant's agreement to commit to perform the Assurance Work that no other CPA firm would agree to provide and that would entail an extremely high risk of very substantial reputational damage and many years of entanglement in legal proceedings having nothing to do with the quality of the work Claimant performed.

78.    Accordingly, by email dated November 3, 2021, Mr. Cipolla rejected NRIA's request for a refund of the fees and demanded that NRIA fund the escrow-type account that it had contractually undertaken to fund:

> The engagement agreements were negotiated and entered into voluntarily and with a full understanding by NRIA of the terms which are very explicit, after very lengthy discussions between us, as well as NRIA's extensive consultation with its attorneys, based upon which we made revisions NRIA demanded. Moreover, the agreements are very clear about the circumstances in which the fee is refundable and non-refundable. NRIA is currently in breach of its obligation to fund the Escrow-Type Savings Account and demand is hereby made on behalf of CFA Review Services LLC that it do so immediately

79.    Notwithstanding its contractual obligation to fund the escrow-type account in the amount of $2.85 million, NRIA has continued to fail and refuse to do so.

### E.  NRIA's Termination of Claimant's Other Engagements at the Behest of the WCG

80.    The WCG also pressured Grabato and Salzano into agreeing to install Brian Casey – who, as set forth above, had been performing appraisal-related litigation consulting services for the WCG – as the co-manager of the Fund with sole authority over the expenditure

of any funds originating with the Fund.   This was accomplished pursuant to an agreement dated October 20, 2021, pursuant to which the Casey Group, Ltd. was appointed as an additional manager of the Fund effective as of November 1, 2021.

81.     Upon information and belief, Casey continues to report for all practical purposes to the WCG, acts at its behest, and is in sole control of the disbursement of the Fund's money in accordance with their direction or approval.   As a result, the WCG now functionally controls the Fund through Casey and Casey, in turn, controls NRIA as a result of his financial control over the Fund whose money is comingled with NRIA's money.

82.     Following execution of the October 26 Engagement Agreements Claimant continued providing accounting consulting services at the behest of Fierro and NRIA management pursuant to its previous engagement agreements.

83.     For example, on November 1 and November 2, 2021, Albert Manzo, CPA, of Claimant met with Fierro and his staff all day at NRIA's headquarters to assist them in completing NRIA's 2018-2020 accounting.   Indeed, during these meetings Manzo identified $4 million of cost savings to NRIA at the expense of pre-Fund investors (pre-2018 investors).

84.     However, when the WCG lawyers learned that Claimant was continuing to render consulting services to NRIA, they instructed Fierro and Colins to require that Claimant's personnel leave the building until NRIA's demand for repayment of the October 26 Engagement fees had been resolved.

85.     Notably, during the November 1, 2021 meeting, Fierro told Manzo that Casey was evaluating the continued necessity of every NRIA employee and was expected to initiate a mass layoff of up to half of the staff.   At that point it was apparent that Casey was using his control over the Fund's finances to exert overall control over NRIA as well.

86.     On or about November 3, 2021, in an additional effort to force Claimant to repay the October 26 Engagement fees, the WCG instructed Fierro to have no further communication with Claimant and he has had no further communications with Claimant to this day.

87.     In another effort to force Claimant to return the October 26 fees, on November 3, 2021, Pashman Stein made allegations in an email to Claimant's counsel (Lustberg) that Claimant had committed ethical violations and violated the Independence Rule of the AICPA Code of Professional Conduct ("AICPA Code") by undertaking to perform assurance (or "attest") services for NRIA after having previously been engaged to perform the litigation consulting services by Pashman Stein and Reed Smith.   However, the AICPA Code only prohibits an accountant from performing attest services for a client for which it has been engaged to perform *expert witness services*, which it defines as being "engaged to render an opinion before a trier of fact."   Indeed, the AICPA Code expressly permits an accountant to perform *litigation consulting services* and other consulting services for an attest client provided the usual independence rules are observed.   Here, as set forth above, Claimant was engaged only to

perform litigation consulting services and other consulting services for NRIA and was never asked – and never agreed – to provide expert witness services.

88.     By letter dated November 9, 2021, Joseph Hayden of Pashman Stein wrote on behalf of his firm and Reed Smith to inform Claimant that they "no longer need[ed] [Claimant's] services." However, Hayden did not purport to "cancel" the May 17, 2021 engagement agreement and pursuant to the terms of that agreement Claimant was – and remains – entitled to be compensated for all of the ongoing work it is required to perform by virtue of the subpoenas that have been served upon it in the regulatory and criminal proceedings involving NRIA and its principals and officers.

