**GIBBONS P.C.**
Robert K. Malone, Esq.
Mark B. Conlan, Esq.
Christopher P. Anton, Esq.
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey  07102
Telephone:  (973) 596-4500
Email: rmalone@gibbonslaw.com
       mconlan@gibbonslaw.com
       canton@gibbonslaw.com
       kmcevilly@gibbonslaw.com

*Attorneys for the Cipolla Defendants*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC,<br><br>          Debtor. | Chapter 11<br><br>Case No. 22-14539 (JKS)<br><br>Hon. John K. Sherwood |
| AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>          Plaintiff,<br><br>   v.<br><br>JOSEPH CIPOLLA, CIPOLLA & CO., LLC, CFA ASSURANCE SERVICES LLC, CFA REVIEW SERVICES LLC, CFA TAX SERVICES LLC, CIPOLLA FINANCIAL ADVISORS LLC, and DOES 1-100,<br><br>          Defendants. | Adv. Pro. No. 24-01097-JKS |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF CIPOLLA
DEFENDANTS TO DISMISS PLAINTIFF'S FIRST AMENDED
ADVERSARY COMPLAINT PURSUANT TO RULE 7012 OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY...................................................... 3

      A.      The Debtors' Business ........................................................................... 4

      B.      The Kovel Engagements ....................................................................... 4

      C.      The CFA Review and CFA Tax Retentions ........................................ 5

      D.      The Bankruptcy Filing ....................................................................... 12

      E.      Cipolla Proofs of Claim ..................................................................... 14

ARGUMENT ..................................................................................................................... 15

I.       LEGAL STANDARDS ............................................................................................. 15

      A.      Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6) ........................... 15

      B.      Fed. R. Civ. P. 8 (a)(2) and 9(b) ......................................................... 16

II.      COUNTS I AND III (ACTUAL FRAUDULENT TRANSFERS) MUST BE
       DISMISSED ............................................................................................................. 17

      A.      The Liquidation Trustee is Barred from Bringing Avoidance Actions ................ 18

      B.      The Liquidation Trustee Failed to Plead Fraud with Particularity ....................... 20

III.     COUNTS II AND IV (CONSTRUCTIVELY FRAUDULENT TRANSFERS)
       MUST BE DISMISSED ............................................................................................ 23

      A.      The Liquidation Trustee Failed to Plead Receipt of Less Than Reasonably
              Equivalent Value...................................................................................... 24

      B.      The Debtor Fails to Plead Insolvency .................................................. 27

      C.      The Liquidation Trustee is Barred from Bringing Avoidance Actions ................ 28

IV.     COUNT V (TURNOVER) MUST BE DISMISSED ...................................................... 28

V.      COUNT VI (CONVERSION) MUST BE DISMISSED.................................................. 29

      A.      The Amended Complaint Fails to State a Claim for Conversion. ........................ 29

Case 24-01097-JKS   Doc 23-1   Filed 11/04/24   Entered 11/04/24 17:44:26   Desc
Memorandum of Law   Page 3 of 60
Table of Contents (continued)

Page

B.    State Law Tort Claims Cannot Lawfully Be Assigned to the Liquidation
Trust ............................................................................................... 31

C.    The Economic Loss Doctrine Bars the Liquidation Trustee's Conversion
Claim ............................................................................................... 32

D.    Judicial Estoppel Bars the Liquidations Trustee's Conversion Claim.................. 33

1.    The Cipolla Defendants Have Suffered From Irreconcilably
Inconsistent Positions.................................................................34

2.    The Change in Positions Were Undertaken in Bad Faith ..........................35

3.    Judicially Estopping the Liquidation Trustee is Appropriate ...................36

VI.    COUNT VII (FRAUDULENT INDUCEMENT) MUST BE DISMISSED .................. 37

A.    The Amended Complaint Fails to Plausibly Allege All of the Elements of
a Claim for Fraudulent Inducement ...................................................... 37

B.    The Amended Complaint Fails to Plead Fraudulent Inducement with
Particularity.................................................................................. 38

C.    The Economic Loss Doctrine Bars the Liquidation Trustee's Claim for
Fraudulent Inducement .................................................................... 39

D.    State Law Tort Claims Cannot Lawfully Be Assigned to the Liquidation
Trust ............................................................................................... 41

E.    Even Assuming the Liquidation Trustee has a Viable Fraudulent
Inducement Claim, the Claim Must be Dismissed as to Defendants
Cipolla, Cipolla & Co., and Cipolla Financial Advisors. .................................... 41

F.    Judicial Estoppel Bars the Liquidation Trustee's Fraudulent Inducement
Claim............................................................................................... 41

VII.    COUNT VIII (BREACH OF CONTRACT) MUST BE DISMISSED ............................ 42

VIII.    COUNT IX (DISALLOWANCE OF CLAIMS) MUST BE DISMISSED .................... 45

IX.    COUNT X (EQUITABLE SUBORDINATION) MUST BE DISMISSED ................... 45

X.    COUNT XI (UNJUST ENRICHMENT) MUST BE DISMISSED ................................ 46

CONCLUSION.............................................................................................. 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Trust v. Goldman Sachs & Co.*,
  748 F.3d 110 (2d Cir. 1024)......................................................................................33

*Advanced Enterprises Recycling*,
  376 N.J. Super. 153 (App. Div. 2005) .....................................................................30

*In re Allonhill, LLC*,
  No. 14-10663 (KG), 2019 WL 1868610 (Bankr. D. Del. Apr. 25, 2019), *aff'd
  in part, remanded in part*, No. 13-11482 (KG), 2020 WL 1542376 (D. Del.
  Mar. 31, 2020)..........................................................................................................18

*Amash v. Home Depot U.S.A., Inc.*,
  503 B.R. 232 (Bankr. NDNY 2013) .........................................................................37

*AMS v. VFP LLC Campbell Soup Co.*,
  482 F.3d (3d. Cir. 2007)............................................................................................26

*Archer v. Defenders, Inc.*,
  2020 WL 3128029 (Bankr. D. Del. June 12, 2020).................................................34

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................3, 15, 16

*Associated Builders, Inc. v. Alabama Power Co.*,
  505 F.2d 97 (5th Cir. 1974) ........................................................................................3

*AV Design Servs., LLC v. Durant*,
  2021 U.S. Dist. LEXIS 60661 (D.N.J. March 30, 2021)....................................29, 30

*Azzil Granite Materials, LLC v. Canadian Pac. Ry. Corp. (In re Lizza Equip.
  Leasing, LLC)*,
  614 B.R. 653 (Bankr. D.N.J. 2020) ..........................................................................38

*Barton v. RCI, LLC*,
  No. 10-3657, 2011 U.S. Dist. LEXIS 80134, 2011 WL 3022238 (D.N.J. July
  22, 2011) ...................................................................................................................39

*In re Bayou Grp., LLC*,
  362 B.R. 624 (Bankr. S.D.N.Y. 2007)......................................................................21

*Bear Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
  397 B.R. 1 (S.D.N.Y. 2007)..........................................................................2, 20, 21

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................................16

*Bergen Bev. Distribs.. LLC v. Eastern Distribs., Inc.*,
    2022 U.S. Dist. LEXIS 50331; 2022 WL 833373 (D.N.J. March 21, 2022) ..........................40

*Bogie v. Rosenberg*,
    705 F.3d 603 (7th Cir. 2013) ...................................................................................3

*Callano v. Oakwood Park Homes Corp.*,
    91 N.J. Super. 105, 219 A.2d 332 (App. Div. 1966) ...............................................47

*Cargill Global Trading v. Applied Dev. Co.*,
    706 F.Supp.2d 563 (D.N.J. 2010) ..........................................................................30

*Chen v. HD Dimension Corp.*,
    2010 U.S. Dist. LEXIS 120599, 2010 WL 4721514 (D.N.J. Nov. 15, 2010) .................39, 40

*Chicago Title Ins. Co. v. Ellis*,
    409 N.J. Super. 444 (App. Div. 2009), *cert. denied*, 200 N.J. 506, 983 A.2d
    1113 (2009) ...........................................................................................................29

*Communications Programming, Inc. v. Summit Manufacturing, Inc.*,
    1998 U.S. Dist. LEXIS 9006 (D.N.J. June 16, 1998) ...........................................30

*Conopco, Inc. v. McCreadie*,
    826 F. Supp. 855 (D.N.J. 1993) ............................................................................31

*Costanzo v. Costanzo*,
    590 A.2d 268 (N.J. Super. Ct. App. Div. 1991) ....................................................31

*In re Crowthers McCall Pattern, Inc.*,
    120 B.R. 279 (Bankr. S.D.N.Y. 1990) ...................................................................19

*Cummings v. Premier Rehab Keller, PLLC*,
    596 U.S. 212 (2022) ..............................................................................................44

*In re Cybergenics Corp.*,
    226 F.3d 237 (3d Cir. 2000) ..................................................................................18

*Danise v. Saxon Mortg. Servs. Inc.*,
    738 F. App'x 47 (3d Cir. 2018) .............................................................................35

*DHP Holdings II Corp. v. Home Depot, Inc*,
    435 D.R. 264, 272 (Bankr. D. Del. 2010) .............................................................45

*In re DSI Renal Holdings, LLC*,
    No. 11-11722 (KBO), 2020 WL 550987 (Bankr. D. Del. Feb. 04, 2020) .................18, 19, 20

*East Orange Lumber Co. v. Feiganspan*,
    199 A. 778 (N.J. 1938)................................................................31

*Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*,
    926 F.2d 1458 (5th Cir. 1991) ...............................................46

*Flood v. Caro Corp.*,
    272 N.J. Super. 398 (App. Div. 1994) ...................................24

*Fox v. State Farm Fire & Cas. Co.*,
    2021 U.S. Dist. LEXIS 184787 (D.N.J. Sept. 24, 2021) .......48

*In re Fruehauf Trailer Corp.*,
    444 F.3d 203 (3d Cir. 2006)....................................................24

*G-I Holdings, Inc. v. Reliance Inc. Co.*,
    586 F.3d 247 (3d Cir. 2009)....................................................33

*Gennari v. Weichert Co. Realtors*,
    148 N.J. 582, 691 A.2d 350 (1997)........................................38

*Goldfarb v. Solimine*,
    245 N.J. 326 (2021) ...............................................................42

*Gross v. Yeskel*,
    100 N.J. Eq. 293, 134 A. 737 (N.J. Eq. 1926) ......................48

*Ill. Nat. Ins. v. Wyndham Worldwide Operations, Inc.*,
    653 F.3d 225 (3d Cir. 2011)....................................................48

*Image Masters, Inc. v. Chase Home Finance*,
    439 B.R. 375 (Bankr. E.D. Pa. 2013) ....................................17

*Integrated Solutions, Inc. v. Service Support Specialties, Inc.*,
    124 F.3d 487 (3d Cir. 1997)..............................................31, 32

*Jurista v. Amerinox Processing, Inc.*,
    2013 U.S. Dist. LEXIS 44057 (D.N.J. March 28, 2013).....28, 29

*Jurista v. Amerinox Processing, Inc.*,
    492 B.R. 707 (Bankr. D.N.J. 2013) .......................................17

*Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Fin. Servs., LLC)*,
    2011 Bankr. LEXIS 2394 (Bankr. M.D. Fla. June 24, 2011) ...............21

*Krystal Cadillac-Oldsmobile GMC Truck, Inc., Inc. v. GMC*,
    337 F.3d 314 (3d Cir. 2003)..............................33, 34, 35, 36

*Kwanzaa v. Tell*,
   2019 U.S. Dist. LEXIS 186077 (D.N.J. Oct. 28, 2019).........................................4, 16

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006)...........................................................................................39

*Lightning Lube, Inc. v. Witco Corp.*,
   4 F.3d 1153 (3d Cir. 1993).............................................................................................44

*Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*,
   787 F.3d 716 (5th Cir. 2015) .........................................................................................32

*Liquidating Tr. of the Amcast Unsecured Creditor Liquidation Trust v. Baker (In re Amcast Indus. Corp.)*,
   365 B.R. 91 (Bankr. S.D. Ohio 2007)......................................................................28, 29

*Longo v. Envtl. Prot. & Improvement Co.*,
   2017 U.S. Dist. LEXIS 85681; 2017 WL 2426864 (D.N.J. June 5, 2017)...............30, 33

*In re Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*,
   716 F.3d 736 (3d Cir. 2013)...........................................................................................18

*Mayer v. Belichick*,
   605 F.3d 223 (3d Cir. 2010).............................................................................................3

*In re Messina*,
   687 F.3d 74 (3d Cir. 2012).............................................................................................18

*MHA, LLC v. Amerigroup Corp.*,
   539 F. Supp. 3d. 349 (D.N.J. 2021) ...............................................................................17

*Microbilt Corp. v. L2C, Inc.*,
   2011 N.J. Super. Unpub. LEXIS 2280, 2011 WL 3667645 (App. Div. Aug. 23, 2011) ....................................................................................................................37

*Montrose Med Grp. Participating Savings Plan v. Bulger*,
   243 F.3d 773 (3d Cir. 2001).............................................................................13, 33, 36

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*,
   331 F. 3d. 406 (3d Cir. 2003).........................................................................................17

*Motorworld, Inc. v. Bennkendorf*,
   228 N.J. 311 (2017) .......................................................................................................25

*MSKP Oak Grove, LLC v. Venuto*,
   875 F. Supp. 2d. 426 (D.N.J. 2002) ...............................................................................17

*Munenzon v. Peters Advisors, LLC*,
    553 F. Supp. 3d 187 (D.N.J. 2021) .......................................................................37

*In re Nat'l Pool Constr., Inc.*,
    598 Fed. App'x 841 (3d. Cir. 2015)......................................................................26

*National Amusements, Inc. v. New Jersey Turnpike Authority*,
    261 N.J. Super. 468 (N.J. Super. 1992) ...........................................................47, 48

*In re New Life Audult Med. Day Care Ctr., Inc.*,
    2014 Bankr. LEXIS 4924 (Bankr. D.N.J. Dec. 3, 2014) .......................................19

*In re Norvergence, Inc.*,
    405 B.R. 709 (Bankr. D.N.J. 2009) ......................................................................17

*In re Oakwood Homes Corp.*,
    325 B.R. 696 (Bankr. D. Del. 2005) .....................................................................17

*In re Odom Antennas, Inc.*,
    340 F.3d 705 (8th Cir. 2003) ...............................................................................45