89.     Neither NRIA nor the WCG has ever purported to cancel NRIA's original March 30, 2021 engagement agreement for Claimant to perform consulting services. However, since its completion of certain ongoing work assignments on or about November 15, 2021, Claimant has been denied access to Fierro and the other members of NRIA management by the WCG and has not been given any new consulting work by NRIA. Upon information and belief NRIA has engaged the accounting firm EisnerAmper to replace Claimant with respect to the tax compliance work (and presumably the consulting work).

## VI.

### NRIA'S IMPROPER REFUSAL TO PAY CLAIMANT FOR ITS ONGOING WORK REQUIRED TO RESPOND TO MULTIPLE CIVIL AND CRIMINAL SUBPOENAS RELATING TO ITS NRIA WORK

#### A. The Extensive Work Required of Cipolla to Determine Potential *Kovel* Privilege for More than 70,000 Documents

90.     The work Cipolla is required to perform under its engagement agreements has not ended merely because NRIA and its counsel have declared they do not require any further work to be performed. To the contrary, Claimant in conjunction with its counsel at Gibbons is continuing to respond to the SEC subpoena on a rolling basis and now must respond to additional subpoenas including (a) a Grand Jury subpoena served on Claimant on January 12, 2022 by the U.S. Attorney's Office for the District of New Jersey as part of its ongoing criminal investigation into NRIA and its principals; and (b) a subpoena from the NJBOS served on March 30, 2022. In short, the very risks of being dragged into endless regulatory, criminal and civil proceedings (potentially as a defendant) requiring an enormous amount of continuing time and cost and reputational risk that underpinned the consideration Claimant that sought and received in the October 26 Engagement Agreements is now materializing in a very concrete manner.

91.     Responding to the subpoenas involves the enormously complex and fact-intensive determination of what may arguably be protected by NRIA's *Kovel* privilege. On one end of the spectrum, much of the accounting work performed and advice given by Claimant on a daily basis directly to the client at the client's request is not even arguably protected by *Kovel* privilege. For example, the analysis Claimant performed to correct accounting treatment for advertising

expenses was undertaken to provide accounting advice to the client's CFO to enable his department to prepare 2020 financial statements and is an example of work that was clearly non-*Kovel* accounting work performed for the client (not for the WCG).  Likewise, Claimant provided ongoing advice on an almost daily basis to enable CFO Fierro and his staff to correct the prior period bookkeeping and accounting and perform other work required to complete 2020 financial statements.  The fact that Claimant reported the results of this work after-the-fact to the WCG in joint defense meetings does not somehow transform non-*Kovel* accounting advice into *Kovel*-privileged work product.

92.    At the other end of the spectrum, certain other accounting work that Claimant performed at the direction of Reed Smith in rendering its advice concerning investment company status under the securities laws (as opposed to the separate analysis performed for the client under GAAP accounting rules) would very likely qualify as *Kovel* privileged work – or would have qualified if Reed Smith and Pashman Stein had properly carried out their duties as legal counsel to enter into a timely *Kovel* engagement agreement with Claimant and thereafter taken basic steps to "ring fence" this work from the non-*Kovel* work they knew Claimant was also performing.  Claimant also performed work for the purpose of enabling the WCG to understand the tax and accounting issues that could impact the regulatory and criminal investigations.

93.    However, other work performed by Claimant was for the dual purpose of both providing accounting advice to the client and helping the WCG attorneys understand the issues.  This makes the dividing line between privileged and non-privileged work extremely difficult to determine as Joseph Hayden of Pashman Stein openly admitted during the September 8, 2021 joint defense meeting when he asserted that it was a "fine line" between the *Kovel* and non-*Kovel* work Claimant was doing.

94.    NRIA's counsel has also instructed Claimant in writing not to turn over any *Kovel*-privileged documents and threatened to sue Claimant if it does so.  The *Kovel* case law makes clear that this requires that the documents in Claimant's possession be reviewed and evaluated on a document-by-document basis.

95.    As a result, this has required Claimant (in conjunction with advice received from their counsel) to individually review, catalog and evaluate (a) approximately 43,000 emails it sent or received (through November 8, 2021); and more than 28,000 other documents created or received during their engagement (some of which are duplicates) that are potentially responsive to the subpoenas.  This review must be performed in order to attempt determine in good faith for each document and email the purpose for which it was created or obtained during the course of their engagements.  The staff of Claimant must therefore personally review such documents because only they – and not their counsel – have the ability to determine the purpose for which each document was sent, received or created. After Claimant's review, its lawyers at Gibbons review Claimant's assessment and transmit the production in tranches to the Department of Justice and other government regulators.