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988)............................................................................33, 37

*Ortlieb v. Hudson Bank*,
    312 F.Supp.2d 705 711 (E.D. Pa. 2004) ...........................................................34, 36

*In re Pearlman*,
    440 B.R. 569 (Bankr. M.D. Fla. 2010) .................................................................20

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002).................................................................................26

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
    998 F.2d 1192 (3d Cir. 1993)..................................................................................3

*Petric & Assocs., Inc. v. CCA Civ., Inc.*,
    2020 N.J. Super. Unpub. LEXIS 1089, 2020 WL 3041418 (N.J. Super. Ct.
    App. Div. June 8, 2020) ........................................................................................40

*Phillips v. County of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)..................................................................................15

*PHP Liquidating, LLC v. Robins (In re PHP Healthcare Corp.)*,
    128 Fed. App'x 839 (3d Cir. 2005)........................................................................26

*RNC Sys. v. Modern Tech. Group, Inc.*,
    861 F. Supp. 2d 436 (D.N.J. 2012) ..................................................................40, 41

*Rolo v. City Investing Co. Liquidation Trust*,
    155 F.3d. 64174 (3d Cir. 1998)..........................................................................17

*Schiano v. MBNA*,
    2013 U.S. Dist. LEXIS 81440, 2013 WL 2452681 (D.N.J. Feb. 11, 2013) ..........................42

*Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd.*,
    345 F. Supp. 3d 515 (S.D.N.Y. 2018)..................................................................38

*Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*,
    554 F.3d 382 (3d. Cir. 2009)......................................................................45, 46

*Sikirica v. US Foods, Inc.*,
    500 B.R. 729 (Bankr. W.D. Pa. 2013) ................................................................45

*Stanziale v. Pepper Hamilton LLP (In re Student Finance Corp.)*,
    335 B.R. 539 (D. Del. 2005)......................................................................28, 29

*State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*,
    646 F. Supp. 2d 668 (D.N.J. 2009) ..................................................................41

*Sun Coast Merchandice Corp. v. Myron Corp.*,
    393 N.J. Super. 55 (App. Div. 2007) ................................................................30

*Swift v. Pandey*,
    2013 U.S. Dist. LEXIS 93245 (D.N.J. July 1, 2023)..........................................32, 42

*Thor 725 8th Ave. LLC v. Goonetilleke*,
    2019 U.S. Dist. LEXIS 180282 (D.N.J. Oct. 17 2019)..........................................24

*Turner v. Williams*,
    65 F.4th 564 (11th Cir. 2023) ......................................................................3

*United States v. Kovel*,
    296 F.2d 918 (2d Cir. 1961)......................................................................4, 5

*United States v. Noland*,
    517 U.S. 535, 116 S. Ct. 1524, 134 L. Ed. 2d 748 (1996)......................................46

*Village of Ridgewood v. Shell Oil Co.*,
    673 A.2d 300 (N.J. Super. Ct. App. Div. 1996)....................................................31

*Viridian Res., LLC v. Inco Ltd.*,
    2023 U.S. Dist. LEXIS 99466 (D.N.J. June 7, 2023) ............................................32

*In re Weinstock*,
    1999 Bankr. LEXIS 616 (Bankr. E.D. Pa. May 25, 1999) ......................................28

*Winer Family Trust v. Queen*,
   503 F.3d 319 (3d Cir. 2007)..............................................................................3, 16

*Zazzali v. 1031 Exch. Group LLC (In re DBSI, Inc.)*,
   476 B.R. 413 (Bankr. D. Del. 2012) ....................................................................20

**Statutes**

11 U.S.C. 101(16) ................................................................................................13

11 U.S.C. §§ 101-1532 ........................................................................................12

11 U.S.C. § 544(b) ....................................................................................19, 23, 24

11 U.S.C. § 547 ....................................................................................................24

11 U.S.C. § 548 ..............................................................................................24, 26

11 U.S.C. § 550(a) ........................................................................................ *passim*

11 U.S.C.  § 551(a) ..................................................................................17, 18, 23

11 U.S.C. § 101(5) ........................................................................................13, 14

11 U.S.C. § 502(d) ........................................................................................14, 45

11 U.S.C. § 510(b) ..............................................................................................13

11 U.S.C. § 510(c) ........................................................................................2, 15, 46

11 U.S.C. § 542 ....................................................................................................28

11 U.S.C. § 542(b) ..............................................................................................28

11 U.S.C. § 544(b) ..............................................................................................18

11 U.S.C. § 548(a)(1)(A) ....................................................................................17

11 U.S.C. § 548(a)(1)(B) ..............................................................23, 24, 26, 27

N.J.S.A. § 2A:25-1................................................................................................31

N.J.S.A § 25:2-20................................................................................................19

N.J.S.A. § 25:2-25(a)(1)(A) ................................................................................18

N.J.S.A. § 25:2-25(b)............................................................................................23

N.J.S.A. § 25:2-29................................................................................................19

N.J.S.A. § 25:2-29(1) ...................................................................................................................23

**Other Authorities**

COLLIER ON BANKRUPTCY at § 510.05 ......................................................................................46

NJ UVTA § 25:2-25 (a)(2) .........................................................................................................27

**Rules**

Fed. R. Bankr. P 3007 ..................................................................................................................45

Fed. R. Bankr. P. 7001 ................................................................................................................45

Fed. R. Bankr. P. 7012 ................................................................................................................15

Fed. R. Civ. P. 8 .......................................................................................................................2, 16

Fed. R. Civ. P. 8(a)(2) ............................................................................................................16, 42

Fed. R. Civ. P. 10(c) .....................................................................................................................3

Fed. R. Civ. P. 12(b)(6) .............................................................................................3, 15, 16, 28

Fed. R. Civ. P. 9(b) ......................................................................................................... *passim*

**Treatises**

17 *C.J.S. Contracts* § 6 (1963) ..................................................................................................47

Joseph Cipolla ("**Cipolla**"), Cipolla & Co., LLC ("**Cipolla & Co.**"), CFA Assurance

Services, LLC ("**CFA Assurance**"), CFA Review Services, LLC ("**CFA Review**"), CFA Tax

Services, LLC ("**CFA Tax**") and Cipolla Financial Advisors, LLC (collectively, the "**Cipolla**

**Defendants**") hereby submit this Memorandum of Law is support of the *Motion of Cipolla*

*Defendants to Dismiss Plaintiff's First Amended Adversary Complaint Pursuant to Rule 7012 of*

*the Federal Rules of Bankruptcy Procedure* (the "**Motion to Dismiss**")[1] and, in support thereof,

respectfully state as follows:

**PRELIMINARY STATEMENT**

The Amended Complaint is nothing more than a backdoor attempt by a Liquidation Trust

to divest the Debtors' (as defined below) former accountants of fees that were paid and fully earned

pre-petition pursuant to binding contracts.  The Amended Complaint includes thirty-two (32)

exhibits that fortunately speak for themselves; in many instances the exhibits (i) are not written by

the people that the Amended Complaint alleges they were written by, or (ii) do not in any way

state what the Amended Complaint alleges they state.  The exhibits require diligent scrutiny.  More

importantly, the Liquidation Trustee's unfounded and sensationalized allegations in the Amended

Complaint are flatly contradicted by the Amended Complaint's exhibits, which control for

purposes of this Motion to Dismiss.

The Amended Complaint conveniently ignores the relevant timeline, which is critical to

understanding the Amended Complaint's deficiencies.  Thomas Nicholas Salzano ("**Salzano**"),

who is alleged to be the mastermind of a fraudulent scheme at National Realty Investment

Advisors, LLC ("**NRIA**") and its debtor affiliates (collectively, the "**Debtors**"), was arrested on

March 4, 2021, which, according to the New Jersey Board of Securities ("**NJBOS**"), cast a cloud

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the
Motion to Dismiss.

over the NRIA Partners Portfolio Fund I, LLC (the "**Fund**").[2]  Cipolla & Co., an independent professional firm, was not engaged by the NRIA, but rather by NRIA's outside counsel (McCarter & English, LLP) to "provide confidential services as may be requested and guided by Counsel" twenty-two (22) days later on March 26, 2021.  Compl., Exhibit E.  Exhibit E alone forecloses all allegations that Cipolla & Co., a respected accounting firm, was part of the fraud; rather, as the facts and timeline clearly show, Cipolla & Co. was retained by NRIA's defense and regulatory counsel as part of the solution.  Ultimately, part of the solution included CFA Review and CFA Tax restating erroneous financial statements in accordance with Generally Accepted Accounting Principles ("**GAAP**"), issuing consolidated GAAP complaint financial statements for numerous NRIA related entities for seven (7) reporting periods and preparing hundreds of unfiled income tax returns.  The October 2021 Agreements (defined below), the very contracts that the Liquidation Trustee attempts to disturb, foreclose any notion of fraud.

The Amended Complaint's "shotgun pleading" approach once again makes no effort at all to distinguish between different Cipolla Defendants and independent contracts in contravention of Rules 8 and 9 of the Federal Rules of Civil Procedure.  Among many shortfalls, the Amended Complaint seeks to avoid certain contractually negotiated transfers from NRIA to certain Cipolla Defendants for the benefit of equity security holders—not creditors of NRIA or its affiliated Debtors—in violation of Third Circuit precedent and New Jersey state law.  Further, the Amended Complaint and its exhibits do not support the Liquidation Trustee's bare allegations that the Cipolla Defendants' accounting services somehow substantially furthered the alleged Ponzi Scheme or that certain Cipolla Defendants' claims should be equitably subordinated under section

---

[2] *See* the NJBOS' Summary Cease & Desist Order, which is expressly referenced in the Amended Complaint [¶ 23] and available on the docket in the Bankruptcy Case at ECF No. 60.

510(c) of the Bankruptcy Code.  In fact, the Liquidation Trustee's own exhibits make plain that the disputed transfers were for necessary, transparent financial and tax compliance reporting to bring NRIA and its affiliated Debtors in compliance with the law (the opposite of furthering a fraud).  The Amended Complaint also asserts pre-judgment state law tort claims that were impermissibly assigned to the Liquidation Trust.  For these reasons, and those stated below, the Court should dismiss the Complaint in its entirety.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Solely for purposes of this Motion to Dismiss only, the Cipolla Defendants rely upon and incorporate herein by reference the allegations of the Liquidation Trustee's Amended Complaint,[3] inasmuch as the Court is required, on a Fed. R. Civ. P. 12(b)(6) motion,[4] to consider only the Amended Complaint, exhibits attached to the Amended Complaint, matters of public record (including judicial proceedings) and documents identified or explicitly relied upon in the pleading. *See, e.g.*, *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).

Moreover, "[w]hen an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss."  *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).  "If the appended document, to be treated as part of the complaint for all purposes under *Rule 10(c), Fed. R. Civ. P.*, reveals facts which foreclose recovery as a matter of law, dismissal is appropriate."  *Id.* (quoting *Associated Builders, Inc. v. Alabama*

---

[3] The Amended Complaint included 32 exhibits, designated Exhibits A – FF.  Each of these exhibits are incorporated into the Amended Complaint.  The Cipolla Defendants may also cite to documents that were filed on the Bankruptcy Court docket (Case No. 22-14539) and/or the within adversary proceeding (Adv. Proc. No. 24-01097).  The Court may therefore take judicial notice of these documents without converting this motion into one for summary judgment.  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

[4] While factual allegations on a Fed. R. Civ. P. 12(b)(6) motion are to be taken as true, the Court is not required to accept Plaintiffs' assertions of law.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Power Co*., 505 F.2d 97, 100 (5th Cir. 1974)).  *See also Turner v. Williams*, 65 F.4th 564 (11th Cir. 2023) ("If an exhibit attached to a complaint contradicts the allegations about the exhibit set forth in the complaint itself, the exhibit controls."); *Kwanzaa v. Tell*, 2019 U.S. Dist. LEXIS 186077, at \*2 (D.N.J. Oct. 28, 2019) ("Where the facts as stated in the exhibits cannot be reconciled with the facts alleged in the pleading, the exhibit controls.").

### A.    The Debtors' Business

NRIA and its affiliated Debtors operated a real estate development firm with dedicated fund management specializing in luxury home sales and apartment rental divisions.  *Declaration of Brian J. Casey in Support of Chapter 11 Petitions and First Motions* [Bankruptcy Case ECF No. 16, ¶ 7] ("**Casey Decl**.").[5]

NRIA is a Delaware limited liability company formed on November 27, 2006.  NRIA owned 100% of the common interests of the Fund.  Casey Decl., ¶ 8.

On or about March 4, 2021, Salzano, who is alleged to be an "Insider" of NRIA (Compl., ¶ 22), was arrested and charged with one (1) count of wire fraud and one (1) count of aggravated identity theft in connection with an offer to sell an interest in the Fund.  Compl., ¶ 46; *see also* D.N.J. Case No. 22-cr-00690 (EP), ECF No. 1 at 2-3; Casey Decl., ¶ 27.

On March 6, 2021, the Office of the United States Attorney for the District of New Jersey obtained a warrant authorizing the (i) search of the Debtors' premises, and (ii) seizure of certain records and tangible items.  Casey Decl., ¶ 27.

### B.    The *Kovel* Engagements

On March 26, 2021, twenty (20) days following the execution of the search warrant and twenty-two (22) days after Salzano's arrest, Cipolla & Co. was retained by the Debtors' then

---

[5] The Casey Declaration is expressly referred to in paragraph 93 of the Amended Complaint.

4

outside counsel, McCarter & English, LLP ("**McCarter**"), as *Kovel*[6] accountants to assist counsel

with the representation of NRIA and its affiliates.  Compl., ¶ 2; *see also* Compl., Exhibit E.

McCarter subsequently withdrew from the engagement with NRIA and was replaced by

Reed Smith LLP ("**Reed Smith**").  Compl., ¶ 54.  Pashman Stein Walder Hayden, P.C. ("**Pashman**

**Stein**") was also retained by NRIA to provide legal services.  Compl., ¶ 49.

On May 17, 2021, Cipolla & Co. entered into a new *Kovel* agreement with Pashman Stein

and Reed Smith that effectively superseded the *Kovel* agreement with McCarter.  Compl., ¶ 55,

Exhibit I.  On March 30, 2021, NRIA engaged another Cipolla entity, CFA Assurance, to provide

certain "tax, consulting and assurance services."  Compl., Exhibit F.