### A. **NRIA's Unambiguous Ongoing Contractual Obligation to Pay for the Subpoena Response Work**

96.    Three of Claimants' engagement agreements expressly permit it to invoice NRIA for the work performed in responding to the subpoenas and expressly require NRIA to pay for such work:

    (a)    Pursuant to the terms of the May 17, 2021 engagement agreement with Pashman Stein and Reed Smith, NRIA expressly agreed that in the event Claimant was "called upon to respond to "third-party inquiries" NRIA would pay for the "time and expenses incurred" by Claimant in doing so.

    (b)    Pursuant to the terms of both the October 25, 2021 Engagement Agreements, NRIA, the NRIA Fund and Rey Grabato personally agreed that: (1) the $3.36 million and $1.25 million fees NRIA paid Claimant for the multi-period review engagement and the income tax return compliance engagement "does not include [Claimants'] time with respect to any pending threatened or actual litigation or with respect to any regulatory or governmental investigations, or any proceeding requiring [Claimants' or owners'] time and resources … arising from this engagement or any engagement between any [Claimant] and [NRIA or its] legal counsel"; and (2) they would pay for such services at the hourly rates set forth in the October 25 engagement agreements.

97.    Accordingly, Claimant continued to bill NRIA for the extensive work involved in responding to the subpoenas which has been ongoing since the firms stopped work on other aspects of their engagements.  However, notwithstanding these clear and unambiguous contractual obligations, NRIA has failed to pay any of the 33 invoices issued by Claimant through May 31, 2022 for the work performed in responding to the subpoenas and undertaking the enormous amount of work involved in performing the document-by-document *Kovel* analysis in conjunction with its counsel.

98.    NRIA's counsel asserted in a letter dated February 21, 2022 to Claimant's counsel that NRIA does not have to pay for such time because it purportedly terminated the engagements.  In purported support of this argument, it has referenced the Hayden's letter dated November 9, 2021 to Joseph Cipolla in which Hayden stated that Reed Smith and Pashman Stein "no longer require your services as an accountant relative to pending or anticipated litigation or regulatory enforcement actions against NRIA."  However, the discontinuance of further new work under the engagement agreements cannot and does not, as a matter of law extinguish the legal liability of NRIA, the Fund and Mr. Grabato personally under the terms of the foregoing engagement agreements to pay for the work Claimant are required to continue to perform in responding to the current subpoenas and its continued involvement as required by law in the current and future regulatory, criminal and civil proceedings relating to the work it previously performed for NRIA.

## **THE AGREEMENTS TO ARBITRATE**

99.    The Engagement Agreements contain identical provisions requiring all disputes to be arbitrated under the auspices of the American Arbitration Association and contain the following dispute resolution provision

> Dispute Resolution.  If a dispute or claim arises out of or relates to the engagement described herein, Client and Representatives agree to settle such dispute between them or claim by arbitration administered by the American Arbitration Association ("AAA") under its Arbitration Rules for Professional Accounting and Related Services Disputes ("Arbitration Rules") using three arbitrators with all AAA fees and other arbitration/litigation costs, including but not limited to, arbitrator costs, all AAA administrative fees and costs, transcription costs, our reasonable attorney fees (including our legal contingency fees incurred), expert, expert consulting and forensic accounting fees (including but not limited to CFA and CFA affiliate forensic accounting and expert time[3]) and our professional time incurred by virtue of being a party to this or any legal proceeding at rates for this engagement as adjusted from time to time, chargeable to and payable by Client as costs and fees arise and  are invoiced.  Client and Representatives agree to this exclusive remedy, and to be bound by the results of arbitration.  Client and Representatives acknowledge they had the right to consult, and in fact consulted, independent legal counsel regarding this agreement and this provision and expressly acknowledge and agree that by this provision each is waiving and relinquishing its respective right to a jury trial in any and all disputes, including with respect to fees, between the parties related to this agreement or the professional services to be rendered hereunder.  Client and Representatives agree that any such arbitration hearing will be conducted remotely and virtually via Zoom or another similar video conferencing platform.  The arbitration panel shall have no authority to award non-monetary or equitable relief. The arbitrators' decision shall be final and judgment may be immediately entered of the arbitrator's award in any court having jurisdiction and the signatories hereto agree to waive their right to appeal and that no appeals of the arbitrator's decision and award shall be taken. To the extent Client fails to pay any costs described in this paragraph on a timely basis, interest shall be charged at default interest rates described in this

---

[3] The Engagement Agreements specify that expert time and costs may be for CFA or one of its affiliates rendering expert, consulting expert and/or forensic accounting services at rates described in the Engagement Agreements.

agreement.