Notwithstanding the Liquidation Trustee's persistent and careless use of the words "audit"

and "auditors" in the Amended Complaint (*see, e.g.*, Compl., ¶ 2), none the Cipolla Defendants

ever agreed to or perform an "audit" for any of the Debtors.  *See* Compl., Exhibits E, F, I, T & U.

Indeed, the October 25, 2021 Agreements (defined below) expressly provide that "CFA has not

nor will we audit or compile the financial information provided to us and, accordingly, we express

no audit opinion regarding this information."  Compl., Exhibit T at 9, Exhibit U at 11.

C.     **The CFA Review and CFA Tax Retentions**

The Amended Complaint pushes the false narrative that the Cipolla Defendants were

somehow pressuring the Debtor to retain CFA Review and CFA Tax to do additional accounting

work.  *See e.g.*, Compl., ¶ 93.  Nothing could be further from the truth.  If anyone was pushing the

retention of the CFA Review and CFA Tax, it was Rey Grabato ("**Grabato**"), not Cipolla or even

Salzano.  *See* Compl., Exhibit W.

---

[6] *See United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961) (extending the attorney client privilege
to include work product prepared by accountants engaged by attorneys in connection with the
provision of legal advice).

In paragraph 50 of the Amended Complaint, the Liquidation Trustee alleges that:

As part of his pitch, Cipolla claimed that he and the Cipolla Affiliates were nimbler and could provide the same services. Cipolla also claimed he had significant experience working on complex engagements, including underscoring his own "30+ years in forensic accounting," and represented that NRIA required various expert accounting services, including forensic accounting, assurance services, tax return preparation, and litigation support. *See* Exhibit B.

Compl., ¶ 50. First, Exhibit B is a March 22, 2021 e-mail from NRIA CFO Thomas Fierro ("**Fierro**") to NRIA management, Grabato, Glenn La Mattina and Tim Oyediran, summarizing a phone call Fierro had with Joseph Cipolla about the difficulties Fierro was facing at NRIA. It is in no way a "pitch" from Joseph Cipolla. Exhibit B merely shows that Fierro, who started working for NRIA in February 2021, had reached out to his former employer looking for help as he started to grasp the scope and magnitude of the accounting issues at NRIA. Compl., Exhibit B. Moreover, Exhibit B is silent on Cipolla being "nimbler and providing the same services."

Following Salzano's arrest on March 4, 2021, NRIA's accounting and auditing firms both resigned. Compl., ¶ 46. According to Grabato, by October 2021, NRIA had tried and failed to retain 7-8 other accounting firms. Compl., Exhibit W. The other accounting firms all said that they could not take on the risk of working for NRIA because of the known risks, which were not insurable. Compl., Exhibit W. Any accounting firm that would agree to do work for NRIA also would be assuming significant risk of future litigation, as the Amended Compliant here amply demonstrates, as do the binding contracts between certain Cipolla Defendants and the Debtors.

According to paragraph 53 of the Amended Complaint, CFA Assurance was retained "to provide NRIA with audit, 'tax, consulting and assurance services.'" Compl., ¶ 53. The reference to "audit" however, like much of the Amended Complaint, is pure fiction. The relevant engagement agreement never mentions the word "audit." Compl., Exhibit F. The Liquidation

Trustee shamelessly adds words to a binding contract and then brazenly asks this Court to bind CFA Assurance to such fabrication.

Again, paragraph 58 of the Amended Complaint asserts that "[b]etween March and October 2021, Cipolla and Cipolla & Co. audited Structured Credit…."  As set forth above, there are five (5) engagement letters signed by one or more of the Cipolla Defendants and not one of them provides for any of the Cipolla Defendants to provide audit services.  *See* Compl., <u>Exhibits E, F, I, T & U</u>.  The Liquidation Trustee and its counsel, who have conducted a scorched earth investigation and issued more than 100 subpoenas (*see generally* Bankruptcy Case Docket), make brazen misrepresentations to this Court that the Liquidation Trustee and its counsel know are false.

The Amended Complaint cites to a single time entry on <u>Exhibit J</u> to support the allegation that the Cipolla Defendants agreed to perform an audit.  Compl., ¶ 70.  That time entry by Joseph Cipolla, on March 23, 2021, states: "discussion with AFM regarding *potential* audit by Cipolla Financial Advisors, LLC."  Compl., <u>Exhibit J</u> at 2 (emphasis added).  That time entry, on what appears to be the second day of the engagement with Cipolla & Co., does not support an allegation that Cipolla agreed to perform an audit.  It merely refers to a "potential audit," which, as evidenced by the Amended Complaint's exhibits, the Cipolla Defendants never agreed to, and did not, perform.

The Cipolla entities were reluctant to take on additional work from NRIA for the reasons that are set forth in the October 25, 2021 Agreements.  The review work required a massive review of the consolidated financial statements of the NRIA entities for seven (7) reporting periods between 2018 and 2022, and restating/correcting erroneous 2018 and 2019 financial statements.  Essentially, the engagement necessarily covered all periods since the Fund was established.

Likewise, CFA Tax agreed to prepare tax returns for the consolidated group of NRIA, including its controlled affiliates, the Fund and its investee affiliates, and other NRIA controlled

entities.  That engagement would necessarily require the preparation and filing of hundreds of federal, state and local tax returns for many entities to make them complaint with the law.

In light of 7-8 other accounting and advisory firms refusing to contract with NRIA to perform accounting services (Compl., Exhibit W.), the CFA Review and CFA Tax engagement agreements (the "**CFA Review Agreement**" and the "**CFA Tax Agreement**," respectively, and together, the "**October 2021 Agreements**") explicitly recognized the potential hazards, including but not limited to reputational and litigation risks associated with the engagements, including potential litigation involving the U.S. Securities and Exchange Commission ("**SEC**"), the New Jersey Attorney General, investors and others.  Compl., Exhibit T at 6-7 of 11; Exhibit U at 8-9 of 13.  Hence the $2,850,000 escrow account NRIA agreed to fund to "be used to fulfill the Release, Hold-Harmless and Indemnification obligations…." (Compl., Exhibit U).  NRIA's failure to fund such account rendered it in breach of the contract.  *See* Bankruptcy Case ECF No. 942 at 81 (pre-petition arbitration commenced by certain Cipolla Defendants due to NRIA's breach of the CFA Review Agreement and CFA Tax Agreement).

Notably, the October 2021 Agreements both observed that the Client (*i.e*., NRIA) had made consequential progress in correcting its accounting issues in the six (6) months leading up to the October 2021 engagements.  Specifically, the October 2021 Agreements provide, in relevant part, that:

> Client has undertaken major, positive transformative changes in the last six months, including but not limited to the wholesale restructuring of the accounting department with qualified, experienced CPAs of integrity, new compliance counsel, a new CFO, a new Fund administrator and general manager, and other counselors and advisors….

Compl., Exhibit T at 6 of 11; Exhibit U at 8 of 13.

Contrary to the Amended Complaint's relentless use of the word "retainer," the CFA Review and CFA Tax engagements were both done on a flat-fee basis, with the fees paid in

advance, and earmarked for specific work.  The word "retainer" does not appear anywhere in either

contract.  The CFA Review engagement was priced at a flat fee of $480,000 per reporting period

(totaling $3,360,000) and the CFA Tax engagement was priced at a flat fee of $625,000 per tax

year (totaling $1,250,000).  Both fees could be refundable to NRIA *unless*:

> . . . (iv) *Client terminates the engagement* on the basis of any reason other than
> CFA's failure to timely issue a review report; or (v) such fee is non-refundable
> should you *or the Fund or NRIA later decide or determine that any or all of the*
> *services contemplated by this agreement are not desired or required*, or should we
> withdraw from this engagement because we are unable to perform due to
> circumstances beyond our control."

Compl., <u>Exhibit U</u> (emphasis added); *see also* Compl., <u>Exhibit T</u> (similar).

The fees associated with the CFA Tax and CFA Review contracts necessitated a premium

hourly rate in the event of NRIA's breach and payment in advance for a number of reasons, many

of which were expressly set forth in the October 2021 Agreements:

a.   The amount of time and resources that would need to be spent on the engagements,
     including the negative impact those engagements would have on other existing
     Cipolla clients;

b.   The multi-year risk of becoming embroiled in litigation, including subpoenas, law
     suits, and testimony from various potential adverse parties, including the
     Department of Justice, the SEC, the New Jersey Attorney General, investors and
     others;

c.   The known withdrawal by and refusal of other accounting firms to provide the
     requested tax and review services;

d.   The reputational risk having nothing to do with the quality of CFA Tax and CFA
     Review's work;

e.   The lack of adequate professional liability insurance in a scenario where the firms
     were taking on "known risks;" and

f.   The ongoing investigations of the company, its owners and managers.

Compl., <u>Exhibit T</u> at 6-7 of 11; <u>Exhibit U</u> at 8-9 of 13.

In light of the growing interest in the Fund's financial statements by regulators, the October

2021 Agreements prudently included the following provision:  "You agree that this engagement

will not be funded in any part by Fund investor funds and/or equity, and we cannot enter into this engagement if you do not agree to this fact." Exhibit T at 2 of 11; Exhibit U at 2 of 13.  Moreover, the October 2021 Agreements each provided that, at the conclusion of the engagements, NRIA would again confirm NRIA's representations that no Fund investor funds or equity were used to pay CFA Tax's and CFA Review's fees.  Exhibit T at 3 of 11; Exhibit U at 4 of 13.

Paragraph 89 of the Amended Complaint, concerning internal NRIA discussion on the October 2021 Agreements, asserts that because Salzano generally used "all-caps text," the Exhibit S e-mail must have been written by Salzano.  Compl., ¶ 89.  Whether or not Salzano allegedly "ghost wrote" the substance of Exhibit S is of no moment, the email indisputably came from Grabato.  Paragraph 90 of the Amended Complaint maintains that "[b]y the next morning, Cipolla stated that he had reconsidered the engagement and was no longer interested because 'he was feeling too much pressure from the attorneys.'"  Compl., ¶ 90, citing Exhibit Z.  Once again, the Exhibit Z e-mail is not from Cipolla, nor is he even copied on it, neither is Salzano.  The quoted language was from Glenn La Matina, NRIA's Chief Operating Officer.

Similarly, the Liquidation Trustee relies on Exhibit S, an e-mail between Grabato and NRIA professionals, to summarily conclude that "[t]hese statements alone evidence that NRIA and Cipolla understood that NRIA was insolvent, undercapitalized and on the brink of closure…."  Compl., ¶ 89; Exhibit S.  An internal NRIA discussion does not evidence that Cipolla was aware of anything related to NRIA's financial situation, nor does it support the assertion that certain Cipolla Defendants fraudulently induced NRIA to enter the October 2021 Agreements.

The e-mail chain depicted on Exhibit Z was started by "additional manager" Brian Casey ("**Casey**") on October 26, 2021.  Although the Amended Complaint asserts that Casey of the Casey Group, Ltd. ("**Casey Group**") was appointed to act as an "additional manager" effective November 1, 2021, exhibits to the Amended Complaint make clear that the Casey Group was on

board and acting for the Debtors prior to November 1, 2021.[7]  *See e.g.*, Compl, <u>Exhibits S & Z</u>.  In fact, the agreement appointing the Casey Group was dated October 20, 2021, *six (6) days before the engagement agreements at issue in this adversary proceeding were executed*.  Casey Decl., ¶ 14; *see also* Compl. ¶ 92 and <u>Exhibits T & U</u>.

In fact, Casey provided multiple comments to the CFA Review and the CFA Tax contracts before they were signed.  *See* Compl., <u>Exhibit BB</u> (Oct. 26, 2021, 12:27 a.m. e-mail from Casey to Grabato stating that Casey "would take a look at an updated proposal from Joe"); <u>Exhibit Z</u> (Oct. 26, 2021, 12:46 p.m. e-mail from Casey of the Casey Group to Grabato, Collins ("**Collins**") and Glenn La Mattina from NRIA providing comments on the pending Cipolla engagement more than two hours *before* it was executed on October 26, 2021 at 3:00 p.m.); Compl., ¶ 92.  And, Casey, on behalf of NRIA PPF I, LLC (*i.e.*, the Fund), was copied on the October 2021 Agreements.  Compl., <u>Exhibit T</u> at 12 and <u>Exhibit U</u> at 14.

The Amended Complaint alleges a pressure campaign by Cipolla, Grabato and Salzano to have the October 2021 Agreements executed and paid before the November 1, 2021 "Effective Date" of the Casey Group's engagement.  Compl., ¶ 93.  With Casey's active participation in negotiating the CFA Review and CFA Tax contracts, evidenced in <u>Exhibits S & Z</u> of the Amended Complaint, the allegations of any time-driven pressure campaign in the Amended Complaint are demonstrably false.

The Amended Complaint alleges that immediately after executing the October 2021 Agreements, Cipolla advised NRIA that the tax and review work would not begin until after other

---

[7] On April 29, 2022, Brian Casey entered into that certain *Independent Manager Agreement* with NRIA (the "<u>Independent Manager Agreement</u>").  Pursuant to the Independent Manager Agreement: (a) Brian Casey was appointed as the sole manager of NRIA, (b) Casey Group resigned as the "Additional Manager" of the Fund, and (c) Mr. Grabato resigned as the Member, President, and CEO of NRIA.  Casey Decl., ¶ 18.

work was performed, which the Amended Complaint asserts was not previously disclosed—yet another demonstrably false allegation.  Compl., ¶ 96, *citing* Exhibit CC.  Exhibit CC states that the review of the financial statements cannot begin until the financial statements are completed.  Such a logical statement could not possibly be a surprise to NRIA.  In fact, it is entirely consistent with the last sentence of the CFA Review Agreement:  "Moreover, our review engagement shall not commence until financial statements and related footnotes are produced by Client in substantially complete form for any of the reporting periods."  Compl., Exhibit U at 12.