Client agrees not to challenge the enforceability of this agreement
in a court of law and proceed to arbitration without delay in the
event of a dispute.  In the event a party fails to proceed with
arbitration, unsuccessfully challenges the arbitrator's award, or
fails to comply with the arbitrator's award, the other party is
entitled to costs of suit, including, but not limited to reasonable
attorney fees, our associated professional fees at rates for this
engagement as adjusted from time to time, including, but not
limited to forensic accounting and expert fees, etc. for having to
compel arbitration or defend or enforce the award.

Client shall be responsible for and pay all reasonable costs of all
disputes and litigation (including our costs), regardless of whether
claims or counter-claims have been asserted against us, including
but not limited to attorney's fees, our time at this engagement's
rates as adjusted from time to time, arbitration filing fees, arbitrator
fees, arbitrator and/or court costs, expert fees and expert consulting
costs to compel arbitration,[4] costs of litigation regarding
enforceability of this engagement letter,[5]and default interest
thereon at 1-1/2% per month, or fraction thereof, from the date the
invoice is rendered until payment in full is received.
Representatives shall be entitled to file a Uniform Commercial
Code lien/security interest with respect to any unpaid fees or costs.

Copies of the Assurance Work Engagement Agreement and the Tax Compliance Services
Engagement Agreement are attached hereto, and incorporated herein, as Exhibits "1" and "2"
respectively and are jointly referred to herein as the "October 26 Engagement Agreements").

100.    The March 30, 2021 Engagement Agreement and May 17, 2021 Engagement
Agreement also both included arbitration clauses requiring arbitration administered by the
American Arbitration Association under its Arbitration Rules for Professional Accounting and
Related Services Disputes.  Copies of the March 30, 2021 Engagement Agreement and May 17,

---

[4]  The Engagement Agreements specify that costs to compel arbitration include, but are not
limited to, "attorney fees, [Claimants'] time at this engagement's rates as adjusted from time to
time, including but not limited to forensic accounting and expert fees, arbitration filing fees,
arbitrator fees, arbitrator and/or court costs, etc., as well as default interest thereon."

[5]  The Engagement Agreements specify that costs of litigation regarding enforceability of the
engagement letter include, but are not limited to, "attorney fees, [Claimant's] time at this
engagement's rates as adjusted from time to time, including but not limited to forensic
accounting and expert fees, arbitrator filing fees, arbitrator fees, arbitration and/or court costs,
etc., as well as default interest thereon.

2021 Engagement Agreement are attached hereto, and incorporated herein, as Exhibits "3" and "4" respectively.

## CLAIMS FOR RELIEF

## COUNT I – NRIA'S BREACH OF THE
## OCTOBER 26 ENGAGEMENT AGREEMENTS

101.    Pursuant to the terms of the October 26 Engagement Agreements, Claimant undertook to perform the Assurance Work and Tax Compliance Services in return for which NRIA agreed to: (a) pay two fixed fees upon signing the agreements; (b) provide additional indemnifications for Claimant for current and prior work; and (c) fund an escrow-type bank account as security for the indemnifications of Claimant that NRIA had agreed to provide.  These terms were designed to secure Claimant's services to perform the Assurance Work and Tax Compliance Services, to provide Claimant with additional protection for the services it had already performed and was performing under the earlier engagement agreements and the new Assurance Work and Tax Compliance Services it undertook to perform and to ensure that they were protected against the costs of potential future litigation.

102.    The fixed fees were refundable under certain limited circumstances but were non-refundable in the event NRIA subsequently decided to terminate the services for any reason other than the failure on the part of Claimant to timely perform, because the fees were being paid, in part, to compensate Claimant for the risks it had assumed and the commitment they had provided.