Paragraphs 97 and 98 of the Amended Complaint cite to Exhibits DD & EE in support of the false proposition that Cipolla agreed to rescind the October 2021 Agreements and refund the $4.6 million in fees paid.  Compl., ¶¶ 97-98.  Exhibit DD is an October 29, 2021 e-mail from Collins, NRIA SVP, to Joseph Cipolla requesting a call about NRIA's request for a return of the fees for the review and tax engagements.  There is no response from or agreement by Joseph Cipolla to rescind the October 2021 Agreements or refund the fees paid.  Compl., Exhibit DD.  Exhibit EE is a November 2, 2021 e-mail from Collins again seeking a return of the fees for the review and tax engagements.  Again, there is no response from, and certainly no agreement by, Joseph Cipolla to return the non-refundable fees under the October 2021 Agreements.  Compl., Exhibit EE.

### D.    The Bankruptcy Filing

On June 7, 2022 (the "**Petition Date**"), NRIA and 130 affiliated Debtors each filed voluntary petitions for relief under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**").  Casey Decl., ¶ 2.

As of the Petition Date, the Debtors had completed thirty-one (31) real estate properties (including those assigned by the Debtor to the Fund), three (3) were near completion and sixteen (16) properties were in various planning or development stages.  Casey Decl., ¶ 12.

On August 10, 2023, the Court entered an order [Bankruptcy Case ECF No. 3599] confirming the *First Amended Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* (the "**Plan**").  Bankruptcy Case ECF No. 3256.  The Plan provides that a "Claim" means a 'claim' as defined in section 101(5) of the Bankruptcy Code." Bankruptcy Case ECF No. 3256 at 4.  The Plan also defines "Equity Interests" to include "Membership Interests."  Bankruptcy Case ECF No. 3256 at 8.  "Membership Interests" means a membership interest in any of the Debtors.  Bankruptcy Case ECF No. 3256 at 12.

Paragraph 20 to the Plan proponents' confirmation brief underscores the point that the Membership Interests (*i.e.*, Investor Claims) are "equity securities" (11 U.S.C. 101(16)) that are subject to mandatory subordination under section 510(b) of the Bankruptcy Code:

> [S]eparate classification of Investor Claims in Class 5 from Non-Investor General Unsecured Claims in Class 4 is necessary and appropriate.  ***All of the Investor Claims arise from or are for damages related to such Investors' purchases of equity securities of the Debtors***.  Accordingly, such Claims are subject to mandatory subordination under section 510(b) of the Bankruptcy Code.

Bankruptcy Case ECF No. 3259, ¶ 20 (emphasis added).

The Private Placement Memorandum ("**PPM**") (Compl., Exhibit Q) attached to the Complaint make clear that the Investors were purchasing equity interests in the Debtors.  By way of example:

(i)      "Offering of Preferred Limited Liability Company Interests" (Ex. Q at 1);

(ii)     investments were treated as "Capital Contributions" (Ex. Q at 10);

(iii)    the value of investment is adjusted based on "Equity Multiple" and "Preferred Rate of Return" (Ex. Q at 12);

(iv)     the company established a "Capital Account" for each investor/member (Ex. Q at 20);

(v)     the "Term" of the investment is flexible (Ex. Q at 22-23); and

(vi)     "All investments risk the loss of capital."  (Ex. Q at 37).

Additionally, the tax section of the PPM, consistent with income tax returns for the Fund, treat the Investors' investments as equity, not debt.  To this day, the Liquidation Trustee treats Investor Claims as equity investments in the Debtors, as reflected in the Liquidation Trustee's Quarterly Report for April 1, 2024 through June 30, 2024.  Bankruptcy Case ECF No. 4004 at 4 (Investor Claims (*i.e.*, Investor Contributions and Distributions) are considered Equity on balance sheet).  The Plan cannot magically transform equity into debt by simply "waiving a wand" and stating "an Investor Claim shall be treated as a 'Claim', regardless of whether such Investor Claim arises from a Claim asserted against one or more the Debtors of an Equity Interest Asserted in one or more of the Debtors."  Plan, at 9.  The foregoing makes abundantly clear that the Investor Claims (as defined in the Plan) are equity interests and not creditor claims.

Pursuant to the Plan, the most subordinated "Claims," as defined in section 101(5) of the Bankruptcy Code, are "Class 4 – Non-Investor General Unsecured Claims"  ("**General Unsecured Creditors**").  Bankruptcy Case ECF No. 3256 at 18-24.  General Unsecured Creditors are unimpaired and were not entitled to vote on the Plan; all General Unsecured Creditors are receiving a 100% distribution on their allowed claims.  *See id.*; Bankruptcy Case ECF No. 2559 at 22-23.  Therefore, all "Claims" against the Debtors are to be satisfied in full under the Plan.

### E.     Cipolla Proofs of Claim

The Amended Complaint seeks the disallowance of the claims filed by CFA Review and Cipolla & Co. (together, the **Cipolla Claimants**"), pursuant to section 502(d) of the Bankruptcy

Code (Count IX) and the equitable subordination of those claims pursuant to section 510(c) of the

Bankruptcy Code (Count X).

The Cipolla Claimants timely filed the six (6) proofs of claim on December 20, 2022 as set

forth in paragraph 102 of the Complaint.  CFA Review filed claims in the amount of $2,235,038.22

against Debtors NRIA, the Fund and NRIA Structured Credit Strategies, LLC, and Cipolla & Co.

filed claims in the amount of $258,276.11 against the same three Debtors.  Compl., ¶ 102.  The

proofs of claim are *prima facie* valid.[8]  As such, Count XIII should be dismissed.

## ARGUMENT

## I.    LEGAL STANDARDS

### A.    Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

The legal standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(6), made applicable

to this adversary proceeding pursuant to Fed. R. Bankr. P. 7012, is well-settled.  Fed. R. Civ. P.

12(b)(6) allows a defendant to move to dismiss an action for failure to state a claim upon which

relief can be granted by motion made before the responsive pleading is filed.  Courts considering

a motion to dismiss must "accept all factual allegations as true, construe the complaint in the light

most favorable to the plaintiff, and determine whether, under any reasonable reading of the

complaint, the plaintiff may be entitled to relief."  *Phillips v. County of Allegheny*, 515 F.3d 224,

233 (3d Cir. 2008).  However, the principle that a court must accept as true all of the allegations

contained in a complaint "is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).

---

[8] On October 3, 2024, the Liquidation Trustee filed the *Liquidation Trustee's Fourth Omnibus Objection to Claims (Non-Investor Duplicate Claims)* ("**Claims Objection**") [Bankruptcy Case ECF No. 4027], which, among other things, seeks to disallow duplicate claims filed by certain Cipolla Defendants considering the substantive consolidation of the Debtors. The Cipolla Defendants that filed such proofs of claim did not object to the relief sought in the Claims Objection.

Further, as discussed above, exhibits attached to the complaint, matters of public record (including judicial proceedings) and documents identified or explicitly relied upon in the pleading may be considered on a motion to dismiss. *See, e.g.*, *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007). If the exhibits to the complaint cannot be reconciled with the facts alleged in the pleading, the exhibits controls. *Kwanzaa v. Tell*, 2019 U.S. Dist. LEXIS 186077, at *2 (D.N.J. Oct. 28, 2019).

To survive a motion to dismiss, a plaintiff must plead "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Only non-conclusory factual allegations are entitled to the presumption of truth on review of a motion to dismiss—conclusory allegations of law, inferences not supported by facts, and formulaic recitations of the elements of a claim do not satisfy the pleading standard under the Federal Rules and cannot defeat a Rule 12(b)(6) motion to dismiss. *Id.* at 678; *Twombly*, 550 U.S. at 555. A complaint that contains "facts that are 'merely consistent with' a defendant's liability" is insufficient as it "'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

**B.      Fed. R. Civ. P. 8 (a)(2) and 9(b)**

"Federal Rule of Civil Procedure 8(a)(2) requires a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotations omitted); Fed. R. Civ. P. 8. Where, however, a complaint alleges fraud or mistake, Fed. R. Civ. P. 9(b) provides that "a party must state with particularity the circumstances constituting the fraud or mistake." Fed. R. Civ. P. 9(b). On a motion to dismiss a complaint "based upon a plaintiff's failure to meet the heightened pleading requirements of Fed. R. Civ. P. 9(b)," mandating "the

pleadings of fraud claims with precision," the Court will require the party alleging fraud to "state with particularity the circumstances constituting fraud." *In re Norvergence, Inc.*, 405 B.R. 709, 726 (Bankr. D.N.J. 2009). This demand "for specificity exists to enable defendants to prepare a defense to the allegations," and not to "test the factual allegations of the claim." *Id*. at 726 (citing *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F. 3d. 406, 414 n.2 (3d Cir. 2003); *Rolo v. City Investing Co. Liquidation Trust*, 155 F.3d. 64174, 659 (3d Cir. 1998).

In addition to fraud claims, the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply "to claims under any legal theory whose supporting factual allegations 'sound in fraud.'" *MHA, LLC v. Amerigroup Corp.*, 539 F. Supp. 3d. 349, 360 (D.N.J. 2021). Similarly, in bankruptcy proceedings, actual fraudulent transfer claims are among those that must be pleaded with particularity under Rule 9(b). *In re Oakwood Homes Corp.*, 325 B.R. 696 (Bankr. D. Del. 2005); *Jurista v. Amerinox Processing, Inc*., 492 B.R. 707, 746 (Bankr. D.N.J. 2013); *MSKP Oak Grove, LLC v. Venuto*, 875 F. Supp. 2d. 426 (D.N.J. 2002) (fraud pleading rule applies to claims under New Jersey Uniform Fraudulent Transfer Act); *Image Masters, Inc. v. Chase Home Finance*, 439 B.R. 375, 393 (Bankr. E.D. Pa. 2013).

For the reasons set forth below, the Liquidation Trustee has failed to plead its claims of fraudulent transfer and fraud in the inducement with the required specificity to survive a motion to dismiss, requiring, on this basis alone, the dismissal of Counts I, III and VII of the Amended Complaint.

## II.    COUNTS I AND III (ACTUAL FRAUDULENT TRANSFERS) MUST BE DISMISSED

Count I of the Amended Complaint seeks to avoid and recover the $4.61 million of fee payments as actual fraudulent transfers pursuant to sections 548(a)(1)(A), 550(a) and 551(a) of the Bankruptcy Code. Count III seeks to avoid and recover the same transfers as actual fraudulent

transfers pursuant to N.J.S.A. § 25:2-25(a)(1)(A) and sections 544(b), 550(a) and 551(a) of the Bankruptcy Code.  These claims must be dismissed because (1) the Liquidation Trustee may not recover more under section 550(a) of the Bankruptcy Code than is needed to pay creditors in full and (2) the Amended Complaint does not meet the particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure.

### A.        The Liquidation Trustee is Barred from Bringing Avoidance Actions

The Liquidation Trustee's avoidance powers under section 550 of the Bankruptcy Code are rendered moot because creditors are to be paid in full under the Plan.  Specifically, Investors are not creditors of the Debtors and, under Third Circuit precedent and New Jersey state law, cannot benefit from the avoidance of transfers from NRIA to certain Cipolla Defendants.  Section 550(a) of the Bankruptcy Code provides, in relevant part, that "to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(b) of the [Code], the trustee may recover, *for the benefit of the estate*, the property transferred, or, if the court so orders, the value of such property."  11 U.S.C. § 550(a) (emphasis added).

The Third Circuit has interpreted the phrase "for the benefit of the estate" to mean "for the benefit of creditors," in turn prohibiting debtors (and their equity holders) from benefiting from a trustee's avoidance powers.  *In re DSI Renal Holdings, LLC*, No. 11-11722 (KBO), 2020 WL 550987, at *8 (Bankr. D. Del. Feb. 04, 2020) (citing *In re Cybergenics Corp.*, 226 F.3d 237, 243-47 (3d Cir. 2000); *In re Messina*, 687 F.3d 74 (3d Cir. 2012); *In re Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736 (3d Cir. 2013)); *see also In re Allonhill, LLC*, No. 14-10663 (KG), 2019 WL 1868610, at *52 (Bankr. D. Del. Apr. 25, 2019), *aff'd in part, remanded in part*, No. 13-11482 (KG), 2020 WL 1542376 (D. Del. Mar. 31, 2020) (finding that "[t]o the extent Allonhill prevails on its avoidance claims, it cannot recover in excess of the outstanding creditor claims.  To hold otherwise would result in a windfall to equity . . . that

Section 550 and Third Circuit law precludes"); *In re New Life Audult Med. Day Care Ctr., Inc.*, 2014 Bankr. LEXIS 4924, at * 16 (Bankr. D.N.J. Dec. 3, 2014) (debtor "may not recover the alleged fraudulent transfers identified in its Complaint because any recovery would solely benefit equity . . . and thus would not be 'for the benefit of the estate' as required by § 550(a)"); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 288 (Bankr. S.D.N.Y. 1990) ("a transaction can be avoided under section 544(b) only to the extent the avoidance benefits unsecured creditors").

The *DSI Renal* case is instructive. Faced with a request to cap recoveries on avoidance actions, the Bankruptcy Court reasoned that, when "decid[ing] whether to limit those recoveries [resulting from the Bankruptcy Code's avoidance powers], the Court must look to *who will benefit* from the recoveries and not *who is bringing the action*." *DSI Renal*, 2020 WL 550987, at *8 (emphasis in original). The motivating principle here is that if a debtor were permitted to recover in excess of creditor claims, this would result in equity holders receiving a recovery not available outside of bankruptcy under applicable state law (which limits recovery on fraudulent transfer claims to creditor claims). *Id.* In this case, like in *DSI Renal*, the Debtors would receive an excess after the creditors are paid in full. *Id.* And, like in *DSI Renal*, this would result in value to the Debtors that they were otherwise not entitled to, nor were given, outside of bankruptcy. *Id.*

As referenced above, the limitation holds true under the New Jersey Uniform Voidable Transactions Act (N.J.S.A § 25:2-20 *et seq.*) ("NJ UVTA"), which provides, in relevant part, that "[i]n an action for relief against a transfer or obligation under this article, *a creditor*, subject to limitation in R.S. 25:2-30, may obtain: (A) [a]voidance of the transfer or obligation to the extent necessary to satisfy the *creditor's claim*." N.J.S.A. § 25:2-29 (Remedies of creditor) (emphasis added). By its express language, claims under NJ UVTA may only be brought by "creditors" to the "extent necessary to satisfy the creditor's claim." *Id.* Equity may not seek the avoidance of transfers under NJ UVTA, nor benefit from the avoidance of transfers under NJ UVTA.