103.    By letter dated November 18, 2021, attorneys for Casey Group wrote to Claimant purporting to act on behalf of the Fund.  The letter claimed that: (a) NRIA was supposedly not authorized to enter into the Engagement Agreements on behalf of the Fund, notwithstanding that NRIA was the sole manager of Fund as of the date it executed the Engagement Agreements; (b) the Fund was purportedly "rescinding" the payment of the engagement fees and demanding their immediate repayment, notwithstanding that the fees were paid solely by NRIA using its own funds and not those of the Fund; and (c) baselessly threatening that the Casey Group on behalf of the Fund would seek "all appropriate civil recourse against" Claimant if the funds paid by NRIA were not paid to and "received" by the Fund and the Casey Group within seven days of the letter.

104.    The October 26 Engagement Agreements are valid and enforceable contracts and the purported attempts by NRIA and the Fund to rescind and/or cancel the agreements are baseless.  Moreover, the October 26 Fees paid by NRIA pursuant to the October 26 Engagement Agreements are non-refundable and were earned when Claimant entered into the October 26 Engagement Agreements and committed to provide the services thereunder.

105.    Despite demands from Claimant, NRIA has failed to fund the escrow-type account that it contractually undertook to fund pursuant to the terms of the Engagement Agreements.

25

106.    As a result of the foregoing, NRIA has breached the terms of the October 26 Engagement Agreements and Claimant is entitled to damages against NRIA.

107.    As a result of the foregoing, Claimant is also entitled to an award declaring that the October 26 Fees are non-refundable and that NRIA and the Fund have no rights or entitlement with respect thereto.

## COUNT II – NRIA'S BREACH OF
## ALL ENGAGEMENT AGREEMENTS

108.    The May 17, 2021 Engagement Agreement and both the October 25, 2021 Engagement Agreements expressly permit Claimant to invoice NRIA for the work performed in responding to the subpoenas and expressly require NRIA to pay for such work

109.    NRIA has failed to pay 33 invoices totaling $1,287,300.72 rendered by Claimant Cipolla & Co., LLC between October 18, 2021 and May 31, 2022 for (a) consulting work performed prior to November 15, 2021; (b) Claimant's work in responding to the SEC subpoena.[6]

110.    As a result of the foregoing, NRIA has breached the terms of the May 17, 2021 and October 26 Engagement Agreements and Claimant is entitled to damages against NRIA.

## PRAYER FOR RELIEF

Pursuant to the terms of the Engagement Agreements, and AAA Accounting Rule A-15(a), CFA requests that three arbitrators be appointed to hear this case.

WHEREFORE, Claimant is entitled to an award against Respondents as follows:

(a)    Declaring that Respondents are required to arbitrate all disputes and claims with Claimant relating to its engagements by NRIA and/or the Fund, the fees paid thereunder and the actions of the WCG to tortuously interfere with the Engagement Agreements;

(b)    Declaring that the terms of the Engagement Agreements remain in effect and that Respondents are not entitled to any refund or return of any fees paid to Claimant thereunder, including but not limited to the October 26 Fees;

(c)    Awarding damages in a sum to be determined at the Hearing for NRIA's failure to fund the escrow-type account as required by the October 26 Engagement Agreements;

---

[6] Including $72,695.43 of interest through May 31, 2022 and $23,962.80 paid to TransPerfect for document hosting with respect to the subpoena response.

(d)      Awarding damages in a sum to be determined at the Hearing for NRIA's failure to pay invoices submitted for Claimant's consulting services and the work performed and to be performed by Claimant and its counsel in responding to the July 26, 2021 SEC subpoena served on Claimants, the DOJ Subpoena served on Claimant and any and all additional subpoenas served on Claimant relating to NRIA and/or the Fund.

(e)      Pursuant to the terms of the Engagement Agreements, awarding Claimant interest thereon at the contractual default interest rate of 18 percent per annum until the date of the award;

(f)      Pursuant to the terms of the Engagement Agreements, awarding Claimant an entitlement to be paid interest thereon at the contractual default interest rate of 18 percent per annum from the date of the award until (a) judgment is entered on the award; and (b) the sums awarded are paid to Claimant.

(g)      Pursuant to the terms of the Engagement Agreements, awarding Claimant full reimbursement from NRIA and the Fund, jointly and severally, for all of the fees and costs of the American Arbitration Association, its attorneys' fees and expenses, and the professional time incurred by Claimant in this proceeding and any related litigation;

(h)      Awarding Claimant such other and further relief as the arbitrators determine is just and proper.

Dated: New York, New York
      June 6, 2022

                            KAISER SAURBORN & MAIR, P.C.
                            Attorneys for Claimants

By:    _____
                          David N. Mair
                          Henry Saurborn, Jr.
                    30 Broad Street, 37th Floor
                    New York, New York 10004
                    (212) 338-9100