The Investor Claims arise from equity investments in the Debtors; binding law simply does not permit equity to benefit from avoidance actions. Outside of bankruptcy, Investors would not be able to avail themselves of the fraudulent transfer laws. It would, therefore, be "impermissible for the Debtors to receive any surplus avoidance recoveries obtained in this proceeding." *DSI Renal*, 2020 WL 550987, at *8. Because the Plan expressly provides for full creditor recoveries, without the need for avoidance actions, the Liquidation Trustee is barred from bringing such actions. Counts I and III of the Amended Complaint must be dismissed.

**B.      The Liquidation Trustee Failed to Plead Fraud with Particularity**

In alleging that the transfers were made with actual intent to hinder, delay or defraud creditors, the Liquidation Trustee asserts that the transfers were made "in furtherance of and perpetuated" the Debtors' alleged Ponzi scheme and that "in the context of a Ponzi Scheme, intent to hinder, delay, or defraud creditors is presumed." Compl., ¶¶ 108, 122. These allegations fall far short of meeting Fed. R. Civ. P. 9(b)'s particularity requirement, even assuming for purposes of this Motion to Dismiss that the Liquidation Trustee's allegation that NRIA and related entities operated as a Ponzi scheme are true.

When the Ponzi presumption is available, the plaintiff still has the burden of showing that the transfer at issue was made "in furtherance of" the Ponzi scheme. *See, e.g.*, *Zazzali v. 1031 Exch. Group LLC (In re DBSI, Inc.)*, 476 B.R. 413 (Bankr. D. Del. 2012) (citing *Bear Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007)) (noting that the court must determine "whether the transfers at issue were related to a Ponzi scheme" before it can apply the Ponzi presumption); *In re Pearlman*, 440 B.R. 569, 575 (Bankr. M.D. Fla. 2010) ("To rely on the Ponzi scheme presumption, the trustee must allege the debtors' loan repayments were somehow in furtherance of either the EISA Program or the TCTS Stock Program Ponzi schemes."). This is because even where the plaintiff has alleged the existence of a broad, fraudulent scheme,

"the [c]ourt must focus precisely on the specific transaction or transfer sought to be avoided in order to determine whether that transaction falls within the statutory parameters of [an actually fraudulent transfer]." *In re Bayou Grp., LLC*, 362 B.R. 624, 638 (Bankr. S.D.N.Y. 2007). *See also Manhattan Inv. Fund*, 397 B.R. at 11 (noting that "[c]ertain transfers may be so unrelated to a Ponzi scheme that the presumption not apply").

In *Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Fin. Servs., LLC)*, 2011 Bankr. LEXIS 2394, at *18 (Bankr. M.D. Fla. June 24, 2011), the court found that "[t]he Ponzi scheme presumption must have some limitations, lest it swallow every transfer made by a debtor, whether or not such transfer has anything to do with the debtor's Ponzi scheme." In sum, the plaintiff must plead that the debtor was engaged in a Ponzi scheme *and* that the transfers at issue were related to or in furtherance of the fraudulent scheme. Even if the Debtor is alleged to have operated a Ponzi scheme, the Court cannot permit the Liquidation Trustee to rely on the Ponzi scheme presumption to survive a Fed. R. Civ. P 9(b) motion to dismiss without also alleging specific facts that support the wholly conclusory statement that the transfers at issue here were made in furtherance of the Debtors' alleged Ponzi scheme. Compl., ¶¶ 108, 122.

Contrary to the conclusory allegations in the Amended Complaint that the transfers were made in furtherance of a Ponzi scheme, Exhibit T and Exhibit U of the Amended Complaint, among others, make crystal clear that CFA Tax and CFA Review were engaged to prepare and file hundreds of income tax returns pursuant to the law, restate erroneous previously issued financial statements, and issue GAAP financial statements for seven (7) reporting periods—all to bring NRIA and its affiliated Debtors in compliance with the law. The CFA Tax and CFA Review engagements were explicitly intended to bring NRIA in compliance with the law, which is the antithesis of furthering a Ponzi scheme. The accounting and tax work contemplated by the October 2021 Agreements would have been detrimental to the continued operation of a Ponzi scheme.

Indeed, the CFA Review engagement agreement (Compl., <u>Exhibit U</u>) included numerous

contractual provisions that were purposefully designed to expose and deter fraud.  Pursuant to the

CFA Review engagement agreement, NRIA assumed, among other things, the following:

> … responsibilities that are fundamental to our undertaking the engagement in accordance with SSARS [Statements on Standards for Accounting and Review Services]:
>
> 1. The selection of accounting principles generally accepted in the United States of America as the financial reporting framework to be applied in the preparation of the financial statements.
>
> 2. The design, implementation, and maintenance of internal controls relevant to the preparation and fair presentation of the financial statements.
>
> 3. The prevention and detection of fraud.
>
> 4. To ensure that the entity complies with the laws and regulations applicable to its activities.
>
> 5. The accuracy and completeness of the records, documents, explanations, and other information, including significant judgments, you provide to us for the engagement.
>
> * * *
>
> 7.     The preparation and fair presentation of the financial statements in accordance with [GAAP] and the inclusion of all informative disclosures that are appropriate for [GAAP], as well as informative disclosures that may exceed those required by GAAP, *determined at our discretion*. Informative disclosures include, but are not limited to, subsequent events, such as governmental investigations, responses thereto, litigation and contingencies related thereto and disclosure regarding going concern, including but not limited to, for example, the extent to which governmental investigations or the results thereof may prevent the execution of an established business model or cause a premature winding-up of the Fund's and/or NRIA's activities.
>
> * * *
>
> 10. To include CFA's review report in any document containing financial statements that indicates that such financial statements have been reviewed by us.

Compl, <u>Exhibit U</u>, at 3-4.  Finally, once the review reports were issued by CFA Review, NRIA was then obligated to include the review reports and footnotes approved by CFA Review in any financial statements.  Compl, <u>Exhibit U</u>, at 6.

In light of the foregoing, the Liquidation Trustee has failed to meet its burden of alleging facts that show how the bargained for tax and accounting review services furthered or advanced a Ponzi scheme.  The October 2021 Agreements were indisputably detrimental to a Ponzi scheme. Because the Liquidation Trustee's actual fraudulent transfer claims are premised solely on the Ponzi presumption, without alleging how the transfers at issue were in furtherance of a Ponzi scheme, the Counts I and III must be dismissed.

Counts I and III of the Amended Complaint are asserted against Joseph Cipolla in his individual capacity.  However, the Amended Complaint fails to allege that Joseph Cipolla is the transferee of any of the subject transfers.  *See* Compl., ¶ 59 (chart depicting disputed transfers). Therefore, to the extent, if any, that the Amended Complaint states a viable claim for fraudulent transfers, Counts I and III must be dismissed as against Joseph Cipolla, as he was not the recipient of any transfers from NRIA, nor is he alleged to be.

## III.   COUNTS II AND IV (CONSTRUCTIVELY FRAUDULENT TRANSFERS) MUST BE DISMISSED

Count II of the Amended Complaint seeks to avoid and recover the $4.61 million of fee payments as constructively fraudulent transfers pursuant to sections 548(a)(1)(B), 550(a) and 551(a) of the Bankruptcy Code.  Count IV seeks to avoid and recover the same transfers as constructively fraudulent transfers pursuant to N.J.S.A. §§ 25:2-25(b) and 25:2-29(1) and sections 544(b), 550(a) and 551(a) of the Bankruptcy Code.  These claims must be dismissed because (1) the Amended Complaint does not adequately allege two (2) necessary elements of a constructively fraudulent transfer: (a) that the Debtor did not receive reasonably equivalent value in exchange for

the obligation incurred; and (b) that, at the time the obligation was incurred, certain solvency-related events had occurred or were about to occur, and (2) the Liquidation Trustee is barred from bringing avoidance actions.

### A.     The Liquidation Trustee Failed to Plead Receipt of Less Than Reasonably Equivalent Value

Both of the Liquidation Trustee's constructively fraudulent transfer claims (Counts II and IV) fail for the same reason, *i.e.*, the Liquidation Trustee fails to plausibly allege facts in support of its conclusory allegation that the Debtors received less than reasonably equivalent value in exchange for the October 2021 Agreements. *See* 11 U.S.C. § 548(a)(1)(B). The Liquidation Trustee brings these two (2) avoidance claims under the section 548(a)(1)(B) of the Bankruptcy Code (Count II), and under the NJ UVTA[9] (Count IV). The primary thrust of the Liquidation Trustee's constructively fraudulent transfer claims hinges on the faulty foundational allegation that "NRIA received no value whatsoever for the $4.61 million in retainer payments" [Compl., ¶¶ 116, 128.] These claims are bereft of the legal implications concerning "value" as it pertains to the provision of accounting services and must therefore be dismissed as a matter of law.

The constructively fraudulent transfer claims fail because value must be "based on the circumstances that existed that existed at the time of the transfer," and courts should not consider subsequent events. *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 212 (3d Cir. 2006). Similarly, under NJ UVTA, "the Court must determine whether, at the time of the transfer, the value received was reasonably equivalent to what the debtor gave up." *Thor 725 8th Ave. LLC v. Goonetilleke*,

---

[9] Under 11 U.S.C. § 544(b), a transfer may also be set aside in accordance with state law (*i.e.*, the NJ UVTA). The NJ UVTA provides for the avoidance and recovery of constructively fraudulent transfers on a showing substantially the same as section 548 of the Bankruptcy Code. *Flood v. Caro Corp.*, 272 N.J. Super. 398, 403-404 (App. Div. 1994) ("A prime purpose of [NJ UVTA] is to align state law on fraudulent transfers with the federal Bankruptcy Act, *see* 11 U.S.C. §§ 547 and 548….")

2019 U.S. Dist. LEXIS 180282, at *15 (D.N.J. Oct. 17 2019) (quoting *Motorworld, Inc. v. Bennkendorf*, 228 N.J. 311, 327 (2017)).

As of the date of the transfers on October 26, 2021, in exchange for $1,250,000 fixed fee paid by NRIA, CFA Tax had agreed to prepare and file *hundreds* of federal, state and local tax returns for tax years 2020 and 2021.  Compl., Exhibit T at 2; *see also* Bankruptcy Case ECF No. 16 at 22  (NRIA Corporate Organizational Chart depicting the scope of the number of entities involved).  It was a massive undertaking.  The fee charged under the CFA Tax Agreement was also in consideration for the following concerns that arose upon execution of the CFA Tax Agreement:  (i) the amount of time and resources that would need to be spent on the engagements, including the negative impact those engagements would have on other existing Cipolla clients; (ii) the multi-year risk of becoming embroiled in litigation, including investigations by regulatory authorities, (iii) the known withdrawal by and refusal of other accounting firms to provide the requested tax and review services, (iv) the reputational risk of doing accounting work for NRIA, (v) the professional liability exposure for taking on "known risks" with the engagement, in light of the then ongoing investigations of management.  Compl., Exhibit T at 6-7.

In connection with the CFA Review Agreement, in exchange for the $3,360,000 fixed fee paid by NRIA, CFA Review agreed to conduct a review engagement on a consolidated basis for seven (7) separate accounting periods between 2018 and 2022.  Another massive undertaking.  The fee charge under the CFA Review Agreement was also in consideration of the concerns outlined in (i) through (v) in the preceding paragraph.

When NRIA attempts to cancel the October 2021 Agreements at the end of October, 2021, which is only vaguely hinted at in Compl., Exhibits DD & EE, CFA Tax and CFA Review were ready to complete the engagements.  As measured at the time of the transfers on October 26, 2021, the October 2021 Agreements amply demonstrate reasonably equivalent value.

Because receipt of less than reasonably equivalent value is a *required* element under both 11 U.S.C. § 548(a)(1)(B) and the NJ UVTA, the Liquidation Trustee's inability to plead facts supporting this element is fatal to its constructively fraudulent transfer claims.  *PHP Liquidating, LLC v. Robins (In re PHP Healthcare Corp.)*, 128 Fed. App'x 839, 847 (3d Cir. 2005) (dismissing section 548 claim as "facially deficient" because "it did not plead [debtor] received less than a reasonably equivalent value").  The same is true here.  The Liquidation Trustee has utterly failed to plausibly plead any facts showing why the bargained for accounting services received in exchange of the payment obligations incurred were not of reasonably equivalent value *at the time* the obligations were incurred.

The "reasonably equivalent value" analysis is the same under both 11 U.S.C. § 548(a)(1)(B) and the NJ UVTA.  *In re Nat'l Pool Constr., Inc.*, 598 Fed. App'x 841, 844 (3d. Cir. 2015) (citing *AMS v. VFP LLC Campbell Soup Co.*, 482 F.3d, 630 (3d. Cir. 2007).  Lack of reasonably equivalent value is a necessary, but not sufficient, condition for a constructively fraudulent transfer claim.  5 COLLIER ON BANKRUPTCY, ¶ 548.05 (16th ed.).

Critically, CFA Tax and CFA Review did not unilaterally set the engagement prices in a vacuum—those prices were set after numerous other accounting firms refused to take on the engagement.  The objectively sophisticated nature of the parties, in conjunction with naturally occurring marketplace influences, is the single-most determinative factor on "reasonably equivalent value":

> [I]n determining whether a value is objectively "reasonable" the court gives significant deference to marketplace values.  When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight. . . .

*Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002).

In sum, the Liquidation Trustee's claims do not plausibly allege NRIA received less than reasonably equivalent value under the applicable legal standards, and the Court should accordingly dismiss Counts II and IV.

### B.    The Debtor Fails to Plead Insolvency

The Amended Complaint contains no allegations whatsoever plausibly alleging NRIA's insolvency at the time of the transfers on October 26, 2021.  Rather, the Amended Complaint only recites generally and in a conclusory fashion that it "was insolvent, or became insolvent…." Compl. ¶ 117.  Moreover, paragraph 94 does not even allege that NRIA (the transferor) was insolvent; rather, it alleges generally that the "Debtors were insolvent."  Compl. ¶ 94.  Whether or not "the Debtors" were insolvent on a consolidated basis is not the point.  Exhibit AA to the Amended Complaint establishes that NRIA was the transferor.  There is no allegations in the Amended Complaint that show NRIA was insolvent.  More is required under the *Twombly-Iqbal* pleading standards, however, than a rote formulaic conclusion of law.

The Bankruptcy Code and the NJ UVTA similarly require some demonstration on the Liquidation Trustee's part that NRIA was (i) insolvent on the date of transfer, or became insolvent as a result of the transfer, (ii) the transaction left NRIA with unreasonably small capital, or (iii) NRIA incurred debts beyond its ability to pay as they came due.  11 U.S.C. § 548(a)(1)(B); NJ UVTA § 25:2-25 (a)(2).  The Liquidation Trustee—word for word—recites these elements in paragraphs 117 and 129 of the Amended Complaint.  This is a patent pleading defect that cannot be overlooked by this Court.  Because the Amended Complaint entirely lacks any plausible allegation related to insolvency, Counts II and IV of the Amended Complaint must be dismissed.

**C.** **The Liquidation Trustee is Barred from Bringing Avoidance Actions**

As set forth in Section II.A., *supra*, the Liquidation Trustee is barred from bringing avoidance actions under section 550(a) of the Bankruptcy Code. For the reasons set forth therein, Counts II and IV of the Amended Complaint must be dismissed.

**IV.** **COUNT V (TURNOVER) MUST BE DISMISSED**

Count V of the Amended Complaint, which seeks turnover of the fee payments pursuant to section 542(b) of the Bankruptcy Code, must be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Section 542(b) of the Bankruptcy Code states, in relevant part, that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor." 11 U.S.C § 542(b). Turnover under section 542 of the Bankruptcy Code is intended as a remedy to obtain what is acknowledged to be property of the bankruptcy estate. It is not intended as a mechanism to determine disputed rights of parties to property. *Jurista v. Amerinox Processing, Inc.*, 2013 U.S. Dist. LEXIS 44057, at *85-86 (D.N.J. March 28, 2013) (citing *In re Weinstock*, 1999 Bankr. LEXIS 616, at *30 n.14 (Bankr. E.D. Pa. May 25, 1999)).

Recovery under section 542 is thus limited to assets that are undisputedly property of the bankruptcy estate. *Liquidating Tr. of the Amcast Unsecured Creditor Liquidation Trust v. Baker (In re Amcast Indus. Corp.)*, 365 B.R. 91, 122 (Bankr. S.D. Ohio 2007) (citing *Stanziale v. Pepper Hamilton LLP (In re Student Finance Corp.)*, 335 B.R. 539, 554 (D. Del. 2005). Accordingly, a turnover action under section 542 of the Bankruptcy Code cannot be used to demand the return of assets subject to a title dispute or an unavoided transfer. *Id.*

In the present case, the Liquidation Trustee seeks judgment in Count V of the Amended Complaint for turnover of $4.61 million "paid pursuant to the October 2021 Agreements." The

Liquidation Trustee has not alleged (and cannot allege) that the transfer of the property has already been avoided or that the property transferred is otherwise the undisputed property of the bankruptcy estate.  Although the Liquidation Trustee asserts the fees earned were actually retainers, the October 2021 Agreements make clear that the fees were not retainers and do not include the word "retainer;" the October 2021 Agreements also do not require segregation of the fees earned, which may indicate that the fees were retainers.  The parties' respective rights to and interests in the fee payment is the subject of a contentious dispute.  Therefore, the Liquidation Trustee's claim for turnover in Count V of the Amended Complaint must be dismissed as a matter of law.  *See Jurista v. Amerinox Processing*, 2013 U.S. Dist. LEXIS 44057, at *86; *Liquidating Tr. of the Amcast Unsecured Creditor Liquidation Trust v. Baker*, 365 B.R. at 122; *Stanziale v. Pepper Hamilton LLP*, 335 B.R. at 554.

## V.   COUNT VI (CONVERSION) MUST BE DISMISSED

Count VI of the Amended Complaint, which asserts a claim for conversion, must be dismissed because: (1) the Complaint fails to state a claim for the common law tort of conversion; (2) prejudgment tort claims are not assignable under New Jersey state law; (3) the claim is barred by the economic loss doctrine; and (4) the claim is barred by judicial estoppel.

### A.   The Amended Complaint Fails to State a Claim for Conversion.

The common law tort of conversion in New Jersey consists of the "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."  *AV Design Servs., LLC v. Durant,* 2021 U.S. Dist. LEXIS 60661 (D.N.J. March 30, 2021) (quoting *Chicago Title Ins. Co. v. Ellis,* 409 N.J. Super. 444, 454 (App. Div. 2009), *cert. denied*, 200 N.J. 506, 983 A.2d 1113 (2009)).  The tort of conversion has evolved to apply to "money, bonds, promissory notes, and other types of securities, as long as the plaintiff has an actual interest in the security and

it is capable of misuse in a way that would deprive the plaintiff of its benefit." *Id*. (quoting C*argill Global Trading v. Applied Dev. Co*., 706 F.Supp.2d 563, 578 (D.N.J. 2010)).  The New Jersey Appellate Division has made clear that in order to establish conversion, the property converted "must have belonged to the injured party."  *See, e.g.*, *Sun Coast Merchandice Corp. v. Myron Corp*., 393 N.J. Super. 55, 84 (App. Div. 2007).

When, as in the present case, money is the subject of a conversion claim, "New Jersey courts require that a plaintiff show something more than a contractual obligation on the part of a defendant to pay the plaintiff to establish conversion."  *See id.* (citing *Advanced Enterprises Recycling, Inc. v. Bercaw, 376 N.J. Super 153, 159 (App. Div. 2005) )*.  Specifically, "[t]he plaintiff must show that the money in question was identifiably the plaintiff's property or that the defendant was obligated to segregate such money for the plaintiff's benefit."  *Id.* (citing *Communications Programming, Inc. v. Summit Manufacturing, Inc.*, 1998 U.S. Dist. LEXIS 9006, at *5 (D.N.J. June 16, 1998)).  On its face, the Liquidation Trustee's Amended Complaint fails to make such a showing.

NRIA paid the $4.61 million of fixed fees to CFA Tax Services and CFA Review Services as required by the October 2021 Agreements.  The October 2021 Agreements govern the Liquidation Trustee's claim for the return of the $4.61 million of fixed fees.  Each of the October 2021 Agreements specifically provides that the fixed fee "is non-refundable should you [Grabato] or the Fund or NRIA later decide that any or all of the services contemplated by this agreement are not desired or required."  The October 2021 Agreements also specify the very limited situations in which NRIA may be entitled to a refund of any unused portion of the fee.  Thus, the Liquidation Trustee's remedy, if any, is in breach of contract and not in the common law tort of conversion. *See Longo v. Envtl. Prot. & Improvement Co.*, 2017 U.S. Dist. LEXIS 85681 at *18; 2017 WL 2426864 (D.N.J. June 5, 2017) ("Because Longo's conversion claim asserts that EPIC failed to

honor its obligations under the Earn Out Agreement and Security Agreement, Longo's claim is akin to his Breach of Contract claim against EPIC and is therefore dismissed.").

>    **B.**    **State Law Tort Claims Cannot Lawfully Be Assigned to the Liquidation Trust**

The Plan's definition of "Causes of Action" purports to include claims sounding in tort. Plan at 3. Since the Liquidation Trust did not arise until the Effective Date of the Plan, any Causes of Action that the Liquidation Trustee is attempting to prosecute here were admittedly assigned by the Debtors to the Liquidation Trust.

The Liquidation Trust lacks standing to bring assigned tort claims, including conversion, because New Jersey state law prohibits the assignment of such claims. The Third Circuit definitively ruled in *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 488 (3d Cir. 1997) that any such assignments are *void ab initio*. In *Integrated Solutions*, the Third Circuit reasoned that New Jersey, by statute, permits "all choses in action arising in contract [to] be assignable." *Id.* at 490 (quoting N.J. Stat. Ann. § 2A:25-1). The court further deduced that because no corollary statute existed for assignment of tort claims and because New Jersey case law consistently ruled that tort claims were not assignable, New Jersey did not recognize the assignability of tort claims. *Id.* (collecting cases); *see, e.g.*, *Village of Ridgewood v. Shell Oil Co.*, 673 A.2d 300, 307-08 (N.J. Super. Ct. App. Div. 1996); *Costanzo v. Costanzo*, 590 A.2d 268, 271 (N.J. Super. Ct. App. Div. 1991) ("[I]n New Jersey, as a matter of public policy, a tort claim cannot be assigned."); *East Orange Lumber Co. v. Feiganspan*, 199 A. 778, 779 (N.J. 1938); *see also Conopco, Inc. v. McCreadie*, 826 F. Supp. 855, 865-67 (D.N.J. 1993) ("It is clear that under New Jersey law, choses in action arising out of tort are not assignable prior to judgment.").

The Third Circuit also rejected the argument that New Jersey's non-assignability rule applied differently for intentional torts or in the bankruptcy context: "New Jersey law clearly forbids the assignment of prejudgment tort claims, and applies to the tort claims at issue here [in

the bankruptcy context]." *Integrated Sols.*, 124 F.3d at 490.  To the extent the Liquidation Trustee attempts to rely on the purported waiver contained in Article IV.D.14 of the Plan to support the assignment of claims, the Liquidation Trustee's reliance is clearly misplaced.  The Cipolla Defendants were not entitled to vote on the Plan, were not provided an opt-in or opt-out form, and any such purported waiver would be non-consensual and unknowing in violation of Third Circuit precedent.  Further, the impermissible waiver in in Article IV.D.14 of the Plan only relates to "Contributed Claims," which are "all Causes of Action that a Contributing Investor has against any Person or Entity."  Plan at 4.  Therefore, even if the Court enforces the waiver provision in the Plan, it is inapplicable to the Liquidation Trustee's conversion claim.  The Liquidation Trustee's conversion claim is indisputably on behalf of the Debtors, not the Contributing Investors, which do not have standing to bring such claim.

Conversion is a common law tort under New Jersey law; the Liquidation Trustee's conversion claim must be dismissed with prejudice on that basis alone.  *See Swift v. Pandey*, 2013 U.S. Dist. LEXIS 93245, at *11 (D.N.J. July 1, 2023) (dismissing conversion claim with prejudice where plaintiff did not dispute that he was asserting the claim only as an assignee of debtor's right, title and interest).  Accordingly, Count VI must be dismissed.

### C.      The Economic Loss Doctrine Bars the Liquidation Trustee's Conversion Claim

Relatedly, the Liquidation Trustee's conversion claim must be dismissed based on the economic loss doctrine, which "generally bars a tort claim when no factual basis for the tort claim would exist had the defendant complied with the contract."  *Viridian Res., LLC v. Inco Ltd.*, 2023 U.S. Dist. LEXIS 99466, at *39-40 (D.N.J. June 7, 2023) (quoting *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.,* 787 F.3d 716, 726 (5th Cir. 2015)).  *See id.* (dismissing plaintiff's conversion claim with prejudice where conversion allegations were inextricably tied to its breach of contract

claim); *Longo v. Envtl. Prot. & Improvement Co.*, 2017 U.S. Dist. LEXIS 85681, at *18 (D.N.J. June 5, 2017) ("Because Longo's conversion claim asserts that EPIC failed to honor its obligations under the Earn Out Agreement and Security Agreement, Longo's claim is akin to his Breach of Contract claim against EPIC and is therefore dismissed."). Accordingly, Count VI must be dismissed.

### D.     Judicial Estoppel Bars the Liquidations Trustee's Conversion Claim

The Plan, Disclosure Statement and *Non-Exclusive Description of Preserved Liquidation Trust Actions* (the "Preserved Action List") [ECF No. 2732-4] fail to specifically identify a conversion claim against the Cipolla Defendants, judicially estopping the Liquidation Trustee from bringing the claims in the Amended Complaint. The equitable doctrine of judicial estoppel preserves the integrity of the judicial system by barring a party that has previously asserted a legal position from asserting an inconsistent or contrary legal position in a later proceeding. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988); *Adelphia Recovery Trust v. Goldman Sachs & Co.*, 748 F.3d 110, 118 (2d Cir. 1024) (In bankruptcy, "the position taken by the debtor or plan proponent in the disclosure statement or official schedules may be read into the plan that the court confirms and therefore also may be 'adopted' by the court upon plan confirmation.").

While there is no rigid test for judicial estoppel, the Third Circuit has established a three (3) prong analysis for determining when judicial estoppel is warranted: (i) the two legal positions taken by the party must be irreconcilably inconsistent, (ii) bad faith must be the basis for the change in position, and (iii) judicial estoppel is not to be used unless that remedy is tailored to address the harm identified and no lesser sanction is adequate for that purpose. *Montrose Med Grp. Participating Savings Plan v. Bulger*, 243 F.3d 773, 777-778 (3d Cir. 2001); *Krystal Cadillac-Oldsmobile GMC Truck, Inc., Inc. v. GMC*, 337 F.3d 314, 323 (3d Cir. 2003); *G-I Holdings, Inc.*

*v. Reliance Inc. Co*., 586 F.3d 247, 262 (3d Cir. 2009). Each of the three (3) prongs are satisfied

here.

### 1.    The Cipolla Defendants Have Suffered From Irreconcilably Inconsistent Positions

Full and honest disclosure in bankruptcy—an affirmative and ongoing duty—is of

paramount purpose. When plan proponents have enough information "prior to confirmation to

suggest that it may have a possible cause of action, then that is a 'known' cause of action such that

it must be disclosed." *Krystal*, 337 F.3d at 323. "A party has knowledge of a potential claim when

the events underlying the claim have occurred prior to the filing of the bankruptcy petition."

*Archer v. Defenders, Inc*., 2020 WL 3128029, at *5 (Bankr. D. Del. June 12, 2020) (citing *Krystal*,

337 F.3d at 323). General "boilerplate language is simply not adequate to provide the level of

notice required." *Krystal*, 337 F.3d 321. Plan proponents must specify any possible claims that

are known and attempt to place a monetary value on them. *Id.* Judicial estoppel may be applied

when plan proponents "completely failed to mention [ ] contingent claims" or when plan

proponents "merely failed to adequately characterize [ ] contingent claims." *Ortlieb v. Hudson*

*Bank*, 312 F.Supp.2d 705 711 (E.D. Pa. 2004) (citing *Krystal*, 337 F.3d at 317-319). The Plan

proponents here made no specific mention of the conversion claim asserted against the Cipolla

Defendants and, to the extent the Court finds that the plan proponents did, the claims were

mischaracterized beyond apprehension.

Under binding Third Circuit precedent, the Plan proponents (which includes the Official

Committee of Unsecured Creditors (the "Committee") that had the same counsel as the Liquidation

Trustee) were required to place the Cipolla Defendants on notice of known claims. Rather than

disclose claims against the Cipolla Defendants, the plan proponents opted to include the Cipolla

Defendants on the Excluded Party List [Bankruptcy Case ECF No. 3260] with four hundred and

twenty (420) parties and make general references thereto in the Preserved Action List.  This falls well short of adequately placing the Cipolla Defendants on notice; the Plan proponents were required to name the Cipolla Defendants as potential defendants on the Preserved Action List for specific causes of action.

The Plan proponents recognized the duty to expressly name potential targets because they *listed by name* numerous other parties on the Preserved Action List.  *See* Preserved Action List, ECF No. 2732-4 (listing specific parties, by name, that may be potential defendants).  Moreover, the Preserved Action List is effectively a treatise of boilerplate causes of action that fails to reveal anything specific about the Cipolla Defendants.  Simply, the Plan, Disclosure Statement and Preserved Action List are silent on the Cipolla Defendants being culpable parties as the Amended Complaint asserts.  The failure to name the Cipolla Defendants as potential defendants on the Preserved Action List, while the Plan proponents had complete knowledge of the alleged claims, constitutes irreconcilable inconsistent statements because they were relied upon by the Court and the Cipolla Defendants, among others.

### 2.      The Change in Positions Were Undertaken in Bad Faith

The Plan proponents engaged in bad faith by deliberately concealing the conversion claim asserted against the Cipolla Defendants in the Amended Complaint.  A "rebuttable inference of bad faith arises when averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose."  *Krystal*, 337 F.3d at 321; *Danise v. Saxon Mortg. Servs. Inc.*, 738 F. App'x 47, 50, 51 (3d Cir. 2018) (a motive to conceal is evidenced by the litany of damages sought).  The Third Circuit does not mandate that the offending party benefit from its inconsistent statements; however, a benefit received supports a finding of bad faith.  *Krystal*, 337 F.3d at 324.  The Plan proponents played fast and loose with

the duty to disclose with irrefutable knowledge of the alleged claims in the Amended Complaint at the time of confirmation of the Plan.

As set forth above, the Liquidation Trustee's counsel has been intimately involved in this case since its inception and conducted a "scorched earth" investigation as Committee counsel prior to confirmation of the Plan. The Plan proponents consciously chose not to list the Cipolla Defendants on the Preserved Action List (despite listing many other parties) with full knowledge of the conversion claim now asserted in the Amended Complaint. The reason is clear: conceal potential causes of action against the largest unsecured creditors, the Cipolla Defendants, to blindside them at a later date with the "shot gun" Amended Complaint. The potential benefit conferred upon the Investors (who are not creditors and the Liquidation Trustee's true constituency) is indisputable. The Plan proponents' bad faith conduct by deliberately listing certain parties on the Preserved Action List and hiding others on the Excluded Party List, such as the Cipolla Defendants, should not be rewarded; the Liquidation Trustee is judicially estopped from bringing the conversion claim.

### 3.     Judicially Estopping the Liquidation Trustee is Appropriate

The Plan proponent's double-dealing demands application of judicial estoppel to bar the conversion claim. To determine whether judicial estoppel is appropriate, a court must consider (1) whether judicial estoppel is tailored to address the harm identified, and (2) whether any lesser sanction would adequately remedy the damage done by the party to be estopped. *Krystal*, 337 F.3d at 320 (quoting *Montrose*, 243 F.3d at 779-80). In this case, the "knowing failure" to disclose the conversion claim against the Cipolla Defendants "throughout the proceedings in . . . this very court, coupled with [the] subsequent filing in this court, constitutes the exact type of 'affront to the court's integrity' that judicial estoppel is meant to protect. *Hudson Bank*, 312 F.Supp.2d at 715 (E.D. Pa. 2004) (quoting *Montrose*, 243 F.3d at 785). "To preserve the requisite reliability of

disclosure statements and to provide assurances to creditors regarding the finality of plans which

they have voted to approve," which here the Cipolla Defendants did not, the Plan proponent's

failure to adequately disclose the conversion claim asserted against the Cipolla Defendants

precludes its prosecution at this time. *Amash v. Home Depot U.S.A., Inc*., 503 B.R. 232, 238

(Bankr. NDNY 2013) (quoting *Oneida Motor Freight*, 848 F.2d at 418). Accordingly, the Court

should exercise its inherent equitable power to dismiss the Count IV for the failure to disclose the

claims now asserted against the Cipolla Defendants.

## VI.    COUNT VII (FRAUDULENT INDUCEMENT) MUST BE DISMISSED

The Liquidation Trustee's claim for fraudulent inducement in Count VII of the Amended

Complaint must be dismissed because: (1) the Complaint fails to plausibly allege all of the

elements of a claim for fraudulent inducement; (2) the Liquidations Trustee has failed to plead

Count VII with particularity; (3) the claim is barred by the economic loss doctrine; (4) prejudgment

tort claims are not assignable under New Jersey state law; and (5) judicial estoppel bars the

Liquidation Trustee's claim.

### A.    The Amended Complaint Fails to Plausibly Allege All of the Elements of a Claim for Fraudulent Inducement

Count VII of the Amended Complaint seeks judgment against all the Cipolla Defendants

ordering the October 2021 Agreements rescinded and/or declared void, or, alternatively, an award

of monetary damages on the grounds that the Cipolla Defendants fraudulently induced NRIA into

entering into those Agreements. The elements of fraud in the inducement track those of common

law fraud and consist of: "(1) a material misrepresentation of a presently existing or past fact; (2)

knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it;

(4) reasonable reliance thereon by the other person; and (5) resulting damages." *Munenzon v.

Peters Advisors, LLC,* 553 F. Supp. 3d 187 (D.N.J. 2021) (citing *Microbilt Corp. v. L2C, Inc.,*

2011 N.J. Super. Unpub. LEXIS 2280, 2011 WL 3667645, at *3 (App. Div. Aug. 23, 2011);

*Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 691 A.2d 350, 367 (1997)).

The Liquidation Trustee lists various "advice and representations" in Count VII of the
Amended Complaint that Cipolla allegedly made to NRIA prior to entering into the October 2021
Agreements.  *See* Compl., ¶¶ 141-150.  The Amended Complaint also alleges, in conclusory
fashion, that "NRIA reasonably relied on the above advice and recommendations." Compl., ¶ 149.
However, the Amended Complaint is devoid of any allegations that the so-called "advice and
recommendations" were false (let alone materially false) or that Cipolla had knowledge of their
falsity.  The Amended Complaint is further conflicted because, at paragraph 19, the Liquidation
Trustee concedes that the Cipolla defends have been rendering "identical services for years" while,
at paragraph 153, the Liquidation Trustee makes a "quantum leap" and concludes that "Cipolla
and the Cipolla Affiliates never intended to, and in fact could not, complete the work." *Compare*
Compl., at ¶ 19 *with* Compl., at ¶ 153.   The Liquidation Trustee not only fails to plausibly plead
a fraud in the inducement count, but the allegations that would support its claim are contradicted
by the Amended Complaint itself.  Thus, the Amended Complaint fails to plausibly allege all of
the elements of a claim for fraudulent inducement and Count VII must be dismissed.

**B.      The Amended Complaint Fails to Plead Fraudulent Inducement with
        Particularity**

Claims for fraudulent inducement are subject to the heightened pleading standards of Rule
9(b) of the Federal Rules of Civil Procedure.  *Azzil Granite Materials, LLC v. Canadian Pac. Ry.
Corp. (In re Lizza Equip. Leasing, LLC)*, 614 B.R. 653, 668 (Bankr. D.N.J. 2020).  Accordingly,
a plaintiff asserting a fraudulent inducement claim must:  (1) specify the statements the plaintiff
contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were
made; and (4) explain why the statements were fraudulent.  *Id*. (citing *Senior Health Ins. Co. of*

*Pennsylvania v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 525 (S.D.N.Y. 2018); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)).

The Liquidation Trustee's Amended Complaint provides no specifics as to when, how or where the "advise and representations" that supposedly give rise to a claim for fraudulent inducement were made. Simply, the Amended Complaint does not set forth why or how they were fraudulent. Finally, once again, the Liquidation Trustee fails to differentiate between the various Cipolla Defendants.

Further, the Liquidation Trustee alleges that "Salzano . . . pressured NRIA to accept the agreements," and that Salzano's insistence came over the objection of counsel for NRIA and NRIA's principals. Compl., ¶¶ 81, 89. Assuming *arguendo* that this allegation is true, NRIA's decision to disregard advice of counsel does not transform an arm's length transaction into a fraud. Accordingly, Count VII must be dismissed.

### C.    The Economic Loss Doctrine Bars the Liquidation Trustee's Claim for Fraudulent Inducement

The heart of Count VII of the Amended Complaint appears to be the allegation in paragraph 198 that, "Upon information and belief, Cipolla and the Cipolla Affiliates never intended to, and in fact could not, complete the work agreed to in the October 2021 Agreements." This allegation falls squarely within New Jersey's economic loss doctrine and bars the Liquidation Trustee's claim for fraudulent inducement.

The United States District Court for the District of New Jersey has precisely explained:

The economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract. *Chen v. HD Dimension Corp.*, 2010 U.S. Dist. LEXIS 120599, 2010 WL 4721514, *8 (D.N.J. Nov. 15, 2010). In particular, "whether a tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties." *Id.* "Fraud claims can proceed alongside breach of contract claims where there exists fraud in the inducement of a contract or an analogous situation based on pre-contractual misrepresentations." *Barton v. RCI, LLC*, No.

10-3657, 2011 U.S. Dist. LEXIS 80134, 2011 WL 3022238, *7 (D.N.J. July 22, 2011). Specifically, "a plaintiff may be permitted to proceed with tort claims sounding fraud in the inducement so long as the underlying allegations involve misrepresentations unrelated to the performance of the contract, but rather precede the actual commencement of the agreement." *Chen*, 2010 U.S. Dist. LEXIS 120599, 2010 WL 4721514, at *8.

*RNC Sys. v. Modern Tech. Group, Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012).

Where "[a] pre-contractual misrepresentation relates to a defendant's future intent to perform under the contract, it will be considered intrinsic to the contract, and any related fraud claims will be dismissed." *Petric & Assocs., Inc. v. CCA Civ., Inc.*, 2020 N.J. Super. Unpub. LEXIS 1089, 2020 WL 3041418, at *10 (N.J. Super. Ct. App. Div. June 8, 2020) (citing *RNC*, 861 F. Supp. 2d at 451). Moreover, a fraud or misrepresentation claim is not extraneous to the contract where there is no "independent duty imposed by law." *Bergen Bev. Distribs.. LLC v. Eastern Distribs., Inc.*, 2022 U.S. Dist. LEXIS 50331; 2022 WL 833373 (D.N.J. March 21, 2022) (citing *Petric*, 2020 N.J. Super. Unpub. LEXIS 1089, 2020 WL 3041418, at *10). "Finally, concurrent tort and contract claims are cognizable where a defendant causes 'harm to the plaintiff distinct from those caused by the breach of contract.'" *Id.* (citing *Petric*, 2020 N.J. Super. Unpub. LEXIS 1089, 2020 WL 3041418, at * 11).

In the instant case, the allegation that Cipolla and the Cipolla Affiliates never intended to complete the work agreed to in the October 2021 Agreements and could not complete such work directly relate to the performance of CFA Review Services and CFA Tax Services under those agreements. The alleged misrepresentation is not extraneous to October 2021 Agreements and is not alleged to have caused any harm apart from the harm allegedly caused by the breaches of the October 2021 Agreements. The Liquidation Trustee's fraudulent inducement claim is in essence a breach of contract claim and its right, if any, to a remedy flows from contract, not tort. Accordingly, the economic loss doctrine affords another basis for granting the Cipolla Defendants'

motion to dismiss Count VII of the Amended Complaint.  *See RNC, supra,* 861 F. Supp. 2d at 852

(dismissing fraudulent inducement claim where the defendant's purported misrepresentations were

addressed squarely within the language of the parties' License Agreement and were not "unrelated

to the performance of the contract" as required under the economic loss doctrine).

> **D.**  **State Law Tort Claims Cannot Lawfully Be Assigned to the Liquidation Trust**

 As set forth in Section V.B., *supra,* the assignment of a prejudgment tort claim is

prohibited under New Jersey law.  Under New Jersey law, fraud in the inducement is considered

a tort.  *See State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668,

676 (D.N.J. 2009).  As such, Count VII should be dismissed.

> **E.**  **Even Assuming the Liquidation Trustee has a Viable Fraudulent Inducement Claim, the Claim Must be Dismissed as to Defendants Cipolla, Cipolla & Co., and Cipolla Financial Advisors.**

The Amended Complaint alleges that NRIA was fraudulently induced into entering into

the October 2021 Agreements.  The October 2021 Agreements were between NRIA, on the one

hand, and CFA Review Services and CFA Tax Services, on the other.  Therefore, to the extent, if

any, that the Amended Complaint states a viable claim for fraudulent inducement, Count VII must

be dismissed as against defendants Joseph Cipolla, Cipolla & Co., Cipolla Assurance Services,

LLC and Cipolla Financial Advisors, none of whom are parties to the October 2021 Agreements

that are the subject of Count VII.

> **F.**  **Judicial Estoppel Bars the Liquidation Trustee's Fraudulent Inducement Claim**

As set forth in Section V.D., *supra,* the Liquidation Trustee is judicially estopped from

bring claims that were not appropriately disclosed during the Plan confirmation process.  The

Preserved Action list fails to list the Cipolla Defendants as potential defendants to a fraudulent

inducement claim.  Accordingly, Count VII must be dismissed.

**VII.    COUNT VIII (BREACH OF CONTRACT) MUST BE DISMISSED**

Count VIII of the Amended Complaint, which asserts a breach of contract claim against CFA Review, CFA Tax, and Joseph Cipolla, must be dismissed for failing to state a claim for breach of contract.  The party seeking to prove a breach of contract claim must prove: (i) the existence of a contract with certain terms, (ii) the plaintiff's compliance with those terms, (iii) the defendant's breach of one or more of them, and (iv) a loss to plaintiff caused by that breach. *Goldfarb v. Solimine*, 245 N.J. 326, 338-39 (2021) (citations omitted).

As stated in Point IV.C., *supra*, the Liquidation Trustee is required to "make clear which claims were being asserted specifically against which defendants, and the specific factual basis for each claim against each defendant, as well as the specific relief being sought and the grounds for that relief" and cannot make generalized assertions of wrongdoing against a grouping of defendants without explaining which defendant engaged in what activity.  *Schiano v. MBNA*, 2013 U.S. Dist. LEXIS 81440, 2013 WL 2452681, at *7 (D.N.J. Feb. 11, 2013); *see Swift v. Pandey*, 2013 U.S. Dist. LEXIS 93245, at *10 (D.N.J. July 1, 2023).  Count VIII alleges that "CFA Review Services, LLC, CFA Tax Services, LLC, and [Joseph] Cipolla breached the October 2021 Agreements…." Compl., ¶ 160.  In a single breach of contract claim, the Liquidation Trustee inappropriately maintains that three (3) different defendants each breached two (2) independent contracts, effectively alleging five (5) distinct charges under one count.  The Liquidation Trustee's cluster violates all notions of an adequate pleading under Rule 8(a)(2).

The Liquidation Trustee also failed to plead each element of a breach of contract claim. *First,* the Amended Complaint does not, nor could it, allege that NRIA complied with both the CFA Review Agreement and CFA Tax Agreement.  Bankruptcy Case ECF No. 942 at 81 (pre-petition arbitration commenced by certain Cipolla Defendants due to NRIA's breach of the CFA Review Agreement and CFA Tax Agreement). *Second*, the Liquidation Trustee has not identified

one or more provisions in either the CFA Review Agreement or CFA Tax Agreement that CFA

Review or CFA Tax, respectively, violated.  *Third*, the Amended Complaint does not contain a

single allegation with respect to CFA Tax's breach of the CFA Tax Agreement.  As discussed

below, the lone allegation in the Amended Complaint with respect to breach of contract pertains

only to CFA Review.  Thus, the Amended Complaint is facially deficient because it does not viably

allege a breach of contract claim.

      **Rather,** to support its breach of contract claim, the Liquidation Trustee relies on the lone

allegation that:

> Immediately after executing the agreements, Cipolla informed NRIA that the tax
> and review work could not begin until other work was first performed (and most
> shockingly, paid for separately and not out of the new $4.61 million retainer)—a
> fact not previously disclosed to NRIA management. According to Cipolla, this
> additional work was not covered by the $4.61 million retainer.

Compl., ¶ 96 (relying on Exhibit CC to the Amended Complaint, which only references the CFA

Review and is silent as to CFA Tax).  The Liquidation Trustee, however, proves itself wrong

because the CFA Review Agreement expressly provides that "our review engagement shall not

commence until financial statements and related footnotes are produced by Client in substantially

complete form for any of the reporting periods."  Compl., Exhibit U at 13; Compl., Exhibit T at

11 ([The CFA Tax] engagement shall not commence until financial statements are related

footnotes are produced by Client in substantially complete form for the 2020 year.").

      Furthermore, as the Amended Complaint recognizes, the $3.36 million flat fee under the

CFA Review Agreement was allocated between the seven (7) reporting periods (*i.e.*, $625,000 per

review period).  Likewise, the $1.25 million flat fee under the CFA Tax Agreement was allocated

between the 2020 and 2021 tax years (*i.e.*, $625,000 per year).  Neither agreement provided for

"other work," which, contrary to paragraph 96 of the Complaint, NRIA was well aware at the time

it agreed to enter the October 2021 Agreements.

The Amended Complaint also fails to plausibly allege that NRIA suffered losses. The Amended Complaint's conclusory statement that "NRIA suffered monetary losses . . . including the $4.61 million" is, again, contradicted by the express provisions of October 2021 Agreements. Compl., ¶ 161. The October 2021 Agreements, which are binding and valid contracts, provided that the fees were refundable to NRIA *unless*:

> … (iv) *Client terminates the engagement* on the basis of any reason other than CFA's failure to timely issue a review report; or (v) such fee is non-refundable should you *or the Fund or NRIA later decide or determine that any or all of the services contemplated by this agreement are not desired or required*, or should we withdraw from this engagement because we are unable to perform due to circumstances beyond our control."

Compl., <u>Exhibit U</u> (emphasis added); *see also* Compl., <u>Exhibit T</u> (similar). The Liquidation Trustee, therefore, cannot prove that the $4.61 million was "lost by NRIA" because NRIA agreed that such fees were nonrefundable.[10]

Counts VII alleges that Joseph Cipolla, in his individual capacity, breached both the CFA Review Agreement and the CFA Tax Agreement. However, the Joseph Cipolla was not a party to either contract and, as a matter of law, could not have breached either contract. *See* Compl., <u>Exhibit T</u> and <u>Exhibit U</u>. Therefore, to the extent, if any, that the Amended Complaint states a viable claim for breach of contract, Count VIII must be dismissed as against Joseph Cipolla with prejudice.

---

[10] The Liquidation Trustee seeks punitive damages on its breach of contract claim. Compl., ¶ 162. It is black-letter law that punitive damages are unavailable on a breach of contract claim. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1194 (3d Cir. 1993) (punitive damages are not recoverable under New Jersey law for breach of contract); *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 221-22 (2022) ("It is hornbook law that . . . punitive damages are generally not available for breach of contract." (citations omitted)). Accordingly, the Court should dismiss Count VIII with respect to the request for punitive damages, assuming, *arguendo*, Count VIII even states a claim for breach of contract in the first place.

**VIII.    COUNT IX (DISALLOWANCE OF CLAIMS) MUST BE DISMISSED**

Count IX of the Amended Complaint seeks to disallow, pursuant to section 502(d) of the

Bankruptcy Code, claims asserted by "All Defendants" against the Debtors.   The Liquidation

Trustee's section 502(d) claim is premature.   "[S]ection 502(d) is triggered only after a judgment

has been entered requiring turnover of property to the estate."   *DHP Holdings II Corp. v. Home

Depot, Inc*, 435 D.R. 264, 272 (Bankr. D. Del. 2010) (citing *In re Odom Antennas, Inc*., 340 F.3d

705, 708 (8th Cir. 2003)).   The "purpose of section 502(d) is to ensure compliance with judicial

orders" after an entity is adjudged liable and does not provide affirmative relief of any kind.

*Sikirica v. US Foods, Inc*., 500 B.R. 729, 738-39 (Bankr. W.D. Pa. 2013) (dismissing 502(d) claim

as premature because defendant had not yet been found liable).   The Cipolla Defendants have not

been found liable—rendering section 502(d) unavailable to the Liquidating Trustee.

Moreover, as the Amended Complaint fails to state a single viable claim for relief, the

Liquidation Trustee's request for disallowance of "any and all claims that Defendants may assert

in these Chapter 11 Cases" (Compl., ¶ 214) need not be raised in an adversary proceeding (*see*

Bankruptcy Rule 7001) and should be brought by motion in the Bankruptcy Case (*see* Bankruptcy

Rule 3007).   Accordingly, Count IX of the Amended Complaint must be dismissed.

**IX.    COUNT X (EQUITABLE SUBORDINATION) MUST BE DISMISSED**

Count X of the Amended Complaint seeks to equitably subordinate the claims of  "All

Defendants" "to the claims of the Debtors' general unsecured creditors and Investors."  Compl., ¶

171.  Three (3) conditions must be satisfied before exercise of the power of equitable subordination

is appropriate:   "(1) [t]he claimant must have engaged in some type of inequitable conduct;

(2) [t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an

unfair advantage on the claimant; and (3) [e]quitable subordination of the claim must not be

inconsistent with the provisions of the Bankruptcy [Code]."  *Shubert v. Lucent Techs. Inc. (In re*

*Winstar Communs., Inc.)*, 554 F.3d 382 (3d. Cir. 2009); s*ee also United States v. Noland*, 517 U.S. 535, 538-39, 116 S. Ct. 1524, 134 L. Ed. 2d 748 (1996).

"A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991). On the other hand, "[i]f the claimant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary." *In re Winstar Communs., Inc.*, 554 F.3d at 412 (quoting *In re Fabricators, Inc.*, 926 F.2d at 1465).

Whether or not the Liquidation Trustee can satisfy the three-prong test set out in *Winstar Communs.*, it cannot subordinate the Cipolla Defendants' claims below Investors' equity interests. In *Winstar Communs.*, the Third Circuit found a clear distinction in section 510(c) of the Bankruptcy Code between claims and interests such that creditors' claims may not be equitably subordinated to equity interests. *Id.* at 414 (quoting COLLIER ON BANKRUPTCY at § 510.05 ("Under subsection (c)(1), claims may be subordinated to claims, and interests may be subordinated to interests, but claims may not be subordinated to interests.")). Yet, that is exactly what the Liquidation Trustee is trying to do in this case. The Liquidation Trustee wants to subordinate the Cipolla Defendants' claims below Investors' equity interests; such relief is not available under section 510(c) on the Bankruptcy Code. Therefore, Count X must be dismissed.

## X.    COUNT XI (UNJUST ENRICHMENT) MUST BE DISMISSED

Count XI of the Amended Complaint fails to adequately plead a claim for unjust enrichment and must be dismissed. The claim for unjust enrichment is asserted against "[a]ll Defendants," yet the claim does not allege how each of the Cipolla Defendants was unjustly enriched. Paragraph 176 of the Amended Complaint asserts that "[e]ach of CFA Review Services, CFA Tax Services and Joseph Cipolla were enriched and received economic benefits without justification as a result of their conduct, including but not limited to their receipt of the $4.61

46

million retainers."  Notwithstanding the fact that $4.61 million was never a "retainer," Joseph Cipolla is not a party to the October 2021 Agreements and the fee payments under those agreements were made to the contracting parties, CFA Review Services and CFA Tax Services. Joseph Cipolla must be dismissed.

Moreover, unjust enrichment is not an independent theory of liability, but is the basis for a claim of *quasi*-contractual liability. *National Amusements, Inc. v. New Jersey Turnpike Authority*, 261 N.J. Super. 468, 478 (N.J. Super. 1992) (*citing Callano v. Oakwood Park Homes Corp*., 91 N.J. Super. 105, 108, 219 A.2d 332 (App. Div. 1966)). "Recovery on the theory of *quasi*-contract was developed under the law to provide a remedy where none existed." *Callano*, 91 N.J. Super at 110. In *Callano*, the Appellate Division held that:

> Contracts implied by law, more properly described as *quasi* or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice.  They rest solely on a legal fiction and are not contract obligations at all in the true sense, *for there is no agreement*; but they are clothed with the semblance of contract for the purpose of the remedy, and the obligation arises not from consent, *as in the case of true contracts*, but from the law or natural equity.  Courts employ the fiction of *quasi* or constructive contract with caution. 17 *C.J.S. Contracts § 6, pp.* 566-570 (1963).
>
> In cases based on *quasi*-contract liability, the intention of the parties is entirely disregarded, while in cases of express contracts and contracts implied in fact *the intention is of the essence of the transaction.  In the case of actual contracts the agreement defines the duty, while in the case of quasi-contracts the duty defines the contract.*

*Callano*, 91 N.J. Super. at 108 (emphasis added).

The October 2021 Agreements are express contracts that not only show the intention of the parties, they unambiguously created the duty for NRIA to make the payments that go to the heart of this litigation.  *See* Exhibit T at 5, Exhibit U at 7.  The October 2021 Agreements explicitly stated that the fees paid would *not* be refunded if "(iv) Client terminates the engagement on the basis of any reason other than CFA's failure to timely perform; or (v) such fee is non-refundable

should you or the Fund or NRIA later decide or determine that any or all of the services contemplated by this agreement are not desired or required …." *See* <u>Exhibit T</u> at 6, <u>Exhibit U</u> at 7 (similar).

Assuming, *arguendo*, that the Litigation Trustee could prove a substantive claim of unjust enrichment, the Liquidation Trustee would still not recover under a theory of *quasi*-contractual liability. "Restitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law." *National Amusements*, 261 N.J. Super. at 478. Here, an adequate remedy at law exists. The Liquidation Trustee can and has asserted a claim for breach of contract in connection with the October 2021 Agreements. Compl., at ¶¶ 159-163.

It is important to keep in mind that NRIA was not an unsophisticated consumer negotiating with a professional accounting firm. NRIA was a sophisticated business entity with very capable counsel at the time it executed the October 2021 Agreements. The Court cannot reform the parties' written contracts absent mutual mistake and there has been no allegation of mutual mistake in the Amended Complaint. *See Fox v. State Farm Fire & Cas. Co.*, 2021 U.S. Dist. LEXIS 184787, *16 (D.N.J. Sept. 24, 2021) (under New Jersey law, "a court may reform a contract if it 'was created by the negotiations of the parties, but by mutual mistake is wanting in formal expression or execution, so as to evince the actual intent of the parties.'" *Id*. (quoting *Ill. Nat. Ins. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011) (quoting *Gross v. Yeskel*, 100 N.J. Eq. 293, 134 A. 737, 737 (N.J. Eq. 1926))).

Lastly, the Liquidation Trustee asserts that the retention of earned fees would be unjust because the Cipolla Defendants received payment for services that "aided and abetted the Insiders' fraud, breaches of fiduciary duty, and securities law violations." Compl., at ¶ 178. The Amended Complaint does not include claims that the Cipolla Defendants aided and abetted the Insiders' fraud, breaches of fiduciary duty, and securities law violations, and this unsupported and

conclusory allegation cannot alter binding contracts.  Because of the existence of the October 2021

Agreements that required the payment of the fees at issue here, this is not a case of *quasi* contract

and the Liquidation Trustee's unjust enrichment claim must be dismissed.

## CONCLUSION

**WHEREFORE**, for the reasons set forth above, the Cipolla Defendants respectfully

request that the Court enter the Order, submitted herewith, dismissing the Amended Complaint

with prejudice.

Dated:  November 4, 2024
Newark, New Jersey

GIBBONS P.C.

By: */s/ Robert K. Malone*
    Robert K. Malone, Esq.
    Mark B. Conlan, Esq.
    Christopher P. Anton, Esq.
    Kyle P. McEvilly, Esq.
    One Gateway Center
    Newark, NJ 07102
    Telephone:  (973) 596-4500
    Email: rmalone@gibbonslaw.com
           mconlan@gibbonslaw.com
           canton@gibbonslaw.com
           kmcevilly@gibbonslaw.com

*Attorneys for the Cipolla Defendants*